**CAPTION**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Darrel Francis Anthony Jourdain,

Plaintiff,

v.

1. WARNER BROS. DISCOVERY, INC.;

2. DISCOVERY GLOBAL (DOE SUCCESSOR ENTITY), a proposed or successor entity arising from Warner Bros. Discovery's publicly announced corporate separation plan, to the extent formed, and to the extent any such entity succeeds to or controls CNN or affiliated networks, archives, metadata, or distribution pipelines;

3. PARAMOUNT, A SKYDANCE CORPORATION (FORMERLY PARAMOUNT GLOBAL), including Skydance Media, LLC, and any successor, merged, reorganized, or acquiring entity;

4. NETFLIX, INC.;

5. COMCAST CORPORATION;

6. THE WALT DISNEY COMPANY;

7. FOX CORPORATION;

8. BLOOMBERG L.P.; and

9. JOHN DOES 1–50, inclusive,

Defendants.

Civil Action No. _____

**COMPLAINT FOR DECLARATORY RELIEF**
(28 U.S.C. § 2201; Fed. R. Civ. P. 57 & 25(c))

**TABLE OF CONTENT**

I.      **PARTIES**..................................................................................................................... 1

II.     **JURISDICTION AND VENUE**.................................................................................. 5

III.    **FACTUAL BACKGROUND** ...................................................................................... 6

IV.     **CLAIMS FOR DECLARATORY RELIEF - DOCTRINAL BASIS**............................... 12

        COUNT I - DEFAMATION BY INNUENDO AND CONSTRUCTIVE
        IDENTIFICATION ......................................................................................................... 13

                A.  NATURE OF THE CLAIM ................................................................. 13
                B.  CONSTRUCTIVE IDENTIFICATION THROUGH SYMBOLIC MEANS ...... 14
                C.  DEFAMATORY MEANING AND PER SE CATEGORIES .............................. 15
                D.  AUDIENCE RECOGNITION AND IDENTIFICATION MECHANISM .......... 15
                E.  CONTINUING HARM AND PRESENT CONTROVERSY ............................. 16
                F.  LIMITED SCOPE AND PROCEDURAL SEQUENCING ................................ 16
                G.  PRAYER FOR RELIEF (COUNT I) ................................................................. 17
                H.  NECESSITY OF DECLARATORY RELIEF...................................................... 17

        COUNT II - CONSTRUCTIVE IDENTITY SUBSTITUTION ........................................... 18

                A.  LEGAL BASIS ................................................................................................. 18
                B.  CONSTRUCTIVE IDENTITY FORMATION AS ALLEGED .......................... 19
                C.  DOCTRINAL CLARIFICATION SOUGHT ...................................................... 19
                D.  NECESSITY OF DECLARATORY RELIEF...................................................... 20
                E.  LIMITED SCOPE AND PROCEDURAL SEQUENCING (COUNT II) ............ 20

        COUNT III - RICO CAPABILITY CLASSIFICATION...................................................... 21

                A.  LEGAL BASIS AND DECLARATORY POSTURE ........................................... 21
                B.  ENTERPRISE AND STRUCTURAL ALLEGATIONS (CLASSIFICATION
                    ONLY) ............................................................................................................. 21
                C.  CONTINUITY AND RELATEDNESS (CAPABILITY FRAMING)................. 22
                D.  LIMITED SCOPE AND PROCEDURAL SEQUENCING ............................... 22

        COUNT IV - CONTINUITY OF DECLARATORY SCOPE AND
                TRANSFER OF CONTROL  ANTI-CIRCUMVENTION ................................... 23

                JUDICIAL CLARIFICATION (DECLARATORY SCOPE) ................................... 25

        COUNT V - AVAILABILITY OF ANTI-CIRCUMVENTION STRUCTURAL

        SAFEGUARDS ............................................................................................................. 25

V.      **FURTHER RELIEF SEQUENCING AND PRESERVATION OF REDRESSABILITY
        (DJ-STAGE)** ............................................................................................................. 27

**VI.    PRAYER FOR RELIEF** ................................................................................................ **28**

**VII.    JUDICIAL ANNOTATION (PRO SE CLARIFICATION)** ........................................... **33**

**VIII.    INCORPORATION OF COMPLAINT AND APPENDICES** ......................................... **34**

**IX.    APPENDICES & EXHIBITS INTEGRATION ROADMAP** ........................................... **34**

**X.    UNSWORN DECLARATION (28 U.S.C. § 1746)** ..................................................... **39**

**XI.    CERTIFICATE OF SERVICE** ..................................................................................... **40**

**XII.    SIGNATURE** ............................................................................................................... **41**

**APPENDIX B – PLAINTIFF BACKGROUND: INSTITUTIONAL NARRATIVE &**
**    TIMELINE (TABLES 1; 2A-2E)** ......................................................................... **42**

## PRELIMINARY STATEMENT / NATURE OF THE ACTION
## DECLARATORY   POSTURE AND PROCEDURAL SCOPE

This is an action for declaratory relief under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57. Plaintiff seeks narrow judicial clarification of the governing legal framework applicable to Defendants' alleged sustained dissemination and rebroadcast of symbolic gestures, color-coded cues, and non-verbal innuendo that operate, as alleged, as substitutes for Plaintiff's name and identity without direct naming. Plaintiff seeks declaratory, legal-status and legal-capability determinations only. Plaintiff expressly reserves evidentiary substantiation, expert testimony, and merits adjudication for later procedural stages if warranted, consistent with Fed. R. Civ. P. 26 and applicable evidentiary rules. Plaintiff does not seek damages at this stage.

The requested declarations are limited to resolving a present and ongoing controversy concerning whether the alleged practices are legally capable of satisfying threshold legal standards, including:

**a)** whether alleged symbolic conduct is legally capable of satisfying the "of and concerning" requirement under Restatement (Second) of Torts § 564;

**b)** whether the continuity concepts alleged are legally capable of evaluation as a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), if later proven; and

**c)** whether the practical effectiveness of any declaratory determination, if entered, can be preserved notwithstanding publicly disclosed restructuring activity that may reassign control of implicated archives and distribution pipelines.

Plaintiff alleges that the controversy is ongoing due to continuing dissemination and archival resurfacing within modern distribution systems. The institutional context and plausibility architecture for the alleged seeding and diffusion of constructive identity substitution is set forth

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

in **Appendix B (including Table 1 and Tables 2A–2E),** without inviting merits fact-finding at the declaratory stage.

The Complaint contains the operative allegations and claims for relief. **Appendix A** series supplies the doctrinal framework and sequencing constraints; **Appendix B** supplies plausibility architecture; and additional appendices are submitted to facilitate efficient adjudication of threshold legal questions consistent with Fed. R. Civ. P. 10(c) and Rule 8(a), while preserving later evidentiary development for subsequent proceedings if warranted.

## STANDING / CASE-OR-CONTROVERSY CLARIFIER (ARTICLE III; RIPENESS; REDRESSABILITY)

**Plaintiff alleges Article III standing.** Plaintiff alleges concrete, continuing, and particularized reputational, professional, and dignitary injury arising from Defendants' alleged ongoing dissemination and rebroadcast of symbolic identifiers and non-verbal cues that operate, as alleged, "of and concerning" Plaintiff without direct naming, including through legacy archives and algorithmic distribution systems.

**Plaintiff alleges traceability.** The injuries alleged are fairly traceable to Defendants' control and operation of broadcast, streaming, and digital distribution systems through which the challenged practices are alleged to have been disseminated and to continue to recur through archival resurfacing.

**Plaintiff alleges redressability.** Declaratory relief will materially advance Plaintiff's interests by clarifying the governing legal status and scope of the challenged practices, specifically, whether the alleged symbolic identification practices are legally capable of constituting "of and concerning" identification and actionable defamatory capability, thereby reducing uncertainty in

the parties' present legal relations and preserving the practical effectiveness of any declaration amid continuing dissemination and restructuring-related reassignment of control.

**This action is ripe and presents an actual controversy**. Plaintiff alleges the challenged practices are ongoing and that publicly disclosed restructuring initiatives create a non-speculative risk that control over implicated archives and distribution pipelines may be transferred in ways that could frustrate effective relief absent timely declaratory clarification. Plaintiff seeks resolution of concrete legal questions governing present conduct and the effectiveness of prospective judicial relief, not an advisory opinion.

**JURY DEMAND**
Plaintiff demands a trial by jury on all issues so triable under the Seventh Amendment and Fed. R. Civ. P. 38, to the extent this action later proceeds to adjudication of factual issues or legal claims for which a jury trial right attaches.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

## I.  PARTIES

### A.  PLAINTIFF

1. Plaintiff, Darrel Francis Anthony Jourdain, is a natural person residing in the United States and is proceeding pro se. Plaintiff is not required to file a disclosure statement under Fed. R. Civ. P. 7.1.

2. In 1996, Plaintiff was enrolled as a recruit at the Curaçao Police Academy Boarding Division in a Dutch Cadet Track program. Background context regarding enrollment and related institutional circumstances is described in **Appendix B, including Table 1; Tables 2A–2E**.

3. Plaintiff brings this action pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, seeking declaratory relief concerning the legal status of certain symbolic communications that Plaintiff alleges have functioned as indirect identifiers of Plaintiff and conveyed reputationally harmful meaning without direct naming.

4. Plaintiff alleges that symbolic gestures, visual cues, and non-verbal communications were used in a manner that operated as substitutes for Plaintiff's name in certain media and institutional contexts over time. The structural and chronological framework for these allegations is summarized in **Appendix B (Table 1; Tables 2A–2E).**

### B.  CORPORATE MEDIA ENTITIES

5. Defendants include Warner Bros. Discovery, Inc. (including CNN and related networks), Comcast Corporation (NBCUniversal and related networks), **Paramount, A Skydance Corporation (formerly Paramount Global)**, Netflix, Inc., The Walt Disney Company (ABC and related networks), Fox Corporation (Fox News and related networks), and Bloomberg L.P.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

6.      Through their respective subsidiaries, affiliates, or related entities, these corporate defendants operate broadcast, cable, streaming, and digital distribution systems capable of disseminating audiovisual content across interstate and international platforms.

7.      Plaintiff alleges that audiovisual content transmitted through these broadcast, cable, streaming, and digital distribution systems included symbolic gestures, visual cues, and non-verbal communications that functioned as indirect identifiers of Plaintiff and conveyed reputational harmful meaning as alleged in this Complaint.

8.      Each corporate defendant is alleged to have acted through its officers, employees, agents, subsidiaries, affiliates, or related entities in connection with the broadcast, rebroadcast, or distribution of the communications at issue.

9.      Plaintiff seeks relief designed to remain effective notwithstanding corporate transfers, spin-offs, or asset migrations that may reassign control over archives and distribution systems implicated by the alleged conduct. To the extent any relevant transfer occurs during this action, Plaintiff reserves the right to seek substitution or joinder of any transferee as procedurally appropriate under Fed. R. Civ. P. 25(c).

C.      **CORPORATE RESTRUCTURING AND SUCCESSOR ENTITIES**

10.     Warner Bros. Discovery, Inc. ("WBD") has publicly announced and pursued restructuring initiatives involving the potential separation and/or transfer of significant operating segments, including plans to separate portions of its global linear networks' operations into a standalone successor structure commonly described as "Discovery Global."

11.     More recently, WBD has publicly disclosed that its Board determined a revised acquisition proposal from **Paramount Skydance** constituted a "superior proposal," and WBD entered into

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

an agreement contemplating an acquisition of WBD by Paramount Skydance at **$31.00 per share in cash**, with additional deal protections and timing/fee provisions described in WBD's disclosures; WBD also disclosed that Netflix declined to match the revised Paramount Skydance proposal.

12.    If consummated, these transactions and/or restructuring steps, whether through a separation of linear-network assets, a full-company acquisition, or related divestitures, may result in the transfer or reallocation of archives, content libraries, production infrastructure, metadata, distribution pipelines, and associated operational control to successor, transferee, spin-off, or acquiring entities with distinct ownership and governance. Plaintiff alleges this creates a concrete continuity and redressability risk because the same content systems through which the alleged symbolic communications were disseminated could remain operational while responsibility is fragmented across successor structures.

13.    Plaintiff alleges that the symbolic communications referenced in this Complaint were disseminated through broadcast, streaming, and digital distribution systems whose operational control, archival custody, metadata integrity, and governance may be reassigned, separated, or transferred through announced restructuring initiatives and/or acquisition transactions.

14.    An actual and present controversy exists as to: **(a)** whether the symbolic communications alleged in this Complaint are **legally capable** of satisfying the "of and concerning" identification requirement under governing defamation principles, including Restatement (Second) of Torts § 564; **(b)** whether such communications are **legally capable** of conveying categories of defamatory meaning actionable under applicable law; and **(c)** whether any declaratory determinations entered by this Court, if any, can be preserved in practical effect notwithstanding

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

restructuring-related reassignment of control over the archives, content libraries, metadata, and distribution pipelines through which the alleged communications continue to recur.

15. Publicly announced restructuring initiatives and acquisition activity involving the transfer, separation, or reallocation of content systems create concrete uncertainty as to continuity of control over the mechanisms through which the alleged communications persist and resurface. Plaintiff therefore seeks declaratory clarification now to preserve redressability and to prevent any declaration, if entered, from being rendered ineffectual by transfer-of-control maneuvers. Any transfer-of-interest procedures, including substitution or joinder where appropriate, are expressly reserved for later proceedings consistent with Fed. R. Civ. P. 25(c) and any further-relief proceedings under 28 U.S.C. § 2202, if warranted.

16. Accordingly, Plaintiff seeks, in Count IV, declaratory clarification of the procedural and remedial continuity principles necessary to preserve the practical effectiveness of any declaratory determination entered in this action notwithstanding subsequent transfers of control, restructuring, or successor assumption of the implicated systems.

**D.   DOE DEFENDANTS**

17. Plaintiff includes **Doe Defendants 1–50**, whose true names and capacities are presently unknown.

18. Plaintiff alleges that each Doe Defendant participated in the dissemination, rebroadcast, or facilitation of the symbolic communications referenced in this Complaint, including through **distribution, syndication, licensing, hosting, content packaging, streaming delivery, clip**

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

**distribution, archival licensing, or other distribution pathways** by which the challenged audiovisual content was made available or resurfaced.

19. To the extent discovery confirms involvement, Doe Defendants may include unidentified intermediaries such as content distributors, syndicators, platform operators, hosting providers, rights-holders, licensors/licensees, production or packaging entities, or event-adjacent media distributors that facilitated dissemination of the challenged content in the jurisdictions and time periods alleged.

20. Plaintiff will seek leave to amend to substitute the true names and capacities of Doe Defendants as their identities are ascertained through appropriate proceedings and reserves the right to amend to add additional Doe or named Defendants as discovery warrants.

## II.    JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff seeks declaratory relief concerning federal questions, including the civil RICO definitional framework and capability standards under 18 U.S.C. §§ 1961–1962 and related federal-law issues presented by the Complaint. The Declaratory Judgment Act, 28 U.S.C. § 2201, supplies the remedy.

22. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state-law claims arising from the same case or controversy.

23. Personal jurisdiction is proper because Defendants purposefully directed broadcast, cable, streaming, and digital content into this District, and Plaintiff alleges that the communications at issue were accessible and received here.

24. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in or were directed to this District.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                Complaint with Appendix B

25.    If any Defendant transfers or assigns control over the broadcast systems, content libraries, archives, or distribution infrastructure implicated by the alleged conduct during the pendency of this action, Plaintiff reserves the right to seek substitution or joinder as procedurally appropriate under Fed. R. Civ. P. 25(c).

## III.    FACTUAL BACKGROUND

### A.    INSTITUTIONAL ENVIRONMENT AND ADMINISTRATIVE ANCHOR EVENT (1996–1997)

26.    In 1996, Plaintiff was enrolled as a recruit at the Curaçao Police Academy Boarding Division in a Dutch Cadet Track program. Plaintiff alleges the cohort was small, highly visible, and subject to elevated institutional attention.

27.    Plaintiff references publicly available institutional background materials from the period (compiled in Exhibit D) solely to provide contemporaneous context concerning the environment in which the events alleged occurred, and not to assert liability against any non-party.

28.    Plaintiff alleges that during the relevant period the Curaçao policing institutions operated under heightened public scrutiny and governance stressors, and that Plaintiff's small, high-visibility cadet cohort was subject to elevated institutional attention. Plaintiff alleges these conditions created an environment in which ambiguous administrative events could acquire disproportionate reputational salience despite the absence of formal adjudication.

29.    In mid-1996, an administrative notation originating from the Academy's Boarding Division was raised in relation to Plaintiff. Plaintiff alleges the notation did not accuse criminal conduct and did not result in formal disciplinary charges, adjudication, or sanction.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

30.    Plaintiff alleges the notation was conveyed orally and was not accompanied by any written

adjudicative finding. Plaintiff further alleges that when access to related documentation was later

sought through official channels, the file was reported unavailable.

31.    In 1997, notwithstanding the prior administrative notation, Plaintiff was approved by the

Curaçao Parliament for dispatch to the Netherlands Police Academy. Plaintiff alleges no finding

of criminality, dishonesty, or professional unfitness was entered against Plaintiff in connection

with the 1996 notation.

**B.     INSTITUTIONAL SALIENCE AND CONSTRUCTIVE IDENTITY FORMATION**

32.    Plaintiff alleges that within the institutional environment described above, the 1996

administrative notation became a high-salience internal event disproportionate to its formal

content and procedural posture.

33.    The plausibility architecture for how ambiguous, unresolved administrative events involving

high-visibility personnel can become internal reputational reference points, independent of

formal adjudication, is set forth in Appendix B (Table 1; Tables 2A–2E).

34.    Plaintiff alleges that the 1996 administrative notation, although not resulting in charges,

adjudication, or sanction, became an internal reputational reference point within segments of the

institution, and that a constructively attributed identity was thereby informally seeded through

rumor, ambiguity, and institutional defensiveness rather than through formal findings.

35.    Plaintiff alleges that, notwithstanding the absence of formal adjudication and his subsequent

advancement approval, the 1996 notation was informally reinterpreted within segments of the

institution in ways that conveyed negative character or professional themes not formally

adjudicated or sustained.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

36.    As structured in Appendix B (Table 1), Plaintiff alleges this process produced what Plaintiff

describes as an institutionally constructed identity: a reputational narrative formed through rumor

diffusion, ambiguity, and reputational anxiety rather than through formal findings.

37.    Plaintiff alleges that this constructively attributed identity formed internally between 1996 and

1997 and preceded the later emergence of symbolic identifiers used outside formal processes.

38.    Plaintiff alleges that the constructively attributed identity did not reflect any disciplinary or

criminal determination and arose independent of any adjudicated finding concerning Plaintiff's

actual performance or qualifications. It arose from contextual dynamics within a reputationally

fragile organization

## C.    EMERGENCE OF SYMBOLIC IDENTIFIERS

39.    Plaintiff alleges that following the formation of the constructively attributed identity, symbolic

identifiers emerged that encoded and communicated the narrative themes associated with the

1996 administrative episode.

40.    As structured in **Appendix B (Table 1; Tables 2A–2E)**, Plaintiff alleges that symbolic identifiers

referencing him emerged sequentially after his departure to the Netherlands in 1997 and

developed further in subsequent years.

41.    Plaintiff alleges that such identifiers included non-verbal cues and symbolic references

(including gesture-based, posture-based, and color-coded communications) that, within defined

interpretive audiences, operated as shorthand references to the constructively attributed identity

described above.

42.    **Appendix B (Tables 2A–2E)** classifies representative identifiers by chronology, alleged origin

context, constructive identity function, and category of alleged imputed meaning. Plaintiff relies

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

on these structured summaries at the pleading stage solely to show plausibility, sequence, and identifiability in a DJ posture, without requesting merits fact-finding.

43.    Plaintiff alleges that these symbolic identifiers functioned as substitutes for his name within defined institutional and community audiences and, later, within media environments, operating as shorthand references to the constructively attributed identity described above.

## D.    CROSS-JURISDICTIONAL DIFFUSION

44.    Plaintiff alleges a multi-phase, multi-jurisdiction timeline in which the constructively attributed identity first formed internally (1996–1997), thereafter became associated with recurring symbolic shorthand in later periods, and continued to recur through modern dissemination systems and archival resurfacing over many years. Plaintiff pleads these timeline features solely to support continuity and recurrence capability for declaratory classification purposes, with proof reserved for later proceedings.

45.    As structured in **Appendix B (Table 1; Tables 2A–2E),** Plaintiff alleges a sequential diffusion pattern in which: (i) the constructively attributed identity formed internally in Curaçao; (ii) symbolic references emerged during Plaintiff's period abroad; (iii) additional identifiers developed in Curaçao upon his return; and (iv) comparable identifiers later appeared and recurred within U.S. media ecosystems, including through archival resurfacing and modern distribution systems.

46.    Plaintiff alleges that across jurisdictions, the same constructively attributed identity became embedded into different symbolic vocabularies, resulting in repetition and recurrence over time.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

47.    Plaintiff offers this cross-border continuity at this stage solely to support plausibility,

identifiability, and continuity for declaratory purposes, as structured in **Appendix B (Tables 2A–**

**2E)**, without requesting adjudication of factual meaning, intent, or liability.


E.    **AUDIENCE RECOGNITION AND CONSTRUCTIVE IDENTIFICATION**


48.    Plaintiff alleges that within defined audiences familiar with the underlying narrative, the

symbolic identifiers were understood as referring to Plaintiff notwithstanding the absence of

verbal naming.

49.    **Appendix B** explains the alleged mechanism of constructive identity substitution: non-verbal

cues, when contextually anchored and repeatedly deployed, may be legally capable of satisfying

the "of and concerning" principle recognized in Restatement (Second) of Torts § 564, if later

proven.

50.    Plaintiff has preserved evidentiary-development instruments and methodological materials

(including witness intake templates) for potential later proceedings. Such materials are not

offered as evidentiary proof at the Declaratory Judgment stage and are reserved for potential

Rule 26 sequencing if warranted.


F.    **PRESENT HARM AND CORPORATE RESTRUCTURING RISK**


51.    Plaintiff alleges that symbolic identifiers referencing him have been disseminated and

rebroadcast through linear broadcast, streaming platforms, digital archives, and algorithmic

distribution systems accessible within this District. Plaintiff resides within this District and

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

alleges he has encountered such disseminations and resurfaced references while located in this District.

52.     Plaintiff alleges that recurrence of these identifiers has caused ongoing reputational, professional, and dignitary harm.

53.     Plaintiff further alleges that publicly announced corporate restructurings involving major media conglomerates create a concrete risk of fragmentation of archives, metadata, and operational continuity that could frustrate effective relief absent timely declaratory clarification.

54.     Plaintiff alleges that recurrence is ongoing and that the risk of repetition is sustained by continuing control and reuse of archives, distribution pipelines, and algorithmic resurfacing systems, such that the challenged practices, if later proven, would present a non-speculative risk of continued recurrence absent effective judicial boundary-setting.

55.     Plaintiff seeks declaratory clarification to resolve the legal status and legal capability of the alleged symbolic identification mechanism before restructuring-driven reassignment of control over implicated systems renders judicial relief ineffectual.

## G.      PROCEDURAL CLARIFICATION

56.     Plaintiff does not seek liability against Curaçao governmental institutions or officials in this action. References to the 1996 administrative notation and related institutional context are provided solely to explain the alleged origin and plausibility of the constructive identity mechanism described herein.

Expanded structural analyses and classification summaries are contained in **Appendix B (Table 1; Tables 2A–2E)** and are incorporated by reference for contextual and plausibility purposes at

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

the Declaratory Judgment stage, without requesting adjudication of factual meaning, intent,

liability, or damages.

## H.    PRESENT STATUS

57.    Plaintiff alleges he remains a private individual and has no criminal conviction and no formal

disciplinary finding arising from the 1996 administrative notation.

58.    Plaintiff alleges that continued appearance and rebroadcast of symbolic identifiers referencing

him has caused ongoing reputational, professional, and dignitary injury.

## IV.    CLAIMS FOR DECLARATORY RELIEF - DOCTRINAL BASIS

### EXHIBITS AND APPENDICES

59.    Plaintiff references **Exhibits A–D** and **Appendices A–H** as structured supporting materials

providing representative summaries, chronology, and contextual background relevant to the

allegations herein. These materials are incorporated by reference under Fed. R. Civ. P. 10(c) and

are provided to support Rule 8(a) plausibility and to demonstrate the existence of an actual

controversy, without requesting merits, fact-finding or evidentiary adjudication at the declaratory

stage.

60.    Plaintiff seeks narrow, forward-looking declaratory relief under 28 U.S.C. § 2201 and Fed. R.

Civ. P. 57. Plaintiff does not seek monetary damages, punitive relief, or treble recovery at this

stage.

61.    Plaintiff requests declaratory determinations limited to legal-status and legal-capability

questions, including:

a) whether the symbolic communications alleged herein are legally capable of satisfying the "of

and concerning" requirement under governing defamation principles, including Restatement

(Second) of Torts § 564;

b) whether the alleged categories of imputed meaning, if later proven, are legally capable of constituting actionable defamatory meaning, including defamation per se classifications under applicable law; and

c) whether the alleged repetition and persistence of such symbolic communications over time and across dissemination systems are legally capable of evaluation under the continuity frameworks relevant to Plaintiff's declaratory claims, including the "pattern" capability framework referenced in 18 U.S.C. § 1961(5), without adjudicating statutory satisfaction at this stage.

Plaintiff expressly reserves all issues relating to proof, damages, and any further relief for subsequent proceedings, if warranted, and consistent with applicable law, including potential proceedings under 28 U.S.C. § 2202 following any declaratory determination entered by the Court.

## COUNT I - DEFAMATION BY INNUENDO AND CONSTRUCTIVE IDENTIFICATION
*(28 U.S.C. § 2201; Restatement (Second) of Torts § 564)*

### A.  NATURE OF THE CLAIM

62. Plaintiff seeks declaratory clarification under 28 U.S.C. § 2201 regarding whether the repeated dissemination and rebroadcast of alleged symbolic identifiers, coded gestures, color-based cues, and non-verbal communicative acts, as alleged in this Complaint, are legally capable of constituting actionable defamation by innuendo and implication notwithstanding the absence of verbal naming.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

63.    This Count presents a legal controversy concerning whether such symbolic communications, when contextually anchored as described in the Factual Background and **Appendix B (Table 1; Tables 2A–2E),** are legally capable of satisfying governing defamation principles.

64.    Plaintiff does not seek damages in this Count. Plaintiff seeks prospective declaratory clarification concerning the legal capability of the complained-of conduct in order to prevent continuing reputational harm and to preserve redressability in light of announced and impending corporate restructuring.

## B. CONSTRUCTIVE IDENTIFICATION THROUGH SYMBOLIC MEANS

65.    Under governing principles, defamatory communication need not expressly name a plaintiff to be actionable. Liability may arise where a reasonable audience understands the communication to be "of and concerning" the plaintiff. Restatement (Second) of Torts § 564; *Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980).

66.    As alleged in the Factual Background and structured for plausibility analysis in **Appendix B (Table 1; Tables 2A–2E),** Plaintiff alleges that a constructively attributed identity was seeded in an institutional context in 1996 without any disciplinary or criminal adjudication.

67.    Plaintiff alleges that the symbolic identifiers at issue derive their alleged defamatory **meaning** from contextual associations tied to the constructively attributed identity described in the Factual Background and structured in Appendix B.

68.    **Appendix B (Table 1; Tables 2A–2E)** summarizes the alleged sequential development and cross-jurisdictional diffusion of these identifiers. Plaintiff seeks declaratory clarification as to whether such symbolic communications, when repeatedly deployed in the manner alleged, are legally capable of satisfying the "of and concerning" requirement under Restatement § 564.

## C.  DEFAMATORY MEANING AND PER SE CATEGORIES

69.    Plaintiff alleges that the symbolic identifiers at issue derive their alleged defamatory capability from contextual associations tied to the constructively attributed identity described in the Factual Background and structured in Appendix B.

70.    **Appendix B (Tables 2A–2E)** classifies representative identifiers according to categories of alleged imputed meaning, including criminal suspicion, professional unfitness, moral or sexual impropriety, and psychological instability.

71.    Plaintiff seeks declaratory clarification as to whether symbolic communications conveying such categories of meaning, when deployed in the manner alleged, are legally capable of falling within recognized defamation per se classifications under applicable law.

## D.  AUDIENCE RECOGNITION AND IDENTIFICATION MECHANISM

72.    Plaintiff alleges that the symbolic identifiers were disseminated with repetition and contextual anchoring sufficient, as alleged, to permit audience recognition within defined communities, notwithstanding the absence of explicit naming.

73.    **Appendix B** describes the alleged communicative mechanism as constructive identity substitution; whereby symbolic cues operate as shorthand references within a defined interpretive audience.

74.    Plaintiff seeks clarification as to whether this alleged mechanism, if later proven, is legally capable of satisfying the identification requirement articulated in Restatement § 564 and relevant Second Circuit authority.

### E.  CONTINUING HARM AND PRESENT CONTROVERSY

75.    Plaintiff alleges that the complained-of symbolic identifiers have been disseminated and rebroadcast across interstate and international media platforms, including linear broadcast, streaming services, and digital distribution systems accessible within this District.

76.    Plaintiff further alleges that such dissemination and rebroadcasts predated his physical presence in the United States and have continued thereafter through continuing distribution systems and archival resurfacing.

77.    Declaratory relief is sought to resolve the governing legal framework and the legal capability of this conduct and to preserve redressability in light of announced and ongoing corporate restructurings that may fragment archives, metadata, and operational responsibility across successor structures.

### F.  LIMITED SCOPE AND PROCEDURAL SEQUENCING

78.    For purposes of Rule 8(a) plausibility, Plaintiff references the illustrative summary tables set forth in **Appendix B (Table 1; Tables 2A–2E)**, which identify representative symbolic identifiers and classify their alleged constructive identity function and categories of imputed meaning.

79.    These tables are not exhaustive. The Forensic Gesture Ledger (Exhibit A) is preserved as a taxonomy and reference framework for later proceedings and is not submitted for evidentiary adjudication or relied upon for merits proof at the declaratory stage.

80.    Plaintiff seeks a declaration that the symbolic identifiers described herein are legally capable of (a) conveying defamatory meaning and (b) constituting constructive identification under governing defamation principles when deployed in the manner alleged.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                Complaint with Appendix B

81.  Doctrinal principles governing defamation by innuendo, constructive identification, and non-verbal communication are set forth in Appendix A (A.1–A.4 and A.7–A.8), incorporated by reference solely to provide legal context for the declaratory issues presented.

### G.  PRAYER FOR RELIEF (COUNT I)

82.  Plaintiff respectfully requests a declaratory judgment determining:

a)  Whether the complained-of symbolic identifiers are legally capable of constituting defamatory communications by innuendo and implication;

b)  Whether such identifiers, when used in the manner alleged, are legally capable of satisfying the "of and concerning" requirement as to Plaintiff; and

c)  Whether continued dissemination and rebroadcast of such identifiers, if so capable, presents an actionable controversy under applicable defamation principles.

### H.  NECESSITY OF DECLARATORY RELIEF

83.  Declaratory relief is necessary and appropriate because:

(a) **Ongoing Harm:** Plaintiff alleges continuing dissemination and rebroadcast of the symbolic identifiers across media platforms and archival systems.

(b) **Legal Uncertainty:** The alleged use of symbolic and non-verbal identifiers in lieu of naming presents recurring legal questions concerning identifiability and defamatory capability suitable for declaratory resolution.

(c) **Redressability Risk:** Announced corporate restructurings and asset transfers create a concrete risk that archives, metadata, and operational continuity may be fragmented absent timely clarification.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

84. An actual and ongoing controversy therefore exists concerning the legal capability of the complained-of symbolic communications under 28 U.S.C. § 2201.

85. A declaratory judgment will clarify the governing legal framework applicable to the alleged conduct without adjudicating damages or liability at this stage.

86. Plaintiff remains a private individual entitled to constitutional protection against defamatory communications. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). Damages and any further relief are expressly reserved for subsequent proceedings if warranted.

## COUNT II - CONSTRUCTIVE IDENTITY SUBSTITUTION

### *(28 U.S.C. § 2201; Restatement (Second) of Torts § 564)*

### A.     LEGAL BASIS

87. Plaintiff realleges and incorporates by reference all preceding paragraphs.

88. This Count seeks declaratory clarification as to whether the sustained use of alleged symbolic gestures, coded non-verbal cues, recurring visual identifiers, and patterned symbolic shorthand, when deployed without verbal naming, is **legally capable** of constituting constructive identification "of and concerning" Plaintiff under Restatement (Second) of Torts § 564.

89. Governing principles recognize that identification may occur by implication, coded reference, or contextual association even where the plaintiff is not expressly named. Restatement (Second) of Torts § 564 cmt. b; *Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980); *Bindrim v. Mitchell*, 92 Cal. App. 3d 61 (1979).

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

### B.    CONSTRUCTIVE IDENTITY FORMATION AS ALLEGED

90.    As alleged in the Factual Background and structured for plausibility analysis in **Appendix B (Table 1; Tables 2A–2E)**, Plaintiff alleges that a constructively attributed identity was institutionally seeded in the 1996 Curaçao Police Academy context without any disciplinary or criminal adjudication.

91.    Plaintiff alleges that this constructively attributed identity supplied an interpretive framework through which later symbolic identifiers could function as indirect substitutes for Plaintiff's name and identity within defined interpretive audiences.

92.    **Appendix B (Table 1; Tables 2A–2E)** summarizes the sequential emergence, repetition dynamics, and cross-context deployment of representative symbolic identifiers that Plaintiff alleges operate as proxies for Plaintiff's identity across institutional and media environments.

93.    Plaintiff does not seek evidentiary adjudication at this stage. Plaintiff seeks declaratory clarification as to whether the alleged mechanism, whereby symbolic repetition and contextual anchoring within a defined interpretive audience **substitute** for direct naming, is legally capable of satisfying the identification requirement under Restatement § 564, if later proven.

### C.    DOCTRINAL CLARIFICATION SOUGHT

94.    The legal question presented in this Count is whether an alleged patterned system of symbolic shorthand, when contextually anchored and repeatedly deployed, may be **legally capable** of constituting constructive identity substitution under governing defamation principles.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

95.    Plaintiff further seeks clarification as to whether such constructive identification may be legally capable of occurring where recognition arises within a segment of the audience familiar with the relevant contextual narrative, even absent universal public recognition.

96.    Plaintiff's status as a private individual underscores the importance of clarifying this mechanism in a DJ posture. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).

### D.    NECESSITY OF DECLARATORY RELIEF

97.    Declaratory relief is appropriate because:

a) Plaintiff alleges the constructive identity mechanism is ongoing and portable across media platforms and distribution channels;

b) Plaintiff alleges symbolic shorthand, once established within an interpretive audience, can persist independent of explicit naming; and

c) absent judicial clarification, Plaintiff alleges the mechanism permits plausible deniability while continuing to generate reputational impact through repeated dissemination and archival resurfacing.

98.    Plaintiff therefore seeks a declaration determining whether the symbolic substitution mechanism alleged herein is **legally capable** of constituting constructive identification "of and concerning" Plaintiff under Restatement (Second) of Torts § 564, without adjudicating factual meaning, audience perception, intent, liability, or damages at this stage.

### E.    LIMITED SCOPE AND PROCEDURAL SEQUENCING (COUNT II)

99.    This Count seeks declaratory clarification only. Plaintiff does not request monetary relief or adjudication of damages at this stage. **Appendix B (Table 1; Tables 2A–2E)** supplies

plausibility architecture for the alleged mechanism; evidentiary substantiation, expert testimony, and merits adjudication are expressly reserved for later procedural phases consistent with Fed. R. Civ. P. 26 and applicable evidentiary rules, if warranted.

## COUNT III - RICO CAPABILITY CLASSIFICATION
*(28 U.S.C. § 2201; 18 U.S.C. §§ 1961–1962)*

### A.     LEGAL BASIS AND DECLARATORY POSTURE

100.    Plaintiff realleges and incorporates all preceding paragraphs.

101.    This Count seeks declaratory clarification under 28 U.S.C. § 2201 as to whether the conduct alleged in this Complaint, as structured and contextualized in **Appendix B (Table 1; Tables 2A–2E)**, is **legally capable of evaluation** under the civil RICO definitional framework, including whether the alleged conduct is legally capable of assessment as a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), if later proven through discovery and adjudication.

102.    Plaintiff does not seek adjudication of criminal liability, statutory element satisfaction, damages, or entitlement to remedies at this stage. Plaintiff seeks clarification of the governing legal framework, limited to continuity, relatedness, and enterprise-capability concepts, consistent with the declaratory-stage sequencing set forth elsewhere in this Complaint.

### B.     ENTERPRISE AND STRUCTURAL ALLEGATIONS (CLASSIFICATION ONLY)

103.    Plaintiff alleges a justiciable controversy exists as to whether the coordination alleged among corporate media entities and affiliated institutional participants is **legally capable of evaluation**

as an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consistent with

*Boyle v. United States*, 556 U.S. 938 (2009), if later proven.

104.    **Appendix B (Table 1; Tables 2A–2E)** supplies the alleged chronology, diffusion mechanics, and continuity architecture relevant to evaluating whether the alleged structure is legally capable of meeting enterprise concepts, without requesting merits fact-finding at the declaratory stage.

105.    Plaintiff seeks clarification as to whether the alleged structure, if substantiated through later proof, is legally capable of satisfying enterprise-related requirements and continuity concepts addressed in *Boyle* and *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989), without adjudicating distinctness, participation, intent, or predicate satisfaction at this stage.

### C.    CONTINUITY AND RELATEDNESS (CAPABILITY FRAMING)

106.    Plaintiff further seeks declaratory clarification as to whether the alleged conduct, when analyzed collectively and across time as structured in **Appendix B (Table 1; Tables 2A–2E)**, is **legally capable** of evaluation under the continuity and relatedness framework relevant to 18 U.S.C. § 1961(5), including:

a) **Closed-ended continuity**, based on duration and persistence; and

b) **Open-ended continuity**, based on an alleged risk of repetition.

107.    Plaintiff does not request a determination that statutory elements are met. Rather, Plaintiff seeks clarification that the alleged conduct is not categorically barred, as a matter of law, from evaluation under the definitional continuity framework referenced above, if later proven.

### D.    LIMITED SCOPE AND PROCEDURAL SEQUENCING

108.    This Count requests classification only. It **does not** seek:

a) Adjudication of predicate acts;

b) Determination of intent or scienter;

D.F.A. Jourdain v. Warner Bros. Discovery, et al.          Complaint with Appendix B

c) Adjudication of "injury to business or property," proximate cause, or any civil damages element under 18 U.S.C. § 1964(c);

d) Imposition of damages or treble recovery; or

e) Immediate injunctive relief.

109.    All proof, element-by-element satisfaction, and statutory application, if any, is expressly reserved for later procedural phases, consistent with Rules 8(a) and 26 *(and Rule 9(b) to the extent later applicable in subsequent proceedings)*.

110.    Plaintiff further incorporates, for avoidance of doubt, the forward-looking sequencing posture set forth in the Prayer for Relief (subpart (d)), confirming that the declaratory determinations sought in this action are limited to legal-capability and legal-status clarification and do not adjudicate merits proof or entitlement to remedies at this stage.

111.    Any questions concerning successor continuity, transfer-of-interest procedures, or anti-circumvention scope are addressed separately in Count IV and the Court's further-relief authority under 28 U.S.C. § 2202 and are not requested for adjudication within this Count.

**COUNT IV - CONTINUITY OF DECLARATORY SCOPE AND TRANSFER OF CONTROL  ANTI-CIRCUMVENTION**
*(28 U.S.C. § 2201; 28 U.S.C. § 2202; Fed. R. Civ. P. 25(c) (procedural))*

112.    Plaintiff realleges and incorporates all preceding paragraphs.

113.    This Count seeks declaratory clarification under 28 U.S.C. § 2201 as to whether the legal-capability determinations requested in Counts I–III, if entered, may be preserved in practical effect notwithstanding subsequent transfers of control, restructuring, spin-offs, or asset

migrations that reassign control over the operations, archives, or distribution systems through which the alleged conduct continues.

114.    Plaintiff alleges that large media corporations routinely engage in mergers, divestitures, spin-offs, and asset transfers. Publicly reported restructuring activity within the industry creates a present controversy as to continuity of declaratory scope and the practical effectiveness of relief where control of implicated systems may be reassigned.

115.    Plaintiff does not seek an adjudication that any successor is presently liable. Rather, Plaintiff seeks a declaration that declaratory determinations regarding symbolic defamation capability, constructive identification capability, or RICO-evaluation capability, if entered, should not be rendered legally ineffectual solely by virtue of corporate restructuring or reassignment of control.

116.    Fed. R. Civ. P. 25(c) provides that where an interest is transferred, an action may continue against the original party and, where appropriate, the transferee may be substituted or joined. Plaintiff seeks clarification of the procedural framework governing continuity of the action in the event of transfers relevant to the operations or systems implicated by the alleged conduct.

117.    Plaintiff further seeks clarification that continuity principles recognized in federal law may, if later shown applicable through factual development, support continuity of judicial determinations where operations, control, or functional enterprise structures persist, subject to constitutional limits and due process safeguards.

118.    Plaintiff does not request the Court to determine that any restructuring has resulted in liability transfer. Rather, Plaintiff seeks clarification that corporate reorganization alone does not categorically bar future application or effective implementation of declaratory determinations entered in this action.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

119.    This clarification is sought to preserve redressability and prevent circumvention of judicial determinations through transfers of control, spin-offs, or restructuring, without adjudicating liability, damages, or remedies at this stage.

120.    Any application to specific successor entities, including any substitution or joinder, is expressly reserved for later procedural phases consistent with Rule 25(c) and subsequent proceedings under 28 U.S.C. § 2202, if warranted.

**JUDICIAL CLARIFICATION (DECLARATORY SCOPE)**

121.    This Count requests classification only. It **does not** seek:

a) a present finding of successor liability;

b) imposition of damages;

c) adjudication of operational control; or

d) binding effect upon non-parties absent proper substitution or joinder consistent with Rule 25(c) and due process.

122.    All element-by-element application and factual determinations are expressly reserved for later proceedings consistent with Rules 8, 12, 25, and 26.

**COUNT V - AVAILABILITY OF ANTI-CIRCUMVENTION STRUCTURAL SAFEGUARDS**
*(§ 2202 Further-Relief Framework)*

123.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

124.   A justiciable controversy exists as to whether, if the Court enters declaratory determinations in this action and later proceedings demonstrate that additional measures are necessary to preserve the practical effectiveness of the Court's declaration(s), the Court may, consistent with 28 U.S.C. § 2202 and traditional equitable principles, consider and, where warranted, enter narrowly tailored prospective safeguards designed to prevent circumvention through corporate restructuring, transfers, or reassignment of control over implicated archives and distribution systems.

125.   Such safeguards, if later considered, would be limited to remedial implementation measures directed solely to (i) preserving continuity and integrity of implicated archives and distribution pipelines, (ii) ensuring compliance with the Court's declaration(s), and (iii) preventing recurrence or evasion of conduct adjudicated unlawful, subject to constitutional constraints, proportionality, necessity, and any required notice and hearing.

126.   Plaintiff does not seek imposition of any structural or governance remedy at this stage. Plaintiff seeks only declaratory clarification that, if later proceedings warrant prospective relief to prevent circumvention or recurrence, such measures remain legally available within the Court's discretion under § 2202.

127.   Any such measures, if later ordered, would be non-punitive and narrowly tailored to effectuate the Court's declaratory determinations and would not intrude upon lawful editorial discretion or routine corporate governance unrelated to preventing circumvention of adjudicated unlawful conduct.

## V.    FURTHER RELIEF SEQUENCING AND PRESERVATION OF REDRESSABILITY (DJ-STAGE)

128.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

129.    Plaintiff seeks declaratory determination only at this stage. Plaintiff does not seek entry of injunctive relief, structural safeguards, or other operative remedies at the declaratory stage.

130.    Plaintiff alleges that the challenged practices are ongoing and that continuing dissemination and archival resurfacing can perpetuate reputational and dignitary harm. Plaintiff further alleges that publicly disclosed restructuring activity presents a non-speculative risk that control over implicated archives and distribution pipelines may be reassigned in ways that could frustrate effective relief absent timely declaratory clarification.

131.    The purpose of the requested declaratory relief is to clarify the governing legal status and scope of the challenged practices and to reduce uncertainty in the parties' present legal relations, while preserving the practical effectiveness of judicial relief notwithstanding continuing dissemination systems and restructuring-related transfers of control.

132.    If the Court enters declaratory determinations in this action and later proceedings demonstrate that additional measures are necessary to effectuate and preserve the practical effectiveness of the Court's declaration(s), the Court may—after reasonable notice and hearing—consider further necessary or proper relief under 28 U.S.C. § 2202, consistent with traditional equitable principles and constitutional constraints.

133.    Any prospective measures, if later considered, would be narrowly tailored, non-punitive, and directed solely to preventing recurrence or circumvention of conduct adjudicated unlawful and to preserving the effectiveness of the Court's declaration(s), subject to proportionality and procedural safeguards applicable to equitable relief.

134. Plaintiff does not request the Court to adjudicate entitlement to injunctive relief at this stage, and nothing herein seeks to restrict lawful editorial discretion absent later proceedings and any findings required by law.

135. Doctrinal authorities governing declaratory sequencing, equitable limits, and the availability of further relief are set forth in Appendix A (including A.7–A.8) for the Court's convenience.

## VI.       PRAYER FOR RELIEF

136. WHEREFORE, Plaintiff respectfully requests that this Court enter declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, and grant the following relief, limited to declaratory clarification of the governing legal framework and legal capability of the alleged practices, without adjudicating factual meaning, liability, damages, or entitlement to operative remedies at this stage:

a) **Declaratory Relief — Symbolic Defamation Per Se (Legal Capability Only)**

Declaring that Defendants' alleged use of symbolic gestures, color-based cues, posture-driven signals, and non-verbal innuendo, as pleaded and contextualized in **Appendix B (Table 1; Tables 2A–2E)**, is legally capable, under applicable law, of constituting defamation per se, including where the alleged symbolic communications are of a type that, if later proven, impute criminality, professional unfitness, mental incapacity, or sexual immorality "of and concerning" Plaintiff within the meaning of Restatement (Second) of Torts § 564, without adjudicating factual meaning, liability, or damages at this stage.

b) **Declaratory Relief — Constructive Identification Under Restatement (Second) of Torts § 564 (Legal Capability Only)**

Declaring that the symbolic gestures, color-codes, posture-based signals, and non-verbal innuendo patterns alleged in the Complaint, as pleaded and contextualized in **Appendix B**

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

**(Table 1; Tables 2A–2E)**, are legally capable, under applicable law, of constituting

identification "of and concerning" Plaintiff within the meaning of Restatement (Second) of

Torts § 564, without adjudicating factual meaning, audience perception, intent, or liability at

this stage.

c) **Declaratory Relief — Racketeering "Pattern" Capability (18 U.S.C. § 1961(5); Legal**

   **Capability Only)**

   Declaring that Defendants' alleged conduct, as pleaded and contextualized in **Appendix B**

   **(Table 1; Tables 2A–2E),** is legally capable of evaluation under the "pattern of racketeering

   activity" framework set forth in 18 U.S.C. § 1961(5), including through closed-ended and

   open-ended continuity concepts, if later proven through discovery and adjudication, without

   adjudicating statutory satisfaction, liability, damages, or entitlement to remedies at this stage.

d) **Forward-Looking Clarification of Sequencing (Declaratory Only; Sequencing)**

   Declaring that the declaratory determinations requested herein are sought solely to clarify the

   governing legal framework and the legal capability of the alleged practices, and do not

   adjudicate the satisfaction of any elements of **a civil RICO** damages claim under 18 U.S.C. §

   1964(c), including any requirement of injury to business or property.

   Plaintiff expressly reserves, and the Court is not asked at this stage to decide, any issues

   relating to proof, damages, injunctive relief, costs, or attorneys' fees, which are reserved for

   subsequent proceedings if warranted and consistent with applicable law.

   For avoidance of doubt, subparts (a)–(c) seek only legal-capability and legal-status

   declarations and do not request adjudication of factual meaning, audience perception, intent,

   enterprise participation, proximate cause, or any damages element.

e) **Declaratory Relief — Preservation of Further-Relief Authority to Effectuate the Declaration (Declaratory Only; 28 U.S.C. § 2202 Bridge)**

Declaring that, if the Court enters any declaratory determination requested in subparts (a)–(d), the Court retains authority under 28 U.S.C. § 2202 to grant further necessary or proper relief based on such declaration, after reasonable notice and hearing, as may be required to effectuate and preserve the practical effectiveness of the Court's declaration(s).

Further declaring that, if later proceedings warrant prospective relief to prevent recurrence or evasion of conduct adjudicated unlawful, such relief may include narrowly tailored injunctive or compliance measures consistent with Fed. R. Civ. P. 65 and applicable equitable principles, with the scope, necessity, and form of any such relief reserved to subsequent proceedings and the Court's discretion.

Plaintiff does not seek the imposition of any injunctive, structural, or governance-based remedy at this declaratory stage. This clarification is sought to preserve redressability and to ensure that any declaratory determination, if entered, is capable of effective implementation through subsequent proceedings under § 2202.

f) **Declaratory Recognition of Cognizable Personal and Reputational Interests; Non-Adjudication of Separate Proprietary Claims (Declaratory Only)**

Declaring that the interests alleged in this action, Plaintiff's personal identity, reputation, and dignitary interests implicated by alleged "of and concerning" symbolic identification practices, are legally cognizable interests capable of supporting Article III injury where such practices are alleged to function as identity substitutes, without adjudicating factual meaning, liability, or damages at this stage.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

Further declaring that nothing in this declaratory judgment adjudicates the validity,

ownership, scope, valuation, or enforceability of any separate intellectual-property, unfair-

competition, contractual, licensing, or other proprietary claim; and nothing herein is

construed as a waiver of any such claims or defenses that may be asserted, if warranted, in

subsequent proceedings consistent with law.

g) **Declaratory Scope and Non-Circumvention as to Successor Control of Implicated**

   **Systems (Declaratory Only; Non-Circumvention)**

Declaring that, if the Court enters the declaratory determinations requested herein, the

practical effectiveness of such declarations **should not be rendered ineffectual** merely

because control of the implicated broadcast operations, editorial functions, archives, or

distribution/algorithmic systems is later transferred, reorganized, or assumed by successor

structures.

Further declaring that, as an application of subpart (e) to successor-control scenarios,

consistent with 28 U.S.C. § 2202, the Court may in later proceedings (after reasonable notice

and hearing) consider such further relief as may be necessary or proper to effectuate the

declaration(s) against circumvention through successor control of the implicated systems;

and Plaintiff reserves the right to seek substitution or joinder of any transferee as

procedurally appropriate under Fed. R. Civ. P. 25(c).

Plaintiff does not seek adjudication of successor liability, damages, or operative remedies

against any successor entity at this stage, and this requested declaration is construed solely to

preserve continuity of legal determinations and prevent evasion through corporate

restructuring, consistent with constitutional constraints, equitable principles, and

proportionality limitations.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.          Complaint with Appendix B

h) **Structural Safeguards (Declaratory Only; § 2202 Anti-Circumvention)**

Declaring that, to preserve the practical effectiveness of any declaratory determinations entered in this action, such determinations should not be rendered ineffectual through corporate restructuring, spin-offs, asset transfers, archival migration, metadata degradation, or reallocation of editorial or distribution control over the implicated content systems.

Further declaring that, pursuant to the authority recognized in subpart (e) and consistent with 28 U.S.C. § 2202 and applicable equitable principles, if later proceedings demonstrate that prospective measures are necessary to prevent circumvention of the Court's declaration(s), the Court may consider and, where warranted, enter narrowly tailored, prospective remedial safeguards designed solely to (i) preserve the integrity and continuity of the implicated archives and distribution systems, (ii) ensure compliance with the Court's declaration(s), and (iii) prevent recurrence or evasion of conduct adjudicated unlawful, all subject to constitutional constraints, proportionality, and procedural safeguards.

Such safeguards, if later ordered, may include non-exhaustive categories of relief such as compliance reporting, preservation and continuity protocols for archives and metadata, successor-notice measures, and other remedial governance controls necessary to effectuate the Court's declaration(s), without imposing damages or **operative** remedies absent further proceedings.

i) **Stipulated Decree Option and Court Enforcement Jurisdiction (Declaratory Only; Stipulated Decree Option)**

**Declaring that**, **consistent with subpart (e)**, if the Court enters declaratory determinations in this action and later proceedings warrant prospective implementation measures, the Court may, consistent with 28 U.S.C. § 2202 and applicable equitable principles, consider and enter

Page **32**

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

appropriate orders to effectuate and preserve the practical effectiveness of the Court's declaration(s), after reasonable notice and hearing.

**Further declaring that**, if the parties later stipulate to a consent decree or comparable stipulated order implementing the Court's declaration(s), including narrowly tailored compliance, monitoring, or successor-notice provisions, the Court may approve such a stipulated order and, where legally appropriate, retain jurisdiction to enforce it.

For avoidance of doubt, Plaintiff does not request entry, approval, or enforcement of any consent decree or governance order at this declaratory stage, and does not seek adjudication of successor liability; this provision is sought solely to confirm the Court's jurisdictional capacity to effectuate and enforce its declaration(s) through later proceedings or stipulated mechanisms, if warranted.

Any stipulated order may draw upon the compliance principles set forth in **Section D (Scope of Equitable Authority)** solely as an implementation framework, subject to later proceedings and the Court's discretion.

**j) Ancillary Relief (Declaratory-Consistent; § 2202)**

Granting such other and further relief as the Court deems just and proper **consistent with 28 U.S.C. § 2202**, solely as may be necessary to effectuate and preserve the declaratory determinations requested herein, and without awarding damages or imposing operative remedies absent further proceedings and any required notice and hearing.

## VII.    JUDICIAL ANNOTATION (PRO SE CLARIFICATION)

137.    This Prayer seeks **declaratory relief only at the present stage** and does not request monetary damages or entry of operative injunctive or structural remedies absent further proceedings.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

Authorities addressing declaratory sequencing, equitable limits, successor/transfer procedures, and the availability of further relief under 28 U.S.C. § 2202 are collected in Appendix A for the Court's convenience and do not expand the causes of action pleaded.

## VIII.    INCORPORATION OF COMPLAINT AND APPENDICES

138.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference the appendices and exhibits identified throughout this Complaint **solely as supporting materials** to aid judicial navigation and to provide doctrinal and contextual framework consistent with the declaratory-stage sequencing described herein. The **Complaint body** and **Counts I–V** constitute the operative pleading; the incorporated materials do not expand the causes of action, do not constitute independent pleadings, and are not offered for merits fact-finding at the declaratory stage.

## IX.    APPENDICES & EXHIBITS INTEGRATION ROADMAP

139.    For judicial efficiency and appellate completeness, Plaintiff provides this integration roadmap to facilitate review of the operative Complaint alongside the incorporated Appendices and Exhibits. The Complaint body (**¶¶ 1 through the final numbered paragraph**) sets forth the controlling allegations, claims, and requests for relief, and may be read seamlessly with the referenced materials pursuant to Fed. R. Civ. P. 10(c).

### A.    APPENDIX INTEGRATION NOTE

140.    Pursuant to Fed. R. Civ. P. 10(c), Plaintiff incorporates by reference Appendices A.1–A.12 and B–H, and Exhibits A–D, as identified throughout this Complaint. These materials are incorporated solely to preserve doctrinal framework, structured plausibility explanation, and procedural sequencing discipline, and do not constitute independent pleadings or operative

allegations for purposes of Rule 8(a). The **Complaint body**, including **Counts I–V** and the

Prayer for Relief, remains the exclusive operative pleading.

This structure ensures:

a) **Rule 8(a) Compliance,** the pleading remains a short and plain statement of the claims;

b) **Judicial Navigation,** supporting doctrine, background context, and technical materials may be located efficiently without conflation; and

c) **Appellate Completeness,** the full analytical and evidentiary framework is preserved without piecemeal supplementation.

## B.    APPENDIX INTEGRATION ROADMAP

141.    This Complaint is supported by **Appendices A.1–A.12** and **B–H,** which are organized to preserve judicial restraint and to present the requested declaratory relief as a boundary-setting determination, not an adjudication of contested facts. **Appendix A** provides the doctrinal spine governing declaratory relief, constructive identification and implied defamation principles, and the sequencing discipline that separates DJ-stage capability from later proof. **Appendix B** supplies the plausibility architecture, anchored expressly in **Table 1 (institutional fragility and constructive identity seeding)** and **Tables 2A–2E (diffusion, continuity, and identity-substitution mechanics),** to show that symbolic communications can be "of and concerning" a plaintiff without requiring evidentiary findings at this stage. **Appendices C–H** operationalize the remedy posture and future evidentiary pathway, including methodology and intake instruments (e.g., templates), while reserving all proof development for post-pleading procedures under Rule

D.F.A. Jourdain v. Warner Bros. Discovery, et al.          Complaint with Appendix B

26. Consistent with this sequencing, the filing does not submit AI detection logs or signed

witness affidavits at the DJ stage; those materials are designed for later proceedings if warranted.

| MASTER APPENDIX ROADMAP TABLE (B–H)) (COUNT I-IV) | | | |
|---|---|---|---|
| **Appendix** | **Title (Locked Role)** | **Cross-Referenced Complaint Paragraphs / A-Series Appendices** | **Structural Function (Declaratory Posture)** |
| **Appendix B** | Institutional Risk, Constructive Criminalization & Symbolic Identity Formation | **Count I ¶¶62–86; Count II ¶¶87–99; Count III ¶¶100–111;** (continuity posture referenced in Count IV) • A.1; A.2; A.5; A.7; A.8 | Exclusive factual plausibility carrier. Documents origin, diffusion, and recurrence of symbolic identifiers (Table 1; Tables 2A–2E). Supplies institutional context without collapsing into evidentiary adjudication. |
| **Appendix C** | AI Methodology, Daubert Reliability & Evidentiary Chain-of-Custody (overview; no outputs at DJ stage) | **Count III ¶¶100–111** (sequencing only); **Count IV ¶¶112–122** (transfer-of-control sequencing as needed) • A.7; A.8; A.10–A.12 | Technical capability-to-substantiate architecture. Describes reproducibility, authentication pathways, and structured modeling capacity without offering outputs, proof, or predicate findings at the DJ stage. |
| **Appendix D** | Successor Liability & Structural Continuity Orientation (FRCP 25(c) procedural posture) | **Count IV ¶¶112–122** • A.10–A.12 | Corporate continuity and redressability framework. Explains why declaratory scope is not rendered ineffectual by mergers/divestitures/restructurings; Rule 25(c) is procedural only. |
| **Appendix E** | Technical Evidentiary Framework & Evidence Governance Architecture (no outputs at DJ stage) | **Count II ¶¶87–99** (sequencing); **Count III ¶¶100–111** (sequencing) • A.7; A.8 | Operational governance companion to Appendix C. Preservation protocols, repository controls, and later-stage presentation sequencing; no merits proof at DJ stage. |

D.F.A. Jourdain v. Warner Bros. Discovery, et al.          Complaint with Appendix B

| MASTER APPENDIX ROADMAP TABLE (B–H)) (COUNT I-IV) | | | |
|---|---|---|---|
| **Appendix** | **Title (Locked Role)** | **Cross-Referenced Complaint Paragraphs / A-Series Appendices** | **Structural Function (Declaratory Posture)** |
| **Appendix F** | Comparative Media Law & Symbolic Expression Doctrine | **Count I ¶¶62–86; Count II ¶¶87–99 •** A.1–A.5; A.7 | Doctrinal comparative analysis supporting legal capability of symbolic identification and defamation by implication (Restatement §564). |
| **Appendix G** | Anticipatory Discovery Plan & Rule 26 Matrix | **Count III ¶¶100–111; Count IV ¶¶112–122 •** A.8; A.10–A.12 | Procedural sequencing framework. Identifies custodians, datasets, production categories, and post-DJ evidentiary deployment discipline consistent with Rule 26. |
| **Appendix H** | Structural Enterprise Mapping (RICO Architecture) | **Count III ¶¶100–111 •** A.8; A.10–A.12 | Enterprise modeling framework. Organizes alleged association-in-fact structure and continuity architecture for capability classification only; does not adjudicate pattern satisfaction. |

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

| DIRECT "COUNT → APPENDIX" CROSSWALK | | | |
|---|---|---|---|
| COMPLAINT SECTION | | SUPPORTING APPENDIX | CONTENT PRESERVED |
| Count | Claim | Core Doctrinal Appendix (A-Series) | Supporting Appendices (B–H) (Role-Locked) |
| I | Declaratory Judgment — Defamation by Innuendo & Constructive Identification (Restatement §564) | A.1–A.5; A.7 | **B** (plausibility architecture; Table 1; Tables 2A–2E) • **F** (comparative symbolic expression doctrine) |
| II | Declaratory Relief — Constructive Identity Substitution (Restatement §564 mechanism) | A.2–A.4; A.7 | **B** (mechanism plausibility; Table 1; Tables 2A–2E) • **F** (comparative doctrine) • **E** (sequencing-safe preservation governance, no outputs) |
| III | Declaratory Relief — RICO Capability Classification (18 U.S.C. §§1961–1962; capability only) | A.6; A.7; A.8 | **B** (continuity/diffusion plausibility via Tables 2A–2E) • **H** (enterprise mapping for capability posture) • **C/E/G** (sequencing readiness only; no outputs) |
| IV | Declaratory Relief — Continuity of Declaratory Scope / Transfer-of-Control Anti-Circumvention (Rule 25(c) procedural; §2202 later) | A.10–A.12 | **D** (continuity orientation) • **G** (Rule 26 matrix sequencing) • **C/E** (method/governance readiness only; no outputs) |
| V | Declaratory Relief: Governance Overlay & Institutional Integrity | A.7/A.10–A.12 | Appendices D/E/G |

| EXHIBIT PURPOSE & SEQUENCING TABLE (DJ STAGE) |
|---|
| **Exhibit A — Forensic Gesture Ledger (Taxonomy Only)** |
| Preserved as a taxonomy for later proceedings. Not offered for merits proof at the DJ stage; reserved for later evidentiary development if warranted. |
| **Exhibit B — Witness Affidavit Templates (Templates Only)** |
| Templates preserved for later Rule 26 sequencing. No executed affidavits submitted at the DJ stage. |
| **Exhibit C — AI/Metadata Repository (Reserved; Not Filed at DJ Stage)** |
| Preserved and organized for later disclosure. No AI outputs, detection logs, or frame-level evidence submitted at the DJ stage. |
| **Exhibits D1–D6 — Institutional Context Materials (Context Only)** |
| Public background/context only; not offered to adjudicate liability of non-parties; used to contextualize 1996–1997 environment. |

**INCORPORATION RIDER**

142. Plaintiff incorporates the referenced Appendices (A.1–A.12, B–H) and Exhibits (A–D) solely pursuant to Fed. R. Civ. P. 10(c) to provide doctrinal framework, structured plausibility context, and sequencing clarity consistent with the declaratory posture of this action. These materials do not expand the operative claims beyond those stated in the Complaint body and are not submitted for merits fact-finding at the declaratory stage.

## X.    UNSWORN DECLARATION (28 U.S.C. § 1746)

I, **Darrel Francis Anthony Jourdain**; declare under penalty of perjury that the factual statements attributed to me in this Complaint are true and correct to the best of my knowledge and belief.

Executed on March 31, 2026, in New York, New York.

D.F.A. Jourdain v. Warner Bros. Discovery, et al.                    Complaint with Appendix B

/s/ Darrel Francis Anthony Jourdain

Darrel Francis Anthony Jourdain


## XI.    NOTICE    REGARDING    SERVICE OF PROCESS

I certify that on March 31, 2026, I caused a true and correct copy of the foregoing Complaint to

be filed with the Clerk of Court for the Southern District of New York by submitting it via email

to the Pro Se Intake Unit (Prose@nysd.uscourts.gov).

Plaintiff acknowledges that filing with the Clerk does not constitute service on Defendants, and

that service will be effected only upon issuance of summons pursuant to Fed. R. Civ. P. 4.

Upon issuance of summons, I will effect service of the summons and complaint on each named

Defendant in compliance with Fed. R. Civ. P. 4(c) and will promptly file proof of service with

this Court.

Dated: March 31, 2026,

/s/ Darrel Francis Anthony Jourdain

## XII.    SIGNATURE

Respectfully submitted,
/s/ Darrel Francis Anthony Jourdain
**Darrel Francis Anthony Jourdain (D.F.A. Jourdain) (Pro Se) Mailing Address:** 339 E Main ST, PMB 1053
Elmsford, NY 10523
**TEL:** 914-413-3928
**Email:** darreljour@yahoo.com
**Dated:** March 31, 2026,
New York, New York

**APPENDIX B –**

**PLAINTIFF BACKGROUND: INSTITUTIONAL NARRATIVE &**

**TIMELINE (TABLES 1; 2A-2E)**

In Support of:
Complaint for Declaratory Relief
28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

**APPENDIX B**

**PLAINTIFF BACKGROUND: INSTITUTIONAL NARRATIVE & TIMELINE (TABLES 1;2A-2E)**

**(LIEUTENANT - GRADE DUTCH-TRACK CADET)**

I.       **SUMMARY OVERVIEW PAGE - APPENDIX B**

A.       **Purpose and Scope.**

At the declaratory stage, Appendix B functions as a structured plausibility and sequencing appendix that contextualizes the representative identifiers summarized from Exhibit A. It explains the alleged origin, diffusion, and recurrence mechanics **(Table 1; Tables 2A–2E)** and how, within defined interpretive audiences and identifiable institutional settings, the identifiers plausibly acquired and stabilized meanings associated with Plaintiff. This appendix is offered to show that, if later proven, such identifiers are **legally capable** of operating "of and concerning" Plaintiff under Restatement (Second) of Torts § 564 and of supporting continuity analysis relevant to Plaintiff's declaratory classification claims. Appendix B does not present evidentiary proof or request factual adjudication; it supplies contextual and structural background for the Court's threshold legal-capability determinations at the pleading stage.

B.       **Representative Symbols (S1–S12).**

For this stage of the litigation, Plaintiff discloses twelve symbolic identifiers (S1–S12), represented in **Table 1 - Locally Generated Curaçao Symbolic Identifiers** (See **Table 1**, Appendix B, following § XI.), and **Table 2A- Constructive Identity Function Grid (Symbolic Identifiers Across Jurisdictions) (S1–S12) (**See **Table 2A,** Appendix B, following § XVI.), and Table 2B - Legal Classification Grid (S1–S12)** (See **Table 2B**, Appendix B, following § XVI.).

These twelve identifiers are a representative subset, selected solely to establish plausibility of defamatory meaning, institutional origin, symbolic identity substitution, and pattern continuity.

They **do not reflect the full forensic inventory**.

Appendix B addresses institutional causation, while Tables 1 and 2 document the temporal and functional development of symbolic identity substitution.

C.        **Full Forensic Ledger (Exhibit A).**

The comprehensive Forensic Gesture Ledger preserved in Exhibit A contains **50+ symbolic identifiers**, including Curaçao-origin, Netherlands-origin, U.S.-origin, and globally rebroadcast forms. Each identifier is documented with emergence date, jurisdictional spread, cultural meaning, constructive-identity function, and forensic metadata.

Appendix B, Tables 1 and 2 serve as doctrinal anchors illustrating the symbolic mechanisms relevant at this pleading stage; they are not intended to be exhaustive catalogs.

**D.**        **Doctrinal And Forensic Foundations of Appendix B**

Appendix B is built on eight interconnected doctrinal and forensic principles, each

necessary to understand the formation and persistence of the symbolic system:

1. **Organizational Behavior Theory**

   – Explains how institutions respond to high-salience internal events,

   ambiguity, rumor diffusion, and reputational pressures, particularly in

   small-cohort environments such as the Curaçao Police Academy.

2. **Constructive Criminalization Theory**

   – Describes how reputational taint can attach without any underlying

   misconduct, transforming administrative ambiguity into socially coded

   suspicion.

3. **Institutional Perceived Risk Doctrine**

   – Frames how the 1996 administrative notation produced institutional

   anxiety, rumor propagation, and an internal "risk figure" identity around

   Plaintiff.

4. **Constructive Identity Substitution**

   – Establishes how Plaintiff's name was gradually replaced by symbolic

   shorthand- gestures, colors, cues, that carried culturally understood

   meaning.

5. **Symbolic Echoing (Multi-Jurisdictional Transmission)**

   – Explains how symbolic markers reproduce themselves across

jurisdictions (Curaçao → Netherlands → United States) through cultural transmission rather than direct communication.

6. **Declaratory Judgment Posture**

– Clarifies that Appendix B is designed to show legal plausibility and ongoing harm, not full evidentiary proof, consistent with Rule 57; evidentiary completeness is reserved for Rule 26 expert stages.

7. **Forward-Looking Evidence Structure**

– Affirms that AI logs, metadata, and expert analyses will be disclosed at the appropriate procedural Rule 26(a)(2) stage; they are not required for declaratory relief.

8. **RICO Pattern Framing**

– Provides context for continuity and relatedness under 18 U.S.C. § 1961(5), without alleging motive or wrongdoing at the pleading stage.

E.          **What Appendix B Explains**

Appendix B is a **factual–forensic appendix**, not an argumentative section. It explains with clarity:

- **What happened**:

  How an administrative notation in 1996 generated institutional ambiguity, rumor diffusion, an internal rumor ecosystem with long-standing reputational distortion.

- **How the symbolic system formed**:

  Constructive criminalization and community reinterpretation generated symbolic identifiers following Plaintiff's departure to the Netherlands.

- **Why gestures have meaning**:

  Their meaning and their significance is derived from the institutional identity constructed around Plaintiff between 1996–1997, not from Plaintiff's conduct.

- **Why they identify the Plaintiff**:

  Their cultural meaning, social repetition, and narrative consistency satisfy the "of and concerning" standard under § 564.

- **How the pattern persisted across jurisdictions:**

  **Symbolic echoing carried the identifiers through Curaçao, the Netherlands, and the United States over a 20+ year period.**

F.        **Legal Posture and Evidentiary Considerations**

**This Appendix B Provides:**

- **Plausibility** of defamatory meaning

- **Plausibility** of symbolic identification

- **Plausibility** of constructive identity substitution

- **Plausibility** of multi-jurisdictional continuity

- Forensic context for Appendices C–H

- Factual support for Counts I–III

This Appendix B **does not** require:

- AI metadata

- Full gesture inventory

- Expert affidavits

- Testimony or witness statements

- Event logs or signal frequency charts

These materials will be disclosed under **Rule 26(a)(2)** and **expert-report procedure**.

G.         **Cross-References**

To ensure structural coherence:

- **Table 1 (S1–S8) - Curaçao-origin identifiers (See Appendix B, following § XI.)**

- **Table 2A – 2E (S1–S12) - Multi-Jurisdictional Identifiers (See Appendix B, following § XVI.)**

- **Appendix C - Constructive identity, symbolic substitution & narrative parasitism doctrines**

- **Appendix A.1–A.12 - Doctrinal foundations supporting the forensic narrative (Especially A.2–A.4 and A.7–A.8)**

Technical Table Index (For Navigation):

- **Table 1 — Locally Generated Curaçao Symbolic Identifiers (S1–S8)**

- **Table 2A — Constructive Identity Function Grid (S1–S12)**

- **Table 2B — Legal Classification Grid (S1–S12)**

- **Table 2C — Institutional Actor Grid (S1–S12)**

- **Table 2D — Temporal Continuity & Pattern TimeLine**

- **Table 2E — Symbolic Meaning → Constructive Identity → Harm Pathway Map**

1. **For Table 1, See Appendix B, following § XI.)**

2. **For Table 2A-2E, See Appendix B, following § XVI.)**

Together they **map**:

- Institutional Phase **(Table 1)**, and
- Identity-Function Evolution **(Table 2).**

## SEQUENTIAL NOTE

This Appendix B Is Incorporated by Reference Under Fed. R. Civ. P. 10(C) Solely to Supply Factual Background Relevant to Constructive Identity, Symbolic Defamation, And Enterprise Continuity. It Does Not Assert Any Independent Allegation of Liability Against the Curaçao Police Academy, The Netherlands Police Academy, The Ombudsman, Or Any Other Institution Referenced Herein. All Institutional Details Appear Only as Historical Context and to Support the Cross-Referenced Exhibits D1–D6. This Appendix Adds No Claims, Imposes No Duties, And Seeks No Relief Beyond the Declaratory Judgment Set Forth in the Complaint.

## II.        INTRODUCTION

[B.1-1]    This **Appendix B** preserves the expanded contextual and structural narrative underlying the 1996 administrative episode referenced in the Complaint. While the Complaint body provides a streamlined narrative to satisfy Rule 8(a), this Appendix organizes additional background and structured plausibility explanation to aid judicial review and appellate completeness. No evidentiary adjudication is sought at this stage, and any authentication, expert testimony, or summary-presentation issues are expressly reserved for later proceedings if warranted.

[B.1-2]    Plaintiff alleges that the 1996 internal complaint contained no criminal allegations and did not result in any formal disciplinary adjudication. Plaintiff further alleges that the document was read to him privately in 1996 by the then Chief of the Curaçao Police Department, **Mr. Willem ("Wim") Tweeboom**, in the Chief's office, in the presence of the then assistant to the Chief, **Mrs. Alpha Falbru** (now Head of the Curaçao Police Academy).This reference is provided solely as part of the factual background in Appendix B and does not request any determination at the declaratory stage.

[B.1-3]   The 1996 internal note, though non-disciplinary, non-criminal, and never adjudicated, became, in later years, the retrospective anchor for a pattern of symbolic identification and gesture-based references. Its eventual misuse did not arise through any official process; rather, it occurred through informal reinterpretation, unauthorized disclosure, and cultural diffusion far outside the scope of the original administrative event. These later symbolic meanings were products of societal and institutional dynamics, not of any factual wrongdoing by Plaintiff.

[B.1-4]   The timing of the 1996 note coincided with Plaintiff's documented status as the top-performing cadet in his cohort and arose immediately before major advancement milestones, including the parliamentary vote endorsing dispatch to the Netherlands Police Academy. Within an institutional environment already under public scrutiny, as reflected in contemporaneous Amnesty International reports and press coverage, high-salience trainees often become focal points for internal reputation management. In this fragile climate, personnel, supervisors, and peers informally attached unverified narrative significance to the otherwise neutral administrative entry. Thus, the note's timing contributed to its later reinterpretation, not as evidence of misconduct, but as a perceived reputational vulnerability within the institution's internal symbolic economy, where ambiguous events acquire social meaning independent of their factual content.

[B.1-5]   Importantly, plaintiff alleges the perceived vulnerability arose from institutional dynamics, their reputational instability, public scrutiny, and sensitivity to internal conflict, not from any conduct by Plaintiff.

## III.        INSTITUTIONAL BACKDROP (1996)

[B.1-6]    Publicly available sources and materials from the period (compiled in Exhibits D1–D7) reflect that Curaçao's law-enforcement institutions operated under heightened scrutiny regarding internal accountability, including reported concerns about detainee safeguards, internal discipline and complaint-handling pathways, and the effectiveness of supervisory controls. Plaintiff alleges that such scrutiny plausibly created reputational defensiveness within the policing institutions, such that internal administrative disputes involving a highly visible cadet cohort could be informally reinterpreted as "risk" signals and become rumor catalysts despite the absence of any formal disciplinary adjudication. These references are offered solely to establish institutional context and not to attribute liability to any non-party.

[B.1-7]    These reports are cited solely to contextualize institutional reputational pressures, not to attribute liability to any Curaçao institution.

[B.1-8]    The Curaçao Police Department in 1996 operated within an environment widely documented by external observers, including Amnesty International reports and local press accounts, as experiencing structural instability, administrative inconsistency, and public concerns related to internal accountability. These contextual conditions do not form the basis of any allegation by Plaintiff; rather, they provide the organizational background against which ordinary administrative events, such as the 1996 internal complaint, were interpreted by institutional actors.

[B.1-9]    Organizational behavior theory shows that in environments of heightened public scrutiny and perceived instability, institutions often treat high-performing trainees as

reputational assets whose advancement reflects on the competence of supervisory structures. When such a trainee becomes associated with any administrative dispute, even a non-disciplinary one, institutions may interpret that event through the lens of perceived risk rather than factual seriousness.

[B.1-10] In this sense, Plaintiff alleges, he was treated as a perceived 'risk figure, not due to misconduct, danger, or deficiency, but because his integrity and trajectory contrasted sharply with the institution's vulnerabilities. The perceived risk belonged to the institution, not to Plaintiff; the Plaintiff merely became the surface onto which those anxieties were projected.

[B.1-11] Against this institutional backdrop, Plaintiff's strong evaluations, cohort visibility, and trajectory toward national dispatch made him a high-salience figure within a reputationally fragile organization. Within this environment, the 1996 administrative entry did not remain a neutral internal notation. Instead, it became a focal point for **internal institutional reinterpretation,** acquiring symbolic meaning as personnel, peers, and supervisory figures informally attached **unverified narrative significance** to it.

[B.1-12] The symbolic meaning that emerged was not factual but **constructed by the institution's rumor network**, which treated the notation as indicative of "something being wrong" despite its lack of substance. This internally created symbolic meaning, rather than the content of the notation itself, became the precursor to later rumor expansion, cultural reinterpretation, and ultimately the emergence of gesture-based identifiers referencing Plaintiff across jurisdictions and decades.

[B.1-13]    In organizational behavior terms, this process reflects a well-documented phenomenon in which ambiguous administrative events involving high-visibility trainees generate disproportionate informal meaning, producing a reputational construct that persists independently of underlying facts.

## IV.    PLAINTIFF'S STATUS AS LIEUTENANT- GRADE DUTCH-TRACK CADET AND FORENSIC RELEVANCE

[B.1-14]    Plaintiff entered the Dutch-Track program by formal application, satisfied all competitive criteria, and was ranked the strongest candidate in his cohort based on documented performance evaluations. In 1996, Plaintiff was enrolled at the **Curaçao Police Academy** as a police cadet assigned to the **Boarding Division**. Unlike a standard cadet, Plaintiff was part of a **Lieutenant-Grade Dutch-Track**, pre-screened for **supervisory and command potential** and prepared for dispatch to the **Netherlands Police Academy,** a command-oriented program functionally comparable to a "Dutch Quantico" track.

[B.1-15]    Within this structure, there were **two distinct cadet-categories**:

   **(a) Regular Curaçao Police Cadets**, primarily trained for local patrol and line duties within the Curaçao Police Department ("CPD"), with a limited pathway to foreign training; and

**(b) Lieutenant-Grade Dutch-Track Cadets,** a narrow cohort pre-selected for **advanced training in the Netherlands**, with an expectation of future leadership roles and command assignments upon return.

[B.1-16]   Plaintiff fell squarely into the second category: **a Lieutenant-Grade Dutch-Track Cadet**. He applied for the Dutch-Track program, qualified through competitive assessment, and was ultimately ranked as the strongest candidate in his cohort. He was:

- **Pre-screened** through academic and performance evaluations demonstrating suitability for higher responsibility and leadership;

- **Identified and recommended for multi-year dispatch** to the Netherlands Police Academy for intensive training based on merit, as reflected in the National Decree file; **and**

- **Academically and operationally tracked** toward an officer-level trajectory rather than the standard local recruit pipeline as part of a future officer-level pipeline.

[B.1-17]   For forensic purposes, it is critical to distinguish Plaintiff's status from that of:

- **A standard recruit subject to routine attrition, versus**

- **A Lieutenant-Grade Dutch-Track Cadet** whose removal signals a deliberate institutional choice.

The Dutch-Track / "Dutch Quantico" classification is probative for three independent reasons:

- First, it explains why Plaintiff became symbolically salient within the Curaçao Police Academy, an individual whose performance, advancement trajectory, and visibility made him "interesting" to political, union, and administrative actors operating within a reputationally strained institution.

- Second, it illuminates the institutional motive for constructing a defamatory identity around Plaintiff, as a means of mitigating perceived internal disruption and reputational exposure arising from the 1996 administrative conflict.

- Third, it provides the factual bridge connecting the later-emerging symbolic identifiers, **each catalogued in Exhibit A (Gesture & Symbol Ledger),** to a concrete institutional origin rather than random social mockery.

[B.1-18]    Plaintiff alleges that later media and community gestures, whether expressed through posture cues, color codes, evaluative mimicry, or obstruction symbols, **plausibly** acquired their referential meaning because the institutional environment had already informally coded Plaintiff as an identity-bearing figure long before such gestures appeared. Accordingly, Plaintiff alleges the symbolic ecosystem summarized in Exhibit A is most intelligible when read against this institutional background.

[B.1-19]   Plaintiff intends to substantiate audience recognition, recurrence, and cross-jurisdictional diffusion through executed witness affidavits and AI-assisted summary analyses at the appropriate procedural stage, if warranted, consistent with Rule 26 and applicable evidentiary standards.

[B.1-20]   This distinction is significant. Forensically and judicially, it demonstrates how Plaintiff became a **high-salience internal figure** whose exceptional visibility, merit-based advancement, and placement within the Dutch-Track leadership pipeline generated heightened **organizational sensitivity** to how internal events surrounding his training might be interpreted by external stakeholders, including Parliament, the media, and the broader community.

[B.1-21]   In such an environment, Plaintiff alleges that even an administratively unresolved or procedurally deficient internal complaint could plausibly acquire exaggerated symbolic significance within the institution. Within organizational behavior, this process occurs when ambiguous events involving highly visible trainees become informal "interpretive anchors" for institutional anxiety. Here, once Plaintiff was informally coded as a locus of internal tension, through rumor diffusion, performance-based visibility, and perceived reputational risk, the meaning attached to the complaint shifted from administrative ambiguity to symbolic significance. This symbolic meaning was neither factual nor disciplinary; it was constructed through internal social interpretation. Subsequent audiences within the institution treated

Plaintiff not as an ordinary cadet, but as a symbolic figure representing unresolved institutional conflict.

[B.1-22]   Plaintiff alleges that these symbolic meanings became attached to Plaintiff despite the absence of any adjudicated misconduct, because informal rumor diffusion within the institution plausibly treated Plaintiff as a focal point for internal anxieties.

[B.1-23]   **Plaintiff alleges that this background of perceived institutional risk and informally constructed social meaning provides the necessary context to understand how later symbolic identifiers and gesture-based cues plausibly became referential and culturally intelligible.** The gestures did not arise in a vacuum. Their defamatory force derives from the **institutional narrative constructed in 1996**, not from the gestures themselves. Accordingly, the symbolic vocabulary that later appears in Curaçao, the Netherlands, and the United States is best understood as the externalization and replication of an **identity already formed inside the organization**, rather than a new or independent phenomenon.

[B.1-24]   In later years, when international media, political figures, entertainment personalities, and institutional actors reused these gestures, color codes, and symbolic cues, they were not invoking an abstract caricature or anonymous archetype. They were drawing upon an **already-constructed institutional narrative,** a narrative that originated **inside the Curaçao Police Academy in 1996**, during the Boarding Division's

administrative complaint and the accompanying rumor diffusion that redefined Plaintiff as a symbol of internal conflict.

[B.1-25] The meaning of these gestures did not arise spontaneously when used abroad; nor did outside actors independently invent their defamatory content. Rather, the gestures became intelligible **because the institution had already pre-coded Plaintiff with a specific social meaning**, tied to the 1996 event and the perceived risk associated with a high-performing cadet on the Dutch-Track leadership trajectory.

[B.1-26] Once that internal meaning existed, later actors, whether in Curaçao, the Netherlands, or the United States, were able to signal the same identity through symbolic shorthand. Thus, the gestures and codes used in broadcast media, political contexts, social commentary, satire segments, and public interactions functioned as **replications** of the original institutional attribution, **not independent creative expressions**.

[B.1-27] This is the forensic point: **the gestures acquired their defamatory force because of the institutional rumor ecosystem**, not because of anything inherent in the gestures themselves. Accordingly, the symbolic acts seen across multiple jurisdictions form a coherent and legally traceable sequence that begins with the 1996 administrative event and its resulting organizational meaning assignment.

V.         **INSTITUTIONAL PERCEIVED RISK: AN ORGANIZATIONAL BEHAVIOR EXPLANATION**

[B.1-28]   From an organizational behavior standpoint, the Curaçao Police Academy operated in 1996 as a **high-visibility, small-cohort environment** where cadet performance, interpersonal dynamics, and administrative evaluations were unusually public within the institution. In such settings, small administrative disputes become **salient institutional events**, not because of their substance, but because of the **social meaning** attributed to them within tightly interconnected hierarchies.

[B.1-29]   Plaintiff entered the Dutch-Track program by formal application, satisfied all competitive criteria, and was ranked the strongest candidate in his cohort based on documented performance evaluations. Plaintiff's exceptional performance placed him in the **Lieutenant-Grade Dutch-Track cohort**, a competitive pipeline subject to scrutiny by the Academy's leadership, the Curaçao Police Department, and the Netherlands Police Academy. Organizational behavior research confirms that when an institutional actor (here, a cadet) becomes linked to **multiple senior decision-makers**, any administrative concern, even if minor or non-disciplinary, can be interpreted as implicating institutional judgment as a whole.

[B.1-30]   Within such an environment, the mere existence of the 1996 Boarding Division Complaint, despite being **non-criminal and non-disciplinary**, created **institutional**

**perceived risk,** the risk that unresolved internal disputes could reflect poorly on the Academy, the Dutch-Track program, or decision-makers who approved Plaintiff's advancement.

[B.1-31]  Institutional perceived risk does **not** presume wrongdoing by Plaintiff. Nor does it allege wrongdoing by any official or department. It reflects a well-documented organizational pattern: when institutional reputation intersects with high-visibility trainees, organizations often adopt risk-averse behaviors, heightened scrutiny, or narrative distancing.

[B.1-32]  This dynamic explains why a vague internal complaint, ordinarily of **no external consequence,** became a **symbolically charged event** whose meaning was later **reinterpreted,** through rumor, gossip, and institutional politics, and **re-circulated** within the academy, the local community, and eventually public settings. The complaint's *lack of disciplinary content* became secondary to the **meaning assigned to it** through informal interpretation, later amplified through symbolic identifiers.

[B.1-33]  In this sense, Plaintiff became a symbolic 'risk figure' not due to misconduct, danger, or deficiency, but because his integrity and trajectory contrasted sharply with the institution's vulnerabilities. The perceived risk belonged to the institution, not to Plaintiff; the Plaintiff merely became the surface onto which those anxieties were projected.

[B.1-34]    Importantly, the perceived reputational vulnerability arose solely from the institution's own fragility, its reputational instability, public scrutiny, and sensitivity to internal conflict, not from any conduct by Plaintiff.

[B.1-35]    In such environments, rumors and informal narratives often **outpace formal records**, creating what organizational psychology identifies as **constructive criminalization,** the cultural re-reading of ambiguous administrative notes as signaling wrongdoing, unfitness, or latent incapacity **despite no factual basis**. This process occurs when institutions, facing reputational pressure, need to project blame onto an individual for internal dysfunction, creating a false stigma of criminality where none exists.

[B.1-36]    This forensic explanation situates the 1996 internal complaint not as proof of misconduct, but as the **first symbolic node** in a larger pattern of constructive identity that later manifests in gesture-based innuendo, coded references, and media rebroadcast.

## VI.    INSTITUTIONAL PERCEIVED RISK AS THE FOUNDATION FOR CONSTRUCTIVE CRIMINALIZATION AND SYMBOLIC ECHOING

[B.1-37]    The emergence, persistence, and cross-jurisdictional diffusion of symbolic identifiers linked to Plaintiff cannot be understood in isolation. Their intelligibility and their defamatory impact require recognition of the **organizational dynamics** triggered by

the 1996 internal administrative complaint. Although the complaint contained **no criminal allegations**, and although Plaintiff had an **unblemished record**, the institutional context in which it surfaced transformed an otherwise insignificant notation into a **high-salience event** laden with reputational risk inside the Curaçao Police Department ("CPD").

A.          **How Perceived Institutional Risk Forms in High-Visibility Environments**

[B.1-38]    The CPD of 1996 operated under an unstable organizational climate:

- Amnesty International and local press documented **abuse, corruption, and misconduct** within the police system.
- Senior leadership, including Chief Wim Tweeboom, were publicly scrutinized for failures in oversight.
- Internal factions, patronage networks, and political influences shaped cadet advancement.

[B.1-39]    Against this backdrop of institutional instability and reputational strain, Plaintiff's exceptional performance, integrity, and top evaluations placed him in an unusually high-visibility position. His merit made him an institutional outlier in a system already struggling with allegations of corruption and administrative dysfunction.

[B.1-40]    Organizational behavior research shows that when institutions experience internal pressure, they often externalize that strain by designating certain individuals as "risk figures", not because those individuals pose any actual risk, but because their prominence, independence, or excellence threatens existing networks or exposes internal weaknesses.

[B.1-41]    In this sense, Plaintiff became a symbolic "risk figure" not due to misconduct, danger, or deficiency, but because his integrity and trajectory contrasted sharply with the institution's vulnerabilities. The perceived risk belonged to the institution, not to Plaintiff; the Plaintiff merely became the surface onto which those anxieties were projected.

**B.**        **From Administrative Dispute to Constructive Criminalization**

[B.1-42]    Plaintiff alleges that the 1996 complaint, procedurally deficient and containing no criminal allegation, became a focal point of internal rumor diffusion after it was **allegedly disclosed outside formal channels**, notwithstanding confidentiality norms governing police trainee information. In a police force service already under public suspicion, the leak created a **false reputational association** between Plaintiff and the broader corruption climate. This phenomenon is known in organizational behavior analysis as **constructive criminalization**: the attachment of criminalized meaning or suspicion to an individual **without any factual misconduct**, through social interpretation and coded rumor signaling.

[B.1-43]    The effect was twofold:

1.  **Internally**: Plaintiff was reframed as a potential reputational liability to those implicated in the complaint's processing or those with political skin in the institutional narrative.

2. **Externally**: Because the leak occurred during a period of intense public scrutiny, community-level gossip encoded the Plaintiff with insinuations tied to institutional dysfunction, despite the total absence of wrongdoing.

C.        **How Constructive Criminalization Produces Symbolic Identifiers**

[B.1-44]    Once an individual becomes the subject of institutional rumor and perceived risk, social meaning begins to attach to **non-verbal cues**, **gestures**, and **symbolic shorthand**. These cues enable actors to communicate about the "risk figure" indirectly, without naming the person, thereby avoiding formal accountability.

[B.1-45]    This process is documented in multiple institutional-behavior frameworks: symbols emerge where there are:

- Unresolved organizational conflict;
- Reputational anxiety;
- Taboo or sensitive subject matter;
- Need for "safe" signaling that avoids explicit accusation.

[B.1-46]    As Plaintiff became the subject of institutional rumor and perceived organizational risk, social meaning began to attach to culturally recognizable, yet newly constructed, non-verbal cues. Rather than relying on explicit accusation, community and institutional actors adopted symbolic shorthand that indirectly referenced the institutional identity associated with Plaintiff following the 1996 administrative notation.

[B.1-47]  The emergence, cultural encoding, and functional role of these symbols are documented in **Table 1 - Locally Generated Curaçao Symbolic Identifiers** (See **Table 1**, **Appendix B, following § XI.),** while their corresponding **defamation-per-se classifications** are organized in **Table 2A - Constructive Identity Function Grid (Symbolic Identifiers Across Jurisdictions) (S1–S12) (**See **Table 2A, Appendix B, following § XVI.), and Table 2B - Legal Classification Grid (S1–S12)** (See **Table 2B**, Appendix B, **following § XVI.).**

[B.1-48]  **Appendix B, Table 1 (following § XI)** and **Tables 2A–2E (following § XVI),** together document the institutional origin and subsequent identity-function evolution of the symbolic identifiers referenced in this Complaint.

[B.1-49]  These tables demonstrate that the identifiers were not pre-existing cultural gestures but were novel constructions arising from community reinterpretations of the 1996 event.

Their appearance is therefore intelligible only within the forensic sequence established here:

- Institutional Perceived Risk → Constructive Criminalization → Symbolic Identity Construction → Gesture Diffusion → Cross-Jurisdiction Continuity.

D.       **Cross-Jurisdictional Echoing and RICO and Symbolic Diffusion Relevant Continuity**

[B.1-50]  The absence of symbolic identifiers during Plaintiff's 1996–1997 Academy period confirms that the gesture system was not inherent to Curaçao policing or community

culture. As documented in **Table 1- Locally Generated Curaçao Symbolic Identifiers** (See **Table 1**, Appendix B, following § XI.) and **Table 2A-2B – Legal Classification Grid** (See **Table 2A-B**, Appendix B**, following § XVI.),** symbolic identifiers referencing Plaintiff emerged only after his departure to the Netherlands and developed further upon his return to Curaçao in 2000. This chronology supports the forensic conclusion that symbolic identifiers were constructed later in response to the institutional identity formed around the 1996 administrative notation.

[B.1-51]    The forensic timeline documents the diffusion of symbolic identifiers across Curaçao, the Netherlands, and later the United States, including extended periods in which Plaintiff was not physically present in the relevant jurisdictions. Tables 1 and 2 set forth the institutional origins, symbolic meanings, and cultural encoding of these identifiers within each context.

[B.1-52]    This chronology includes:

> • **1996–1997 (Curaçao):** Institutional perceived risk produced the initial constructive identity.
>
> • **1997–1998 (Netherlands):** Early symbolic references plausibly begin to appear within Dutch institutional and media environments. At this stage, Plaintiff does not offer evidentiary proof but relies on the institutional continuity and identity framework documented herein. Affidavits, witness-expert testimony, and AI-assisted metadata analyses are not offered in

support of declaratory relief at this stage, but will be produced at the appropriate procedural stage, including discovery and any subsequent proceedings, consistent with Fed. R. Civ. P. 26, and evaluated under applicable evidentiary standards, including FRE 702, 901, and 1006.

• **2000–present (Curaçao):** Locally generated symbolic identifiers developed following Plaintiff's return, as catalogued in Table 1.

• **1998–present (USA):** Comparable symbolic identifiers appear in U.S. media and institutional environments.

• **2016–present (USA):** Plaintiff observed the continued presence of these identifiers upon his arrival in the USA, consistent with their prior diffusion rather than any contemporaneous conduct**.**

[B.1-53]   These findings establish the **factual and organizational sequence** on which Appendix B is based. No legal conclusions regarding coordination, intent, or enterprise conduct are asserted in this Appendix.

**E.          Forensic Purpose in the Declaratory Judgment Posture**

[B.1-54]   For the Court, the institutional-perceived-risk theory serves a precise legal purpose:

1. **It explains why non-verbal identifiers are "of and concerning" Plaintiff.** Without this background, gestures could appear generic; with it, their defamatory linkage is legally and culturally coherent.

2. **It neutralizes First Amendment and "generic gesture" defenses.**

   The gestures are not random—they are identity-coded through a known institutional event.

3. **It provides motive and opportunity evidence for constructive identity substitution.**

   The 1996 administrative rupture becomes the explanatory engine for subsequent symbolic defamation.

4. **It forms the foundational narrative for later RICO pattern evidence.**

   Continuity is not accidental; it is culturally inherited and institutionally transmitted.

[B.1-55]   Thus, the symbolic defamation system only becomes intelligible, and judicially recognizable, when placed against the institutional risk conditions generated by the 1996 administrative event. It is this background that explains why gestures, signals, and coded references consistently attach to Plaintiff across decades and jurisdictions.

## VII.        THE FORENSIC TRIGGER

### A.        Institutional Environment and Perceived Sensitivity (1996–1997)

[B.1-56]   In 1996, the Curaçao Police Department operated under structural strain, as documented in contemporaneous reports by **Amnesty International** and the **United Nations Committee Against Torture**, which identified systemic deficiencies, coercive practices, and compromised internal processes. Within this environment, the **Dutch-Track Cadet program,** a small, managerial-path cohort, carried heightened

institutional visibility because cadets were being prepared for supervisory roles within the Department and were evaluated by senior leadership.

[B.1-57]  The Boarding Division's administrative notation concerning Plaintiff, although unsupported by disciplinary findings and producing no adverse action, nonetheless became a high-salience administrative event inside a tightly interconnected institution.

[B.1-58]  The notation triggered:

- Heightened supervisory attention,

- Accelerated rumor diffusion,

- Reputational defensiveness within leadership,

- Concern about external perception during a documented legitimacy crisis, and

- Institutional uncertainty arising from ambiguity in internal reporting.

[B.1-59]  These reactions reflected **institutional vulnerability**, not any misconduct or deficiency by Plaintiff. Plaintiff's subsequent **unanimous parliamentary dispatch** to the Netherlands confirms that no adverse determination was made regarding his fitness or integrity.

[B.1-60]  Organizational-behavior literature recognizes this dynamic as **perceived institutional risk**: when an institution under external scrutiny interprets internally ambiguous

events as reputational liabilities. In such settings, a member of a **small, elite, high-visibility supervisory cohort** may become a focal point for institutional anxiety, not because of anything the member did, but because **the institution projects its own instability onto a visibly successful individual whose trajectory intersects with senior evaluators and external oversight**.

[B.1-61]    Thus, the 1996 notation, never sustained, never resulting in discipline, and followed by full approval for advanced training, became a misinterpreted institutional symbol, later serving as the foundation for rumor-based reinterpretation, constructive criminalization, and the symbolic identity that emerged in the years that followed.

**B.         The 1996 Curacao Police Academy Internal Boarding Division Complaint**

[B.1-62]    In 1996, the **Boarding Division** of the Curaçao Police Academy lodged an internal complaint against Plaintiff. This complaint:

- Contained **no criminal allegations**;

- Was **procedurally baseless**, lacking a clear charging framework or evidentiary standard;

- Relied on **vague criticisms** of Plaintiff's "demeanor," "attitude," and alleged "command suitability;" and

- Included **no concrete evidence of misconduct** and **no verified incident** that would justify termination from a lieutenant-track training program.

[B.1-63]    Instead of particularized facts, the document functioned as a **generalized character critique**, questioning traits such as "fit," "attitude," and "obedience," while never alleging:

- Abuse of Force;

- Dishonesty;

- Criminal Acts; or

- Any breach of duty recognizable under standard disciplinary frameworks.

[B.1-64]    From an organizational behavior perspective, the 1996 internal complaint acquired a symbolic significance unrelated to its factual content. Institutions commonly reinterpret ambiguous administrative events involving high-visibility trainees as potential reputational vulnerabilities. The perceived institutional risk emerges not from misconduct by the trainee, but from the organization's sensitivity to how such events might be publicly understood or internally politicized. This dynamic explains how a non-disciplinary administrative entry later became the cultural anchor from which symbolic identifiers and gesture-based references derived their meaning.

Importantly, the perceived risk arose *solely* from institutional fragility, not from any conduct by Plaintiff.

[B.1-65]    Curacao Police cadet records and internal evaluations are not public information. Under Curaçao police employment regulations and standard public-service privacy rules, information obtained within the Police Academy or Police Department is treated as confidential and may not be disclosed externally. Cadet performance, internal assessments, or administrative notes are therefore insulated from public release or community scrutiny.

[B.1-66]    This legal backdrop is essential to understanding the phenomenon of "institutional perceived risk." Because such information cannot lawfully circulate outside the agency, any internal dispute, even one that is minor, ambiguous, or purely administrative, can take on heightened symbolic significance within the institution. When confidential matters become informally discussed, misinterpreted, or culturally reinterpreted, they can evolve into reputational cues that far exceed their original administrative content.

Thus, the institution's sensitivity was heightened despite Plaintiff's impeccable performance record and absence of any misconduct.

[B.1-67]    Thus, the 1996 internal note did not (and legally could not) constitute a public accusation. Its impact arose not from formal disclosure but from intra-institutional perception, informal rumor propagation, and later extra-institutional symbolic reinterpretation once Plaintiff became a high-salience figure within the academy and later abroad. The confidentiality regime therefore explains why the note's symbolic

meaning grew outside its legal meaning: not because it was ever public, but because institutions often generate internal narratives around high-performing cadets that influence later informal interpretation.

[B.1-68]  That complaint, and its later **leak and or strategic circulation**, becomes the **anchor narrative** around which subsequent **symbolic innuendo** is constructed. Media actors and institutional participants later weaponize gestures, colors, and coded references that all trace back to Plaintiff's **constructive identity as "the (shady) cadet who was blocked"** rather than to any proven misconduct. These symbolic meanings attached to Plaintiff *despite his complete lack of misconduct*, because the institution's informal rumor network needed a focal point for its internal anxieties.

[B.1-69]  In a confidential institutional environment, even an unspecific internal notation can become a locus of heightened attention when arising within a politically charged or reputationally sensitive moment. Although the 1996 notation contained no criminal allegations and imposed no disciplinary consequence, its existence within a climate of instability and scrutiny allowed informal narratives to take shape around Plaintiff's identity.

[B.1-70]  The complaint did not need to be publicly released to acquire symbolic weight. Within organizations experiencing reputational stress, such as the Curaçao Police Department during the 1996 corruption investigations, even private or ambiguous administrative matters can become internally salient and externally susceptible to gossip, reinterpretation, and cultural rumor expansion. This dynamic explains why audiences later treated Plaintiff as symbolically connected to broader institutional misconduct despite the absence of factual basis.

[B.1-71]    Over time, these informal narratives and cultural reinterpretations created fertile ground for symbolic substitution. As Plaintiff advanced through jurisdictions, Curaçao, the Netherlands, and later the United States, gesture-based identifiers and cultural cues became the shorthand through which audiences referenced the original 1996 event, not because of any verified public disclosure but because institutions and communities often attach symbolic meaning to high-salience individuals whose trajectories intersect public controversies.

[B.1-72]    This evolution reflects institutional behavior dynamics, not any factual wrongdoing by Plaintiff.

## VIII.    CONSTRUCTIVE CRIMINALIZATION & SYMBOLIC ECHOING

### A.    Constructive Criminalization

[B.1-73]    Within a small, high-visibility police cohort, even an ambiguous administrative entry can acquire outsized meaning when interpreted within a reputationally sensitive institutional environment. Although the 1996 internal complaint raised *no allegations of misconduct*, organizational behavior research shows that unresolved or unexplained administrative events often become culturally reinterpreted as signifiers of impropriety when institutions experience internal strain.

[B.1-74]  This phenomenon is known as *constructive criminalization*: the transformation of a non-criminal, procedurally deficient administrative note into a socially coded marker of "unfitness," "danger," or "character deficiency." Constructive criminalization is not based on evidence, adjudication, or facts. It arises from *social meaning*, rumor ecology, and institutional anxiety, not from the conduct of the individual involved.

[B.1-75]  Importantly, constructive criminalization is not an allegation of wrongdoing by the institution or any named official. Rather, it is a forensic description of a known organizational mechanism: under conditions of reputational pressure, ambiguity tends to attract stigmatizing interpretations, especially when the subject is a highly visible, high-performing trainee whose trajectory intersects with political or administrative sensitivities.

[B.1-76]  Thus, once the complaint circulated internally, Plaintiff, a cadet with top-tier evaluations and earmarked for the future officer-level Dutch track, became informally associated with insinuations of "something must have been wrong," despite the complete absence of any factual, disciplinary, or criminal allegation. This gap between *fact (zero misconduct)* and *interpretation (perceived impropriety)* became the cultural substrate from which later symbolic identifiers (gestures, color codes, body-language cues, and satirical references) derived their meaning.

[B.1-77]  As these symbolic cues migrated beyond the academy into political, cultural, and eventually (news) media environments, they became recurring shorthand expressions

of that early misconstrued identity. Their repetition, what this Appendix B terms *symbolic echoing,* enabled these cues to become recognizable, socially intelligible signals referring back to Plaintiff's constructive identity, thereby satisfying the "of and concerning" requirement under Restatement (Second) of Torts § 564.

[B.1-78]    In this way, the 1996 internal complaint became the *anchor narrative* for constructive identity substitution: a mechanism by which Plaintiff was symbolically "named" not through words but through a stable set of culturally intelligible gestures that substituted for his name across jurisdictions and over decades. This symbolic substitution forms the doctrinal basis for linking 20+ years of gesture-based defamation across Curaçao, the Netherlands, and the United States.

**These symbolic meanings, attached to Plaintiff despite his complete lack of misconduct, because the institution's informal rumor network needed a focal point for its internal anxieties.**

**B.        Constructive Criminalization Mechanism**

[B.1-79]    The combination of (1) the Boarding Division's administrative complaint and (2) Plaintiff's highly visible lieutenant-track trajectory produced an early *anchor event* that later observers, locally and internationally, could reinterpret, exaggerate, or repurpose symbolically. While the gesture ecosystem did not originate in Curaçao, the

1996 event provided the factual nucleus from which subsequent symbolic defamation patterns radiated.

[B.1-80]  Because cadet records and internal assessments are legally confidential, unresolved internal notes often transform into *symbolic narrative,* stories stripped of factual detail but rich in cultural interpretation. These internal symbolic narratives later form the seeds for constructive identity substitution across jurisdictions.

[B.1-81]  Given that the 1996 administrative note involved:

- Senior Academy personnel,

- Supervisory authority figures,

- The Academy's housing/boarding division, and

- Potential reputational impact on the Academy itself,

The event acquired symbolic salience inside the institution. This led to:

- Exaggerated retellings,

- Internal rumor diffusion,

- Rapid gossip within the local community,

- Interpretive layering by peers, and

- Cultural imprinting of the event is far beyond its actual administrative significance.

[B.1-82]  This constructive criminalization began *before* any symbolic gestures emerged. Its earliest stage was verbal, social, rumor-based, and interpretive, not symbolic. In Curaçao, the Netherlands, and later the United States, symbolic identifiers eventually provided the *visual vocabulary* for referencing this earlier rumor ecosystem.

[B.1-83]  As symbolic cues emerged, they coalesced into a recognizable narrative frame, a frame that circulated socially as a caricatured "Caribbean cadet failure story" or "problem cadet," despite Plaintiff's complete absence of misconduct and his documented top-tier performance. Even without naming Plaintiff explicitly, this symbolic frame functioned as a defamatory proxy for his identity.

*In this sense, Plaintiff became a symbolic 'risk figure' not due to misconduct, danger, or deficiency, but because his integrity and trajectory contrasted sharply with the institution's vulnerabilities. The perceived risk belonged to the institution, not to Plaintiff; the Plaintiff merely became the surface onto which those anxieties were projected.*

[B.1-84]  Emergence Timeline (Forensic Reconstruction)

- **1996–1997:** Internal risk + rumor diffusion
- **1997–1998:** Dutch & U.S. symbolic emergence (Plaintiff not physically present)
- **2000:** Curaçao symbolic inventions upon Plaintiff's return

- **2000–present:** Multi-jurisdiction symbolic echoing (news, entertainment, political contexts)

- **2016–present:** Plaintiff encounters U.S. symbolic cues that predated his arrival

- **2020–present:** Intensification within U.S. political, media, and entertainment spheres

[B.1-85] This timeline establishes **relatedness and continuity,** the two prongs required for RICO pattern analysis under 18 U.S.C. § 1961(5).

## IX.   INSTITUTIONAL PERCEIVED RISK, CONSTRUCTIVE CRIMINALIZATION, AND THE GENESIS OF SYMBOLIC ECHOING (HYBRID NARRATIVE + JUDICIAL-FORENSIC ANALYSIS)

*Institutional Perceived Risk → Constructive Criminalization → Symbolic Echoing*

### A.   Overview

[B.1-86] This section establishes the forensic basis for why a procedurally unsubstantiated 1996 administrative notation within the Curaçao Police Department (CPD), a notation devoid of criminal allegations or corroborative evidence, nonetheless became the **origin point** (reputational trigger) for the 20+ year pattern of **constructive identity**

**substitution**, as documented throughout the Complaint (Counts I–III), **Appendix A.7–A.8**, and **Exhibit A (Gesture Ledger)**.

[B.1-87]   The Court may consider this section in conjunction with:

• **Appendix A** (Doctrinal Appendices, especially A.2–A.4 and A.7–A.8)

• **Appendix C** (Constructive Identity by Gesture Narrative)

• **Appendix G** (AI Metadata + Rule 26 Forward-Looking Evidentiary Framework)

• **Counts I–III** (Defamation by Innuendo, Constructive Identification, Defamation per se)

**B.**          **Institutional Perceived Risk in the 1996 Curacao Police Department (CPD) Environment**

### CONTEXTUAL BASELINE — 1996 CPD UNDER REPUTATIONAL STRAIN

[B.1-88]   Multiple publicly available sources, including **Amnesty International (1996)** and contemporaneous local reporting about abuse, corruption, and detainee mistreatment, confirm that CPD leadership in 1996 operated under substantial institutional pressure. These conditions created a **heightened reputational sensitivity** where even minor administrative incidents could be perceived as threats to institutional image.

### PLAINTIFF AS A HIGH-SALIENCE TRAINEE

[B.1-89]   Plaintiff alleges that he ranked as the top cadet in his cohort, received superior evaluations, and was subsequently approved by unanimous parliamentary vote for

dispatch to the Netherlands Police Academy, **as reflected in a National Decree maintained in Plaintiff's records**. Plaintiff does not proffer that document at the declaratory stage and preserves it for later proceedings if warranted.

[B.1-90]    Within organizational behavior literature, such high-visibility trainees constitute **"symbolic actors"** whose performance reflects upward on leadership. Institutions under reputational strain often develop **perceived risk responses** to actors who are both high-performing and involved in administrative disputes.

### THE ADMINISTRATIVE DISPUTE AND INTERNAL RUMOR DIFFUSION

[B.1-91]    The internal 1996 notation submitted by the Curacao Police Academy Boarding Division, while substantively baseless, became an **internal rumor catalyst**, triggering:

- Gossip among CPD personnel,

- Misinterpretation among trainees,

- Informal speculation about Plaintiff's status.

[B.1-92]    This process corresponds with the **"organizational rumor diffusion"** phenomenon documented in institutional sociology, where ambiguous information is filled in by narrative, not fact.

C.    **Constructive Criminalization: How Context, Not Conduct, Created a False Identity**

**THE COMPLAINT BECAME A REPUTATIONAL VESSEL**

[B.1-93]  Because the CPD's climate was already corrupt and under investigation, **any complaint**, regardless of content, could be *contextually reinterpreted* as indicative of misconduct.

[B.1-94]  Thus, the 1996 notation became a **symbolic proxy for wrongdoing**, even though:

- It alleged no criminal act,
- No disciplinary sanctions issued,
- No investigation resulted in findings,
- Plaintiff continued to receive superior evaluations.

[B.1-95]  This is the foundation of **Constructive Criminalization**:

Where an individual becomes treated as if criminalized through institutional rumor, contextual reinterpretation, and symbolic association, absent any actual criminal allegation or adjudication.

(Cross-Reference: Appendix A.3, A.4)

**ORGANIZATIONAL BEHAVIOR TIE-IN**

[B.1-96]  Institutional-behavior research shows that when public institutions operate under heightened scrutiny or reputational pressure, organizational anxiety is often displaced onto internal actors who lack structural power, particularly when an unresolved administrative event has already created ambiguity around that individual's role.

[B.1-97]  In the 1996–2000 Curacao Police Department and Curacao Police Academy environment, characterized by public attention to policing standards, internal

administrative disputes, and widely reported concerns noted by external observers such as Amnesty International and the U.N. Committee Against Torture, Plaintiff's 1996 administrative notation became a focal point of institutional sensitivity.

[B.1-98] This environment did not attribute fault to Plaintiff but created the conditions in which a constructive identity could form around him, later expressed through the symbolic identifiers documented in **Table 1 - Locally Generated Curaçao Symbolic Identifiers (See** Table 1**, Appendix B, following § XI.),** while their corresponding **defamation-per-se classifications** are organized in **Table 2A- Constructive Identity Function Grid (Symbolic Identifiers Across Jurisdictions) (S1–S12) (**See **Table 2A, Appendix B, following § XVI.), and Table 2B - Legal Classification Grid (S1– S12) (**See **Table 2B**, Appendix B, **following § XVI.).**

[B.1-99] Importantly, the perceived reputational vulnerability arose solely from the institution's own fragility, its reputational instability, public scrutiny, and sensitivity to internal conflict, not from any conduct by Plaintiff.

[B.1-100] As Plaintiff's administrative notation became embedded in the broader institutional environment, the unresolved nature of the 1996 event positioned him, structurally, not intentionally, as a figure around whom organizational tension could accumulate. In such contexts, organizational-behavior research shows that individuals who occupy visible roles with limited institutional power can become symbolic focal points for diffuse institutional anxieties.

[B.1-101] Plaintiff's strong performance, his visibility within a small Dutch-Track cohort, and the involvement of multiple senior officials in his evaluation process heightened the degree to which his presence carried symbolic meaning within the institution.

[B.1-102] This dynamic is captured in the Institutional Perceived Risk framework developed in this Appendix B. Within that framework, Plaintiff's presence came to embody several forms of institutional sensitivity:

1. **A point of reputational uncertainty associated with an unresolved administrative event;**

2. **An unintended symbol of internal conflict during a period of heightened public scrutiny;**

3. **A socially constructed identity that later became expressible through the symbolic identifiers documented in** Table 1 **(**See **Table 1**, Appendix B, following § XI.) **and classified in** Table 2 **(**See Table 2A-2B**,** Appendix B, following § XVI.).

[B.1-103] Through this sequence, Plaintiff's institutional identity gradually shifted from a high-performing Dutch-Track cadet to a culturally encoded reference point, later reinforced through symbolic echoing across jurisdictions.

D.          **Timeline of Symbolic Echoing: From Curaçao → Netherlands → United States**

**1996–1997: INSTITUTIONAL RUMOR → REPUTATIONAL RISK**

[B.1-104]  During the 1996–1997 period, no symbolic gestures or coded non-verbal identifiers referencing Plaintiff had yet emerged. Instead, the unresolved Curaçao Police Academy Boarding Division administrative event gave rise to rumor diffusion and informal institutional signaling that produced a latent narrative concerning Plaintiff within specific factions of the Curaçao Police Department. As reflected in Appendix B, Tables 1 and 2, this period is characterized by institutional fragility, reputational anxiety, and administrative ambiguity, through which Plaintiff became informally treated as a reputational outlier or *persona non grata* despite the absence of any disciplinary or criminal finding.

[B.1-105]  **Institutional Significance:**

This institutional seeding phase preceded, and later enabled, the emergence of symbolic identifiers. Those identifiers did not create Plaintiff's identity; rather, they functioned as expressive substitutes for an identity already informally constructed through non-adjudicative institutional processes. During this period:

- No symbolic gestures or non-verbal identifiers were in use;
- Informal rumor diffusion contributed to the formation of a latent identity narrative concerning Plaintiff; and
- Plaintiff was subject to informal exclusionary treatment within certain Curaçao Police Department and Curaçao Police Academy Boarding Division circles, independent of any disciplinary or criminal finding.

[B.1-106]  **Legal Significance:**

This period constitutes the institutional origin of the identity construct that later enabled the emergence of **constructive identity substitution**, as alleged in Counts I–III. The unresolved administrative handling and associated rumor diffusion described herein supplied the non-adjudicative identity framework upon which later symbolic substitution practices were able to operate.

**1997–1998: EMERGENCE OF SYMBOLIC IDENTIFIERS IN THE NETHERLANDS + SIMULTANEOUSLY IN U.S. MEDIA**

*(CROSS-JURISDICTIONAL PHASE)*

[B.1-107]  The contemporaneous emergence **of symbolic identifiers classified in Table 2 (S-series)** within both Dutch and United States media systems during 1997–1998 eliminates any reasonable inference of coincidence, localized cultural expression, or Plaintiff-specific interaction. The parallel appearance of the same **identity-function categories** across unconnected jurisdictions demonstrates that the symbolic system operated independently of Plaintiff's physical presence and functioned as a **constructive identity mechanism**, not as a response to Plaintiff's conduct.

> • **Simultaneous emergence across unconnected jurisdictions**
>
> • **Identity signaling independent of Plaintiff's presence**

(See Table 2, S-Series, Appendix B, following § XVI.)

[B.1-108]  During this period, media outputs in the Netherlands and the United States began exhibiting specific symbolic identifiers falling within the S-labeled categories already disclosed in Table 2, appearing in institutional, political, and broadcast contexts notwithstanding Plaintiff's absence from those jurisdictions. These identifiers are referenced here solely by classification, not by performance detail, and are offered for pattern recognition, not evidentiary proof.

[B.1-109]  **Judicial Framing:**

Plaintiff will substantiate the timing, diffusion, and classification of the Table 2 (S-series) identifiers at the appropriate procedural stage through:

- AI-assisted broadcast analysis,
- Expert testimony pursuant to Fed. R. Evid. 702, and
- Authenticated summaries under Fed. R. Evid. 1006.

[B.1-110]  **Declaratory Judgment Limitation:**

These allegations are presented solely to establish **legal plausibility and classification** for declaratory relief purposes. Plaintiff does not proffer evidentiary proof at this stage and expressly reserves all substantiation for discovery and subsequent proceedings consistent with the Federal Rules of Civil Procedure.

**2000: CURAÇAO-SPECIFIC SYMBOLIC INVENTIONS AFTER PLAINTIFF'S RETURN**

[B.1-111]  Upon Plaintiff's return to Curaçao in 2000, community and institutional actors began employing culturally novel gestures that served as **Curaçao-specific symbolic identifiers** referencing Plaintiff. Their origin points, cultural meaning, and reconstructive-defamation function are catalogued in **Table 1 - Locally Generated Curaçao Symbolic Identifiers (See** Table 1**, Appendix B, following § XI.),** while their corresponding **defamation-per-se classifications** are organized in **Table 2A- Constructive Identity Function Grid (Symbolic Identifiers Across Jurisdictions) (S1–S12) (See Table 2A, Appendix B, following § XVI.), and Table 2B - Legal Classification Grid (S1–S12)** (See **Table 2B**, **Appendix B, following § XVI.).**

[B.1-112]  These forensic tables show how locally invented gestures, none of which existed before Plaintiff's return, became shorthand expressions for the institutional identity attributed to Plaintiff following the 1996 administrative event. By documenting these patterns, Tables 1 and 2 supply the evidentiary structure for understanding how Curaçao-specific symbolic inventions formed a coherent part of the broader multi-jurisdictional gesture system.

[B.1-113] Several of these gestures were entirely novel creations within the Curaçao institutional and academic environment, while others, though based on neutral physical movements or colors, acquired newly constructed defamatory meanings only

when applied to Plaintiff's identity within the rumor ecosystem. None of these entirely novel gestures existed in Curaçao *prior* to Plaintiff's return.

They emerged as *locally generated symbolic reinterpretations* of the 1996 administrative event, fed by:

- The earlier rumor matrix (The 1996 administrative dispute)

- The academy's perceived reputational risk,

- Unresolved tensions from the Dutch-track dispatch, and

- The cultural need to "interpret" Plaintiff's departure and return.

[B.1-114]  These gestures quickly diffused through academic, social, and cultural settings, forming the nucleus of the constructive-identity system later observed in Netherlands and U.S. media contexts.

[B.1-115]  These facts establish that the gestures and innuendos that arose in Curaçao in 2000 were not adaptations of preexisting cultural conventions but were constructed specifically in reference to Plaintiff. Their emergence as identity-specific signals confirms a process of constructive criminalization in which defamatory meaning was culturally attached to Plaintiff without factual basis. This supports the conclusion that the community engaged in a form of identity coding that substituted symbolic gestures for direct reference to Plaintiff.

**2000–PRESENT: MULTINATIONAL DIFFUSION**

[B.1-116]  Over the next two decades, these gestures diffused into:

- News media,

- Entertainment media,

- Political arenas,

- Evangelical Christian networks,

- Social signaling contexts.

[B.1-117]  The repetition, frequency, and jurisdictional breadth establish **continuity** under RICO (Appendix A.8), demonstrating conduct spanning:

- **3 countries**,

- **20+ years**,

- **Multiple enterprises**,

- **Same symbolic identifiers**,

- **Same constructive identity meaning.**

[B.1-118]  These observations collectively demonstrate that the symbolic identity schema associated with Plaintiff was already established within U.S. media and cultural environments long before Plaintiff's USA arrival in 2016. The record further supports the conclusion that Plaintiff played no role in initiating, shaping, or disseminating these symbolic identifiers; rather, he encountered a pre-existing symbolic framework

that had already substituted his identity through gesture-based and innuendo-based cues.

## 2016–PRESENT: PLAINTIFF IDENTIFIED IMMEDIATELY UPON ENTERING THE U.S.

[B.1-119]  When Plaintiff physically moved to the United States, he encountered:

- The same symbolic identifiers,

- Performed by people with no knowledge of him personally,

- Proving **pre-existing symbolic echoing** in U.S. networks.

[B.1-120]  This matches the Netherlands / U.S. 1997–1998 emergence window.

[B.1-121]  Cross-reference: Complaint Sec. III (E), Constructive Identity Substitution; Appendix H Declaratory–RICO Bridging.

[B.1-122]  These observations collectively demonstrate that the symbolic identity schema associated with Plaintiff was already established within U.S. media and cultural environments long before Plaintiff's arrival in 2016. The record further will support the conclusion that Plaintiff played no role in initiating, shaping, or disseminating these symbolic identifiers; rather, he encountered a pre-existing symbolic framework that had already substituted his identity through gesture-based and innuendo-based cues.

**FORENSIC CONCLUSION**

[B.1-123]  This timeline establishes:

- The **origin** of the symbolic system (Curacao Police Department / Curacao Police Academy and Board Division perceived risk and rumor diffusion),

- The **criminalizing reinterpretation** (Constructive Criminalization),

- The **symbolic migration** (NL/USA emergence),

- The **custom local inventions** (Curaçao),

- The **multijurisdictional continuity** (USA, NL, Curaçao, global media),

- The **constructive identity** carried through gestures (per Exhibit A),

- The **ongoing injury** (Counts I–V).

X.        **FROM INSTITUTIONAL PERCEIVED RISK TO SYMBOLIC IDENTITY CONSTRUCTION: A FORENSIC CAUSAL SEQUENCE.**

[B.1-124]  This is the foundational causal chain:

**STEP 1 — ADMINISTRATIVE DISPUTE (1996)**

[B.1-125]  The 1996 internal administrative notation did not allege criminal conduct, yet it occurred in a highly sensitive institutional environment marked by political scrutiny, reputational pressure, and public controversy. In such conditions, even ambiguous internal events can generate disproportionate institutional attention.

### STEP 2 — RUMOR DIFFUSION IN A SMALL, HIGH-VISIBILITY ENVIRONMENT

[B.1-126]  Within a compact police training ecosystem, where cohort performance and advancement decisions receive heightened internal and community interest, informal narratives can form rapidly. Plaintiff's strong performance and visibility positioned him as a "symbolic trainee," making his trajectory a matter of institutional and public curiosity.

### STEP 3 — CONSTRUCTIVE CRIMINALIZATION (NO ACTUAL ALLEGATION OF CRIME)

[B.1-127]  Constructive criminalization occurs when an individual becomes associated with negative institutional meaning despite the absence of any factual basis or formal adjudication. In this case, the 1996 notation, although procedurally benign, acquired symbolic weight due to its timing, institutional context, and the surrounding climate of public concern about police integrity.

### STEP 4 — EXTERNAL SYMBOLIC IDENTIFIERS EMERGE (1997–1998)

[B.1-128]  As Plaintiff transitioned to the Netherlands for continued training, symbolic cues and cultural references began to appear in local Dutch media and political contexts.

Preliminary analytic review suggests that symbolic identifiers traceable to Plaintiff's 1996 institutional experience began appearing in Dutch local media and political discourse during 1997–1998. Plaintiff intends to substantiate this chronology through AI-assisted forensic media analysis and expert testimony at the appropriate procedural stage, consistent with Rule 26 and Rule 702.

### STEP 5 — ECHOING ACROSS JURISDICTIONS (2000–PRESENT)

[B.1-129]  Over the following decades, symbolic identifiers, including gestures, codes, colors, and narrative cues, appear repeatedly across contexts:

- **Curaçao (post-2000),**
- **The Netherlands,**
- **The United States (media, entertainment, politics),**
- **Transnational social-signaling environments.**

These repetitive patterns are not treated as isolated incidents, but as consistent symbolic references tied back to the original 1996 institutional event.

### STEP 6 — 20+ YEAR CONTINUITY (LEGALLY SIGNIFICANT)

[B.1-130]  This multijurisdictional persistence is directly relevant to:

- **RICO predicate continuity (pattern spanning more than a decade),**

- **Enterprise pattern establishment,**

- **Constructive identity substitution,**

- **Defamation per se (presumed injury),**

- **Article III injury-in-fact,**

- **Declaratory Judgment suitability,**

- **Injunction support,**

- **International defamation doctrines recognizing symbolic identification as actionable.**

[B.1-131]  This continuity supports declaratory relief by demonstrating that the symbolic environment is ongoing, pervasive, and continues to shape the Plaintiff's constructive public identity.

[B.1-132]  This causal chain is **not an allegation of wrongdoing by the institution itself**, but a forensic explanation for how an otherwise non-criminal, vague complaint became the *anchor narrative* that supported:

- Identity Substitution,

- Gesture-Based Signifiers,

- Symbolic Innuendo, and

- Enterprise-Level Rebroadcast Continuity.

[B.1-133]  This sequence explains how the 1996 event became the first temporal node for constructive identity under Restatement (Second) of Torts § 564, and why, later symbolic broadcasts (domestic and international) were reasonably understood by audiences as referencing Plaintiff.

[B.1-134]  Following the institutional leak and the rumor diffusion that accompanied it, culturally encoded gestures began to function as **Constructive Identifiers,** non-verbal signals that substituted for Plaintiff's name within institutional, community, and later media environments. The specific gestures, their dates and locations of first emergence, and their symbolic meanings are catalogued in **Table 1 - Locally Generated Curaçao Symbolic Identifiers** (See **Table 1**, **Appendix B**, **following § XI.),** while their corresponding **defamation-per-se classifications** are organized in **Table 2A- Constructive Identity Function Grid (Symbolic Identifiers Across Jurisdictions) (S1–S12) (**See **Table 2A, Appendix B, following § XVI.**), **and Table 2B - Legal Classification Grid (S1–S12) (**See **Table 2B**, **Appendix B, following § XVI**.).

[B.1-135]  Together, these forensic tables document how symbolic cues, originating from the institutional identity coding that began in 1996, evolved into a stable, cross-jurisdictional system of identification. These grids therefore provide the evidentiary foundation for understanding how Constructive Identity Substitution developed from

institutional perceived risk and how each gesture acquired its 'of and concerning' character through repeated cultural use.

These identifiers spread across Curaçao institutions, political debates, and (news) media. Their repetition created a stigmatizing proxy identity understood by audiences as "of and concerning" Plaintiff under **Restatement (Second) of Torts § 564**.

[B.1-136] **Tables 1 and Tables 2A-2E** are incorporated as forensic summaries pursuant to Fed. R. Evid. 1006, drawing directly from the authenticated metadata, definitions, and continuity analysis preserved in the Forensic Gesture Ledger (Exhibit A). Together they demonstrate:

    1) Origin;

    2) Defamatory meaning;

    3) Symbolic identity function; and

    4) Cross-jurisdictional persistence over 20+ years.

[B.1-137] **Mapping Clarifier: Narrative vs. Table Function**

Appendix B provides the institutional and organizational context explaining *why* the relevant actors responded as they did, following the 1996 Curaçao Police Academy administrative event.

**Table 1** maps the *institutional seeding phase*, identifying the non-adjudicative conditions, reputational anxieties, and informal processes through which a latent identity narrative concerning Plaintiff emerged.

**Tables 2A–2E** trace the subsequent *identity-function evolution*, documenting how symbolic identifiers later operated as expressive substitutes for that pre-existing, institutionally constructed identity.

Accordingly, **Appendix B** explains the *causal environment*, while **Tables 1 and 2** document the *observable effects* as they unfolded over time.

### SEQUENTIAL NOTE

This Sub-Section provides contextual, historical background under Rule 10(c). It does not assert liability against the Curaçao Police Academy, its Boarding Division, or the Netherlands Police Academy. Institutional references appear solely to explain the cultural, narrative, and forensic mechanisms that enabled constructive identity and long-term symbolic rebroadcast patterns relevant to Exhibits A and D1–D6.

## XI. LOCALLY GENERATED SYMBOLIC ECOSYSTEMS IN CURAÇAO (2000): ORIGIN AND CULTURAL ENCODING OF DEFAMATORY GESTURE CONSTRUCTS

*Institutional Perceived Risk, Constructive Criminalization, and Cultural Gesture Formation*

### A. Introduction: The Significance of Locally Generated Gestures

[B.1-138]  Upon Plaintiff's return to Curaçao in September 2000, a distinctive class of symbolic gestures and innuendos emerged within the academic environment of the University of the Netherlands Antilles (UNA), particularly in the Build Environment and Civil Engineering ("B&C") faculty, and in broader community settings **(See Table 1, Appendix B, following § XI.).**

Several of these gestures were entirely novel creations within Curaçao's institutional and cultural environment. Others, though based on neutral physical movements or preexisting colors, acquired newly constructed defamatory meanings **only when applied to Plaintiff** within the rumor ecosystem that had formed around the 1996 administrative event.

[B.1-139]  These gestures did **not** exist in Curaçaoan cultural vocabulary prior to Plaintiff's return. They were not borrowed from Dutch, American, or regional symbolic traditions. Rather, they arose as local, community-driven attempts to:

1.  Interpret the rumor-laden 1996 Boarding Division administrative dispute,

2.  Make sense of Plaintiff's abrupt dismissal from the Dutch Police Academy (1998),

3.  Reconcile Plaintiff's exceptional performance and visibility in 1996–1997 with later institutional rejection, and

4.  Project meaning onto unresolved tensions within the Curaçao Police Academy (CPA).

[B.1-140]  Their defamatory meanings were **constructed**, not inherited. They were products of Curaçao's rumor ecosystem, shaped by institutional perceived risk, constructive criminalization, and the social reinterpretation of Plaintiff's trajectory. These symbolic constructions thus form a unique evidentiary category: **identity-specific defamation symbols** fabricated in response to Plaintiff's institutional history **(See Table 1, Appendix B, following § XI.).**

The gestures discussed in this section are catalogued in Table 1 (Curaçao-Origin Symbolic Identifiers), which functions as a Rule 1006 summary of the locally emerged identifiers documented in the Forensic Gesture Ledger (Exhibit A). Table 1 includes only the eight gestures that originated in Curaçao, whereas Exhibit A contains the full ledger of more than fifty symbolic identifiers.

[B.1-141]  Because these gestures were invented or reinterpreted in reaction to Plaintiff's circumstances, and because the community had no lawful access to Plaintiff's confidential administrative record, the gestures operated as symbolic substitutes for explicit accusation. Their meaning was intelligible only within the closed-loop system of rumor, institutional tension, and perceived risk that originated with the 1996 event **(See Table 1, Appendix B, following § XI.).**

*[B.1-142]*  Forensically, these gestures are legally probative because they satisfy Restatement (Second) of Torts § 564's "of and concerning" requirement: the gestures **did not exist**

**independent of Plaintiff**, and audiences reasonably understood them as referencing Plaintiff specifically, not a general or anonymous archetype.

*These gestures constitute locally generated symbolic identifiers that emerged uniquely in relation to Plaintiff's reintegration into Curaçaoan institutional and academic environments after 2000 (See Table 1, Appendix B, following § XI.).*

B.            **Institutional Perceived Risk as Catalyst for Symbolic Invention**

[B.1-143]  The 1996 internal complaint, though substantively empty, produced within the Curaçao Police Department a state of **institutional perceived risk,** a phenomenon well recognized in organizational behavior literature. This theory holds that institutions react not only to actual threats, but also to:

- Perceived threats to hierarchical stability,
- Perceived threats to reputational control, and
- Perceived threats posed by high-performing individuals who fall outside patronage networks.

[B.1-144]  In Plaintiff's case, the institutional context included:

- A known corruption scandal within the Curacao Police Academy and Ministry of Justice,
- Public and political scrutiny of police practices,
- Plaintiff's exceptional performance and visibility within the cohort,

- Tension between Curacao Police Academy leadership and the Boarding Division,

- Parliamentary interest following the academy's recommendation,

- Social fascination around cadet advancement.

[B.1-145] Because of these conditions, **Plaintiff became symbolically loaded,** a "high-salience trainee", whose trajectory represented institutional fragility. This perceived risk environment created the **fertile ground** from which locally generated symbolic identifiers emerged in 2000.

Importantly, the perceived reputational vulnerability arose solely from the institution's own fragility, its reputational instability, public scrutiny, and sensitivity to internal conflict, not from any conduct by Plaintiff.

C.          **Constructive-Criminalization Through Cultural Invention**

[B.1-146] These gestures were not pre-existing symbols with general cultural meaning; rather, they were deliberately **constructed by the community** in response to **institutionally produced perceptions** of Plaintiff. The 1996 **Curaçao Police Academy Boarding Division** internal complaint, coupled with the resulting **rumor diffusion**, created a **stigmatized identity** for Plaintiff that was socially codified and represented in the gestures. This process is a textbook example of **constructive criminalization**, in which an individual is socially branded as suspect or morally compromised, despite the absence of any factual wrongdoing.

In this sense, Plaintiff became a symbolic "risk figure" not due to misconduct, danger, or deficiency, but because his integrity and trajectory contrasted sharply with the institution's vulnerabilities. The perceived risk belonged to the institution, not to Plaintiff; the Plaintiff merely became the surface onto which those anxieties were projected.

[B.1-147]  These gestures were **not pre-existing symbols** with general cultural meaning. Instead, they were **locally generated** in direct response to **Plaintiff's internal administrative conflict** within the 1996 Curacao Police Academy and the 1996 Curaçao Police Department (CPD). These gestures emerged **specifically for Plaintiff**, reflecting the **community-driven social coding** of Plaintiff as a problematic figure, despite the lack of any factual basis for such labeling. The origin, meaning, and **defamatory significance** of each gesture are cataloged in **Exhibit A** and **Table 1 – Locally Generated Curaçao Symbolic Identifiers (Curaçao, 2000), (See Table 1, Appendix B, following § XI.),** which document their development, **novelty**, and **forensic significance** in this context.

D.        **Table 1 – Locally Generated Curaçao Symbolic Identifiers (Curaçao, 2000):**

[B.1-148]  This table provides a detailed list of the **specific gestures** generated within the Curaçao community, including:

- **Origin**: Where and how each gesture was created in relation to the Plaintiff's internal dispute and dismissal.

- **Defamatory Meaning**: The social and reputational impact of each gesture on Plaintiff, and how it became linked to Plaintiff's constructed identity.

- **Novelty**: The fact that these gestures did not exist before but were **invented for the Plaintiff**.

- **Forensic Significance**: The role of these gestures in the **cultural coding system** that perpetuated the defamation.

[B.1-149]  These gestures were **culturally invented symbols;** they did not exist prior to 2000 and were not part of Curaçao's cultural lexicon. Instead, they were created to represent **Plaintiff's internal administrative conflict** with the CPD and functioned as a **community-driven system** to explain, stigmatize, and mock Plaintiff's dismissal.

E.        **Cultural Diffusion and Identity Fixation (2000–2001)**

[B.1-150]  Once created, these gestures rapidly diffused through multiple social spheres:

- **UNA student circles**

- **Academic settings**

- **Local media outlets**

- **Political environments**

- **Neighborhood communities**

• **Social and government agencies**

• **Informal networks** among former CPD personnel.

[B.1-151]  What makes these gestures forensically significant is not simply their **rapid spread**, but their **consistency** across various platforms. Everyone using these gestures understood:

> • The gestures referred to **Plaintiff**,
>
> • The meaning of the gesture was a **symbolic reenactment** of the 1996 dispute,
>
> • The gesture carried **derogatory or humiliating force**, imbuing it with defamation per se.

This aligns with the **legal standard of audience identifiability** under § 564.

F.        **Forensic Significance: Local Symbolic Ecosystems as Proof of Identity Substitution**

[B.1-152]  These locally generated gestures are critical for three reasons:

1. **Plaintiff-Specific Origin**: The gestures were **created about Plaintiff**, not pre-existing cultural symbols that Plaintiff could have "walked into."

2. **Independent, of Plaintiff's Presence**: The community developed these symbols **before Plaintiff became aware of them**, illustrating the process of **constructive identity substitution**.

3. **Alignment with Gesture Ledger**: These gestures align perfectly with entries in **Plaintiff's forensic gesture ledger**, which documents their **origin, meaning**, and **symbolic function**. This subsection lays the sociological and historical foundation for making these gestures legally significant.

G.      **How This Supports Declaratory Judgment and RICO**

[B.1-153]  **Declaratory Judgment:**

These gestures demonstrate why judicial recognition is necessary: the **symbolic identification mechanism** is entrenched, long-standing, and still in use.

[B.1-154]  **RICO Pattern:**

These locally generated gestures contribute to a **multi-jurisdictional pattern** of symbolic defamation that continues across the **Netherlands**, the **United States**, and **international media**.

[B.1-155]  **Identity Substitution:**

These gestures show a **complete substitution** of Plaintiff's name with symbolic gestures, satisfying the doctrinal test for **identity substitution** in the **Declaratory Judgment** posture.

H.      **Conclusion**

[B.1-156]  The locally generated **symbolic ecosystem** that emerged upon Plaintiff's return to Curaçao in 2000 is a foundational pillar in the **25+ years of reputational distortion**. These gestures serve as concrete evidence of:

- **Institutional perceived risk**

- **Constructive criminalization**

- **Community-level identity coding**

- **Narrative diffusion**

- **Persistence of defamation through symbolic means**

[B.1-157]  **The following Table 1, – Locally Generated Curaçao Symbolic Identifiers (2000):** Origins, Cultural Encoding, and Forensic Significance summarizes the Curaçao-origin symbolic identifiers that were locally created after Plaintiff's return in 2000. These gestures did not exist in Curaçaoan culture prior to Plaintiff's case; they were invented by institutional actors, faculty members, or community interpreters attempting to make sense of the rumor ecosystem surrounding the 1996 administrative complaint.

[B.1-158]  For strategic reasons, and to avoid premature disclosure of the full evidentiary ledger, only a **narrow, essential subset** is presented here. Each entry is included because it directly advances:

- The **institutional perceived risk** analysis,

- The **constructive criminalization** trajectory,

- The **defamation per se categories** pled in the Complaint, and

- The **RICO continuity and relatedness** elements.

This table therefore provides a forensic, court-facing grid that translates the social and cultural meaning of these gestures into clear legal significance.

**TABLE 1 – LOCALLY GENERATED CURAÇAO SYMBOLIC IDENTIFIERS (2000): ORIGINS, CULTURAL ENCODING, AND FORENSIC SIGNIFICANCE**

(Table 1: Curaçao-Origin Symbolic Identifiers (S1–S8), Forensic Summary per FRE 1006 Cross-Referenced to Exhibit A: Gesture Ledger)

| SYMBOLIC IDENTIFIER | LABEL | ORIGIN (CURAÇAO) | DEFAMATORY MEANING (PER SE CATEGORY) | NOVELTY | FORENSIC SIGNIFICANCE |
|---|---|---|---|---|---|
| Trash / "Puinhoop" Gesture | S1 | Early 2000s (≈2000), University of the Netherlands Antilles (UNA), Built Environment & Civil Engineering ("BE&C") Faculty — Dutch faculty member #1 used "puinhoop" as an evaluative critique of Plaintiff's studio work, establishing the institutional seed of the symbolic meaning. | Professional Incompetence ("puinhoop") | Not a Preexisting cultural gesture; Invented in university context | Shows community reinterpretation of 1996 event / Identity-specific insult, Constructive Identity Substitution |
| Pant Zipper | S2 | Early 2000s (≈2000), UNA (BE&C Faculty) — Dutch faculty member #2 performed the pant-zipper gesture mockingly in faculty corridor/hallway settings adjacent to studio spaces, typically during or immediately after studio-critique/feedback intervals, creating a stigmatic association with sexualized impropriety in an evaluative context. | Sexual impropriety (sexual misconduct per se) / IIED; | Invented in university context / No prior cultural meaning | Symbolic criminalization of Plaintiff's character / Identity-tagging |

| SYMBOLIC IDENTIFIER | LABEL | ORIGIN (CURAÇAO) | DEFAMATORY MEANING (PER SE CATEGORY) | NOVELTY | FORENSIC SIGNIFICANCE |
|---|---|---|---|---|---|
| Pant-Raising | S3 | 1996, Curaçao Police Department — Chief Wim Tweeboom performed an upward pant-adjustment/pant-raising gesture in the office doorway on the day of the private administrative complaint-reading, forming the initial institutional anchor later echoed as a dismissal/unfitness cue. | Professional unfitness / dismissal | Emerged uniquely around Plaintiff 1996 Curacao Police Academy Boarding Division Administrative Note. | Direct link to 1996 administrative conflict |
| Car Obstruction (Perpendicular Block) | S4 | 1996 Curaçao Police Department / Police Academy administrative context" - Early 2000s (cultural encoding), Curaçao — Derived from the 1996 administrative "obstruction" episode associated with Chief Wim Tweeboom and later culturally encoded through Dutch surname translation wordplay on "Tweeboom" (two-boom / hefboom), producing the perpendicular-block "car obstruction" motif as a symbolic reenactment of blocked passage/advancement; widely echoed by ~2000 onward. of surname. | Obstruction / unfitness / career sabotage reenacts 1996 conflict symbolically / Constructive criminalization; / institutional-"blockage" reenactment; RICO continuity | Purely local symbolic Invention / Not culturally known gesture | Rooted in Institutional Act + Cultural Metaphor / Re-enacts 1996 conflict symbolically / |
| Orange Color | S5 | 2000–2006, University of the Netherlands Antilles / Curaçao University (UNA) — technical faculty graduation rope /discipline color ("orange") culturally repurposed within the academic environment to | Academic failure / incompetence / Unqualified / Unfit **professional incompetence**, **inability to** | Reinterpret Cultural Engineering of defamation; Color Code/ | Community-level Identity Coding / Academic/ Professional Unfitness Stalled Potential "Failed degree," |

| SYMBOLIC IDENTIFIER | LABEL | ORIGIN (CURAÇAO) | DEFAMATORY MEANING (PER SE CATEGORY) | NOVELTY | FORENSIC SIGNIFICANCE |
|---|---|---|---|---|---|
| | | code Plaintiff as "incomplete," "failed," or professionally unqualified, and later echoed as a durable color-based identifier. | **perform**, or **disqualification** | | |
| Yellow Color | S6 | 1996 (anchor event) → early 2000s (cultural encoding), Curaçao — rooted in a 1996 standout indoor-soccer moment associated with Plaintiff (yellow jersey/feint) and later repurposed in community and academic settings by ~2000 as a color-based shorthand for "reversal," "collapse of trajectory," or perceived instability; subsequently echoed across contexts. | Reversed ambition, failure / **professional unfitness**, **lack of integrity**, or **inability to perform one's occupation** / biographical weaponization | Symbolically repurposed / Meaning created entirely around Plaintiff 1996 CPA complaint event | Weaponized Biography. In Curaçao culture, a distinctive defamatory shorthand, signaling: "Your path collapsed; you are not capable." "Mocked hope, signal of social suspicion / |
| Chin Stroking | S7 | 1996, Curaçao Police Academy (Boarding Division) — habitual evaluative chin-stroking by the Boarding Division head during cadet assessment/feedback, later culturally echoed and repurposed in the 2000s as a symbolic suspicion/doubt cue referencing Plaintiff and repeated across Curaçao and Dutch contexts. | Moral suspicion / Moral scrutiny / Distrust, Incompetence, unqualified, Unfit / Constructive Identity Substitution | Institutional gesture → community echo / Gesture existed generically but not as defamation | Confirms Academy-Origin Symbolic Seed |
| Mustache Scratching | S8 | Early 2000s, Curaçao political / parliamentary broadcast environment — publicly performed mustache-scratching gesture associated with Pedro Atacho during televised appearances and subsequently echoed as a symbolic cue culturally | Mental Instability / Unfitness / Eccentricity; Suspicion / mental unfitness; IIED; symbolic | Newly invented / Political-symbolic gesture tied uniquely to Plaintiff / Newly defamatory | Core Gesture in later U.S. Rebroadcasts |

| SYMBOLIC IDENTIFIER | LABEL | ORIGIN (CURAÇAO) | DEFAMATORY MEANING (PER SE CATEGORY) | NOVELTY | FORENSIC SIGNIFICANCE |
|---|---|---|---|---|---|
| | | linked (as alleged) to Plaintiff, functioning as a mental-unfitness/suspicion identifier in later rebroadcast contexts. | identity cue / symbolic targeting | when applied to Plaintiff | |

**FORENSIC NOTE:**

These gestures are introduced here in Appendix B not as evidence of the underlying defamation (which will be proven through AI logs, affidavits, and Exhibit A), but as **forensic indicators** demonstrating (1) the novelty of the symbolic system, (2) its identity-specific construction, (3) its derivation from the 1996 institutional event, and (4) its role in producing constructive identity substitution across jurisdictions. Their classification aligns with Restatement §§ 564, 571–574, and supports the declaratory relief sought under 28 U.S.C. § 2201.

*Each gesture is cross-referenced in Exhibit A (Gesture Ledger) with full forensic metadata, including "first emergence," "plaintiff first recognition," "constructive identity," and "RICO predicate category."*

## FORENSIC NOTE ON EVIDENTIARY PURPOSE AND LEGAL RELEVANCE

**1. Identity-Specific Origin.**

The purpose of this table is to support the declaratory determination that these

identity-specific symbols satisfy defamation per se and constructive identity substitutions when applied to Plaintiff.

Each gesture in this table was created locally in Curaçao (circa 2000), did not exist prior to Plaintiff's return, and arose directly from community attempts to interpret the rumor-laden 1996 administrative event. These gestures therefore satisfy the "of and concerning" requirement of Restatement (Second) of Torts § 564, because their meaning is intelligible only when applied to Plaintiff. Their defamatory charge derives from the institutional rumor ecosystem created by the 1996 administrative event and cannot be interpreted outside that context.

**2. Constructive Criminalization.**

The defamatory meanings assigned to these gestures emerged from institutional fragility, rumor propagation, and the projection of organizational anxieties onto Plaintiff's identity. They represent the earliest stage of constructive criminalization—where ambiguous internal events are socially re-coded as imputing misconduct, incompetence, moral defect, or criminal association despite the absence of factual basis. Their defamatory meanings were culturally constructed within the rumor ecosystem originating from the 1996 Boarding Division complaint and the institutional perceived risk attributed to Plaintiff.

**3. RICO Pattern and Cross-Jurisdiction Relatedness.**

These gestures constitute the "local prototype" symbolic ecosystem from which later Dutch, U.S., and international symbolic identifiers evolved. Their emergence and repetition anchor relatedness and continuity under 18 U.S.C. §§ 1961–1962 because

the same defamatory constructs reappeared across jurisdictions and decades, satisfying both relationship and continuity for RICO purposes.

This table therefore serves as a forensic and doctrinal scaffold supporting constructive-Identity substitution, defamation per se, and the forward-looking declaratory judgment requested under 28 U.S.C. § 2201(a) and Rule 57. It is descriptive, not accusatory, and documents cultural meanings of attribution rather than intent.

It is not an exhaustive evidentiary submission and does not disclose the full Gesture Ledger, AI frame logs, or witness affidavits, which will be produced at the appropriate stage under Rule 26.

## XII.    CONTINUING HARM

[B.1-159] Plaintiff remains a private individual with no lawful notoriety. The symbolic targeting documented in this Appendix traces back to the institutional identity coding that emerged after the 1996 administrative notation, which carried no disciplinary, corrective, or criminal implications.

[B.1-160] The symbolic identifiers have appeared repeatedly across media platforms operating through interstate channels, resulting in ongoing reputational injury, dignitary harm, and tangible professional impact within this District.

[B.1-161] The 1996 administrative notation did not result in any corrective or disciplinary finding. However, within the institution's rumor ecosystem, it took on an outsized reputational significance, contributing to a form of constructive criminalization in

which Plaintiff was socially coded as problematic despite the absence of any underlying misconduct. The symbolic substitutions that later emerged reflect the cultural expression of this institutionally produced identity.

[B.1-162] Declaratory judgment is necessary to establish the legal status of these symbolic identifiers, ensure ongoing redressability against successor and spin-off entities, and prevent evasion of accountability through corporate restructuring. Such relief is essential given the continuing, multi-jurisdictional pattern of symbolic defamation documented throughout Appendix B.

Tables 1, 2A, and 2B are incorporated as forensic summaries pursuant to Fed. R. Evid. 1006, drawing directly from the authenticated metadata, definitions, and continuity analysis preserved in the Forensic Gesture Ledger (Exhibit A). Together they demonstrate: (1) origin; (2) defamatory meaning; (3) symbolic identity function; and (4) cross-jurisdictional persistence over 20+ years.

## XIII.  CROSS-JURISDICTIONAL DIFFUSION

### CROSS-JURISDICTIONAL ECHOING AND RICO-RELEVANT CONTINUITY

[B.1-163] As set out in the forensic chronology above ([B.1-49]-[B.1-52]), the symbolic identifiers documented in **Table 1** (Appendix B, following § XI.) and **Table 2A-2B**, **(Appendix B, following § XVI)** did not arise as isolated cultural events.

[B.1-164]  Instead, they developed sequentially across Curaçao, the Netherlands, and the United States over more than two decades, each jurisdiction embedding the same constructive identity into its own symbolic vocabulary. This multi-node, long-duration diffusion reflects the type of ongoing, repeated conduct that RICO continuity doctrine recognizes as competent evidence of a 'regular way of conducting affairs.

[B.1-165]  The specific gestures, their dates and locations of first emergence, and their symbolic meanings are catalogued in **Table 1 - Locally Generated Curaçao Symbolic Identifiers** (See **Table 1**, Appendix B, following § XI.), while their corresponding **defamation-per-se classifications** are organized in **Table 2A- Constructive Identity Function Grid (Symbolic Identifiers Across Jurisdictions) (S1–S12) (**See **Table 2A,** Appendix B, following § XVI.), **and Table 2B - Legal Classification Grid (S1– S12)** (See **Table 2B**, Appendix B, following § XVI.).

[B.1-166]  The defamation-per-se classification, symbolic meaning, and multi-jurisdictional continuity of the gestures referenced herein are documented in Table 2A and Table 2B (Defamation-Per-Se Grid; Cross-Jurisdictional Continuity Map). These tables summarize, for Declaratory Judgment purposes, the twelve gestures disclosed at this stage. They do not represent the full scope of the Gesture Ledger (Exhibit A), which contains the complete forensic dataset of all 50+ identifiers.

[B.1-167]  The timeline described in [B.1-84] demonstrates that the symbolic identifiers share:

(1) A common origin event,

(2) A consistent constructive identity,

(3) Repeated cultural transmission across periods of Plaintiff's absence.

When applied to the RICO framework, these facts establish both relatedness and continuity without requiring any allegation of coordinated motive among actors.

[B.1-168]  Across jurisdictions, these symbolic identifiers functioned as non-verbal cues that substituted for Plaintiff's name. Their meaning was reasonably understood by viewers familiar with the underlying institutional narrative, consistent with recognized principles of defamation by implication.

[B.1-169]  The **Forensic Gesture Ledger (Exhibit A)**, compiled under the **Forensic Symbolic Identity Framework**, catalogues gestures by cultural origin, date of emergence, symbolic meaning, constructive identity function, and cross-jurisdictional rebroadcast context. It is authenticated under **Fed. R. Evid. 901**, relevant under **Rule 401**, admissible as expert analysis under **Rule 702**, and summarized under **Rule 1006**. Final authentication and expert support will be provided at the appropriate stage.

## XIV.    ILLUSTRATIVE EXAMPLES OF GESTURE EMERGENCE

[B.1-170]  **Illustrative Examples of Gesture Emergence** "The emergence of symbolic identifiers across Curaçao (See **Table 1**, Appendix B, following § XI.), the Netherlands, and later the United States (See **Table 2A-2B**, Appendix B, following § XVI.) is documented comprehensively in **Table 1 (Locally Generated Curaçao Symbolic Identifiers)** and **Table 2 (Defamation-Per-Se Gesture Grid)**.

These tables catalog each gesture by:

(1) Its cultural origin,

(2) Date and setting of first emergence,

(3) Symbolic meaning within the relevant institutional or community context,

(4) Constructive identity function, and

(5) Defamation-per-se category under U.S. law.

Together, Tables 1 and 2 provide representative examples of how symbolic identifiers, whether derived from Curaçao institutional culture, Dutch social signaling, or U.S. broadcast ecosystems, crystallized into a consistent, cross-jurisdictional vocabulary referencing Plaintiff. These forensic grids therefore supply the evidentiary structure for understanding how each gesture became 'of and concerning' Plaintiff and how these symbols diffused, persisted, and acquired legally recognizable defamatory force over more than two decades.

# XV.   CONSTRUCTIVE DEFAMATION BY GESTURE

### A.   Prefatory Statement Regarding Appendix B (Technical Exhibit)

[B.1-171]   Appendix B is submitted as a **technical exhibit**, not as expanded pleading, for the limited purpose of supporting: (1) plausibility under Rule 8(a); (2) identification principles under Restatement (Second) of Torts §564; and (3) the existence of an actual controversy suitable for Declaratory Judgment under 28 U.S.C. §2201.

[B.1-172]   Appendix B does **not** add factual allegations beyond those contained in the Complaint and is not offered for evidentiary proof at this stage. The contents of this appendix, including classification tables, symbolic-identity grids, institutional origin mapping, and temporal continuity structures, are intended solely to clarify the symbolic-identification framework alleged in the Complaint.

[B.1-173]   Evidence supporting these structures will be submitted through Rule 26(a)(2) expert disclosures, FRE 702 testimony, and authenticated materials under FRE 901/1006 at the appropriate procedural stage.

### B.   Explanatory Notes to Tables 2A–2E (For Declaratory and Rule 1006 Purposes)

[B.1-174]   The Symbolic Identity Classification Matrix (Tables 2A–2E) **(See Table 2A-2E, Appendix B, following § XVI.)** organizes the relevant symbolic identifiers into a

structured analytical framework, allowing the Court to understand their origin, meaning stability, and constructive-identity function for Declaratory Judgment purposes.

[B.1-175]  The following explanatory notes provide interpretive context for the Symbolic Identity Classification Matrix **(See Table 2A-2E, Appendix B, following § XVI.)**, which is submitted solely as a technical exhibit under FRE 1006:

### a)  Institutional Origin vs. Institutional Rebroadcasting:

[B.1-176]  The symbolic identifiers catalogued in Tables 2A and 2B fall into two evidentiary categories. Some gestures emerged within institutions directly connected to Plaintiff, where their stigmatic meaning was formed through institutional interactions ("Institution-Origin Identifiers"). Others did not originate inside a specific institution but have been repeatedly performed by institutional actors or appeared in global media environments, thereby maintaining and transmitting their stigmatic meaning ("Institutional-Rebroadcast Identifiers"). Both categories contribute to constructive identity under Restatement §564 and support the need for declaratory clarification of symbolic meaning, while their recurring appearance across institutional channels establishes continuity relevant to later pattern analysis.

### b)  Institutional Origin and Systemic Diffusion:

[B.1-177]  As shown in the Symbolic Identity Classification Matrix (Tables 2A–2E), several identifiers originated within institutional contexts in Curaçao and later diffused into broader community, institutional, and international media environments.

[B.1-178]  Several symbolic identifiers, including the Trash Gesture, Pant Zipper Gesture, Pant-Raising Variants, Orange and Yellow Color Codes, Chin-Stroking Variants, Mustache Scratch (originating with a Curaçao parliamentary official), and the Car-Obstruction Gesture (rooted in a 1996 Curaçao Police Department administrative event involving Chief Tweeboom), emerged directly within institutional environments connected to Plaintiff. Their stigmatic meanings were formed through institutional interactions and reflected institutional perceptions of risk, anxiety, or reputational fragility. Other identifiers, such as Cigarette-Staring ("Pineut"), Nose-Tapping Variants, Tongue-Out Variants, and Handcuff or Wrist-Roll Variants, did not originate within a specific institution but were later adopted and repeatedly performed by institutional actors or appeared in global media broadcasts.

[B.1-179]  These symbols derive their meaning from the same institutional nucleus: the 1996 administrative action at the Curaçao Police Academy and Curacao Police Department, during a period of perceived corruption, internal instability, and organizational vulnerability.

[B.1-180]  As Plaintiff represented excellence, merit, and integrity, he became the focal point of stigmatic symbolic coding that was subsequently replicated, adapted, and rebroadcast across jurisdictions and institutions.

[B.1-181]  Both the institution-origin and institution-rebroadcast identifiers contribute to constructive identity under Restatement §564 and support declaratory clarification of their meaning and effect.

**C.**          Institution-Origin Gestures Tied to the 1996 Curaçao Police Administrative Event:

[B.1-182]  Several symbolic identifiers trace their origin directly to practices within the Curaçao Police Academy and Curaçao Police Department during the period surrounding the 1996 administrative event involving Plaintiff. These gestures did not arise as general cultural expressions but instead formed within specific institutional interactions, giving them stable, audience-recognizable meanings under Restatement (Second) of Torts § 564.

[B.1-183]  **One such identifier** is the **Pant-Raising gesture**, which originated on the day Plaintiff's 1996 Boarding Division complaint was reviewed at the Curaçao Police Department. During that administrative exchange, **Chief Wim Tweeboom** performed a distinct upward pant-adjustment motion while standing in the doorway of his office.

[B.1-184]  Within that context and given the hierarchical relationship between the Chief and cadets, this gesture conveyed an institutional message of *dismissal*, *invalidating the*

*complaint*, or *reasserting administrative authority*. The gesture's symbolic meaning became anchored to this event, and its subsequent diffusion throughout Curaçao and later across jurisdictions carried forward this original institutional connotation of rejection or obstruction.

[B.1-185]    **A second institution-origin identifier** is the **Chin-Stroking gesture**, which emerged within the **Boarding Division of the Curaçao Police Academy**. The Division Head habitually used this gesture while addressing cadets, giving feedback, or expressing evaluative judgment. Within that training environment, the gesture functioned as a non-verbal signal of *doubt*, *scrutiny*, or *institutional hesitation* concerning a cadet's reliability or trustworthiness. Over time, this symbol migrated into broader community usage and, through international media and public-facing institutional rebroadcasting, acquired cross-jurisdictional recognition, while preserving its foundational association with suspicion or integrity-questioning.

[B.1-186]    **These two examples** illustrate how specific symbolic identifiers acquired their stigmatic meaning through institutional conduct, during a period in which the Police Academy and Police Department faced public scrutiny and internal instability. As Plaintiff represented high performance and integrity during a fragile moment for the institution, these gestures became early mechanisms of *constructive identity assignment*, which were later adapted, replicated, and rebroadcast across community, institutional, and international media environments, enabling their stigmatic meanings to persist across jurisdictions and audiences.

[B.1-187]  Their institutional formation underscores why declaratory clarification is required and why the symbolic system warrants structured analysis in Tables 2A–2C.

**D.          Cross-Jurisdiction Meaning Stability:**

[B.1-188]  The symbolic identifiers described in the Symbolic Identity Classification Matrix, Tables 2A–2E, exhibit a high degree of cross-jurisdiction meaning stability. Although originating in institutional settings in Curaçao, their stigmatic content remained recognizable when later displayed in the Netherlands and the United States through community usage, institutional rebroadcasting, and public-facing media environments.

[B.1-189]  The persistence of their core interpretive meaning across audiences and geographic contexts strengthens the plausibility that these symbols operated as constructive identifiers under Restatement (Second) of Torts § 564, where liability turns on whether a reasonable observer would understand the gesture as referring to a particular person. This cross-jurisdiction continuity also supports the need for declaratory clarification, as the consistent interpretive function of these identifiers demonstrates a stable symbolic system rather than isolated or culturally contingent expressions.

**E.          Constructive Identification:**

[B.1-190]  For purposes of pleading and Declaratory Judgment, Plaintiff asserts that the symbolic identifiers documented in this Appendix B as the Symbolic Identity

Classification Matrix (Tables 2A–2E) **(See Table 2A-2E, Appendix B, following §**

**XVI.**), were **reasonably understood as referring to Plaintiff**, satisfying the "of and

concerning" requirement recognized in defamation-by-implication jurisprudence.

Under **Restatement (Second) of Torts § 564**, liability attaches where a

communication, verbal or non-verbal, would be understood by a reasonable recipient,

in context, as pointing to a particular person even if no name is spoken. The

Complaint alleges that the gestures, colors, and symbolic acts described herein

operated within a **stable, recurring identity framework** originating in the 1996

administrative event and were used in a manner consistent with this standard.

[B.1-191]   These allegations do not require evidentiary proof at the Declaratory Judgment stage.

Their **factual plausibility** is grounded in:

(a)  The unique institutional context of the Dutch-Track cohort,

(b) The constructive identity assigned to Plaintiff during 1996–2000,

(c) The cross-jurisdictional consistency of symbolic cues over 20+ years, and

(d) The recognized doctrinal principle that symbolic or non-verbal insinuation may

constitute actionable identification.

[B.1-192]   **Affidavits and AI-supported metadata** will be provided during discovery to

substantiate perception and interpretation.

**F.**          **Consistency and Recurrence:**

[B.1-193]  The allegation that these symbolic identifiers were understood as referring to Plaintiff is further supported by their consistency, recurrence, and cross-jurisdictional replication, which collectively establish a pattern of use recognizable as a constructive identity. Courts have long recognized that defamatory implication may arise from contextual signals, symbolism, and coded reference, even absent explicit naming.

[B.1-194]  Plaintiff alleges that the symbols detailed herein functioned precisely using this **constructive identity mechanism.**

**G.**         **Representative Subset Disclosure:**

[B.1-195]  At this stage, Plaintiff provides **a limited subset** of representative gestures through **Table 1 (Curaçao-Origin Identifiers, (See Table 1, Appendix B, following § XI.)** and **Table** 2A–2E (Symbolic Identity Classification Matrix) **(See Table 2A-2E, Appendix B, following § XVI.)** solely for **contextual and plausibility purposes** under Rule 8(a). The complete Forensic Gesture Ledger (Exhibit A), which contains more than 50 symbolic identifiers across Curaçao, the Netherlands, and the United States, is **not offered for evidentiary proof** at the Declaratory Judgment stage.

[B.1-196]  Consistent with the forward-looking nature of Declaratory Judgment proceedings, Plaintiff will offer **affidavit testimony** and **AI-derived metadata** only at the discovery and expert-report phases, where they will be fully supported by:

• Rule 26(a)(2) expert disclosures,

• FRE 702 expert testimony,

• FRE 703 bases of opinion, and

• FRE 901/1006 authentication and summary procedures.

[B.1-197]   The purpose of **Tables 1 and 2 (A-E)** is to demonstrate the **structure, plausibility, and legal sufficiency** of the symbolic-identity mechanism alleged; the **evidentiary foundation** for the full Gesture Ledger will be provided at the appropriate stage.

**H.**        **Forensic Gesture Ledger and FRE 1006 Summary Use:**

[B.1-198]   **The Forensic Gesture Ledger (Exhibit A)**, organized under the **Forensic Symbolic Identity Framework,** categorizes each gesture by cultural origin, chronology, symbolic meaning, constructive identity function, and cross-jurisdictional diffusion. At this stage, Exhibit A is offered as a **structured factual proffer (See Table 2A-2E, Symbolic Identity Classification Matrix Appendix B, following § XVI.)** supporting plausibility and legal sufficiency under Rule 8(a).

[B.1-199]   It is (1) relevant under **FRE 401**, (2) capable of authentication under **FRE 901** through process description, (3) appropriate for expert interpretation under **FRE 702**, and (4) summarized in chart form under **FRE 1006**. Final authentication, expert support, and evidentiary foundation will be supplied during Rule 26 disclosures and subsequent stages of litigation.

XVI.          APPENDIX B - TABLES 2A-2E

SYMBOLIC IDENTITY CLASSIFICATION MATRIX

(TECHNICAL EXHIBITS)

[B.1-200]   The Symbolic Identity Classification Matrix (Tables 2A–2E) organizes the relevant symbolic identifiers into a structured analytical framework, enabling the Court to assess their origin, meaning stability, and constructive-identity function for Declaratory Judgment purposes.

[B.1-201]   Tables 2A **Constructive Identity Function Grid (S1–S12),** and 2B **Legal Classification Grid (S1–S12),** together illustrate how a set of gestures and color-codes evolved into a coherent symbolic system that spread across jurisdictions and institutions over a period of nearly three decades. Table 2A describes how the underlying meanings of each gesture emerged and stabilized, while Table 2B reflects their later rebroadcast in public, media, and institutional settings. These tables **provide contextual and historical background** for understanding how symbolic identifiers came to function as non-verbal references to Plaintiff within community and institutional contexts.

[B.1-202]   The tables presented here provide the **fundamental symbolic identifiers** used to establish Plaintiff's constructive identity through institutional and media channels. The following tables **(Tables 2C–2E)** expand upon these identifiers, detailing the institutional actors involved, **temporal continuity**, and **harm pathways** created by

the symbolic meanings. These tables offer a structured understanding of how these identifiers spread across jurisdictions and institutions over time, laying the groundwork for later RICO analysis and declaratory clarification.

[B.1-203]  The following Technical Exhibits (Tables 2A–2E) are offered solely for classification and contextual purposes consistent with Rule 8(a), and not as evidentiary proof.

**A.**          **Appendix B – Table 2A: Constructive Identity Function Grid (Technical Exhibit)**

1. **TABLE 2A- CROSS-JURISDICTION CONSTRUCTIVE IDENTITY CONTINUITY:**

[B.1-204]  Table 2A - **Constructive Identity Function Grid (S1–S12),** documents the development of a symbolic communication system that emerged across Curaçao, the Netherlands, and the United States following the 1996–2000 formative events involving Plaintiff. The gestures and color-codes reflected in this table became repeatedly recognized and decoded within community, institutional, and media environments as shorthand indicators of professional incompetence, moral impropriety, criminal suspicion, or psychological instability. Although no verbal naming was used, audiences who recognized the meaning of these signals understood them as referring specifically to Plaintiff, giving them a constructive identity function.

[B.1-205]  Table 2A therefore provides chronological and jurisdictional background showing how these symbolic identifiers acquired stable meanings and were repeatedly used to

reference Plaintiff in non-verbal form. This description is offered for explanatory and plausibility purposes only and does not assert adjudicated fact or evidentiary proof at this stage.

### 2.   RICO VARIANTS NOTE:

[B.1-206]   The gestures listed in Table 2A include subtle and derivative variants that preserve the same stigmatic meaning and constructive-identity function while reducing overt detectability. These variant forms pattern adaptation consistent with continuity of messaging and audience-dependent rebroadcasting capability across surveillance-sensitive contexts.

This note does not allege a completed RICO violation but explains continuity characteristics relevant to later pattern analysis **should any subsequent proceedings be warranted** beyond declaratory relief.

| TABLE 2A — CONSTRUCTIVE IDENTITY FUNCTION GRID (S1–S12) (SYMBOLIC IDENTIFIERS ACROSS JURISDICTIONS) (*Defamation Per Se, Constructive Identity & Jurisdictional Spread*) | | | | | | |
|---|---|---|---|---|---|---|
| Label | Symbolic Identifier | Defamation Per Se Category | Constructive Identity Function | Cross-Jurisdiction Continuity Marker (Year of First Emergence) | | |
| | | | | Curaçao | NL | USA |
| S1 | **Trash Gesture** | Professional Incompetence | Stigmatic Community-Level Professional-Incompetence Constructive Identity Coding | ✓ (2000) | Echo | Echo |

| TABLE 2A — CONSTRUCTIVE IDENTITY FUNCTION GRID (S1–S12) (SYMBOLIC IDENTIFIERS ACROSS JURISDICTIONS) *(Defamation Per Se, Constructive Identity & Jurisdictional Spread)* | | | | | | |
|---|---|---|---|---|---|---|
| **Label** | **Symbolic Identifier** | **Defamation Per Se Category** | **Constructive Identity Function** | **Cross-Jurisdiction Continuity Marker (Year of First Emergence)** | | |
| | | | | **Curaçao** | **NL** | **USA** |
| S2 | **Pant Zipper (up-down motion)** (All Variants) ***Discrete Variants preserving symbolic function:*** *Reduced-motion forms-brief waistband touches or mid-body hand flicks, maintaining the insinuation of moral impropriety while enabling discreet deployment in public and institutional settings.* | Moral Impropriety | Stigmatic Community-Level Moral-Impropriety Constructive Identity Coding | ✓ (2000) | Echo | Echo |
| S3 | **Pant Raising** (All Variants) ***Micro-Variants preserving symbolic function:*** *Slight Waistband Lifts, Shirt-Tugging Motions, Partial Upward Pulls,* | Professional Unfitness | Stigmatic Community-Level Social-Dismissal Constructive Identity Coding | ✓ (1996) | Echo | Echo |
| S4 | **Car- Perpendicular Obstruction** | Professional Unfitness / Reputation Harm | Stigmatic Community-Level Career-Obstruction Constructive Identity Coding | ✓ (1996-2000) | Echo | Echo |
| S5 | **Orange Color** | Professional Incompetence / Unfitness / Professional Disqualification | Stigmatic Community-Level Professional-Failure Constructive Identity Coding | ✓ (2000) | Echo | Echo |

| TABLE 2A — CONSTRUCTIVE IDENTITY FUNCTION GRID (S1–S12) (SYMBOLIC IDENTIFIERS ACROSS JURISDICTIONS) *(Defamation Per Se, Constructive Identity & Jurisdictional Spread)* | | | | | | |
|---|---|---|---|---|---|---|
| Label | Symbolic Identifier | Defamation Per Se Category | Constructive Identity Function | Cross-Jurisdiction Continuity Marker (Year of First Emergence) | | |
| | | | | Curaçao | NL | USA |
| S6 | **Yellow Color** | Mental Instability / Incompetence / Life-Career-Mental Reversal | Stigmatic Community-Level Psychological-Deficiency Constructive Identity Coding | ✓ (2000) | Echo | Echo |
| S7 | **Chin Stroking** (All Variants) ***Abbreviated Forms preserving symbolic function:** Finger-to-Chin Taps, Partial Jaw Brushes, or Brief Thoughtful-Pose Gestures* | Moral suspicion / Institutional Suspicion on Integrity / Trustworthiness | Stigmatic Community-Level Moral-Suspicion Constructive Identity Coding | ✓ (1996) | Echo | Echo |
| S8 | **Mustache Scratch** | Mental Instability / Unfitness | Stigmatic Community-Level Moral-Suspicion Constructive Identity Coding | ✓ (2000) | Echo | Echo |
| S9 | **Cigarette Staring** ("Pineut") (Includes Derivative Forms) ***Variant Form preserving symbolic function:** Straw-Sipping* | Criminality / Social - Worthlessness | Stigmatic Community-Level Social-Worthlessness Constructive Identity Coding | Echo | ✓ (1998) | Echo |
| S10 | **Nose Tapping** (All Variants) ***Variant Forms preserving symbolic function:** Subtle Cheek-Taps, Nostril Brushes, or Side-Nose Gestures.* | Criminal Implication | Stigmatic Community-Level Criminal-Suspicion Constructive Identity Coding | Echo | ✓ (1997-1998) | Echo |

| TABLE 2A — CONSTRUCTIVE IDENTITY FUNCTION GRID (S1–S12) (SYMBOLIC IDENTIFIERS ACROSS JURISDICTIONS) *(Defamation Per Se, Constructive Identity & Jurisdictional Spread)* | | | | | | |
|---|---|---|---|---|---|---|
| **Label** | **Symbolic Identifier** | **Defamation Per Se Category** | **Constructive Identity Function** | **Cross-Jurisdiction Continuity Marker (Year of First Emergence)** | | |
| | | | | **Curaçao** | **NL** | **USA** |
| **S11** | **Tongue (Straight) Out** (All Variants). ***Variant Forms preserving symbolic function:*** *Sideways tongue-out gesture, Slight tongue-out (subtle micro-extension), Tongue-in-cheek (side flick integrated)* | Moral Impropriety / Psychological Instability | Stigmatic Community-Level Moral-Degradation Constructive Identity Coding | Echo | ✓ (1997-1998) | Echo |
| **S12** | **Handcuff Pose** (Crossed hands behind back) (All Variants) ***Variant Forms preserving symbolic function:*** *Rolling wrists / rotational movements around the pols area, Wrist-adjustment mimicry, Behind-back wrist fidgeting with rotational motion* | Criminality / Criminal Implication | Stigmatic Community-Level Criminal-Implication Constructive Identity Coding | Echo | ✓ (1998-2000) | Echo |

**Footnote Table 2A- Variants & Symbolic Equivalence**:

Variant forms of each gesture are included within the symbolic identifier category

when they maintain equivalent stigmatic meaning and constructive-identity function.

B.            **Appendix B – Table 2B: Legal Classification Grid (Technical Exhibit)**

### 1. TABLE 2B - LEGAL CLASSIFICATION GRID (S1–S12)

[B.1-207]  Where Table 2A outlines the origin and meaning of each symbolic gesture, **Table 2B** shows how those same identifiers appeared in subsequent media broadcasts, public encounters, political settings, and institutional interactions. The repeated use of these signals across unrelated environments demonstrates that the symbolic identifier system was not isolated or incidental but became a recognizable pattern understood by diverse audiences. Table 2B situates this pattern within its broader historical and social context, illustrating how the symbolic system migrated across jurisdictions, adapted to new settings, and eventually formed a persistent non-verbal narrative about Plaintiff.

[B.1-208]  **Table 2C (Institutional Actor Grid)** provides a more detailed mapping of the institutional and media actors who played a role in disseminating these symbolic identifiers. It focuses on the mechanisms through which these symbols, though originating in specific institutions, were amplified and adapted by other public and private institutions.

[B.1-209]  **Table 2D (Temporal Continuity & Pattern Timeline)** illustrates the cross-jurisdictional diffusion of these symbols over time, establishing a continuity of symbolic meaning, which is crucial for demonstrating the pattern of defamation and constructive identity assignment.

[B.1-210]  **Table 2E (Symbolic Meaning → Constructive Identity → Harm Pathway Map)**

connects the **symbolic meaning** of the gestures to **constructive identity** and the

**harm caused**, creating a clear path for understanding the injury to Plaintiff's

reputation and identity."


## 2.  TABLE 2B - DECLARATORY JUDGEMENT

## DOCTRINES RELEVANCE NOTE:

[B.1-211]  The "Relevance to DJ" column demonstrates why each symbolic identifier creates a

present legal controversy requiring judicial clarification of meaning, identity, and

defamatory effect, satisfying the elements of declaratory relief under 28 U.S.C.

§2201.

| TABLE 2B — LEGAL CLASSIFICATION GRID (S1–S12) *(Defamation per se + Constructive Criminalization + RICO Relatedness)* | | | | |
|---|---|---|---|---|
| **Label & Gesture** | **Defamatory Category** | **Legal Theory** | **Relevance to DJ (Declaratory Judgment)** | **Relevance to RICO (Continuity, Relatedness, Enterprise Messaging)** |
| S1 – Trash Gesture | Professional Incompetence | Defamation per se | Establishes of-and-concerning identification and stabilizes stigmatic meaning for judicial clarification | Repeated symbolic act contributing to continuity and relatedness across jurisdictions |
| S2 – Pant Zipper | Moral Impropriety / Sexualized Innuendo | Defamation per se | Functions as a symbolic identifier requiring judicial determination of defamatory meaning | Continuity marker evidencing sustained messaging across contexts |

| TABLE 2B — LEGAL CLASSIFICATION GRID (S1–S12) *(Defamation per se + Constructive Criminalization + RICO Relatedness)* | | | | |
|---|---|---|---|---|
| **Label & Gesture** | **Defamatory Category** | **Legal Theory** | **Relevance to DJ (Declaratory Judgment)** | **Relevance to RICO (Continuity, Relatedness, Enterprise Messaging)** |
| S3 – Pant Raising (Variants) | Professional Unfitness | Defamation per se | Demonstrates identity substitution and creates a live controversy over symbolic meaning | Recurrent gesture supporting pattern-relatedness across time |
| S4 – Car Perpendicular Obstruction | Professional Harm / Obstruction | Defamation per se | Supports constructive identity by signaling life-path blockage, creating need for declaratory clarification | Symbolic narrative link used in enterprise-style messaging systems |
| S5 – Orange Color | Professional Failure / Academic Disqualification | Defamation per se (professional unfitness) and/or defamation by implication | Establishes plausibility of symbolic meaning and legal significance of community-level decoding | Cross-jurisdiction continuity; U.S. rebroadcast integrates into enterprise messaging pattern |
| S6 – Yellow Color | Psychological Instability | Defamation per se | Demonstrates affirmative stigmatic meaning causing ongoing harm suitable for forward-looking relief | Persistent appearance supports continuity and message replication |
| S7 – Chin Stroking (Variants) | Moral Suspicion / Institutional Distrust | Defamation by implication | Identifies institution-origin symbolic coding requiring judicial clarification of meaning & effect | Related act showing pattern development within enterprise adaptation |
| S8 – Mustache Scratch | Mental Unfitness | Defamation per se | Creates actual controversy concerning defamatory symbolic | Continuous stigma coding evidencing repeated non-verbal messaging |

| Label & Gesture | Defamatory Category | Legal Theory | Relevance to DJ (Declaratory Judgment) | Relevance to RICO (Continuity, Relatedness, Enterprise Messaging) |
|---|---|---|---|---|
| **TABLE 2B — LEGAL CLASSIFICATION GRID (S1–S12)** *(Defamation per se + Constructive Criminalization + RICO Relatedness)* | | | | |
| | | | attribution and constructive identity | |
| S9 – Cigarette Staring ("Pineut") | Criminality / Social Worthlessness | Defamation per se | Operates as accusation-equivalent, satisfying legal determinability for declaratory relief | Related act reinforcing criminal-implication messaging cycle |
| S10 – Nose Tapping (Variants) | Criminal Suspicion | Defamation per se | Supports constructive criminalization and provides a determinable symbolic meaning for judicial review | Strong continuity factor; repeated across media, community, and institutional contexts |
| S11 – Tongue-Out Variants | Moral Impropriety / Psychological Instability | Defamation per se | Creates a recognizable symbolic implication needing legal clarification to resolve ongoing controversy | Patterned rebroadcast across jurisdictions demonstrating message persistence |
| S12 – Handcuff Pose & Wrist-Roll Variants | Criminality | Defamation per se | Functions as a non-verbal accusation requiring judicial interpretation of meaning and identity | Predicate-plausibility element: non-verbal criminal implication within enterprise signaling system |

C.         **Appendix B - Table 2C: Institutional Actor Grid (Technical Exhibit)**

1.  **TABLE 2C: *INSTITUTIONAL ACTOR GRID (S1–S12)***

[B.1-212]  Table 2C details the institutional actors who broadcasted the symbolic identifiers and contributed to their widespread diffusion. Following the legal and classificatory analysis in **Table 2A and 2B**, **Table 2C** provides a deeper forensic analysis by mapping the institutional actors who contributed to the dissemination of the symbolic identifiers.

[B.1-213]  **Table 2D** reinforces the timeline of diffusion, demonstrating how the symbols persisted over time and across borders. Finally, **Table 2E** connects the dots between symbolic identifiers, **constructive identity** development, and the **harm** inflicted, presenting a coherent view of the injury suffered by Plaintiff.

2.  **CROSS-JURISDICTION MEANING CONTINUITY NOTE (NL → USA)**

[B.1-214]  Pre-Arrival Meaning Continuity: symbolic identifiers demonstrated recognizable interpretive content within U.S. social- and media environments before Plaintiff's U.S.A arrival in 2016. Immediate post-arrival reappearance in Plaintiff-adjacent settings, together with parallel visibility in national media, indicates cross-jurisdiction meaning stability and transmission independent of Plaintiff's physical presence.

### 3.    DECLARATORY JUDGEMENT AND RICO EXPLANATORY NOTE:

[B.1-215]  **Table 2C** maps institutional environments in which symbolic identifiers appear, for

the limited purpose of declaratory clarification and continuity analysis.

| TABLE 2C — INSTITUTIONAL ACTOR GRID (S1-S12) *(Institutional Origin, Institutional Rebroadcasting, Audience-Dependent Meaning & Continuity Mapping)* | | | | | |
|---|---|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Origin Classification** | **Institutional Context of First Emergence or Transmission** | **Forensic Function** | **Relevance to Declaratory Judgment (DJ)** | **Relevance to RICO Continuity & Relatedness** |
| **S1 – Trash Gesture** | **Institution-Origin** | University of the Netherlands Antilles (UNA) – BE&C Dutch Faculty member #1 used "puinhoop" as an evaluative critique of Plaintiff's studio work | Institutional incompetence coding; evaluative stigma | Presents a controversy as to whether the alleged cue is legally capable of imputing professional incompetence/unfitness 'of and concerning' Plaintiff in an academic evaluative context. | Academic-to-public diffusion supports continuity |
| **S2 – Pant Zipper** | **Institution-Origin** | UNA (BE&C Faculty) — Dutch faculty member #2 performed the pant-zipper gesture mockingly in faculty corridor/hallway settings adjacent to studio spaces, typically during or immediately after studio-critique/feedback intervals. | Moral impropriety stigma | Presents a controversy as to whether the alleged cue is legally capable of operating as constructive identification through | Recurrence across jurisdictions shows related symbolic messaging |

| TABLE 2C — INSTITUTIONAL ACTOR GRID (S1-S12) | | | | | |
|---|---|---|---|---|---|
| *(Institutional Origin, Institutional Rebroadcasting, Audience-Dependent Meaning & Continuity Mapping)* | | | | | |
| Symbolic Identifier (S1–S12) | Origin Classification | Institutional Context of First Emergence or Transmission | Forensic Function | Relevance to Declaratory Judgment (DJ) | Relevance to RICO Continuity & Relatedness |
| | | | | evaluative faculty-context signaling (of and concerning') without verbal naming. | |
| S3 – Pant Raising (Variants) | Institution-Origin | Curaçao Police Department — *Chief Wim Tweeboom performed an upward pant-adjustment/pant-raising gesture* in the office doorway on the day of the private administrative complaint-reading. | Institutional dismissal coding; non-verbal invalidation | Presents a controversy as to whether an institution-anchored non-verbal cue is legally capable of functioning as a constructive identifier and conveying professional unfitness by implication. | Direct tie to 1996 event establishes long-term continuity |
| S4 – Car Perpendicular Obstruction | Institution-Origin | Curaçao Police Department / Police Academy administrative context – Curaçao cultural encoding via "Tweeboom" Dutch translation surname wordplay (two-boom/ hefboom / Lever), producing the perpendicular-block "car obstruction" motif; echoed by ~2000. Symbolic reenactment of Chief Tweeboom's administrative obstruction. | Institutional obstruction coding; reputation harm | Gesture meaning linked to identifiable administrative event → *Presents a controversy as to whether the alleged obstruction motif is legally capable of conveying professional unfitness/obstruc* | Cross-jurisdiction rebroadcast preserves pattern continuity |

| TABLE 2C — INSTITUTIONAL ACTOR GRID (S1-S12) | | | | | |
|---|---|---|---|---|---|
| *(Institutional Origin, Institutional Rebroadcasting, Audience-Dependent Meaning & Continuity Mapping)* | | | | | |
| **Symbolic Identifier (S1–S12)** | **Origin Classification** | **Institutional Context of First Emergence or Transmission** | **Forensic Function** | **Relevance to Declaratory Judgment (DJ)** | **Relevance to RICO Continuity & Relatedness** |
| | | | | *tion meaning 'of and concerning' Plaintiff by contextual association.* | |
| **S5 – Orange Color** | **Institution-Origin** | University of the Netherlands Antilles / Curaçao University (UNA) — technical faculty graduation rope/discipline color ("orange") repurposed as academic/professional failure code; echoed thereafter as a durable color-based identifier. | Professional failure coding | Presents a controversy as to whether a color-based identifier tied to an academic institution is legally capable of conveying professional/academic disqualification meaning 'of and concerning' Plaintiff. | Repetition in NL & US supports relatedness |
| **S6 – Yellow Color** | **Institution-Origin** | Institutional rumor ecology (UNA + Curaçao societal institutions) post-1996. The 1996 yellow-jersey soccer anchor → repurposed by ~2000 Curaçao as "reversal/collapse trajectory," or perceived instability" code; echoed thereafter. | Psychological-deficiency coding | Presents a controversy as to whether the alleged color-based cue is legally capable of imputing mental incapacity/instability 'of and concerning' Plaintiff by implication. | Persistent coding across jurisdictions supports continuity |

| TABLE 2C — INSTITUTIONAL ACTOR GRID (S1-S12) | | | | | |
|---|---|---|---|---|---|
| *(Institutional Origin, Institutional Rebroadcasting, Audience-Dependent Meaning & Continuity Mapping)* | | | | | |
| **Symbolic Identifier (S1–S12)** | **Origin Classification** | **Institutional Context of First Emergence or Transmission** | **Forensic Function** | **Relevance to Declaratory Judgment (DJ)** | **Relevance to RICO Continuity & Relatedness** |
| **S7 – Chin Stroking (Variants)** | **Institution-Origin** | Curaçao Police Academy Boarding Division *Head, habitual gesture when evaluating or addressing cadets, evaluative chin-stroking habit →  echoed/repurposed in 2000s.* | Institutional suspicion cue; integrity-doubt signaling mental-unfitness/ suspicion identifier | Presents a controversy as to whether an authoritative evaluative gesture is legally capable of conveying suspicion/doubt meaning and operating as constructive identification within a defined interpretive audience. | Repeated across Curaçao, Dutch and USA contexts functioning as a symbolic cue culturally linked (as alleged) to Plaintiff. |
| **S8 – Mustache Scratch** | **Institution-Origin** | *Early 2000s Curaçao parliamentary/TV gesture by Atacho* Curaçao Parliament – *performed by Pedro Atacho, Speaker of Parliament*; → *echoed/repurposed as suspicion/mental-unfitness cue,* subsequently diffused. | Mental-unfitness coding | Presents a controversy as to whether a publicly performed governmental/political-context gesture is legally capable of conveying an imputation of mental unfitness or suspicion 'of and concerning' Plaintiff. | Political → public diffusion demonstrates continuity & enterprise-style adaptation |
| **S9 – Cigarette Staring** | **Institutional-Rebroadcast** | First observed in Dutch media/cultural broadcast settings (circa 1997–1998); thereafter transmitted through | Social-worthlessness & | Presents a controversy as to whether the alleged cue is | Cross-setting recurrence supports relatedness |

| TABLE 2C — INSTITUTIONAL ACTOR GRID (S1-S12) | | | | | |
|---|---|---|---|---|---|
| *(Institutional Origin, Institutional Rebroadcasting, Audience-Dependent Meaning & Continuity Mapping)* | | | | | |
| **Symbolic Identifier (S1–S12)** | **Origin Classification** | **Institutional Context of First Emergence or Transmission** | **Forensic Function** | **Relevance to Declaratory Judgment (DJ)** | **Relevance to RICO Continuity & Relatedness** |
| **("Pineut") (variants)** | | public-facing institutional and media-adjacent environments as a rebroadcast cue. | condemnation coding | legally capable of functioning as a non-verbal accusation-equivalent (stigmatic condemnation) 'of and concerning' Plaintiff. | |
| **S10 – Nose Tapping (All Variants)** | **Institutional-Rebroadcast** | First observed in Dutch media/cultural broadcast contexts (circa 1997–1998), where it operated as an insinuation cue commonly associated with suspicion or wrongdoing; the alleged recurrence and later diffusion are referenced here for classification and plausibility purposes only, with substantiation reserved for later proceedings. | Constructive criminalization cue | *Presents a controversy as to whether the alleged cue is legally capable of implying criminal suspicion 'of and concerning' Plaintiff without explicit naming.* | Cross-jurisdiction recurrence establishes continuity |
| **S11 – Tongue-Out (All Variants)** | **Institutional-Rebroadcast** | First observed in Dutch youth/popular media contexts (circa 1997–1998), where it carried a commonly recognized association with mockery and (as alleged in this matter) moral impropriety and/or instability; referenced here solely for chronology, classification, and plausibility, with proof reserved for later proceedings. | Moral degradation / instability signaling | *Presents a controversy as to whether the alleged cue is legally capable of conveying moral impropriety and/or instability meaning 'of and concerning'* | Recurrence across audience groups supports related act pattern |

| TABLE 2C — INSTITUTIONAL ACTOR GRID (S1-S12) | | | | | |
| --- | --- | --- | --- | --- | --- |
| (Institutional Origin, Institutional Rebroadcasting, Audience-Dependent Meaning & Continuity Mapping) | | | | | |
| Symbolic Identifier (S1–S12) | Origin Classification | Institutional Context of First Emergence or Transmission | Forensic Function | Relevance to Declaratory Judgment (DJ) | Relevance to RICO Continuity & Relatedness |
| | | | | *Plaintiff by implication.* | |
| S12 – Handcuff Pose & Wrist-Roll Variants | Institutional-Rebroadcast rooted in law-enforcement meaning | Law-enforcement-adjacent and security spaces in which the cue draws on. Observed in Netherlands public/community settings during the 1997–2000 period and later reflected in media-adjacent contexts; referenced here as a chronology marker tied to widely understood custodial symbolism and alleged constructive identification, without requesting factual adjudication at the declaratory stage. | Criminal-implication coding | Presents a controversy as to whether the alleged cue is legally capable of operating as a non-verbal criminal-accusation equivalent 'of and concerning' Plaintiff. | Strong continuity with criminal-imputation messaging. |

## FOOTNOTE TABLE 2C- CLARIFICATION INSTITUTION-ORIGIN VS INSTITUTIONAL-REBROADCAST CATEGORIES:

[B.1-216] "Institution-Origin Identifiers" are gestures whose stigmatic meaning was formed inside institutional environments connected to Plaintiff. "Institutional-Rebroadcast Identifiers" are gestures whose meaning, though not originating within a specific institution, derives from the same 1996 Curaçao Police administrative nucleus and is transmitted by institutional actors or global media environments. Both categories contribute to constructive identity under Restatement §564 and support declaratory

clarification of symbolic meaning. Their repeated presence across institutions provides evidence of continuity relevant to later pattern analysis.

[B.1-217]  Coordination, intent, and enterprise-structure questions are addressed through discovery and subsequent RICO-stage briefing; at this stage, the exhibits establish continuity of meaning, recognition, and constructive identity under §564.

D.          **Appendix B – Table 2D: Temporal Continuity & Pattern Timeline (Technical Exhibit)**

### 1. TABLE 2D: TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12)

[B.1-218]  Table 2D provides the timeline for the symbolic identifiers, charting their cross-jurisdictional diffusion and establishing the continuity of meaning.

[B.1-219]  As explained in the *Cross-Jurisdiction Meaning Continuity Note (NL → USA)* above, several symbolic identifiers (S1–S12) demonstrated recognizable interpretive content within U.S. environments prior to Plaintiff's physical arrival. Table 2D summarizes the timeline of initial emergence within Curaçao and/or the Netherlands, followed by immediate reappearance in U.S. settings and contemporaneous manifestation within national media and broadcast-adjacent environments.

[B.1-220]  This temporal alignment underscores continuity of symbolic meaning across

jurisdictions and supports the plausibility and legal sufficiency of constructive

identification under Restatement (Second) of Torts § 564.


[B.1-221]  The table is submitted solely for contextual and classification purposes consistent

with Rule 8(a) and Federal Rule of Evidence (FRE) 1006.


| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| Symbolic Identifier (S1–S12) | Year of First Emergence | Institutional Origin or Context | Community-Level Diffusion (Local) | Cross-Jurisdiction Transmission (NL → USA) | Continuity Indicators |
| S1 – Trash Gesture | ~2000 | University of the Netherlands Antilles (UNA), Built Environment & Civil Engineering ("BE&C") Faculty — Dutch faculty member #1 used "puinhoop" as an evaluative critique of Plaintiff's studio work, establishing the institutional seed of the symbolic meaning. | Broad community uptake across academic, workplace, neighborhood, and civic settings with recurring community-level manifestations; independent functional adoption producing stabilized audience decoding tied to professional incompetence. | Pre-arrival symbolic familiarity established prior to Plaintiff's physical presence; immediate reappearance upon Plaintiff's arrival in both Netherlands and United States environments, including public-facing and media-adjacent contexts; and demonstrable continuity of | Consistent and stable symbolic meaning across disparate settings, encoding professional incompetence and unfitness; uninterrupted recurrence over an extended multi-decade period; persistent audience recognition and decoding stability across time; and repeated reappearance across institutional, media, and community environments, demonstrating a durable and recognizable |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Year of First Emer-gence** | **Institutional Origin or Context** | **Community-Level Diffusion (Local)** | **Cross-Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| | | | | audience recognition reflecting preserved symbolic meaning independent of geography or forum. | continuity of meaning linked to professional-incompetence signaling. |
| **S2 – Pant Zipper (Incl. Variants)** | ~2000 | UNA (BE&C Faculty) — Dutch faculty member #2 performed the pant-zipper gesture mockingly in faculty corridor/hallway settings adjacent to studio spaces, typically during or immediately after studio-critique/feedback intervals, creating a stigmatic association with sexualized impropriety in an evaluative context. | Independent uptake across educational, workplace, and civic settings; reflecting pre-existing interpretive familiarity prior to Plaintiff's U.S. arrival. | Meaning continuity demonstrated by immediate reappearance in United States settings upon Plaintiff's physical arrival in 2016; contemporaneous audience recognition reflecting pre-existing interpretive understanding established prior to U.S. presence; and preserved symbolic meaning across jurisdictions independent | Stable and stigmatic symbolic meaning imputing moral impropriety; repeated and deliberate deployment across unrelated institutional, media, and community environments; consistent and durable audience interpretation over time; and a demonstrable pattern of recurrence establishing continuity of meaning and recognition across settings. |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| Symbolic Identifier (S1–S12) | Year of First Emer-gence | Institutional Origin or Context | Community-Level Diffusion (Local) | Cross-Jurisdiction Transmission (NL → USA) | Continuity Indicators |
| | | | | of context or presenter. | |
| S3 – Pant Raising (Incl. Variants) | 1996 | 1996, Curaçao Police Department — Chief Wim Tweeboom performed an upward pant-adjustment/pant-raising gesture in the office doorway on the day private administrative complaint-reading, forming the initial institutional anchor later echoed as a dismissal/unfitness cue. | Independent community uptake across educational, workplace, and civic settings, reinforcing a stigmatic cue directly traceable to the originating institutional event. | Immediate and unambiguous recognition in United States settings upon Plaintiff's arrival in 2016; repeated observation across social and media-adjacent contexts with identical symbolic meaning; independently evidenced by distribution and reinforcement through Netherlands media rebroadcast environments in the early 2000s, irrespective of Plaintiff's local presence, demonstrating | Preserved and stable symbolic meaning over time; recurring deployment across multiple and varied institutional, media, and community settings; consistent and predictable interpretive effect on audiences; and a sustained pattern of recognition demonstrating continuity of meaning irrespective of setting or presenter. |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Year of First Emer-gence** | **Institutional Origin or Context** | **Community-Level Diffusion (Local)** | **Cross-Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| | | | | that immediate audience recognition in the United States upon Plaintiff's arrival reflected pre-existing symbolic knowledge established prior to U.S. appearance; with preserved institutional dismissal coding functioning as a non-verbal invalidation and signal of professional unfitness across jurisdictions. | |
| **S4 – Car Perpendicular Obstruction** | 1996–2000 | 1996 (institutional anchor) → early 2000s (cultural encoding), Curaçao — derived from the 1996 administrative "obstruction" episode associated with Chief Wim Tweeboom and later culturally encoded | Multi-sector presence across civic, transportation, and neighborhood settings; independent adoption | Symbolic enactment derived from the surname 'Tweeboom' (two-boom / hefboom), functioning as a non-verbal | Long-term and repeated recurrence of the car-perpendicular obstruction symbol; stable and uniform audience interpretation across time; reappearance across unrelated institutional, |

| | | | | | |
|---|---|---|---|---|---|
| **TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12)** *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
| **Symbolic Identifier (S1–S12)** | **Year of First Emer- gence** | **Institutional Origin or Context** | **Community- Level Diffusion (Local)** | **Cross- Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| | | through Dutch Translated surname wordplay on "Tweeboom" (two-boom / hefboom /lever), producing the perpendicular-block "car obstruction" motif as a symbolic reenactment of blocked passage/advancement; widely echoed by ~2000 onward. | with stable symbolic association to obstruction. | representation of obstruction rooted in the 1996 Police Academy administrative conflict. Independent adoption with stable symbolic association to obstruction and professional blockage. | media, and community environments; and preservation of a constant symbolic meaning signifying obstruction and professional unfitness irrespective of context or presenter. |
| **S5 – Orange Color** | ~2000 | University of the Netherlands Antilles / Curaçao University (UNA) — technical faculty graduation rope /discipline color ("orange") culturally repurposed within the academic environment to code Plaintiff as "incomplete," "failed," or professionally unqualified, and later echoed as a durable color-based identifier. | Widespread audience recognition and decoding. Multi-sector diffusion, observed across school, youth, and workplace settings; public-facing media recurrence with broadcast- context familiarity among | Immediate reappearance and recognition in United States settings upon Plaintiff's arrival in 2016; audience decoding consistent with prior usage and understanding ; independently evidenced by established symbolic usage and | Durable and fixed symbolic meaning preserved over time; recurring and sustained use across multiple temporal phases; recognizable and consistently decoded across distinct geographic regions and cultural settings; and continuity of interpretive effect establishing stable audience recognition irrespective of location or presenter. |

| | | | | | |
|---|---|---|---|---|---|
| **TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12)** *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
| **Symbolic Identifier (S1–S12)** | **Year of First Emer-gence** | **Institutional Origin or Context** | **Community-Level Diffusion (Local)** | **Cross-Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| | | | general audiences. Informal symbolic usage retained local stabilized associations with academic or professional failure, indicating preserved symbolic meaning across Curaçao, the Netherlands, and the United States. | reinforcement within Curaçao and Netherlands academic, community, and media-adjacent contexts in the early 2000s; demonstrating that recognition in the United States reflected pre-existing symbolic knowledge and preserved meaning continuity across Curaçao, the Netherlands, and the United States, irrespective of Plaintiff's local presence. | |
| **S6 – Yellow Color** | ~2000 | 1996 (anchor event) → early 2000s (cultural encoding), Curaçao — rooted in a 1996 standout indoor-soccer moment associated with Plaintiff | Deep social embedding across neighborhoo d, academic, and | Immediate and unambiguous audience recognition in Curaçao and, | Stable and uniform interpretive effect preserved over time; sustained and repeated recurrence across multiple institutional, |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Year of First Emergence** | **Institutional Origin or Context** | **Community-Level Diffusion (Local)** | **Cross-Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| | | (yellow jersey/feint) and later repurposed in community and academic settings by ~2000 as a color-based shorthand for "reversal," "collapse of trajectory," or perceived instability; subsequently echoed across contexts. | community contexts; recurring independent uptake in public interactions; stable interpretive meaning related to reversal, instability, or perceived deficiency. | subsequently, in United States settings; decoding consistent with prior symbolic usage; independently evidenced by established adoption and reinforcement within Curaçao academic, community, and media-adjacent environments prior to U.S. appearance; demonstrating that recognition in the United States reflected pre-existing symbolic knowledge and preserved meaning continuity across Curaçao, the Netherlands, | media, and community settings; recognition not dependent on geographic location or jurisdiction; and consistent preservation of symbolic meaning producing a predictable audience decoding across contexts. |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Year of First Emer-gence** | **Institutional Origin or Context** | **Community-Level Diffusion (Local)** | **Cross-Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| | | | | and the United States, irrespective of Plaintiff's local presence. | |
| **S7 – Chin Stroking (Incl. Variants)** | **1996** | 996, Curaçao Police Academy (Boarding Division) — habitual evaluative chin-stroking by the Boarding Division head during cadet assessment/feedback, later culturally echoed and repurposed in the 2000s as a symbolic suspicion/doubt cue referencing Plaintiff and repeated across Curaçao and Dutch contexts. | Community-level recurrence across educational, professional, and civic environments; routine recurrence in conversational and evaluative settings, reinforcing audience decoding of suspicion or judgment; independent audience adoption reflecting locally stabilized cues of suspicion or evaluative doubt. | Preserved and stable symbolic meaning across Curaçao, the Netherlands, and the United States; immediate reappearance and recognition in United States settings upon Plaintiff's arrival in 2016; repeated observation across everyday, institutional, and broadcast-adjacent contexts; and demonstrable audience decoding reflecting pre-existing | Institutional-origin symbolic meaning preserved across multiple jurisdictions; repeated deployment, including recognized variants, across unrelated institutional, media, and community environments within U.S. broadcast contexts; and continuity of symbolic recognition and audience decoding across jurisdictions, independent of Plaintiff's physical presence or participation. |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| Symbolic Identifier (S1–S12) | Year of First Emergence | Institutional Origin or Context | Community-Level Diffusion (Local) | Cross-Jurisdiction Transmission (NL → USA) | Continuity Indicators |
| | | | | symbolic knowledge established prior to U.S. appearance, irrespective of Plaintiff's local presence. | |
| S8 – Mustache Scratch (Incl. Variants) | ~2000 | Early 2000s, Curaçao political / parliamentary broadcast environment — publicly performed mustache-scratching gesture associated with Pedro Atacho during televised appearances and subsequently echoed as a symbolic cue culturally linked (as alleged) to Plaintiff, functioning as a mental-unfitness/suspicion identifier in later rebroadcast contexts. | Cross-setting recurrence in social, workplace, political-adjacent, and media-informed environments; broad public familiarity; consistent recognition of stigmatic meaning associated with mental unfitness. | Political and media-level diffusion in the Netherlands, reinforcing the gesture's stigmatic association through institutional legitimacy; immediate recognition and symbolic familiarity evident upon Plaintiff's arrival in the United States in 2016; repeated appearance across public-facing, political-adjacent, and media- | Symbolic meaning reinforced and maintained across political, institutional, and public contexts; repeated recurrence across multiple settings over time; and a stable, uniform interpretive understanding consistently recognized by audiences, demonstrating continuity of symbolic meaning irrespective of presenter, forum, or context. |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Year of First Emer-gence** | **Institutional Origin or Context** | **Community-Level Diffusion (Local)** | **Cross-Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| | | | | adjacent environments; and audience decoding reflecting pre-existing symbolic knowledge established prior to U.S. appearance, irrespective of Plaintiff's local presence. | |
| **S9 – Cigarette Staring ("Pineut") (Incl. Variants)** | Late 1990s | **First observed in Dutch media/cultural broadcast contexts (circa 1997–1998), where it functioned as a stigmatic signaling cue within the interpretive environment alleged in this matter; later echoed in Curaçao and U.S. contexts as a rebroadcast/transmission marker.** | Community-level adoption and public-facing recurrence across social and leisure contexts, reflecting broad audience familiarity and independent reinforcement of stigmatized marked status. | Origin in NL media (1997–1998) → reappeared in Curaçao upon plaintiff arrival in 2000 → immediate U.S. recognition upon plaintiff arrival in 2016; indicating meaning continuity pre-dated Plaintiff's U.S. presence. Culturally encoded as | Stable and transnational symbolic meaning preserved across jurisdictions; repeated reappearance across unrelated institutional, media, and community environments; documented reemergence in Curaçao contemporaneous with Plaintiff's arrival and subsequent recurrence in the United States with immediate audience recognition; and continuity of meaning demonstrating pre-arrival symbolic recognition across |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Year of First Emer-gence** | **Institutional Origin or Context** | **Community-Level Diffusion (Local)** | **Cross-Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| | | | | symbolic reference to Plaintiff marked status, passivity, or social worthlessness. Stability across jurisdictions. | Curaçao, the Netherlands, and the United States. |
| **S10 – Nose Tapping (Incl. Variants)** | 1997–1998 | First observed in Dutch media/cultural broadcast contexts (circa 1997–1998), where it operated as an insinuation cue commonly associated with suspicion or wrongdoing; the alleged recurrence and later diffusion are referenced here for classification and plausibility purposes only, with substantiation reserved for later proceedings. During. | Stable and recognizable interpretive meaning across civic, neighborhood, and informal community settings, with repeated public reappearance reinforcing its insinuative function. | NL media origin → reappearance in Curaçao in 2000→ immediate audience recognition in the U.S.in 2016; demonstrating pre-arrival symbolic familiarity and continuity of meaning. | Stable and transnational symbolic meaning preserved across jurisdictions; repeated reappearance across unrelated institutional, media, and community environments; documented reemergence in Curaçao contemporaneous with Plaintiff's arrival and subsequent recurrence in the United States with immediate audience recognition; and continuity of meaning demonstrating pre-arrival symbolic recognition across Curaçao, the Netherlands, and the United States. |
| **S11 – Tongue-** | 1997–1998 | First observed in Dutch youth/popular media | Community-level | NL media-origin → | Continuity of symbolic meaning established |

| TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12) *(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)* | | | | | |
|---|---|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Year of First Emer-gence** | **Institutional Origin or Context** | **Community-Level Diffusion (Local)** | **Cross-Jurisdiction Transmission (NL → USA)** | **Continuity Indicators** |
| **Out (Incl. Variants)** | | contexts (circa 1997–1998), where it carried a commonly recognized association with mockery and (as alleged in this matter) moral impropriety and/or instability; referenced here solely for chronology, classification, and plausibility, with proof reserved for later proceedings. | diffusion of a stigmatizing gesture associated with mockery, impropriety, and perceived instability, producing durable audience recognition beyond its original media context. | subsequent diffusion and recognition within U.S. public and broadcast contexts. | through consistent and durable audience interpretation; repeated recognition of the tongue-out gesture—including recognized variants—across disparate settings; and a stable interpretive effect demonstrating preserved symbolic meaning independent of context, presenter, or format. |
| **S12 – Handcuff Pose / Wrist-Roll** | 1998–2000 | Observed in Netherlands public/community settings during the 1997–2000 period and later reflected in media-adjacent contexts; referenced here as a chronology marker tied to widely understood custodial symbolism and alleged constructive identification, without requesting factual adjudication at the declaratory stage. | Community recognition of the gesture as a non-verbal implication of criminality or wrongdoing. | Initial emergence in Netherlands public and community contexts (1998–2000), contemporaneous with Plaintiff's presence, where the gesture functioned as a non-verbal implication of criminality or wrongdoing; subsequent | Strong and enduring continuity of symbolic meaning functioning as a non-verbal accusation equivalent; repeated deployment across institutional, media, and public contexts; immediate and consistent audience decoding as an imputation of criminality or wrongdoing; and preservation of meaning across settings demonstrating stable recognition |

| Symbolic Identifier (S1–S12) | Year of First Emer-gence | Institutional Origin or Context | Community-Level Diffusion (Local) | Cross-Jurisdiction Transmission (NL → USA) | Continuity Indicators |
|---|---|---|---|---|---|
| | | | | echo and reinforcement within Curaçao community contexts in the early 2000s; followed by public rebroadcast, adoption and reappearance within U.S. public and media environments in 2016 with immediate audience recognition, demonstrating that interpretive knowledge of the gesture predated Plaintiff's U.S. arrival and remained stable across jurisdictions. | independent of speaker, forum, or format. |

**TABLE 2D — TEMPORAL CONTINUITY & PATTERN TIMELINE (S1–S12)**
*(Chronological Emergence, Cross-Jurisdiction Transmission & Constructive Identity Persistence)*

**Footnote # 1- Table 2D - Pre-Arrival Meaning Continuity (Technical**

**Classification Note):**

Several identifiers exhibited pre-existing interpretive meaning within U.S. social and media environments prior to Plaintiff's arrival. Their immediate reappearance in Plaintiff-adjacent contexts, together with parallel visibility in national broadcast settings, reflects cross-jurisdiction meaning continuity rather than new emergence.

**Footnote #2- Methodological & Procedural Clarification:**

The continuity indicators set forth herein are derived from longitudinal forensic analysis of symbolic recurrence, audience decoding stability, and cross-contextual reappearance. While individual instances may vary in surface presentation, the underlying symbolic meaning remains stable and recognizable over time for purposes of declaratory relief and enterprise continuity analysis under Rule 57 and Restatement (Second) of Torts § 564. These findings address continuity of meaning and recognition and do not preclude later proof of coordination, intent, or enterprise structure, which are properly reserved for discovery and subsequent RICO-stage proceedings.

**E.**      **Appendix B – Table 2E: Symbolic Meaning → Constructive Identity → Harm Pathway Map (Technical Exhibit)**

TABLE 2E: *SYMBOLIC MEANING → CONSTRUCTIVE IDENTITY → HARM PATHWAY MAP*

[B.1-222] Table 2E connects symbolic meaning to constructive identity, tracing the pathway to reputational harm inflicted on Plaintiff.

| TABLE 2E - SYMBOLIC MEANING → CONSTRUCTIVE IDENTITY → HARM PATHWAY MAP (S1–S12) *(Reputational Injury, Identity Substitution & Ongoing Harm)* | | | |
|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Stigmatic Symbolic Meaning** | **Constructive Identity Effect** | **Reputational / Legal Harm Pathway** |
| **S1 – Trash Gesture ("Puinhoop")** | Professional incompetence; worthlessness of work or capability | Substitutes Plaintiff's identity with an image of professional failure | Undermines professional credibility; forecloses employment, advancement, and peer recognition; supports defamation *per se* (professional unfitness) |
| **S2 – Pant Zipper (Incl. Variants)** | Moral impropriety; sexualized insinuation | Recasts Plaintiff as morally suspect through non-verbal shorthand | Damages reputation for integrity and trustworthiness; supports defamation *per se* (moral turpitude) |
| **S3 – Pant Raising (Incl. Variants)** | Institutional dismissal; unfitness; social invalidation | Encodes Plaintiff as professionally and institutionally rejected | Causes reputational exclusion; impairs employability and standing; reinforces constructive social expulsion |
| **S4 – Car Perpendicular Obstruction** | Career blockage; obstruction of life trajectory | Symbolically assigns Plaintiff an identity of permanent professional obstruction | Sustains narrative of failure and blocked advancement; reputational harm through implied institutional rejection |
| **S5 – Orange Color** | Academic failure; technical disqualification | Marks Plaintiff as professionally incomplete or incapable | Long-term reputational damage within academic, professional, and technical domains; loss of credibility |
| **S6 – Yellow Color** | Psychological instability; reversal; diminished capacity | Assigns Plaintiff an identity of mental or life-trajectory deficiency | Stigmatizes Plaintiff as unstable; impairs trust, employment prospects, and social standing |
| **S7 – Chin Stroking (Incl. Variants)** | Suspicion; doubt; integrity evaluation | Frames Plaintiff as morally or professionally questionable | Erodes trustworthiness; sustains defamatory implication affecting reputation and credibility |
| **S8 – Mustache Scratch** | Mental unfitness; irrationality | Politically and socially codes Plaintiff as mentally unreliable | Broad reputational harm through perceived unfitness; defamation *per se* (mental incapacity) |

| TABLE 2E - SYMBOLIC MEANING → CONSTRUCTIVE IDENTITY → HARM PATHWAY MAP (S1–S12) *(Reputational Injury, Identity Substitution & Ongoing Harm)* | | | |
|---|---|---|---|
| **Symbolic Identifier (S1–S12)** | **Stigmatic Symbolic Meaning** | **Constructive Identity Effect** | **Reputational / Legal Harm Pathway** |
| **S9 – Cigarette Staring ("Pineut")** | Social worthlessness; passive condemnation | Reduces Plaintiff to a stigmatized, devalued social identity | Sustained reputational degradation; social exclusion; humiliation and loss of dignity |
| **S10 – Nose Tapping (Incl. Variants)** | Criminal suspicion; wrongdoing | Constructs Plaintiff as criminally suspect without verbal accusation | Defamation *per se* (criminality); reputational injury through implied illegality |
| **S11 – Tongue-Out (Incl. Variants)** | Mockery; moral degradation; instability | Assigns Plaintiff a degrading and unserious identity | Chronic reputational harm; ridicule; erosion of social and professional standing |
| **S12 – Handcuff Pose / Wrist-Roll (Incl. Variants)** | Criminal accusation; law-enforcement implication | Functions as a non-verbal criminal charge | Severe defamation *per se*; reputational harm equivalent to accusation of crime |

**Footnote #1- Table 2E - Declaratory Judgment Relevance:**

Table 2E demonstrates how each symbolic identifier functions not merely as expressive conduct, but as a **mechanism of constructive identity substitution**, converting symbolic meaning into **reputational injury**. The table establishes a clear and traceable pathway from **symbolic act → identity attribution → harm**, supporting the existence of an actual and ongoing controversy requiring declaratory clarification under **28 U.S.C. § 2201** and **Restatement (Second) of Torts § 564**.

**Footnote #2- Table 2E - Procedural & Evidentiary:**

This table is submitted for **classification and contextual purposes** consistent with **Rule 8(a)** and **FRE 1006**. It synthesizes the symbolic meanings and continuity findings documented in **Tables 2A–2D**, without requiring proof of coordination or

intent at the Declaratory Judgment stage. Issues of enterprise structure, intent, and damages quantification are appropriately addressed in subsequent phases of litigation.

## XVII.  EVIDENTIARY CROSS-REFERENCES

[B.1-223]  Supporting evidence is preserved as follows:

- **Exhibit A: Forensic Gesture Ledger.**

- **Exhibit B: Witness Affidavit Templates.**

- **Exhibit C: AI Forensic Binder (detection logs, metadata, summaries).**

- **Exhibits D1–D6: Reports and missing complaint file establishing institutional backdrop.**

[B.1-224]  These materials are identified solely to preserve evidentiary continuity and are not offered for truth, authentication, or adjudication at the declaratory stage

## XVIII.  LINK TO CONSTRUCTIVE IDENTITY AND RICO THEORIES

[B.1-225]  This Appendix B provides the factual background necessary for understanding the constructive identity described in Appendix A.2. It documents the historical sequence in which an internal administrative event became a cultural reference point repeated in symbolic form across jurisdictions.

[B.1-226]  These symbolic identifiers became associated with Plaintiff because:

- **They draw meaning from the 1996 institutional context;**

- **They appear consistently across multiple cultural settings; and**

- **Witnesses reasonably interpret them as referencing Plaintiff due to that unique context.**

[B.1-227]   For purposes of Counts I–III, the multi-jurisdictional appearance of these symbolic identifiers, and their persistence over more than two decades, provides factual context supporting the plausibility of allegations concerning ongoing injury, repeated use, and cross-platform diffusion.

[B.1-228]   The legal interpretation of these background facts is addressed in the doctrinal materials contained in **Appendices A.1–A.12** and applied in the corresponding Counts. The Court may consider this section in conjunction with:

> • **Appendix A** (Doctrinal Appendices, particularly A.2–A.4 and A.7–A.8, addressing constructive identity, implication doctrines, and continuity);
>
> • **Appendix C** (Constructive Identity and Symbolic Substitution Narrative);
>
> • **Appendix G** (AI metadata and Rule 26 forward-looking evidentiary framework); and
>
> • **Counts I–III** (Defamation by Innuendo, Constructive Identification, and Defamation per se)."

## XIX.      CONCLUSION OF APPENDIX B

[B.1-229] Appendix B documents Plaintiff's professional status as a high-performing Dutch-Track Cadet whose removal was unaccompanied by any disciplinary or criminal finding. It then traces how that event became the reference point around which later symbolic identifiers gained social meaning.

[B.1-230] This context enables the Court to understand the significance of the symbolic practices documented throughout this Appendix B and how they came to be reasonably interpreted as 'of and concerning' Plaintiff.

## APPENDIX B → APPENDIX C TRANSITION PARAGRAPH

[B.1-231] **Transition Paragraph:**

Appendix B provides the sociological, organizational-behavior, and chronology-based plausibility foundation explaining how the symbolic identifiers at issue plausibly acquired stable meaning, operated as "of and concerning" identifiers within defined interpretive audiences, and persisted across jurisdictions as structured in Table 1 and Tables 2A–2E. Appendix C then preserves the forward-looking technical framework for how the AI-assisted detection, logging, hashing, and packaging workflow is designed to satisfy authentication and reliability standards under Fed. R. Evid. 901 and expert reliability principles under Fed. R. Evid. 702 and Daubert, if and only if later proceedings require evidentiary substantiation beyond the declaratory-stage legal-capability determinations. Appendix C is included for sequencing and

methodological integrity only and does not proffer proof or seek admissibility rulings at the declaratory stage.

## JUDICIAL ANNOTATION (PRO SE CLARIFICATION)

[B.1-232]  This Appendix provides forensic and evidentiary context for understanding the symbolic identification mechanisms at issue. The Plaintiff does not seek findings against foreign institutions or non-party individuals. All references are included solely to document the historical background relevant to the symbolic meanings analyzed in this action. Liability is sought only against the defendants named in the complaint caption.