UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

DARREL FRANCIS ANTHONY JOURDAIN,

Plaintiff,

v.

WARNER BROS. DISCOVERY, INC., et al.,

Defendants.

**Case No.** _____

**APPENDICES**

(Incorporated by Reference Pursuant to Fed. R. Civ. P. 10(c))

Filed in Support of Plaintiff's Complaint for Declaratory Relief

Under 28 U.S.C. § 2201

**Darrel Francis Anthony Jourdain (Pro Se)**

**Mailing Address:** 339 E Main ST, PMB 1053, Elmsford, NY 10523

**Tel:** 914-413-3928

**Email:** darreljour@yahoo.com

**Dated:** March 31, 2026

New York, New York

# APPENDICES TABLE OF CONTENTS

## DOCTRINAL FRAMEWORK (APPENDIX A)

Appendix A.1 – Defamation by Innuendo (Doctrinal Support) ...........................…...**8**

**Appendix A.2 – Constructive Identity Doctrine** ................................................**22**

Appendix A.3 – Narrative Parasitism and Coordinated Innuendo ..........................**35**

**Appendix A.4 – "Of and Concerning" Doctrine** ....................................................47

Appendix A.5 – Defamation Per Se ...........................................................................**59**

**Appendix A.6 – Article III Standing** .......................................................................78

Appendix A.7 – Constitutional Balance .................................................................**101**

**Appendix A.8 – Civil RICO Continuity Doctrine** ...............................................134

Appendix A.9 – Declaratory Relief Clarification ...................................................**188**

**Appendix A.10 – Legal Doctrines Supporting Structural Relief** .....................210

Appendix A.11 – Consent Decree: Dual-Class Governance Protections …...…....**221**

**Appendix A.12 – Final Closer (Structural Consolidation)** ...............................229

## FACTUAL FOUNDATION

Appendix B – Factual Timeline and Contextual Background **(Filed with Complaint)**

## TECHNICAL CAPABILITY ARCHITECTURE (APPENDIX C)

Appendix C.1 – Summary: AI Methodology, Reliability, and Chain ....................**249**

**Appendix C.2 – AI Forensic Reliability** ...........................................................255

Appendix C.3 – AI Authentication & Chain-of-Custody .....................................**262**

**Appendix C.4 – AI Forensic Workflow & Analytical Process** ........................268

Appendix C.5 – AI Detection Capability (Per Se Structural Mapping) ..............**278**

**Appendix C.6 – Technical–Doctrinal Linkage Matrix** ...................................283

Appendix C.7 – Traceability & AI Forensic Chain .............................................**298**

**Appendix C.8 – Enterprise Continuity & Temporal Graph Capability** …....302

Appendix C.9 – Civil RICO Predicate Continuity & AI Mapping ..................... **308**

**Appendix C.10 – Technical Companion (AI Forensic & RICO Continuity).**315

# STRUCTURAL CONTINUITY & SUCCESSOR PRESERVATION

Appendix D – Successor Liability & Structural Continuity ................................325

# EVIDENTIARY FRAMEWORK

Appendix E – Technical Evidentiary Framework (FRE 401–1006) ....................336

# COMPARATIVE DOCTRINAL FRAMEWORK

Appendix F – Comparative Media Law & Symbolic Expression Doctrine …......347

# DISCOVERY ORIENTATION

Appendix G – Anticipatory Discovery Framework & Rule 26 Orientation …... 362

# ENTERPRISE-CAPABILITY MAPPING

Appendix H – Structural Enterprise Mapping (RICO Capability Framework) ...369

## APPENDIX ARCHITECTURE OVERVIEW
### *(For Judicial Orientation Only)*

This overview is provided solely to orient the Court to the functional role of each Appendix accompanying the Complaint. The Appendices are organized into doctrinal, factual, technical, evidentiary, structural, and comparative components and are incorporated by reference pursuant to **Fed. R. Civ. P. 10(c).**

At the declaratory stage, the Appendices are included only to demonstrate that the allegations set forth in the Complaint are capable of evaluation, authentication, and structured development under ordinary procedural and evidentiary rules. No Appendix requests an adjudication of liability, admissibility, or statutory satisfaction at this stage.

I.        **DOCTRINAL FRAMEWORK (APPENDIX A SERIES)**

- **Appendices A.1–A.5** establish the doctrinal foundation for defamation by innuendo, constructive identity, coordinated narrative dissemination, "of and concerning" identification, and defamation per se.

- **Appendix A.6** addresses Article III standing, including injury-in-fact, traceability, and redressability.

- **Appendix A.7** provides constitutional boundary-setting and balancing principles.

- **Appendices A.8–A.9** address civil RICO continuity doctrine and declaratory relief clarification under a capability-based framework.

- **Appendices A.10–A.11** address structural relief doctrines, including successor continuity, governance protections, and implementation authority.

- **Appendix A.12** consolidates the doctrinal and structural architecture of declaratory relief.

## II.       FACTUAL FOUNDATION

- **Appendix B (Filed with Complaint)** provides the factual and contextual foundation, including timeline, institutional background, and development of symbolic identification patterns supporting Counts I–III.

## III.      TECHNICAL CAPABILITY ARCHITECTURE

- **Appendix C (C.1–C.10)** provides the AI-assisted forensic framework, including reliability considerations, authentication protocols, analytical workflow, detection capability, doctrinal linkage, traceability, temporal modeling, and continuity-capability mapping.

## IV.      STRUCTURAL CONTINUITY AND SUCCESSOR PRESERVATION

- **Appendix D** provides structural continuity orientation, including successor liability concepts, anti-circumvention safeguards, and preservation of declaratory scope across corporate restructuring or operational transfer.

## V.          EVIDENTIARY FRAMEWORK

- **Appendix E** provides the evidentiary architecture under the Federal Rules of

  Evidence, including relevance, authentication, expert reliability, business

  records, and summary evidence capability.

## VI.          COMPARATIVE DOCTRINAL FRAMEWORK

- **Appendix F** provides comparative legal analysis concerning symbolic

  expression, implication-based communication, and defamation principles

  across U.S., New York, and related authorities.

## VII.          DISCOVERY ORIENTATION (DECLARATORY-SAFE)

- **Appendix G** provides a Rule 26-oriented framework demonstrating that the

  preserved evidentiary architecture is capable of phased, proportional, and

  judicially manageable discovery, if later proceedings are reached.

## VIII.          ENTERPRISE-CAPABILITY MAPPING

- **Appendix H** provides a structural framework through which the alleged

  conduct is capable of evaluation under enterprise, continuity, and pattern-

  oriented doctrines, without asserting liability or statutory satisfaction.

Appendices – D.F.A Jourdain v. WBD, et al.                                    03/25/2026

| MASTER APPENDIX AUTHORITY & FUNCTION ORIENTATION TABLE (For Judicial Reference Only) | | | |
|---|---|---|---|
| **APPENDIX** | **TITLE / SUBJECT** | **PRIMARY FUNCTION (DECLARATORY STAGE)** | **COMPLAINT CROSS-REFERENCE** |
| A.1 | Defamation by Innuendo | Establishes doctrinal basis for implication-based defamation | Count I ¶¶62–86 |
| A.2 | Constructive Identity Doctrine | Defines identification without naming under Restatement §564 | Counts I and III ¶¶62–111 |
| A.3 | Narrative Parasitism & Coordinated Innuendo | Explains coordinated dissemination of symbolic narratives | Counts I–III ¶¶62–111 |
| A.4 | "Of and Concerning" Doctrine | Establishes identification standard under symbolic context | Counts I–III ¶¶62–111 |
| A.5 | Defamation Per Se | Defines per se categories (criminality, unfitness, etc.) | Counts I and III ¶¶62–111 |
| A.6 | Article III Standing | Establishes injury, traceability, and redressability | Complaint ¶¶1–15; ¶¶26–58; Counts I–III |
| A.7 | Constitutional Balance | Provides First Amendment boundary-setting framework | Counts I–II |
| A.8 | Civil RICO Continuity Doctrine | Defines continuity and relatedness (capability framing) | Count III ¶¶100–111 |
| A.9 | Declaratory Relief Clarification | Clarifies DJ posture and procedural sequencing | Complaint ¶¶75–77; ¶¶106–111 |
| A.10 | Structural Relief Doctrines | Successor liability, governance protections, anti-dilution | Count IV ¶¶112–122 |
| A.11 | Consent Decree Framework | Enforcement authority and governance implementation mechanisms | Count IV ¶¶112–122 |
| A.12 | Final Closer | Consolidates declaratory architecture and appendix integration | Entire Complaint |
| B | Factual Foundation | Timeline, institutional context, and symbolic identification development | Complaint ¶¶26–58 |

| MASTER APPENDIX AUTHORITY & FUNCTION ORIENTATION TABLE (For Judicial Reference Only) | | | |
|---|---|---|---|
| **APPENDIX** | **TITLE / SUBJECT** | **PRIMARY FUNCTION (DECLARATORY STAGE)** | **COMPLAINT CROSS-REFERENCE** |
| C | AI Forensic Framework | Reliability, authentication, detection, traceability, and continuity capability | Count III ¶¶100–111 |
| D | Structural Continuity | Successor preservation, anti-circumvention, portability of relief | Count IV ¶¶112–122 |
| E | Evidentiary Framework | FRE-based admissibility architecture (401, 702, 901, 1006) | Count III ¶¶100–111 |
| F | Comparative Doctrine | Symbolic expression and defamation doctrine across jurisdictions | Count I ¶¶62–86 |
| G | Discovery Orientation | Rule 26 capability framework (phased, proportional discovery) | Count III ¶¶100–111; Prayer ¶136(e), (j) |
| H | Enterprise Mapping | Structural enterprise and continuity-capability framework | Count III ¶¶100–111 |

# APPENDIX A.1 –

# DEFAMATION BY INNUENDO (DOCTRINAL SUPPORT)

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No**. _____

## APPENDIX A.1    -

## DEFAMATION BY INNUENDO (DOCTRINAL SUPPORT)
*(Incorporated by reference under Fed. R. Civ. P. 10(c); Cross-Referenced from Count I ¶¶62–86; Supported by Appendices A.2–A.5 and Appendix F; Referenced in Appendix E; Integrated with Exhibits A and B.)*

## I.    PURPOSE AND SCOPE

[A.1-1]    This **Appendix A.1** provides the doctrinal foundation for Count I (Declaratory Relief Symbolic Defamation). It explains how symbolic gestures, color codes, and non-verbal rebroadcasts, **have the legal capability to** satisfy the "of and concerning" requirement of **defamation per se** under the **Restatement (Second) of Torts § 564** and **U.S. precedent,** and why such conduct warrants declaratory recognition under **28 U.S.C. § 2201.**

[A.1-2]    This **Appendix A.1** is not an evidentiary brief; it preserves the governing legal doctrines and authorities that, when applied to the factual matrix stated in the **Complaint** and the structured factual context set forth in **Appendix B, including Table 1 (institutional origin, following § XI) and Tables 2A–2E (identity-function evolution, following § XVI),** demonstrate that Defendants' alleged conduct is legally actionable under defamation and RICO standards once symbolically linked to Plaintiff.

## II.        GOVERNING DOCTRINES OF DEFAMATION BY INNUENDO

### A.        Actionability Without Explicit Naming

[A.1-3]    Under **§ 564 of the Restatement (Second) of Torts,** a statement, or, by extension, any communicative act, is actionable if the recipient reasonably understands it as referring to the plaintiff." Courts repeatedly hold that a plaintiff need not be expressly named when contextual cues, audience knowledge, or symbolic references identify him.

[A.1-4]    Key precedents:

- **Bindrim v. Mitchell, 92 Cal. App. 3d 61 (1979)** (upholding liability where a fictionalized depiction unmistakably referred to the plaintiff).

- **Clark v. American Broadcasting Companies, 684 F.2d 1208 (6th Cir. 1982)** (finding implied identification actionable).

- **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)** (rejecting an absolute "opinion" shield where statements imply verifiable facts).

[A.1-5]    These authorities extend to non-verbal or symbolic communication when the audience decodes them as identifiers "of and concerning" the plaintiff.

**B.**        **Defamation Per Se and Presumed Injury**

[A.1-6]    Certain categories of statements, including those imputing criminal conduct, sexual immorality, professional incompetence, or mental instability, are defamation per se; harm is presumed. See **Balboa Island Village Inn v. Lemen, 40 Cal. 4th 1141 (2007).**

[A.1-7]    The symbolic identifiers referenced in this Complaint, as organized and classified in **Exhibit A (Forensic Gesture Ledger)** and contextualized in **Appendix B (Timeline),** fall within established categories of defamation per se, including gestures implying criminality, moral deviance, or professional unfitness.

[A.1-8]    At this stage, the **Forensic Gesture Ledger (Exhibit A)** is offered solely as a structured classification and contextual framework illustrating the types, recurrence, and symbolic characteristics of the identifiers alleged. See **Appendix B, Table 1 (following § XI)** and **Tables 2A–2E (following § XVI)**, which together document the institutional origin and subsequent identity-function evolution of the symbolic identifiers referenced in this Complaint. It is not submitted for evidentiary proof, adjudicated recognition, or fact-finding. Where such identifiers are plausibly alleged to be understood by reasonable observers as referring to Plaintiff within the institutional and symbolic context described in **Appendix B**, their use is **legally capable o**f giving rise to presumed injury under settled defamation doctrine, without the need for proof of special damages.

[A.1-9]    The more than fifty Plaintiff-identifying symbolic gestures catalogued in the **Forensic Gesture Ledger (Exhibit A),** as mentioned, are not offered for evidentiary proof at

this stage, but will be presented at the appropriate procedural stage, including discovery and any subsequent proceedings, consistent with **Fed. R. Civ. P. 26** and applicable evidentiary rules. In cases alleging symbolic defamation and constructive identity, AI-assisted detection and viewer affidavits constitute the principal mechanisms by which contextual recognition, repetition, and identity-substitution are substantiated.

[A.1-10]   Their deferred presentation reflects procedural sequencing, not evidentiary deficiency or weakness, and does not diminish their relevance to the declaratory determinations sought.

[A.1-11]   For institutional background and origin context, see **Appendix B, Table 1 (following § XI)**. For the structured evolution and functional use of symbolic identifiers, see **Appendix B, Tables 2A–2E (following § XVI)**. Taken together, these tables map: (a) **the institutional seeding phase of Plaintiff's constructive identity (Table 1)**; and

(b) **the subsequent identity-function evolution of symbolic identifiers across jurisdictions and media environments (Tables 2A–2E).**

## III.        CONSTRUCTIVE IDENTITY AND SYMBOLIC REFERENCE

[A.1-12]   **"Constructive identity"** arises when a composite of cues, gestures, colors, recurring phrases, forms a stable proxy for a person's name. Such proxies, if contextually understood by the audience, satisfy **"of and concerning."**

[A.1-13]  The doctrine parallels **Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980),** where indirect fictional portrayal was found sufficient for identification. Here, recurrent symbolic rebroadcasts serve the same function.

[A.1-14]  **New York courts** apply the same **Restatement § 564 "reasonable recipient"** standard **(See Appendix F):**

- **Collecting Stepanov v. Dow Jones & Co., Inc., 120 A.D.3d 28 (1st Dep't 2014);**

- **Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016);** and

- **Church of Scientology Int'l v. Time Warner, Inc., 806 F. Supp. 1157 (S.D.N.Y. 1992).**

[A.1-15]  These decisions confirm that implication-based defamation is actionable where context conveys defamatory meaning "of and concerning" the plaintiff, even absent explicit naming.

## IV.  RELATION TO CIVIL RICO EVALUATIVE FRAMEWORK (CAPABILITY ONLY)

[A.1-16]  Although defamation is not itself a predicate act under 18 U.S.C. § 1961(1), Plaintiff pleads this action in a sequencing posture: the Complaint and Appendix B frame a long-duration, cross-platform dissemination system whose **continuity and relatedness** are the precise structural features civil RICO doctrine evaluates under **H.J. Inc.** This **Appendix A.1** preserves the governing point that the same interstate

distribution channels and standardized dissemination mechanics alleged here are legally capable of evaluation under predicate-eligible federal statutes, with any element-by-element predicate identification, intent, and statutory satisfaction reserved for the appropriate procedural stage consistent with **Fed. R. Civ. P. 26** and applicable pleading and evidentiary standards (including Rule 9(b) to the extent later implicated).

[A.1-17]    At the declaratory stage, Plaintiff does not ask the Court to determine that any predicate act occurred, that any Defendant possessed fraudulent intent, or that **Rule 9(b)** standards have been met. Plaintiff seeks only a declaration that the alleged multi-year dissemination pattern is **legally capable of evaluation** under civil RICO's continuity/relatedness and enterprise-capability framework, with element-by-element satisfaction reserved for later proceedings if warranted.

[A.1-18]    See **H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)** (continuity and relatedness) and **Boyle v. United States, 556 U.S. 938 (2009)** (association-in-fact enterprise), cited here to preserve the evaluative framework relevant to **Count III's classification request.**

[A.1-19]    Although defamation per se itself is not a RICO predicate, the use of defamatory identifiers through interstate wires, for fraudulent or intimidatory purposes, can **constitute wire fraud (18 U.S.C. § 1343)** and **obstruction of justice / witness tampering (18 U.S.C. §§ 1503, 1512).**

## V.         APPLICATION TO PLAINTIFF'S FACTUAL MATRIX

[A.1-20]    **The Complaint (¶¶ 26–58)** details how a 1996 Curaçao Police Academy administrative incident produced the institutional conditions from which symbolic identifiers later emerged and were amplified through media and public-facing channels. As documented in **Appendix B, Table 1 (following § XI)** and **Tables 2A–2E (following § XVI)**, these identifiers did not create Plaintiff's identity but evolved as expressive substitutes for an identity already constructed through non-adjudicative institutional processes. Over time, the repeated use of these symbols functioned as a linguistic and visual code reasonably understood by audiences, in context, as referring to Plaintiff.

[A.1-21]    The progression of symbolic rebroadcasts from Curaçao to subsequent appearances in European and United States media environments plausibly reflects both geographic dispersion and temporal continuity, features relevant to assessing whether the alleged conduct is legally capable of satisfying the relatedness and continuity components of a RICO pattern under **18 U.S.C. § 1961(5).** As alleged, these symbolic references operated within a recurring interpretive framework that reasonably conveyed stigmatic meanings, such as criminality, instability, or professional unfitness, when understood in the institutional and historical context described in the **Complaint** and **Appendix B.**

[A.1-22]    At this stage, the Court need not accept Plaintiff's allegations as established fact or resolve disputed evidentiary questions. It need only determine whether Plaintiff has

plausibly alleged an actual and immediate controversy appropriate for declaratory resolution, and whether the requested declaration would clarify the legal status of Defendants' ongoing conduct and the parties' respective rights and obligations. Declaratory relief is sought precisely to resolve that legal uncertainty before further harm accrues.

## VI.        ANTICIPATED EVIDENTIARY PROOF AND RULE 702 RELIABILITY

[A.1-23]    The legal significance of AI-assisted detection, structured gesture classification, and viewer affidavits is central to symbolic defamation and constructive-identity cases involving non-verbal or coded communication. Such materials constitute the principal mechanisms by which contextual recognition, repetition, and identity-substitution are substantiated. Their relevance arises from their established role in demonstrating how symbolic communications are perceived, decoded, and understood by reasonable observers within a defined institutional, cultural, and media context.

[A.1-24]    At the declaratory judgment stage, Plaintiff does not seek evidentiary findings, admissibility rulings, or Daubert determinations regarding such materials. These references are made solely to demonstrate that the allegations pleaded are capable of substantiation through admissible proof if the action proceeds beyond threshold declaratory determinations. Consistent with **Fed. R. Civ. P. 26,** such materials would

be produced and evaluated at the appropriate procedural stage and assessed under applicable evidentiary standards, including **Fed. R. Evid. 702, 901, and 1006.**

[A.1-25]   The deferred presentation of AI-assisted analyses, structured classification data, and viewer affidavits reflects procedural sequencing, not evidentiary deficiency, and does not diminish their relevance to the declaratory determinations sought. Declaratory relief under **Rule 57** permits the Court to clarify the legal status of symbolic conduct and constructive identification without requiring premature proof, while preserving orderly development of the evidentiary record for subsequent proceedings, including any later civil RICO phase.

## VII.       FIRST AMENDMENT AND SATIRE REBUTTALS

[A.1-26]   Defendants may contend that some challenged content constitutes parody, satire, or protected opinion. This Appendix preserves the governing doctrinal distinction that expressive framing does not categorically bar liability where a communication, verbal or non-verbal, can reasonably be understood as conveying a defamatory factual implication "of and concerning" a plaintiff. See **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)** (no absolute "opinion" shield where a provably false factual implication is conveyed); **Hustler Magazine v. Falwell, 485 U.S. 46 (1988)** (recognizing constitutional limits and the relevance of context); **Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016)** (context governs whether meaning is actionable). Where the pleaded symbolic cues function as identity substitutes within a defined interpretive audience, the threshold legal question for

declaratory purposes is whether such non-verbal communications are legally capable of conveying actionable defamatory implications under applicable standards.

[A.1-27]    At the declaratory stage, Plaintiff does not ask the Court to resolve disputed issues of meaning, audience perception, fault, or defenses. Plaintiff seeks only a declaration that the challenged symbolic practices, as pleaded and contextualized in **Appendix B (Table 1; Tables 2A–2E),** are legally capable of constituting actionable defamation by implication and constructive identification "of and concerning" Plaintiff under **Restatement (Second) of Torts § 564** and the authorities cited herein, with all proof reserved for later proceedings consistent with **Fed. R. Civ. P. 26** and applicable evidentiary standards.

[A.1-28]    Plaintiff seeks declaratory clarification, without adjudicating factual meaning, fault, or damages, that the symbolic rebroadcast practices alleged in the Complaint, as contextualized in **Appendix B (Table 1; Tables 2A–2E)**, are legally capable of constituting actionable defamation by implication and, where applicable, defamation per se "of and concerning" Plaintiff under **Restatement (Second) of Torts § 564. See Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980) (identification by implication); Stepanov v. Dow Jones & Co., 120 A.D.3d 28 (1st Dep't 2014) (defamation-by-implication framework); Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)** (no categorical "opinion" shield where a factual implication is conveyed); **Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016)** (context governs defamatory

meaning). Declaratory relief is sought to resolve legal uncertainty governing ongoing conduct, consistent with **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).**

## VIII.        DECLARATORY AND FORWARD-LOOKING FUNCTION

[A.1-29]    Plaintiff further seeks declaratory clarification that the pleaded continuity structure, long-duration recurrence, cross-platform dissemination, and repeated symbolic use as alleged, is legally capable of evaluation under civil RICO's continuity and relatedness framework, without adjudicating predicate acts, intent, damages elements, or statutory satisfaction at this stage. See **H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)** (continuity and relatedness); **Boyle v. United States, 556 U.S. 938 (2009)** (enterprise evaluative structure). Any predicate-specific theories, element-by-element statutory application, and proof are reserved for later proceedings if warranted, consistent with **Fed. R. Civ. P. 26** and applicable pleading and evidentiary standards (**including Rule 9(b)** to the extent later implicated).

[A.1-30]    Declaratory recognition also preserves continuity for RICO analysis (Count III) by confirming that the underlying acts are qualitatively uniform and predicate-eligible under **§ 1961(1).**

[A.1-31]    This forward-looking posture comports with **Fed. R. Civ. P. 57,** which permits declaratory judgments resolving legal status and capability prior to evidentiary adjudication. Plaintiff does not seek damages or coercive relief at this stage but preserves such remedies contingent upon post-discovery substantiation, at the appropriate procedural stage, including discovery and any subsequent proceedings,

consistent with **Fed. R. Civ. P. 26,** and evaluated under applicable evidentiary standards, including **FRE 702, 901, and 1006.**

[A.1-32]    For the reasons set forth above, the alleged symbolic rebroadcast practices described in the Complaint and contextualized in **Appendix B** are legally capable of constituting actionable defamation by implication and constructive identification "of and concerning" Plaintiff under **Restatement (Second) of Torts § 564** and applicable precedent, without factual adjudication at this stage. **See Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980); Stepanov v. Dow Jones & Co., 120 A.D.3d 28 (1st Dep't 2014); Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990).** Declaratory relief is sought to clarify the governing legal status and capability questions in a live controversy, consistent with **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).**

## IX.    CONCLUSION AND CROSS-REFERENCES

[A.1-33]    For the reasons set forth above, symbolic rebroadcasts constituting gesture-based innuendo should be recognized as defamation per se and "of and concerning" Plaintiff under **Restatement § 564** and U.S. precedent.

[A.1-34]    Supporting forensic and evidentiary material is cross-referenced as follows:

- **Appendix B** – Timeline and Narrative Background
- **Appendix C –** AI Methodology & Daubert Reliability
- **Appendix E** – Technical Evidentiary Framework

- **Appendix F** – Comparative Media Law & Symbolic Expression

[A.1-35]    This **Appendix A.1** is submitted solely for doctrinal support **under Fed. R. Civ. P. 10(c).** It creates no independent claim but preserves the legal foundation necessary for judicial recognition of symbolic defamation as actionable conduct within this Court's jurisdiction.

# APPENDIX A.2 –

# CONSTRUCTIVE IDENTITY DOCTRINE

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

## APPENDIX A.2     – CONSTRUCTIVE IDENTITY DOCTRINE

*(Cross-Referenced from Count I ¶¶62–86 and Count III ¶¶100–111; Supported by Appendices A.1, A.4, and A.8; Referenced in Appendix B; Integrated with Appendix C.)*

## X.     DOCTRINAL OVERVIEW AND PURPOSE

[A.2-1]     This **Appendix A.2** sets forth the legal basis by which symbolic, non-verbal, or coded expressions become "of and concerning" a specific individual even where no name is spoken. Under ***Restatement (Second) of Torts § 564***, a statement, or its symbolic equivalent, is actionable if a reasonable recipient understands it to refer to the plaintiff.

[A.2-2]     Plaintiff alleges that the symbolic identifiers described in the Complaint and contextualized in Appendix B are legally capable of operating as **constructive identification** "of and concerning" Plaintiff through coded, non-verbal reference within defined interpretive audiences. At this stage, Plaintiff seeks only declaratory clarification of the governing legal framework and capability standards under **Rule 57 and 28 U.S.C. § 2201,** without adjudicating factual meaning, fault, or damages.

## XI.     JUDICIAL ANCHORS AND AUTHORITIES

[A.2-3]     Federal and state courts consistently hold that identification may arise through **description, context, or recognizable cues**, not just explicit naming:

- ***Bindrim v. Mitchell*, 92 Cal. App. 3d 61 (1979)** – fictional portrayal recognizable as plaintiff is actionable.

- ***Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980)*** – defamation lies where audience can "reasonably conclude" the plaintiff is meant.

- ***Clark v. American Broadcasting Companies*, 684 F.2d 1208 (6th Cir. 1982)** – televised implication sufficed even absent name reference.

- ***Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)** – no constitutional privilege for statements implying false factual assertions.

[A.2-4]    Taken together, these authorities establish that constructive identification is a context-sensitive inquiry focused on whether a reasonable recipient could understand the communication as referring to the plaintiff. At the declaratory stage, Plaintiff does not ask the Court to make evidentiary findings; Plaintiff seeks clarification that the alleged symbolic-coding mechanism is legally capable of satisfying Restatement § 564, with evidentiary substantiation reserved for the appropriate procedural stage. Affidavits, witness testimony, and AI-assisted analytical materials are preserved for later production and testing, should the action proceed beyond threshold declaratory determinations, consistent with **Fed. R. Civ. P. 26** and applicable evidentiary standards, including **Fed. R. Evid. 702, 901,** and **1006.**

## XII.          APPLICATION TO SYMBOLIC IDENTIFIERS

[A.2-5]    Plaintiff alleges that constructive identification through symbolic means operates, as

pleaded, through the following interrelated mechanisms:

### A.          Anchor-Event Contextualization

[A.2-6]    The symbolic identifiers at issue are alleged to trace back to a discrete and

documented 1996 administrative event within the Curaçao Police Academy Boarding

Division, which provided a historical and institutional context tethering those

identifiers to Plaintiff's identity, as detailed in **Appendix B,  including Table 1**

**(following § XI)** and **Tables 2A–2E (following § XVI)**, which together document the

institutional origin and subsequent identity-function evolution of the symbolic

identifiers referenced in this Complaint.

### B.          Repetition Across Time and Platforms

[A.2-7]    Over an extended period spanning more than two decades, the same categories of

symbolic identifiers are alleged to have recurred across multiple media, broadcast,

and public-facing platforms, including interstate and international distribution

environments. Plaintiff alleges that, in a doctrinal sense, repetition and contextual

anchoring can convert otherwise ambiguous signals into recognizable coded

references for reasonable observers within defined interpretive audiences, thereby

supporting constructive identification and defamatory implication by context. See

**Cianci v. New Times Publ'g Co., 639 F.2d 54 (2d Cir. 1980)** (context may render

implication actionable); **Stepanov v. Dow Jones & Co., 120 A.D.3d 28 (1st Dep't**

**2014) (implication turns on the communication's overall context); Three Amigos**

**SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016**) (meaning assessed in full

context); **Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980)** (identification may be indirect). Plaintiff does not seek a finding at this stage that repetition occurred as alleged; this paragraph preserves the governing doctrine demonstrating that, if substantiated, repeated coded reference may satisfy the "of and concerning" inquiry under **Restatement (Second) of Torts § 564.** All proof of recurrence, audience decoding, and meaning is reserved for later proceedings consistent with **Fed. R. Civ. P. 26.**

[A.2-8]     Where a communication is later established to be "of and concerning" Plaintiff and defamatory, subsequent disseminations may be treated as renewed publications for purposes of defamation doctrine, consistent with the Restatement's treatment of imputations of mental incapacity and related per se categories. See **Restatement (Second) of Torts § 571.**

[A.2-9]     Courts assess meaning and identifiability by context and reasonable audience understanding, including where a composite of expressive elements, images, gestures, coded motifs, or recurring cues; permits recognition without explicit naming. See **Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980)** (indirect identification); **Bindrim v. Mitchell, 92 Cal. App. 3d 61 (1979)** (recognizable portrayal actionable); **Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016)** (context controls meaning).

[A.2-10]    **Appendix B** is incorporated pursuant to **Fed. R. Civ. P. 10(c)** for the limited and specific purpose of explaining how symbolic identifiers are **legally capable** of operating as constructive identity substitutes when institutional context, origin, and continuity are present. **Appendix B, at the declaratory stage,** does not offer

evidentiary proof. Instead, it provides structured historical, organizational, and sociological context demonstrating that the symbols alleged in this Complaint did not arise in a vacuum but emerged from identifiable institutional processes and later functioned as expressive substitutes for an already-constructed identity.

C.        **Contextual Recognizability by Audiences**

[A.2-11]    Plaintiff alleges that, within the cultural and institutional backdrop described in **Appendix B,** reasonable observers familiar with that context would plausibly understand the recurring symbolic identifiers as referring to Plaintiff.

[A.2-12]    **Affidavits, viewer testimony, and AI-assisted analytical materials** are preserved and will be produced at the appropriate procedural stage, including discovery and any subsequent proceedings, consistent with **Fed. R. Civ. P. 26,** and evaluated under applicable evidentiary standards, including **FRE 702, 901,** and **1006.**

[A.2-13]    Affidavit templates **(Exhibit B)** are designed to elicit witness perception relevant to the "reasonable recipient" inquiry under **Restatement (Second) of Torts § 564,** including how a defined audience may recognize indirect or coded references without explicit naming. **See Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980)** (identification may be indirect where reasonable recipients could understand the reference); **Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016)** (meaning and implication assessed in full context). To the extent continuity concepts are later implicated, such testimony may also support later evaluative analysis of repetition and relatedness, consistent with **H.J. Inc. v. Northwestern Bell Tel. Co.,**

**492 U.S. 229 (1989),** with any element-by-element statutory application reserved for subsequent proceedings if warranted.

[A.2-14]   In cases alleging symbolic defamation and constructive identity, **AI-assisted detection and viewer affidavits** constitute the principal mechanisms by which contextual recognition, repetition, and identity-substitution are substantiated; their deferred presentation reflects procedural sequencing, not evidentiary optionality or deficiency.

**D.          Defamatory Sting**

[A.2-15]   As alleged, the symbolic identifiers convey meanings falling within established categories of defamation per se, including implications of criminality, mental instability, professional unfitness, or sexual immorality, for which injury is presumed once identification is plausibly established under **Restatement (Second) of Torts § 564.**

[A.2-16]   Symbolic insinuations, when visually recognizable and repeated in public broadcasts, convey the same defamatory sting as direct verbal accusation. **See *Bindrim v. Mitchell*, 92 Cal. App. 3d 61 (1979)** (fictional portrayal recognizable as plaintiff held actionable).

[A.2-17]   By integrating these components, Plaintiff plausibly satisfies the **Restatement (Second) of Torts § 564 "of and concerning"** standard. The symbolic and non-verbal nature of the communications alleged does not diminish legal sufficiency;

rather, it underscores the use of innuendo and coded reference as a means of avoiding explicit naming while still conveying identity to a contextually informed audience.

[A.2-18]   The symbolic identifiers referenced in this Complaint, as preserved and organized in **Exhibit A (Forensic Gesture Ledger),** fall within the categories disclosed in **Appendix B, including Table 1 (institutional origin, following § XI) and Tables 2A–2E (identity-function evolution, following § XVI).** At this stage, the **Forensic Gesture Ledger (Exhibit A)** is offered solely as a structured classification and contextual framework illustrating the types, recurrence, and symbolic characteristics of the identifiers alleged. The Complaint plausibly alleges that these symbolic communications, disseminated through interstate broadcast, streaming, and digital media systems, functioned as constructive identity proxies rather than descriptive statements. Under **Restatement § 564,** liability may attach where communication, verbal or non-verbal, would be understood by a reasonable recipient, in context, as referring to a particular person, even absent explicit naming.

[A.2-19]   **Affidavit templates** preserved as **Exhibit B,** together with **AI-assisted detection frameworks** referenced elsewhere in the Complaint and appendices, reflect that the allegations pleaded are capable of evidentiary substantiation through witness perception and pattern analysis. Such materials are not submitted for adjudication or factual determination at the declaratory judgment stage but are referenced to demonstrate that contextual recognition by reasonable observers can be established, and will be produced at the appropriate procedural stage, through discovery and

subsequent proceedings consistent with **Fed. R. Civ. P. 26** and applicable evidentiary standards.

[A.2-20]    In this manner, constructive identity operates as the analytical conduit through which symbolic defamation may be evaluated not only under traditional tort principles, but also, where appropriate, in relation to continuity and relatedness considerations relevant to later pattern analysis under **18 U.S.C. § 1961 et seq**. Declaratory clarification at this stage serves to resolve the legal status of the symbolic communications alleged, without adjudicating evidentiary proof or enterprise liability.

## XIII.         INTERRELATION WITH RICO AND EVIDENTIARY PROOF

[A.2-21]    The symbolic broadcast acts alleged herein are pleaded as communicative acts capable of supporting constructive identification under **Restatement (Second) of Torts § 564** and are alleged to traverse interstate broadcast, streaming, and digital distribution systems. Plaintiff preserves the doctrinal point that, depending on later factual development and applicable pleading standards, dissemination practices occurring through interstate electronic channels may be evaluated under federal statutes that can qualify as predicate offenses under **18 U.S.C. § 1961(1).** At this declaratory stage, however, Plaintiff seeks no finding that any predicate offense occurred, and no statutory element is adjudicated; any predicate-specific analysis is reserved for subsequent proceedings, if warranted, consistent with **Fed. R. Civ. P. 26** and applicable evidentiary standards.

[A.2-22]    Plaintiff does not allege state-law defamation as a RICO predicate. Plaintiff's Count III request is limited to a declaratory capability classification concerning continuity, relatedness, and enterprise-capability concepts. Any determination of predicate offenses, element-by-element statutory satisfaction, intent, reliance, proximate cause, or damages under **18 U.S.C. § 1964(c)** is expressly reserved for later proceedings if warranted and is not sought at the declaratory stage.

[A.2-23]    The forensic methodology underlying the alleged symbolic-identity linkage, including AI-assisted gesture detection, NLP-based semantic clustering, and broadcast timestamp correlation, is summarized in Appendix C. These methodologies are not offered for evidentiary adjudication at the declaratory stage and are referenced solely to demonstrate that the allegations pleaded are capable of substantiation through expert analysis and authenticated digital process evidence, consistent with **Fed. R. Evid. 702 and 901(b)(9),** with any Daubert reliability litigation reserved for later proceedings if warranted.

## XIV.        ARTICLE III STANDING AND DOCTRINAL REBUTTALS

[A.2-24]    **Injury-in-fact:** Plaintiff alleges concrete and ongoing reputational and dignitary injury from the challenged symbolic identification practices, which is sufficient at the pleading stage for Article III purposes. See **Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992); Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)** (reputation interests in defamation context).

[A.2-25]  **Causation:** Plaintiff alleges that the challenged symbolic identifiers were disseminated through Defendants' broadcast, streaming, and digital distribution systems, plausibly linking the alleged injury to the conduct complained of at the pleading stage.

[A.2-26]  **Redressability:** Declaratory relief will clarify the legal status and capability of the challenged symbolic practices and reduce uncertainty regarding ongoing dissemination and successor control, consistent with **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).**

## XV.       REBUTTALS TO ANTICIPATED DEFENSES:

[A.2-27]  *"Generic gesture"*: **Rule 401/403** relevance satisfied by frequency + context analysis.

[A.2-28]  *"Satire or parody"*:  Fails under *Milkovich*; false implication of criminality/unfitness is factual, not opinion.

[A.2-29]  *"Plaintiff is to blame for misinterpretation"*:  Contradicted by independent witness perception; the test is audience understanding, not speaker intent.

[A.2-30]  *First Amendment:* Defamation is not protected where the governing standards for actionable defamatory implication are met; the applicable fault and constitutional limits turn on plaintiff status, context, and the nature of the speech. See **Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974); Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990).**

## XVI.        COMPARATIVE AND PROCEDURAL INTEGRATION

[A.2-31]   International frameworks reinforce the same reputational protection:

- **ECHR Art. 8: "**Right to respect for private life" interpreted to include reputation (*Pfeifer v. Austria*, 2007).

- **ICCPR Art. 17:** prohibits unlawful attacks on honor and reputation.

   While non-self-executing, these provisions serve as persuasive authority

   confirming that reputation is a protected interest under U.S. due-process norms.

[A.2-32]   Procedurally, declaratory judgment under **28 U.S.C. § 2201** and **Fed. R. Civ. P. 57** is

appropriate where clarification will terminate uncertainty regarding ongoing harm.

This appendix provides the doctrinal basis for such clarification without seeking

damages or equitable enforcement beyond the prayer's narrow injunctive clause.

## XVII.       CONCLUSION AND BLACK-LETTER RULE

[A.2-33]   Constructive identity transforms symbolic communication into actionable defamation

when:

- **The audience reasonably understands it to identify the plaintiff;**

- **The content implies false and defamatory meaning; and**

- **The communication is repeated with continuity and relatedness sufficient to**

   **form a pattern.**

[A.2-34]   Declaratory clarification of the constructive-identity doctrine would establish the

governing legal framework for evaluating whether coded, non-verbal rebroadcasts

can function as actionable "of and concerning" communications under Restatement §

564. Any further relief or later statutory evaluation is reserved for subsequent

proceedings if warranted, consistent with Rule 26 and the sequencing posture stated

in the Complaint.

[A.2-35]    Accordingly, Plaintiff respectfully submits that this Constructive Identity Doctrine

provides the doctrinal bridge for the declaratory determinations sought in Counts I

and III and supports the forward-looking sequencing and preservation of

redressability set forth in the Complaint at **¶¶ 128–135** (Further Relief Sequencing

and Preservation of Redressability (DJ-Stage)) and in the **Prayer for Relief,**

**beginning at ¶136 (subparts (a)–(j))**. See **Appendix A.3** (Narrative Parasitism and

Coordinated Innuendo) for the related continuity framework.

## APPENDIX A.3-

## NARRATIVE PARASITISM AND COORDINATED INNUENDO

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

## APPENDIX A.3        –

## Narrative Parasitism and Coordinated Innuendo

### *(Cross-Referenced from Counts I–III ¶¶ 62–111; Supported by Appendices B, C, and F; Doctrinally Linked to A.1, A.2, A.4)*

## XVIII.   DOCTRINAL OVERVIEW

[A.3-1]    This **Appendix A.3** defines "narrative parasitism" as an alleged dissemination dynamic in which recurring symbolic or gestural cues operate as substitutes for a person's name over time. Plaintiff pleads the concept as legally capable of supporting defamation-by-implication and constructive identification analysis, and, if later supported by appropriate proof and statutory elements, capable of evaluation under civil RICO continuity doctrines referenced in **18 U.S.C. § 1961(5).**

[A.3-2]    The concept integrates two settled doctrines:

1.   **Constructive Identity** under *Restatement (Second) of Torts* **§ 564**—liability arises when a communication "could reasonably be understood as referring to the plaintiff."

2.   **Defamation by Implication** under *Milkovich v. Lorain Journal Co.*, **497 U.S. 1 (1990)** and *Bindrim v. Mitchell*, **92 Cal. App. 3d 61 (1979),** a publisher may not evade liability by using implication or disguise.

[A.3-3]    When a pattern of non-verbal symbols uniquely identifies the plaintiff and imputes criminality, mental instability, or professional unfitness, the conduct is actionable as

**defamation per se**, satisfying the "of and concerning" element through contextual recognition.

## XIX.   NARRATIVE PARASITISM DEFINED

[A.3-4]   *Narrative parasitism* describes a communication strategy in which defamatory identity is sustained across time and institutions by recurring symbolic identifiers, gestures, color codes, or visual motifs, used to evoke the plaintiff without naming him.

[A.3-5]   Repeated dissemination of alleged identifiers may function as derivative iterations within a continuing alleged narrative, where later proof establishes that the communications are "of and concerning" Plaintiff and convey defamatory implication in context. Plaintiff pleads that the alleged symbolic system drew interpretive content from the institutional backdrop described in **Appendix B,** without requesting factual adjudication at this stage.

[A.3-6]   Courts recognize that identification may arise through composite or coded depiction that an audience reasonably understands as referring to a specific person, even without explicit naming. See **Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980)** (indirect identification); **Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016)** (context governs meaning); **Clark v. Am. Broad. Cos., 684 F.2d 1208 (6th Cir. 1982)** (televised implication).

## XX.              LEGAL MECHANICS OF CONSTRUCTIVE IDENTIFICATION

[A.3-7]    Under **Restatement (Second) of Torts § 564,** whether a gesture or symbol is "of and concerning" a plaintiff is a question of fact once contextual recognition by reasonable observers is plausibly alleged. At this stage, Plaintiff relies on the structured institutional and symbolic context documented in **Appendix B**, including its tables and narrative framework, to demonstrate the plausibility that the symbolic identifiers described herein would be reasonably understood as referring to Plaintiff. See **Appendix B, Table 1 (following § XI)** and **Tables 2A–2E (following § XVI)**, which together document the institutional origin and subsequent identity-function evolution of the symbolic identifiers referenced in this Complaint.

[A.3-8]    Affidavits, witness testimony, and AI-assisted metadata analyses are not offered in support of declaratory relief at this stage. Such materials will be produced at the appropriate procedural stage, including discovery and any subsequent proceedings, consistent with **Fed. R. Civ. P. 26,** and evaluated under applicable evidentiary standards, including **FRE 702, 901,** and **1006.**

[A.3-9]    Their absence at the pleading stage does not defeat plausibility where the Complaint and incorporated appendices adequately allege contextual identifiability, repetition, and the legal capability of the challenged symbolic conduct to function as constructive identification.

[A.3-10]   The legal significance of AI-assisted detection, structured gesture classification, and viewer affidavits is central to symbolic defamation and constructive-identity cases of

this nature. These mechanisms constitute the principal means by which contextual recognition, repetition, and identity-substitution are substantiated. Their deferred presentation reflects procedural sequencing, not evidentiary deficiency, and does not diminish their relevance to the declaratory determinations sought.

[A.3-11]   Plaintiff alleges that, at later stages of this action, Plaintiff will offer viewer affidavits and related testimonial evidence demonstrating that the symbolic identifiers described herein were in fact decoded by recipients as referring to Plaintiff. Such materials are not submitted for adjudication or evidentiary consideration at the declaratory judgment stage and are referenced solely to demonstrate that the pleaded allegations are capable of evidentiary substantiation through discovery and later proceedings consistent with the **Federal Rules of Civil Procedure.**

[A.3-12]   Where later proceedings establish that a challenged communication is defamatory and "of and concerning" Plaintiff, subsequent disseminations may be treated as renewed publications in circumstances constituting republication. See **Restatement (Second) of Torts § 577A (3).** This point is preserved to explain why repetition may matter to legal capability and redressability, not to request adjudication at this stage.

[A.3-13]   Plaintiff alleges that certain categories of imputed meaning associated with the pleaded identifiers, criminality, mental incapacity, sexual immorality, or professional unfitness, are of a type traditionally treated as defamation per se, with presumed harm if identification and falsity are later established under applicable standards. See

**Restatement (Second) of Torts §§ 570–574; Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974).**

## XXI.    CONTINUITY, RELATEDNESS, AND ENTERPRISE FORMATION

[A.3-14]    Plaintiff pleads that the alleged repetition of identity-function categories across time, platforms, and jurisdictions is legally capable of evaluation under civil RICO continuity and relatedness concepts, without adjudicating predicate acts, intent, or statutory satisfaction at this stage. See **H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)** (continuity/relatedness); **Boyle v. United States, 556 U.S. 938 (2009)** (enterprise evaluative structure).

[A.3-15]    At the declaratory stage, Plaintiff does not seek a finding that any predicate offense occurred, that any Defendant possessed fraudulent intent, or that **Rule 9(b)** pleading standards have been satisfied. Plaintiff's Count III request is confined to whether the pleaded structure is legally capable of evaluation within the definitional RICO framework, with any element-by-element predicate identification and proof reserved for later proceedings if warranted.

[A.3-16]    To the extent later proceedings implicate predicate-eligible statutes under **18 U.S.C. § 1961(1),** any such analysis would occur only upon appropriate factual development, notice, and application of governing pleading and evidentiary standards. This **Appendix A.3** preserves only the continuity/enterprise capability concepts, not a merits determination.

[A.3-17]     The alleged presence of multiple entities and channels is pleaded to preserve the

enterprise-capability question under **Boyle and Turkette** for later stages if warranted;

no enterprise finding is requested at the declaratory stage.

[A.3-18]     Plaintiff alleges that the repetition of the same identity-function categories across

networks and jurisdictions reflects a continuity structure that is legally capable of

evaluation under the civil RICO "continuity and relatedness" framework described in

**H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989),** if later substantiated

through appropriate proof. At this declaratory stage, Plaintiff seeks only capability

classification and does not request any finding that a "pattern of racketeering activity"

has been established.

[A.3-19]     Plaintiff further alleges that the pleaded timeline, as structured in **Appendix B (Table**

**1; Tables 2A–2E),** is alleged to reflect reflects both long-duration recurrence (closed-

ended continuity) and an ongoing risk of repetition (open-ended continuity), concepts

addressed in **H.J. Inc., 492 U.S. at 239–43**, without adjudicating predicate acts,

intent, or statutory satisfaction at this stage. Any predicate-specific analysis involving

interstate transmission statutes, including any **Rule 9(b)**-governed theories, is

expressly reserved for later proceedings if warranted, consistent with **Fed. R. Civ. P.**

**26** and applicable evidentiary standards.


[A.3-20]     Plaintiff alleges that, depending on later factual development, certain dissemination

practices, if later shown to be undertaken with the requisite elements, may be

evaluated under predicate-eligible federal statutes enumerated in **18 U.S.C. § 1961(1),**

including statutes addressing obstruction or witness tampering. At the declaratory

stage, however, Plaintiff seeks no finding that any such predicate offense occurred and requests only capability classification and sequencing discipline, with any predicate-specific analysis reserved for later proceedings if warranted.

[A.3-21]  Plaintiff pleads that the alleged multi-entity dissemination structure is legally capable of evaluation under association-in-fact enterprise principles recognized in **Boyle v. United States, 556 U.S. 938 (2009),** if later substantiated through appropriate proof. Plaintiff does not request an enterprise finding at this declaratory stage and reserves all element-by-element application and proof for later proceedings if warranted.

[A.3-22]  Declaratory relief is sought to clarify capability and legal status questions without infringing protected expression. Where a communication conveys a provably false factual implication "of and concerning" a private individual, it may fall outside constitutional protection under the governing standards. See **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)**; **Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974).**

[A.3-23]  Plaintiff alleges that, if the symbolic identifiers are later substantiated to function as constructive identifiers "of and concerning" Plaintiff, the repetition and cross-platform dissemination mechanics pleaded may be evaluated not only under defamation doctrine but also, where statutory elements are later met, under civil RICO's definitional continuity and enterprise-capability framework. At this stage, Plaintiff seeks only legal-capability clarification and does not request findings as to coordination, predicate acts, or liability.

## XXII.        CONSTITUTIONAL AND COMPARATIVE SAFEGUARDS

[A.3-24]    The theory is pleaded within constitutional limits: it does not seek to punish protected opinion, satire, or lawful editorial discretion, but addresses symbolic communications alleged to convey false factual imputations "of and concerning" Plaintiff when understood in context.

[A.3-25]    Comparative reputational frameworks similarly recognize the boundary between protected expression and unlawful factual attribution when identification and defamatory implication are established in context. See, e.g., **Pfeifer v. Austria, App. No. 12556/03 (ECHR 2007); Axel Springer AG v. Germany, App. No. 39954/08 (ECHR 2012).** These authorities are cited as persuasive context regarding reputational interests and balancing principles, not as operative law.

[A.3-26]    Plaintiff seeks a forward-looking declaration that the alleged coordinated symbolic rebroadcast practices are legally capable of constituting (1) constructive identification and defamatory implication "of and concerning" Plaintiff under **Restatement § 564 and (2)** conduct capable of evaluation under civil RICO's definitional continuity and enterprise framework, if later substantiated through appropriate proof and statutory standards. Plaintiff does not seek adjudication of predicate acts, intent, or damages at the declaratory stage.

## XXIII.       FORENSIC EVIDENTIARY BRIDGE

[A.3-27]    Technical verification of the AI-assisted detection methodology proceeds under ***Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),** at the

appropriate procedural stage. Gesture detections referenced herein are generated by a Clarifai-based model, a rule- and model-driven system designed to identify symbolic gesture patterns in audiovisual media. The system's operation, inputs, and outputs are capable of authentication under **Fed. R. Evid. 901(b)(9)** through description of the process, validation protocols, and expert testimony. Quantitative performance metrics, validation results, and expert reliability opinions will be presented, if necessary, through **Rule 26(a)(2)** disclosures and **FRE 702** testimony.

[A.3-28]   Data outputs, time-stamped frames, confidence scores, and metadata chains, are summarized in *Appendix C (Technical Extract)* and incorporated as **FRE 1006 summaries** in *Exhibit C.*

[A.3-29]   Pursuant to **28 U.S.C. § 2201(a),** Plaintiff seeks declaratory clarification of the governing legal framework applicable to the alleged symbolic identification practices, including continuity and successor-control implications, without seeking monetary damages at this stage, and with any further relief reserved to later proceedings consistent with **28 U.S.C. § 2202** and the Court's discretion.

## XXIV.        DECLARATORY FUNCTION AND RULE 8(A) COMPLIANCE

[A.3-30]   Plaintiff seeks a forward-looking declaration that the challenged symbolic rebroadcast practices alleged in the Complaint are legally capable of constituting constructive identification and defamatory implication "of and concerning" Plaintiff under **Restatement § 564,** and are legally capable, if later substantiated through appropriate proof, of evaluation under civil RICO's definitional continuity and enterprise

framework. Plaintiff does not seek adjudication of predicate acts, intent, statutory

satisfaction, damages, or entitlement to coercive remedies at the declaratory stage.

[A.3-31]    This relief clarifies legal relations and preserves redressability before discovery,

consistent with **MedImmune v. Genentech, 549 U.S. 118 (2007).** No damages are

sought at this stage; any damages or additional relief are reserved for subsequent

proceedings if warranted and consistent with law.

## XXV.        CROSS-REFERENCES FOR JUDICIAL NAVIGATION

| Linked Appendix / Exhibit | Purpose |
|---|---|
| Appendix B – Plaintiff Background Narrative & Timeline | Plausibility timeline and continuity structure (capability stage) (1996 → present). |
| Appendix C – AI Methodology & Daubert Reliability | Technical admissibility and FRE 702–901 compliance. |
| Appendix F – Comparative Media Law & Symbolic Expression | Comparative doctrinal validation of symbolic defamation. |
| Appendix A.8 – Civil RICO Predicate Continuity | Substantive RICO predicate analysis and enterprise mapping. |
| Exhibit C – Forensic Evidentiary Binder | Frame captures, metadata logs, and summary charts. |

# XXVI.        CONCLUSION

[A.3-32]   Plaintiff alleges that the pleaded pattern of recurring symbolic cues functions as a narrative-parasitism mechanism by which coded identifiers can operate as recognizable identity tokens over time and across jurisdictions. This **Appendix A.3** preserves the doctrinal framework explaining how such a mechanism is legally capable of evaluation under defamation-by-implication and continuity doctrines, without adjudicating contested facts at this stage.

[A.3-33]   Pursuant to **28 U.S.C. § 2201(a),** Plaintiff seeks declaratory clarification of the governing legal framework applicable to the alleged symbolic identification practices, including continuity and successor-control implications, without seeking monetary damages at this stage, and with any further relief, reserved to later proceedings consistent with **28 U.S.C. § 2202** and the Court's discretion.

[A.3-34]   Pursuant to **28 U.S.C. § 2201(a),** Plaintiff seeks declaratory clarification of the governing legal framework applicable to the alleged symbolic identification practices, including continuity and successor-control implications, without seeking monetary damages at this stage, and with any further relief reserved to later proceedings consistent with **28 U.S.C. § 2202** and the Court's discretion.

# APPENDIX A.4 -

# "OF AND CONCERNING" DOCTRINE

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

**APPENDIX A.4    – "OF AND CONCERNING" DOCTRINE**

**(Cross-Referenced from Counts I–III ¶¶62–111; Supported by Appendices A.1–A.3, A.8, B, C, and F.)**

## I.    DOCTRINAL FOUNDATION – RESTATEMENT § 564

[A.4-1]    Under **Restatement (Second) of Torts § 564,** a defamatory communication is actionable when it "could reasonably be understood as referring to the plaintiff." The rule requires neither explicit naming nor direct description where a reasonable recipient, drawing on context, associates the words, images, or other communicative acts with a specific individual. See **Restatement (Second) of Torts § 564; Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980); Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016);** *Bindrim v. Mitchell***, 92 Cal. App. 3d 61 (1979);** *Clark v. Am. Broad. Cos.***, 684 F.2d 1208 (6th Cir. 1982).**

[A.4-2]    Courts recognize that identifiability may be assessed from the communication's overall context, including symbolic and composite expressions, such as images, gestures, or coded motifs, where repetition within a defined cultural or institutional setting can make the reference plausibly recognizable as pointing to a particular individual, without explicit naming. See **Geisler v. Petrocelli, 616 F.2d 636 (2d Cir.**

**1980) (indirect identification); Stepanov v. Dow Jones & Co., 120 A.D.3d 28 (1st Dep't 2014) (implication assessed in full context); Three Amigos, 28 N.Y.3d at 90–92 (same).**

[A.4-3]  Accordingly, Plaintiff alleges that recurring dissemination or rebroadcast of symbolic gestures and color cues, when tethered to the institutional and narrative context structured in **Appendix B,** is legally capable of functioning as constructive identification "of and concerning" Plaintiff, even in the absence of spoken words. At this declaratory stage, Plaintiff seeks only legal-capability clarification and does not request findings as to actual audience perception, falsity, liability, or damages.

## II.    AUDIENCE RECOGNITION AND CONSTRUCTIVE IDENTITY

[A.4-4]  Identification is evaluated by whether a reasonable recipient, considering context, could understand the communication to refer to the plaintiff; explicit naming is not required. See **Restatement (Second) of Torts § 564; Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980); Three Amigos, 28 N.Y.3d 82**.

[A.4-5]  At the declaratory judgment stage, Plaintiff relies on the structured institutional and symbolic context documented in **Appendix B, including Table 1 (following § XI) and Tables 2A–2E (following § XVI),** to plausibly allege that the symbolic identifiers described herein functioned as non-verbal references to Plaintiff. Evidence of audience perception, including affidavits and AI-assisted analyses, is not offered for evidentiary proof at this stage, but will be produced at the appropriate procedural

stage, including discovery and any subsequent proceedings, consistent **with Fed. R. Civ. P. 26,** and evaluated under applicable evidentiary standards, including **FRE 702, 901, and 1006.**

[A.4-6]   Temporal and geographic continuity reinforces constructive identification. As detailed in **Appendix B,** the institutional conditions giving rise to Plaintiff's constructive identity emerged during the 1996–1997 Curaçao Police Academy Boarding Division administrative environment, during a period of heightened institutional scrutiny and unresolved ambiguity, without any finding of fault or misconduct by Plaintiff.

[A.4-7]   Following this institutional seeding phase, symbolic identifiers associated with that identity later appeared within Dutch and United States media and institutional environments, including during periods when Plaintiff was not physically present. The persistence of these symbolic cues across jurisdictions and over time supports the plausibility that reasonable observers could understand such non-verbal references as pointing to the same individual within a stable contextual framework.

[A.4-8]   This cross-jurisdictional continuity concerns the interpretive function of the symbols, not their point of origin, and supports the allegation that the challenged conduct is legally capable of satisfying the "of and concerning" requirement under **Restatement (Second) of Torts § 564.**

[A.4-9]   The foregoing allegations, taken together and construed at the pleading stage, satisfy the factual plausibility required for constructive identification and the foreseeability

of reputational harm arising from nationwide and international dissemination of non-verbal symbolic content. As alleged, the symbolic identifiers described in this action were capable of being understood by reasonable observers, within their institutional and cultural context, as referring to Plaintiff, notwithstanding the absence of explicit naming.

[A.4-10]    Where reputational injury is plausibly alleged to arise from content distributed through interstate and global media systems and experienced within the forum, jurisdictional and venue principles may be satisfied. See **Keeton v. Hustler Magazine, Inc., 465 U.S. 770 (1984)**. Plaintiff pleads accessibility and distribution into this District as set forth in the Jurisdiction and Venue section of the Complaint.

## III.    SEQUENCING NOTE — IDENTIFICATION DOCTRINE VS. RICO PREDICATE ANALYSIS (DECLARATORY STAGE)

[A.4-11]    The "of and concerning" requirement functions as an identifiability gateway: if later proceedings establish that challenged symbolic identifiers are understood by a reasonable recipient as referring to Plaintiff, that identification determination may be relevant to subsequent analyses that depend on whether particular communications are directed at a specific person. At the declaratory stage, Plaintiff seeks only legal-capability clarification of identifiability under **Restatement § 564** and does not request adjudication of any federal predicate offense.

[A.4-12]  To the extent **Count III** invokes civil RICO capability classification, Plaintiff pleads that the alleged repetition and cross-platform dissemination mechanics described in **Appendix B** are legally capable of evaluation under continuity and relatedness concepts recognized in **H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)**, without adjudicating predicate acts, intent, statutory satisfaction, or damages at this stage.

[A.4-13]  Any predicate-specific analysis under statutes enumerated in **18 U.S.C. § 1961(1),** including any theories that would require heightened pleading or proof, would be addressed, if warranted, only in later proceedings upon appropriate factual development, notice, and application of the governing standards **(including Fed. R. Civ. P. 9(b**) where applicable)**.** This **Appendix A.4** preserves only the conceptual linkage between identifiability and later evaluative frameworks; it does not assert that any particular transmission "constitutes" a predicate offense.

[A.4-14]  Accordingly, this Section is included solely to maintain doctrinal coherence across the appendix set: identifiability under **Restatement § 564 (Appendix A.4)** supplies a threshold concept that may inform later continuity/enterprise evaluation preserved in **Appendix A.8,** while the declaratory request in this action remains confined to legal-capability and legal-status clarification.

## IV.          DECLARATORY NECESSITY AND JUDICIAL FUNCTION

[A.4-15]   Declaratory relief under **28 U.S.C. § 2201** authorizes this Court to resolve concrete legal uncertainty concerning the status of challenged conduct before irreparable harm compounds or remedial avenues are impaired. See **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).** Where ongoing conduct presents an actual controversy and future adjudication risks fragmentation through delay, restructuring, or evidentiary erosion, declaratory adjudication serves as stabilizing and clarifying judicial function.

[A.4-16]   Here, the declaration sought **(Complaint ¶ 98)** would confirm whether the symbolic rebroadcasts alleged in the Complaint are legally capable of constituting communications "of and concerning" Plaintiff under settled defamation doctrine. This determination addresses a threshold legal question independent of damages or intent and provides the necessary framework for subsequent proceedings, while preserving applicable **First Amendment** and due-process safeguards.

[A.4-17]   The legal significance of AI-assisted detection, structured gesture classification, and viewer affidavits is central to symbolic defamation and constructive-identity cases of this nature. Such materials constitute the principal mechanisms by which contextual recognition, repetition, and identity-substitution are substantiated. Consistent with **Fed. R. Civ. P. 26,** these materials will be produced and evaluated at the appropriate procedural stage and assessed under applicable evidentiary standards, including **FRE**

**702, 901, and 1006.** Their deferred presentation reflects procedural sequencing, not evidentiary deficiency, and does not diminish their relevance to the declaratory determinations sought.

[A.4-18]    This forward-looking posture comports with **Fed. R. Civ. P. 57,** which permits declaratory judgments resolving legal status and capability prior to evidentiary adjudication. Plaintiff does not seek damages or coercive relief at this stage but preserves such remedies contingent upon post-discovery substantiation, should further proceedings be warranted.

## V.          REBUTTAL MATRIX – ANTICIPATED DEFENSES

| Defense Category | Defendant Position (Typical) | Plaintiff Rebuttal (Condensed) |
|---|---|---|
| **Satire / Parody** | Gestures are humorous or symbolic commentary. | Even satirical framing does not immunize communications that a reasonable viewer could understand as conveying a provably false factual implication "of and concerning" a private individual. See **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988)** (limits and context). |

| Coincidence / Generic Use | Gestures not uniquely tied to Plaintiff. | Frequency, timing, and audience recognition prove specific reference. **(See Affidavits and Appendix B Timeline).** |
|---|---|---|
| **Public Figure Doctrine** | Plaintiff is a public figure, thus actual malice required. | Plaintiff is a private citizen; defamation per se presumes harm. Even if "limited-purpose" public figure, actual malice shown by coordinated broadcast continuity. |
| **First Amendment Shield** | Symbolic expressions are protected speech. | False factual implications and defamatory meaning, if later established, are not categorically shielded by the First Amendment; declaratory clarification here is sought to define legal boundaries without ordering coercive relief at this stage. See **Milkovich, 497 U.S. 1; Gertz, 418 U.S. 323.** |

## VI.     EVIDENTIARY PATHWAY AND TECHNICAL INTEGRATION

[A.4-19]    If this action proceeds beyond threshold declaratory determinations, proof of identification and audience recognition can draw on, among other materials:

(a) witness affidavits or testimony **(Exhibit B templates)** addressing perception and recognition pathways;

(b) AI-assisted detection outputs and process descriptions **(Appendix C)** capable of authentication under **Fed. R. Evid. 901(b)(9);** and

(c) summary charts or compilations **(Exhibit C),** where appropriate, consistent with **Fed. R. Evid. 1006.**

[A.4-20]    These materials are referenced here only to show that the allegations pleaded are capable of substantiation through admissible proof in later proceedings. Plaintiff does not request, and the Court is not asked to make any present rulings regarding admissibility, Daubert reliability, or evidentiary weight at the declaratory stage.

[A.4-21]    Consistent with **Fed. R. Civ. P. 26** and the sequencing posture described in the Complaint and Appendix framework, any such materials would be produced and evaluated at the appropriate procedural stage, and assessed under applicable evidentiary standards, including **Fed. R. Evid. 702, 901,** and **1006,** if warranted.

[A.4-22]    The deferred presentation of affidavit evidence, AI outputs, and authentication foundations reflects procedural sequencing and judicial efficiency, not an absence of evidentiary support or deficiency, and does not diminish their relevance to the declaratory determinations sought.

[A.4-23]    Accordingly, the absence of such materials at the pleading stage does not defeat plausibility where the Complaint and incorporated appendices adequately allege contextual identifiability, repetition, and the legal capability of the challenged symbolic conduct to function as constructive identification.

## VII.            JUDICIAL IMPLICATIONS AND RULE 8(A) COMPLIANCE

[A.4-24]    Because the complaint seeks only declaratory classification, not damages, the Court

need not make credibility determinations now. **Rule 8(a)** requires only a short, plain

statement showing entitlement to relief; detailed doctrine is preserved here to guide

future adjudication.

[A.4-25]    This **Appendix A.4** therefore functions as doctrinal scaffolding: a legal map for

interpreting symbolic defamation under federal and comparative law without adding

claims beyond **Counts I–III.**

## VIII.            CROSS-REFERENCES FOR JUDICIAL NAVIGATION

| Linked Appendix / Exhibit | Purpose |
| --- | --- |
| Appendix A.1–A.3 | Foundational defamation per se and constructive-identity doctrines. |
| Appendix A.8 | Predicate continuity and enterprise mapping for Count III. |
| Appendix B | Chronological timeline and cultural context of recognition. |
| Appendix C | Daubert reliability and AI chain-of-custody standards. |
| Appendix F | Comparative media law rebuttals to press freedom arguments. |
| Exhibits A–C | Forensic gesture ledger and affidavit summaries (FRE 401, 901, 1006). |

## IX.          CONCLUSION

[A.4-26]    The "of and concerning" doctrine explains how symbolic or coded communications may satisfy identifiability under **Restatement § 564** when a reasonable recipient could understand the reference in context. Declaratory clarification of this capability is central to resolving the live controversy pleaded in **Counts I–II** without adjudicating damages or intent at this stage.

[A.4-27]    By clarifying the legal capability of symbolic communications to be "of and concerning" a plaintiff, the Court provides boundary-setting guidance for subsequent proceedings, if warranted, while preserving constitutional limits and due-process safeguards.

# APPENDIX A.5 - DEFAMATION PER SE

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

### APPENDIX A.5        – Defamation Per Se

*(Cross-Referenced from Count I ¶¶ 62–86; and Count III ¶¶ 100–111;*

*Supported by Appendices A.1–A.4, A.8, and Appendix F; Technical*

*orientation preserved in Appendices C and E.)*

## I.        PURPOSE AND SCOPE

[A.5-1]    This **Appendix A.5** provides the doctrinal framework for Count I and Count II insofar as they concern defamation per se arising from symbolic and non-verbal rebroadcasts. It explains how symbolic identifiers, when plausibly understood to refer to a particular individual within an identifiable institutional and cultural context, fall within established categories of defamation per se under U.S. law.

[A.5-2]    This **Appendix A.5** does not offer evidentiary proof or factual adjudication. Instead, it applies settled defamation-per-se doctrine to the institutional origin and identity-function evolution of symbolic identifiers as described in **Appendix B,** demonstrating that the conduct alleged in the Complaint is legally capable of giving rise to presumed injury once identification is plausibly established under **Restatement (Second) of Torts § 564.**

## II.            DOCTRINAL FRAMEWORK

[A.5-3]   Under *Restatement (Second) of Torts* **§§ 569–573**, defamatory meaning is *per se* when the statement, or symbolic act, imputes (a) criminality, (b) sexual immorality, (c) professional incompetence, or (d) mental unfitness.

[A.5-4]   The law presumes injury without proof of special damages. See *Balboa Island Village Inn v. Lemen*, **156 P.3d 339, 344 (Cal. 2007).** The purpose of the doctrine is to safeguard reputational integrity where falsity attacks the core of one's moral and professional worth.

[A.5-5]   In symbolic-defamation contexts, gesture clusters or coded images may operate as "composite communications." Where the Complaint plausibly alleges that contextually informed recipients would understand such composite communications to imply a per se category "of and concerning" Plaintiff, the conduct is legally capable of satisfying defamation-per-se doctrine. See **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990)**.

## III.           APPLICATION TO SYMBOLIC REBROADCASTS

[A.5-6]   As alleged in the Complaint and contextualized in Appendix B, the symbolic identifiers at issue fall within **recognized categories of defamation per se**, including imputations of criminality, moral deviance, professional unfitness, and mental instability. These meanings arise not from isolated expression, but from a **stable symbolic system** whose origin and interpretive framework are documented in

**Appendix B**, **including Table 1 Institutional Origin (following § XI)** and **Tables 2A–2E Identity-Function Evolution (following § XVI)**.

[A.5-7]    At the declaratory judgment stage, Plaintiff **does not** ask the Court to determine whether particular viewers did, in fact, interpret any specific rebroadcast as referring to Plaintiff. **Rather,** Plaintiff alleges, based on the institutional seeding, contextual continuity, and symbolic stability described in **Appendix B,** that reasonable observers familiar with that context would plausibly understand the recurring symbolic identifiers as referring to Plaintiff, satisfying the "of and concerning" requirement under **Restatement (Second) of Torts § 564.**

[A.5-8]    Where symbolic rebroadcasts are plausibly alleged to function as constructive identifiers and to convey meanings falling within defamation-per-se categories, injury is presumed as a matter of law **once identification is later established under the governing standard**. For declaratory purposes, Plaintiff alleges that repeated dissemination across time and platforms is legally capable of being treated as publication or republication under applicable defamation principles, without requesting factual findings at this stage.

[A.5-9]    Declaratory clarification at this stage addresses the legal character and capability of such conduct, without adjudicating enterprise coordination or predicate proof.

# IV.        DEFAMATION PER SE — DOCTRINAL CORE

### A.        Defamation-Per-Se Classification of Symbolic Communications

[A.5-10]   Under settled defamation doctrine, certain categories of imputation, including criminality, moral deviance, professional incompetence, and mental instability. constitute defamation *per se*, for which injury is presumed once identification is plausibly established. See ***Balboa Island Village Inn v. Lemen*, 40 Cal. 4th 1141 (2007).** The symbolic gestures, color-codes, posture-based signals, and non-verbal innuendo alleged in this Complaint are pleaded as falling within these established categories when understood in context as referring to Plaintiff.

### B.        Institutional Origin and Contextual Meaning (Appendix B Integration)

[A.5-11]   The defamation-per-se character of the symbolic identifiers alleged does not arise from abstract gesture form alone, but from their **institutional origin, stabilized meaning, and contextual deployment**, as documented in **Appendix B.** Specifically, **Appendix B**, **Table 1 (following § XI)** documents the institutional seeding phase in which Plaintiff's constructive identity emerged within a fragile administrative environment, while **Tables 2A–2E (following § XVI)** document the subsequent evolution, stabilization, and cross-jurisdictional rebroadcast of symbolic identifiers that plausibly convey defamatory imputations when decoded by contextually informed observers. These tables provide the factual matrix necessary to evaluate defamatory meaning without asserting evidentiary proof at this stage. At this stage,

the Gesture Ledger **(Exhibit A)** is offered solely as a structured classification and contextual framework illustrating the types, recurrence, and symbolic characteristics of the identifiers alleged **(Appendix B).**

C.        **Legal Capability of Presumed Injury Without Proof of Special Damages / Repetition**

[A.5-12]    Where symbolic communications are plausibly alleged to be understood by reasonable observers as referring to Plaintiff within the institutional and cultural context described in **Appendix B**, their defamatory sting falls within recognized defamation-per-se categories, and injury is legally presumed without the need for proof of special damages.

[A.5-13]    At the declaratory judgment stage, Plaintiff does not ask the Court to adjudicate factual truth, audience reaction, or damages, but to recognize that the pleaded symbolic rebroadcasts are **legally capable** of constituting defamation *per se* under **Restatement (Second) of Torts § 564** and related precedent.

[A.5-14]    Repetition across time and platforms may bear on how a reasonable recipient would understand the communication in context and may reduce the plausibility of an "innocent construction" argument where identifiability is adequately pleaded. See **Cianci v. New Times Pub. Co., 639 F.2d 54 (2d Cir. 1980)**.

**D.**          **Procedural Posture and Evidentiary Sequencing**

[A.5-15]  At this stage, the symbolic identifiers referenced in this Appendix A. as organized and classified in Exhibit A (Forensic Gesture Ledger) and contextualized through **Appendix B**, are offered solely as a **structured classification and contextual framework** demonstrating legal sufficiency and doctrinal applicability. They are not submitted for evidentiary adjudication, factual confirmation, or findings of liability. Consistent with Fed. R. Civ. P. 57 and governing declaratory judgment principles, recognition of defamation-per-se capability precedes, and does not depend upon, the later presentation of affidavits, AI-assisted detection, expert testimony, or damages proof, all of which will be produced and evaluated at the appropriate procedural stage consistent with **Fed. R. Civ. P. 26** and assessed under applicable evidentiary standards, including **Fed. R. Evid. 702, 901,** and **1006.**

[A.5-16]  Their absence at the pleading stage does not defeat plausibility where the Complaint and incorporated appendices adequately allege contextual identifiability, repetition, and the legal capability of the challenged symbolic conduct to function as constructive identification.

[A.5-17]  The deferred presentation of AI-assisted analyses, structured classification data, and viewer affidavits reflects procedural sequencing, not evidentiary deficiency, and does not diminish their relevance to the declaratory determinations sought. Declaratory relief under Rule 57 permits the Court to clarify the legal status of symbolic conduct and constructive identification without requiring premature proof, while preserving

orderly development of the evidentiary record for subsequent proceedings, including

any later civil RICO phase.

# V.     DEFAMATION PER SE - CATEGORIES

### A.     Imputation of Criminal Conduct

[A.5-18]    Symbolic identifiers that convey criminality, suspicion of unlawful conduct, or

association with criminal wrongdoing fall squarely within recognized categories of

defamation per se. Once such identifiers are plausibly understood by reasonable

observers as referring to Plaintiff within the institutional and symbolic context

described in Appendix B, injury is presumed as a matter of law.

[A.5-19]    As alleged, certain symbolic cues documented in **Appendix B** and classified in

**Tables 2A–2E** functioned to imply criminal suspicion or institutional

untrustworthiness. These meanings did not arise generically but were culturally

encoded within the specific institutional environment surrounding the 1996 Curaçao

Police Academy Boarding Division administrative event and its aftermath, as mapped

in **Appendix B, Table 1 (following § XI).**

[A.5-20]    When such criminally suggestive symbols were later rebroadcast through media,

public-facing institutional settings, or digital distribution systems, they operated as

non-verbal accusations understood by contextually informed audiences to reference

Plaintiff. Under settled doctrine, symbolic insinuations of criminality are no less actionable than express verbal accusations once identification is plausibly established.

[A.5-21]    Courts treat imputations of criminality as **defamation per se** once a communication is understood "of and concerning" the plaintiff. ***Kelly v. Schmidberger*, 806 F.2d 44 (2d Cir. 1986).** In addition, where a publication is repeated or republished through mass-media channels, repetition can reinforce the defamatory sting and diminish "innocent" constructions in the eyes of a reasonable recipient, depending on context. ***Cianci v. New Times Pub. Co.*, 639 F.2d 54 (2d Cir. 1980).** Whether a publisher's framing reflects ridicule, stigmatization, or insinuation is ordinarily a fact inquiry tied to context and recipient understanding and is therefore reserved for later proof. At the declaratory stage, Plaintiff seeks only recognition that the pleaded symbolic imputations are **legally capable** of constituting per se defamation and constructive identification under **Restatement § 564,** with audience decoding, scienter, and liability reserved for later proceedings.

B.          **Imputation of Professional Unfitness or Incompetence**

[A.5-22]    Statements or symbolic communications that impute professional incompetence, dishonesty, or unfitness in one's vocation constitute defamation per se. This principle applies equally where such imputations are conveyed through recurring symbolic or gestural cues rather than explicit verbal statements.

[A.5-23]  **Appendix B** documents that Plaintiff occupied a specialized Dutch-Track cadet pathway associated with future leadership and managerial responsibility within the Curaçao Police institution. Within that institutional context, symbolic identifiers implying unreliability, disqualification, or institutional rejection carried a specific and professionally damaging meaning when applied to Plaintiff's identity.

[A.5-24]  As alleged, the repetition and rebroadcast of such professionally stigmatizing identifiers across jurisdictions and platforms plausibly communicated that Plaintiff was unfit for professional trust or leadership. Once understood by reasonable observers as referring to Plaintiff, such symbolic rebroadcasts trigger presumed injury without the need for proof of special damages.

[A.5-25]  Imputations that a person is professionally unfit, incompetent in his vocation, or has engaged in dereliction of duty fall within recognized **defamation per se** categories. **Restatement (Second) of Torts § 573;** *Zerangue v. TSP Newspapers, Inc.*, **814 F.2d 1066 (5th Cir. 1987).**

[A.5-26]  Plaintiff alleges that certain symbolic identifier's function, in context, as shorthand for an adverse internal "disciplinary" narrative traced to the 1996 administrative episode and the missing-file history referenced as Exhibit D6. Plaintiff further alleges that recurring rebroadcast or repetition of such identifiers operates as a continuing republication of the same professionally stigmatizing imputation. At the declaratory stage, Plaintiff seeks only a determination that the pleaded symbolic practices are

**legally capable** of (i) conveying professional-unfitness imputations within **§ 573** categories and (ii) operating "of and concerning" Plaintiff under **Restatement § 564** when later substantiated through appropriate proof; questions of falsity, audience perception, liability, and any RICO element-by-element satisfaction are reserved for later proceedings. To the extent later proof demonstrates republication (including resurfacing, re-packaging, or renewed distribution), such events may be evaluated under the republication principles recognized in **Restatement (Second) of Torts § 577A.**

## C.    Imputation of Mental Instability or Psychological Defect

[A.5-27]    Symbolic communications implying mental instability, irrationality, or psychological defect constitute defamation per se under long-recognized categories, as such imputations directly undermine personal credibility and social standing.

[A.5-28]    Plaintiff alleges that certain symbolic identifiers, as classified in **Appendix B, Tables 2A–2E,** conveyed insinuations of abnormality, instability, or diminished judgment when decoded within the institutional and cultural framework established by the unresolved 1996 administrative event. These meanings were not intrinsic to the gestures themselves but derived from their contextual anchoring to Plaintiff's identity.

[A.5-29]    When such identifiers were repeatedly rebroadcast through media or institutional channels, they plausibly functioned as non-verbal assertions of mental unfitness attributable to Plaintiff. Under defamation-per-se doctrine, injury is presumed once such imputations are plausibly "of and concerning" the Plaintiff.

[A.5-30]   Courts recognize imputations of insanity or psychological instability as defamation per se. **Restatement (Second) of Torts § 571**; *Dworkin v. Hustler Magazine*, **867 F.2d 1188 (9th Cir. 1989).**

[A.5-31]   Plaintiff alleges that recurring deployment of the referenced cues across broadcast, streaming, and digital distribution systems constitutes publication and, in context, is **legally capable** of conveying an imputation of mental unfitness "of and concerning" Plaintiff within the meaning of **Restatement § 564.** At the declaratory stage, Plaintiff does not request findings as to audience perception, liability, or damages. Materials directed to perception, repetition, and authentication, including viewer affidavits, expert testimony, and AI-assisted detection summaries, are preserved for production and evaluation at the appropriate procedural stage consistent with **Fed. R. Civ. P. 26** and applicable evidentiary standards, including **Fed. R. Evid. 702, 901,** and **1006.**

## D.            Imputation of Moral Deviance or Social Unfitness

[A.5-32]   Symbolic communications that imply moral deviance, dishonorable character, or socially disqualifying conduct likewise fall within defamation-per-se categories. Such meanings may be conveyed through gestures, color coding, or non-verbal innuendo where cultural context supplies the defamatory sting.

[A.5-33]   As alleged, certain symbolic identifiers stabilized within the cultural and institutional ecosystem described in **Appendix B** as shorthand for moral or character-based

disqualification when applied to Plaintiff. Once rebroadcast across media and institutional settings, these symbols plausibly communicated defamatory meaning "of and concerning" Plaintiff, giving rise to presumed injury as a matter of law. Declaratory recognition at this stage is warranted to clarify the legal status of such symbolic rebroadcasts without adjudicating evidentiary proof or damages.

[A.5-34]    U.S. courts classify imputations of serious sexual misconduct or unchastity as defamation per se because they directly attack moral character. *Youssoupoff v. MGM Pictures Ltd.*, **50 Times L.R. 581 (K.B. 1934);** see also **Restatement (Second) of Torts § 574.**

[A.5-35]    Plaintiff alleges that symbolic insinuations, when visually recognizable, contextually anchored, and repeatedly rebroadcast, are **legally capable** of communicating the same defamatory implication as an express verbal accusation and, when a reasonable recipient could understand the communication as referring to the plaintiff, may satisfy the "of and concerning" requirement. **Restatement (Second) of Torts § 564; see** *Bindrim v. Mitchell*, **92 Cal. App. 3d 61 (1979)** (actionable where depiction was recognizable as plaintiff).

## VI.    FIRST AMENDMENT AND FAIR-COMMENT BOUNDARIES

[A.5-36]    Defendants may invoke satire, parody, or opinion defenses. Governing doctrine distinguishes protected expression from communications that a reasonable recipient could understand, in context, to convey a provably false factual implication about an

identifiable person. See **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990).** Where, as pleaded here, the alleged symbolic communications are directed "of and concerning" a **private individual**, the law recognizes a stronger reputational interest and permits liability under constitutionally bounded standards. See **Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974).** At the declaratory stage, Plaintiff seeks only clarification that the symbolic practices alleged are legally capable of falling on the actionable side of that line when later substantiated, without adjudicating falsity, intent, or audience reaction now.

[A.5-37]    **Hustler Magazine v. Falwell, 485 U.S. 46 (1988),** addresses parody in a public-figure setting and does not foreclose liability where context-dependent expression is plausibly alleged to be understood by recipients as conveying factual imputations "of and concerning" a private individual. Plaintiff does not request a finding at this stage regarding what any audience actually believed; materials such as witness testimony and forensic analyses are referenced only to show capability of later substantiation and are reserved for subsequent proceedings consistent with **Fed. R. Civ. P. 26** and applicable evidentiary standards.

## VII.    INTEGRATION WITH RICO PATTERN (CAPABILITY / SEQUENCING ONLY)

[A.5-38]    Although defamation per se is not itself an enumerated predicate act under **18 U.S.C. § 1961(1),** Plaintiff pleads a sequencing posture in which the Complaint and **Appendix B** describe a long-duration, cross-platform dissemination system whose

recurrence mechanics and continuity features are the same types of features civil RICO doctrine evaluates under **H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989),** if later substantiated and if predicate-eligible elements are shown.

[A.5-39]  In later proceedings, upon development of the evidentiary record through discovery, the alleged interstate dissemination mechanics (broadcast, streaming, syndication, archival licensing, and algorithmic redistribution) may be evaluated under predicate-eligible federal statutes where the required elements are met, without the Court adjudicating predicate acts, intent, or damages at the declaratory stage.

[A.5-40]  Consistent with **Count III** and **Appendix A.8,** Plaintiff seeks at the declaratory stage only clarification that the alleged continuity and relatedness characteristics pleaded here are **legally capable** of evaluation under the definitional "pattern" framework in **18 U.S.C. § 1961(5)** (closed-ended and open-ended continuity concepts), if later proven through discovery and subsequent proceedings.

[A.5-41]  For avoidance of doubt, Plaintiff does not request, and the Court is not asked at this stage to decide, whether any predicate offense has occurred, whether any enterprise exists, whether any defendant acted with the requisite intent, or whether Plaintiff can satisfy any civil-damages elements under **18 U.S.C. § 1964(c).** Those questions are reserved for later proceedings if warranted.

## VIII.    DECLARATORY FIT AND RULE 57 POSTURE

[A.5-42]    Plaintiff seeks declaratory clarification under **28 U.S.C. § 2201 and Fed. R. Civ. P. 57** concerning whether the pleaded symbolic communications are legally capable of constituting defamation per se when "of and concerning" identifiability is satisfied under **Restatement § 564,** without adjudicating falsity, liability, damages, or entitlement to coercive relief at this stage. See **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007).**

[A.5-43]    Such clarification is pleaded to reduce legal uncertainty concerning ongoing dissemination practices and to preserve the practical effectiveness of any declaration through later proceedings, if warranted, consistent with **28 U.S.C. § 2202** and the sequencing posture described elsewhere in the Complaint and Appendix set.

## IX.    COMPARATIVE AND INTERNATIONAL AUTHORITY

[A.5-44]    European and international human-rights law recognize reputation as a protected interest. *ECHR Art. 8* ("private life includes reputation**"); *ICCPR Art. 17*. See *Pfeifer v. Austria*, App. No. 12556/03 (Eur. Ct. H.R. 2007).**

[A.5-45]    While non-self-executing, these norms reinforce the declaratory relief sought by showing global consensus that symbolic reputational injury requires effective remedy.

## X.    PROCEDURAL SEQUENCING AND ADMISSIBILITY

[A.5-46]    Materials referenced in the exhibit set (including templates, ledgers, and proposed summaries) are identified to demonstrate capability of later substantiation and to

preserve an orderly evidentiary pathway under the Federal Rules of Civil Procedure and Evidence. No present admissibility ruling, authentication finding, or Daubert determination is sought at the declaratory stage.

[A.5-47]  Rule 8(a) is satisfied because the Complaint remains the operative pleading; this Appendix is incorporated under Rule 10(c) solely to preserve doctrinal support and to orient the Court to the legal categories implicated by the allegations.

## XI.       REBUTTAL MATRIX

| Defense | Authority | Condensed Rebuttal |
|---|---|---|
| Satire/Opinion | *Milkovich; Hustler* | Symbolic "satire" is not immunized where it plausibly conveys a provably false factual imputation "of and concerning" a private individual; whether recipients understood the defamatory sting is a proof question reserved for later proceedings. |
| Generic Gesture" / Coincidence | *Bindrim / Clark Restatement § 564* | Plaintiff pleads a context-dependent identification mechanism (institutional anchoring + repetition + audience decoding); evidentiary substantiation (recipient testimony / expert authentication / summaries) is sequenced to discovery and later proceedings under Rules 26 and the FRE, including FRE 702, 901, and 1006. |

| Public Figure | *Gertz v. Welch*, 418 U.S. 323 (1974), Appendix A.7 | Plaintiff pleads private-person status; the Court may apply the governing private-figure framework to the declaratory capability questions without adjudicating actual malice or damages at the DJ stage. Applicable standards are preserved in Appendix A.7 |
| Lack of Malice | *Harte-Hanks v. Connaughton*, 491 U.S. 657 (1989) | Actual malice (if reached) is fact-intensive and is reserved for later proceedings; Plaintiff pleads the legal capability of the alleged pattern to support the requisite state-of-mind inferences once the record is developed. |

## XII.        CROSS-REFERENCES FOR JUDICIAL NAVIGATION

| Linked Appendix / Exhibit | Purpose |
|---|---|
| A.1–A.4 | Foundational defamation & "of and concerning" doctrine |
| A.8 | Civil RICO predicate continuity analysis |
| C + C Supplement | AI verification of gesture-to-concept mapping |
| F | Comparative media law and press-freedom rebuttals |
| Exhibits A–C | Forensic gesture ledger & affidavit corroboration |

# XIII.  CONCLUSION

[A.5-48] The defamation-per-se doctrines summarized above support Plaintiff's request that the Court clarify whether the categories of symbolic communications pleaded in the Complaint and contextualized in **Appendix B** are legally capable of falling within per se classifications when identifiability under **Restatement § 564** is satisfied, without adjudicating falsity, liability, or damages at this stage.

[A.5-49] This **Appendix A.5** is submitted as doctrinal scaffolding to assist the Court's threshold legal-capability review and to preserve coherent sequencing across the Appendix architecture.

# APPENDIX A.6 - ARTICLE III STANDING

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

# APPENDIX A.6   – ARTICLE III STANDING

*(Cross-Referenced from Complaint ¶¶1–15 (Jurisdiction and Venue), ¶¶26–58 (Factual Background), Counts I–III, and Prayer for Relief; addressing injury-in-fact, traceability, and redressability; Integrated with Appendix D.)*

## I.   INTRODUCTION

[A.6-1]   To obtain declaratory relief under **28 U.S.C. § 2201,** Plaintiff must establish Article III standing by plausibly alleging (1**) injury-in-fact**, (2) **causation** (fair traceability), and (3) **redressability.**

[A.6-2]   Plaintiff alleges a reputational and dignitary injury closely analogous to harms long recognized at common law, including defamation per se, and seeks declaratory clarification of the legal status and legal capability of the challenged symbolic identification practices, without requesting damages at this stage.

## II.   INJURY-IN-FACT IN DEFAMATION PER SE

### A.   Governing Doctrine

[A.6-3]   The Supreme Court has long recognized that intangible harms may satisfy the "concrete" injury requirement when they are historically tied to causes of action

traditionally recognized at common law. (***Spokeo, Inc. v. Robins***, **578 U.S. 330, 341 (2016)).** Defamation is among the most historically entrenched torts, where injury is not speculative but legally presumed.

[A.6-4]    The **Restatement (Second) of Torts § 569** provides: "One who publishes a slander that ascribes to another conduct constituting a criminal offense punishable by imprisonment… is liable to the other without proof of special harm."

[A.6-5]    Federal courts applying this rule hold that the presumption of harm satisfies **Article III**'s injury prong. See *Meese v. Keene*, **481 U.S. 465, 473–74 (1987)** (finding standing where plaintiff alleged reputational harm from being labeled an "agent of foreign propaganda"); *Havens Realty Corp. v. Coleman*, **455 U.S. 363, 373–74 (1982)** (recognizing intangible injury as sufficient where it impacts a protected statutory right).

**B.**        **Application to Plaintiff's Facts**

[A.6-6]    Here, the symbolic identifiers alleged in this action, falling within the categories disclosed in **Appendix B**, are not random, generic, or culturally neutral gestures. As contextualized in **Appendix B**, these identifiers emerged from and derive meaning within the institutional environment of the Curaçao Police Academy Boarding Division following a 1996 administrative event involving Plaintiff. See **Appendix B, Table 1 (following § XI)**. Over time, these identifiers evolved into stable, audience-

recognizable symbolic cues functioning as substitutes for Plaintiff's identity, as mapped in **Tables 2A–2E (following § XVI).**

[A.6-7]  As alleged, the symbolic identifiers documented in **Appendix B** plausibly convey meanings falling within the four recognized categories of defamation per se under U.S. law:

> (a) **Criminality:** gestures implying theft, corruption, or unlawful conduct.
>
> (b) **Sexual immorality:** gestures or cues imputing salacious or improper behavior.
>
> (c) **Professional unfitness:** symbolic acts signaling incompetence or unsuitability within professional or institutional settings; and
>
> (d) **Mental illness or defect:** gestures suggesting instability or cognitive impairment.

[A.6-8]  Where such meanings are plausibly alleged to be understood by reasonable observers as referring to Plaintiff within the institutional and cultural context described in **Appendix B**, injury is presumed as a matter of law.

[A.6-9]  Because reputational injury of the type alleged has long been cognizable at common law, and because Plaintiff alleges that the challenged symbolic identifiers plausibly function as "of and concerning" identifiers within the institutional and cultural

framework described in **Appendix B**, Plaintiff plausibly alleges a concrete and

particularized injury-in-fact sufficient for **Article III** standing at the pleading stage.

[A.6-10]    At the standing stage, courts do not resolve evidentiary disputes or require proof of

the quantum of reputational harm. Rather, **Article III** is satisfied, where the alleged

injury is of a type historically recognized and presumed at common law. Defamation

per se has long constituted such an injury, giving rise to presumed reputational harm

once identification is plausibly alleged. Accordingly, Plaintiff's allegations describe a

concrete and particularized injury sufficient for standing, independent of later

evidentiary substantiation.

[A.6-11]    This injury is ongoing due to the continued rebroadcast, archival persistence, and

algorithmic resurfacing of the symbolic identifiers alleged, independent of any

present adjudication of damages or evidentiary proof.

## III.        INTANGIBLE HARMS AS "CONCRETE"

[A.6-12]    In **Spokeo, Inc. v. Robins, 578 U.S. 330 (2016),** the Supreme Court distinguished

abstract generalized grievances from intangible harms that bear "a close relationship

to a harm traditionally regarded as providing a basis for lawsuit in American courts."

Defamation was expressly identified as one such historically cognizable harm. The constructive identity substitution alleged here, where symbolic gestures function as non-verbal references placing Plaintiff in a false and stigmatizing light before a contextually informed audience, is closely analogous to traditional defamation and implicates the same reputational and dignitary interests.

[A.6-13]  As pleaded, Plaintiff alleges a **concrete and particularized injury** sufficient for Article III standing because:

- **The alleged harm is ongoing**, arising from repeated symbolic rebroadcasts through contemporary media and distribution systems;

- **The injury is particularized**, as the symbolic identifiers are alleged to operate as references to a single identifiable individual; and

- **The injury is concrete**, falling within a category of reputational and dignitary harm long recognized at common law, including defamation per se.

[A.6-14]  Accordingly, Plaintiff plausibly alleges an injury-in-fact sufficient to satisfy Article III standing, without requiring evidentiary proof or quantification of reputational loss at the declaratory judgment stage

## IV.          ANTICIPATORY REBUTTAL: INJURY CHALLENGES

[A.6-15]    Defendants are expected to argue that:

- **Gestures are innocuous and cause no reputational harm.**

  **Rebuttal:** Courts evaluate **audience understanding**, not defendant's intent. (***Clark v. ABC*, 684 F.2d 1208, 1215–16 (6th Cir. 1982)).** If the audience understands the reference to Plaintiff, injury exists.

- **Plaintiff overstates harm—no measurable damages.**

  **Rebuttal:** For **defamation per se**, damages are presumed, and the absence of quantifiable loss does not bar standing. (***Barnes v. Horan*, 841 F.2d 1249 (4th Cir. 1988)).**

- **Gestures fall outside U.S. common law tradition.**

  **Rebuttal:** The doctrine extends to any symbolic communication understood by an audience to refer to Plaintiff, consistent with Restatement § 564.

## V.          CAUSATION: TRACEABILITY OF HARM TO DEFENDANTS' CONDUCT

### A.          Doctrinal Framework

[A.6-16]    The second prong of **Article III** standing requires that the injury alleged be "fairly traceable to the challenged action of the defendant, and not the result of the

independent action of some third party not before the court." (***Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).** The "traceability" requirement does not demand proximate cause; rather, it requires a **substantial likelihood that the defendant's actions caused the plaintiff's injury. (*Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)).**

**B.          Application to Symbolic Defamation (Traceability)**

[A.6-17]    Plaintiff's alleged injuries are plausibly traceable to Defendants' conduct for Article III purposes because the symbolic rebroadcasts at issue are alleged to have occurred through identifiable broadcast, streaming, and media systems controlled or operated by named Defendants. As pleaded:

- **Broadcast Platforms as Distribution Actors:** Media entities including CNN, HBO, and Netflix are alleged to have disseminated symbolic gestures and non-verbal cues through anchors, directors, scripted programming, or curated content streams. As operators of the distribution channels through which such communications were rebroadcast, these entities are alleged to be capable of traceable causation independent of ultimate liability.

- **Public-Facing Amplification Within Defendants' Media Ecosystems:** Plaintiff alleges that the same symbolic gestures appeared during public interviews, ceremonies, or appearances carried on or rebroadcast by Defendants' platforms. To the extent such symbolic content was disseminated through Defendants' controlled media systems, traceability is plausibly alleged without attributing intent or authorship at this stage.

- **Temporal Continuity of Identifiers:** Plaintiff alleges that **specific categories of symbolic identifiers** (as disclosed in **Appendix B, Tables 1 and 2A–2E**) recur across time, platforms, and jurisdictions. This **continuity** supports a plausible inference that the alleged harm is not the result of isolated or generic expression, but of repeated dissemination through identifiable channels.

**C.            Role of AI and Affidavits in Establishing Causation (Procedural Sequencing)**

[A.6-18]    Plaintiff alleges that causation will be substantiated, at the appropriate procedural stage, through a combination of AI-assisted pattern analysis and viewer affidavits produced at the appropriate procedural stage. As pleaded:

- **AI-assisted analysis** is alleged to be capable of identifying repetition, clustering, and temporal recurrence of symbolic identifiers within video segments disseminated through Defendants' media systems, supporting **objective traceability** of dissemination patterns.
- **Viewer affidavits** are alleged to be capable of establishing reasonable observers decoded the symbolic identifiers as referring to Plaintiff and can identify the broadcast context in which such decoding occurred, supporting **subjective traceability** and recognition.

[A.6-19]    Taken together, these mechanisms are alleged to be legally capable of demonstrating traceability between Defendants' dissemination of symbolic content and Plaintiff's

alleged reputational and dignitary injuries. Their referenced role at this stage reflects procedural sequencing under Fed. R. Civ. P. 26 and does not constitute evidentiary proof or factual adjudication for standing purposes.

[A.6-20]  The legal significance of AI-assisted detection, structured gesture classification, and viewer affidavits is central to symbolic defamation and constructive-identity cases of this nature. Such materials constitute the principal mechanisms by which contextual recognition, repetition, and identity-substitution are substantiated and will be produced and evaluated at the appropriate procedural stage consistent with Fed. R. Civ. P. 26 and applicable evidentiary standards, including FRE 702, 901, and 1006

[A.6-21]  The deferred presentation of AI-assisted analyses, structured classification data, and viewer affidavits reflects procedural sequencing, not evidentiary deficiency, and does not diminish their relevance to the declaratory determinations sought. Declaratory relief under Rule 57 permits the Court to clarify the legal status of symbolic conduct and constructive identification without requiring premature proof, while preserving orderly development of the evidentiary record for subsequent proceedings, including any later civil RICO phase.

**D.**          **RICO Framing of Traceability (Declaratory Posture)**

[A.6-22]    For purposes of declaratory relief, Plaintiff alleges that Article III traceability and the causation component of a RICO "pattern" under 18 U.S.C. § 1961(5) arise from the same underlying factual architecture. Specifically, Plaintiff alleges that repeated dissemination of symbolic identifiers through defendant-controlled broadcast, cable, and streaming systems establishes:

- **Traceability for Standing**: The alleged reputational and dignitary harms are plausibly traceable to symbolic rebroadcasts disseminated through media systems operated or controlled by Defendants; and

- **Predicate-Eligibility for RICO Analysis:** The same repeated transmissions are legally capable of constituting predicate-eligible acts involving interstate wires or broadcast facilities, if later proven to form part of a coordinated scheme directed at reputational harm or professional obstruction.

[A.6-23]    Courts recognize that these inquiries overlap conceptually. In **Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)**, the Supreme Court explained that RICO plaintiffs must show injury "by reason of" predicate acts, a causation standard that

parallels Article III's traceability requirement. At the declaratory judgment stage, Plaintiff need not prove predicate acts, but only plausibly allege that the challenged conduct is legally capable of satisfying both traceability and pattern-related causation if adjudication proceeds beyond threshold review.

## VI.        ANTICIPATORY REBUTTAL: CAUSATION CHALLENGES

[A.6-24]    Plaintiff anticipates that Defendants may challenge causation and traceability at the pleading stage. The following responses demonstrate why such challenges do not defeat standing or declaratory sufficiency.

[A.6-25]    **Independent Audience Interpretation:** Defendants may argue that any harm resulted from viewers' subjective interpretations rather than Defendants' conduct.

**Rebuttal:** Defamation and constructive identification turn on whether a *reasonable audience*, in context, would understand the communication as referring to Plaintiff. See **Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)**. Where symbolic identifiers are repeatedly disseminated through mass-media channels and plausibly decoded by reasonable observers as referring to a particular individual, traceability is satisfied for standing purposes regardless of individualized viewer variation.

[A.6-26]    **Third-Party Participation:** Defendants may contend that other actors also used or repeated similar gestures.

**Rebuttal:** Article III traceability and RICO causation do not require exclusivity. Traceability is satisfied where Defendants are alleged to have substantially

contributed to the dissemination of the challenged conduct through their media

platforms, even if other actors also participated. Joint or parallel contribution does not

sever causation at the pleading stage.

[A.6-27]    **Temporal Gaps:** Defendants may argue that the appearance of symbolic identifiers

over extended periods breaks causal continuity.

**Rebuttal: H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)** rejects the

notion that temporal gaps defeat continuity where conduct reflects a regular or

repeated way of operating. Plaintiff alleges that symbolic identifiers recurred across

decades and platforms in a manner consistent with systemic dissemination, not

isolated or sporadic expression. Such allegations suffice to preserve continuity and

traceability for declaratory review.

# VII.        REDRESSABILITY – WHY DECLARATORY RELIEF CURES THE INJURY

### A.        Doctrinal Framework

[A.6-28]    The third prong of standing requires that the injury is likely to be redressed by a favorable decision. (***Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).** Redressability does not require certainty; it requires that the remedy will likely alleviate the injury. See *Utah v. Evans*, **536 U.S. 452, 464 (2002).**

[A.6-29]    Declaratory judgment is expressly designed for this posture: to establish the rights of parties in ongoing disputes before damages accrue further. ***Steffel v. Thompson*, 415 U.S. 452, 471 (1974),** recognized declaratory relief as a forward-looking remedy that resolves ambiguity without coercive enforcement at the outset.

### B.        Application to Symbolic Defamation by Gestures (Redressability)

[A.6-30]    Plaintiff's alleged injury is redressable through declaratory judgment because a judicial determination clarifying the legal status of the challenged symbolic rebroadcasts would materially affect the parties' legal relations and prospective conduct:

(a) **Judicial Clarification of Legal Meaning:**  A declaration that the symbolic gestures and non-verbal cues described in the Complaint are legally capable of constituting communications "of and concerning" Plaintiff and defamatory per se would resolve existing legal uncertainty surrounding their use. Such clarification eliminates ambiguity as to the legal significance of continued rebroadcasting, without adjudicating intent, damages, or liability for future conduct.

- **Foundation for Prospective Equitable Relief:**  Declaratory recognition of the legal status of the conduct alleged would, if violations persist, provide a predicate legal framework upon which Plaintiff could seek appropriate equitable relief under **Fed. R. Civ. P. 65** or, where applicable, remedies authorized by **18 U.S.C. § 1964(a),** subject to further factual development and proof.

- **Effect on Continuity and Pattern Analysis:** By clarifying whether the symbolic rebroadcasts alleged are legally actionable rather than ambiguous or innocuous, declaratory relief materially affects future assessments of continuity, repetition, and relatedness. Such clarification bears directly on whether subsequent conduct could be evaluated as part of a sustained or

coordinated pattern, without making any present findings as to enterprise

existence or predicate liability.

C.        **Integration with Civil RICO Remedies**

[A.6-31]    Redressability is satisfied because declaratory relief would clarify the parties' legal

relations and the legal status of the challenged practices, reduce uncertainty and guide

prospective conduct. See *Steffel v. Thompson*, **415 U.S. 452, 471 (1974);**

*MedImmune, Inc. v. Genentech, Inc.*, **549 U.S. 118 (2007).**

[A.6-32]    Plaintiff further alleges that, if the Court enters declaratory determinations and later

proceedings warrant implementation measures, the Court may consider "further

necessary or proper relief" under **28 U.S.C. § 2202** after notice and hearing,

consistent with applicable equitable standards and procedural safeguards. Plaintiff

does not request adjudication of civil RICO damages elements, predicate acts, or

remedies at this declaratory stage.

# VIII.        ANTICIPATORY REBUTTALS: REDRESSABILITY

CHALLENGES

A.        **Defendants may argue:**

[A.6-33]    "**Declaratory Relief Won't Stop Audience Recognition**":

- **Rebuttal:** The law does not require perfect remediation; only that relief is likely to reduce injury. Declaratory judgment strips defendants of defenses and enables injunctions, making recurrence less likely.

[A.6-34]    **"Plaintiff Could Just Sue for Damages":**

- **Rebuttal: Rule 57** explicitly states that declaratory relief is not precluded by the existence of other remedies. Courts routinely prefer declaratory rulings in complex disputes to reduce duplicative litigation.

[A.6-35]    **"Gestures Are Non-Coercive":**

- **Rebuttal:** Defamation per se injuries are coercive in themselves. Reputation loss is a recognized irreparable harm warranting equitable relief (***Balboa Island Village Inn v. Lemen*, 156 P.3d 339, 344–45 (Cal. 2007)).**

## B.        Practical Effects of Declaratory Relief

[A.6-36]    A declaratory determination would provide an operative legal framework for evaluating future conduct and would reduce the risk that ongoing uncertainty permits recurrence or evasion through platform changes, archival persistence, or restructuring, issues addressed separately in **Count IV** and the **§ 2202** further-relief provisions**.**

## IX.        UNIFIED STANDING ARGUMENT – SATISFYING ALL THREE PRONGS

**A.        Doctrinal Synthesis**

[A.6-37]    To satisfy **Article III** standing under ***Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992),** Plaintiff plausibly alleges each required element:

(i)  **Injury-in-Fact:** Defamation per se constitutes a historically recognized and legally presumed injury, including imputations of criminality, immorality, professional unfitness, or mental defect. Plaintiff alleges that recurring symbolic gestures and non-verbal cues, such as those catalogued in **Exhibit A** and contextualized in **Appendix B,** functioned as expressive substitutes for his identity and conveyed defamatory meaning to reasonable observers. Where identification is plausibly alleged, injury exists as a matter of law without proof of economic loss.

2)  **Causation:** Plaintiff plausibly alleges that the challenged injury is traceable to Defendants' conduct because the symbolic identifiers at issue were rebroadcast through defendant-controlled media platforms, public programming, and affiliated institutional channels. The Complaint and incorporated appendices allege repetition, consistency, and platform control sufficient to support a reasonable inference of traceability. AI-

assisted analyses and viewer affidavits are preserved and will be offered at later procedural stages to substantiate repetition, diffusion, and audience recognition, consistent with **Fed. R. Civ. P. 26,** and applicable evidentiary standards, including **FRE 702, 901,** and **1006.**

3) **Redressability:** Declaratory relief under **28 U.S.C. § 2201** would materially redress Plaintiff's injury by clarifying the legal status of the challenged symbolic rebroadcasts and resolving uncertainty regarding whether such conduct is legally capable of constituting actionable identification and defamation per se. Such clarification would affect the parties' prospective legal relations and provide a foundation upon which further relief could be sought, if warranted, subject to additional factual development.

[A.6-38]   Taken together, these allegations satisfy the constitutional minimum for standing. The pleaded facts establish a concrete, particularized, and ongoing controversy suitable for declaratory adjudication, involving repeated symbolic conduct, identifiable defendants, and forward-looking legal uncertainty.

[A.6-39]   The Plaintiff does not seek adjudication of damages or coercive relief at this stage, but only judicial clarification of legal status is sufficient to meet **Article III** requirements.

**B.        Why Declaratory Relief Is the Appropriate Threshold Remedy**

[A.6-40]    Declaratory relief is particularly suited to this action because it resolves threshold

legal uncertainty concerning identification and defamatory meaning without requiring

evidentiary adjudication. It permits the Court to determine whether the challenged

symbolic practices are legally capable of constituting actionable conduct, while

preserving discovery and proof for later proceedings if warranted.

[A.6-41]    Courts have repeatedly recognized declaratory relief as appropriate where the dispute

concerns legal status, identity, or rights recognition antecedent to coercive remedies.

*See, e.g., **Steffel v. Thompson**,* **415 U.S. 452, 471 (1974).**

**C.        Reservation of Issues Concerning Immunity and Non-Party Conduct**

[A.6-42]    Plaintiff does not seek adjudication of immunity defenses, governmental liability, or

the conduct of non-party actors at the declaratory judgment stage. Any issues relating

to governmental capacity, immunity doctrines, or attribution of conduct are expressly

reserved for later proceedings, if necessary, and are not material to the standing or

declaratory determinations sought here.

**X.        EXHIBIT A - AS A STANDING REFERENCE FRAMEWORK**

[A.6-43]    **Exhibit A (Forensic Gesture Ledger)** is incorporated at this stage solely as a

**structured reference framework** supporting the plausibility of Plaintiff's standing

allegations. It categorizes symbolic identifiers by type, recurrence, and alleged

defamatory meaning, without offering evidentiary proof or seeking adjudicative findings.

[A.6-44]    The **structured reference framework** supporting Plaintiff's standing allegations is set forth in **Appendix B, including Table 1 (institutional origin, following § XI) and Tables 2A–2E (identity-function evolution, following § XVI).** These tables are incorporated pursuant to Fed. R. Civ. P. 10(c) for the limited purpose of contextualizing how the symbolic identifiers alleged in this action emerged, stabilized, and functioned as constructive identity substitutes over time, without offering evidentiary proof or seeking factual adjudication at this stage.

[A.6-45]    By tethering standing to a defined and internally consistent symbolic framework, Plaintiff ensures that the Court's analysis concerns a concrete and intelligible controversy rather than an abstract grievance, consistent with Article III requirements.

# XI.    IMMUNITY- / NON-PARTY OFFICIAL-ACTOR NOTE (LIMITED; DOE-SEQUENCENCED)

A.    **Non-Party / Official-Capacity Issues (Reserved, If Identified)**

[A.6-46]    Plaintiff does not name any governmental defendants at this declaratory stage. To the extent discovery later identifies any individual or entity acting under color of law or within official capacity as participating in the dissemination or facilitation pathways

alleged **(Complaint ¶¶ 17–20),** Plaintiff preserves the legal position that sovereign or qualified immunity does not bar declaratory relief as to ultra vires, non-discretionary, or otherwise non-legitimate governmental conduct, and that personal-capacity liability may be available where the required standards are later satisfied. See *Hafer v. Melo*, **502 U.S. 21, 27 (1991).** This note is included solely to preserve legal sequencing and does not request adjudication of immunity, public-actor status, or liability at the DJ stage.

**B.        Media Defendants (No Sovereign Immunity; Commercial Broadcast Conduct)**

[A.6-47]  As to the named corporate media defendants, sovereign or quasi-governmental immunity is inapplicable to commercial, revenue-driven broadcasting, streaming, distribution, and editorial dissemination activity. Such conduct is private and commercial in character and remains subject to declaratory adjudication where ongoing harm is plausibly alleged. Any immunity-related issues pertaining to foreign sovereigns or state actors, if they arise, are reserved and would be addressed only if and when proper parties are identified and joined through later proceedings.

## XII.          JUDICIAL ECONOMY AND LITIGATION EFFICIENCY

[A.6-48]    Granting declaratory relief at this stage promotes judicial efficiency consistent with **Fed. R. Civ. P. 1** by resolving, in a single proceeding, the threshold legal question of whether the symbolic identifiers alleged are capable of constituting actionable identification and defamation per se. Early clarification prevents duplicative litigation and inconsistent rulings on identity across subsequent proceedings.

[A.6-49]    Declaratory adjudication narrows the scope of future discovery, reduces motion practice over foundational issues, and establishes a unified legal baseline for any later proceedings, including potential civil RICO and damages phases.

## XIII.          CONCLUSION TO APPENDIX A.6 (SUB-SECTIONS I–XI)

[A.6-50]    As demonstrated in sub-sections I–XI, Plaintiff plausibly satisfies all three elements of **Article III** standing. Injury-in-fact is presumed as a matter of law in cases of defamation per se; causation is plausibly traceable to patterned rebroadcasts controlled or amplified by Defendants; and redressability is immediate through declaratory relief addressing ongoing conduct. Neither sovereign nor derivative immunity doctrines bar adjudication of ultra vires or commercial acts alleged herein.

[A.6-51]    With standing and jurisdictional sufficiency established, this action proceeds to **Appendix A.7** (Constitutional Balance), which addresses why declaratory relief concerning symbolic defamation is consistent with **First, Fourth, and Fourteenth Amendment** protections and necessary to vindicate Plaintiff's rights without chilling lawful expression.

### CONDENSED BLACK-LETTER RULE

[A.6-52]    **Article III** standing is satisfied where defamation per se is plausibly alleged: injury-in-fact is presumed, causation is traceable through recurring symbolic rebroadcasts, and redressability is secured through declaratory and prospective relief. Standing therefore presents no barrier to adjudication at the pleading stage.

# APPENDIX A.7 - CONSTITUTIONAL BALANCE

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

## APPENDIX A.7    – CONSTITUTIONAL BALANCE

*(Cross-Referenced from Counts I–II; Supporting Appendix F; Integrated with Appendix D; Capability and boundary-setting orientation only; no constitutional adjudication sought at the declaratory stage.)*

## I.    CONSTITUTIONAL BALANCE: PURPOSE AND SCOPE

### A.    Purpose

[A.7-1]    **Appendix A.7** addresses the constitutional permissibility of the declaratory relief sought in Count I. It explains why a judicial declaration concerning the *legal capability* of alleged symbolic defamation and constructive identification, as contextualized in **Appendix B**, does not infringe protected speech under the **First Amendment**, does not exceed the **Court's Article III / separation-of-powers role,** and does not improperly insulate ultra vires or purely commercial conduct through overbroad constitutional framing.

## B.          Scope

[A.7-2]    This **Appendix A.7** does not adjudicate factual truth, damages, enterprise liability, or evidentiary proof. It operates at the constitutional boundary level only, confirming that declaratory clarification of whether alleged symbolic rebroadcasts are *legally capable* of being defamatory and "of and concerning" Plaintiff is a judicially permissible function under **28 U.S.C. § 2201** and **Fed. R. Civ. P. 57.**

## C.          Relationship with Other Appendices

[A.7-3]    **Appendix A.7** functions in coordination with:

• **Appendix A.5** (Defamation Per Se: Doctrinal Application),

• **Appendix A.6** (Article III Standing), and

• **Appendix B** (Institutional Origin and Identity-Function Evolution Tables).

[A.7-4]    **Appendix A.7** neither duplicates nor supplants those analyses; it preserves the constitutional boundary conditions confirming that the declaratory relief requested may proceed without constitutional infirmity.

## D.          Procedural Posture

[A.7-5]    Consistent with **Rule 26** and **Rule 57**, this **Appendix A.7** assumes deferred presentation of affidavits, AI-assisted detection outputs, and other proof materials. Their later introduction, if the matter proceeds beyond threshold declaratory determinations, raises no categorical constitutional bar and does not convert the declaratory posture into a merits adjudication at this stage.

## II.    INTRODUCTION: CONSTITUTIONAL STAKES OF SYMBOLIC DEFAMATION

[A.7-6]    At its core, this action presents constitutional boundary questions that inform, rather than displace, the Court's declaratory function. The threshold issue is whether the First Amendment and related constitutional doctrines categorically bar a declaration addressing the *legal capability* of alleged non-verbal symbolic identifiers, repeatedly deployed as alleged, to function as defamatory communications "of and concerning" a private individual.

[A.7-7]    Plaintiff references constitutional doctrines not as independent causes of action, but as limiting principles relevant to the Court's boundary-setting role:

- **The First Amendment**, which does not immunize defamatory falsehoods or communications that plausibly convey provably false factual imputations about an identifiable private individual;

- **The Fourth Amendment**, whose privacy jurisprudence underscores the constitutional sensitivity of persistent, identity-directed public marking and stigmatization when state-aligned participation is later proven; and

- **The Fourteenth Amendment**, whose due process and equal protection principles illuminate the constitutional stakes where governmental involvement is later substantiated and where reputational liberty interests are implicated by state-tolerated stigma without adjudicative process.

[A.7-8] By situating the dispute within these constitutional boundaries, Plaintiff does not ask the Court to adjudicate constitutional tort claims at the declaratory stage. Plaintiff seeks only to prevent constitutional doctrines from being used as categorical shields against the Court's power to clarify the legal status and capability of the alleged symbolic defamation mechanism, while preserving full constitutional safeguards for later proceedings if warranted. The declaratory relief requested is thus a constitutional boundary-setting determination concerning legal capability and classification, not a restriction on protected speech or an adjudication of constitutional liability.

## III.        FIRST AMENDMENT: SCOPE AND LIMITS

### A.        Doctrinal Framework

[A.7-9] The Supreme Court has long distinguished protected expression from unprotected defamatory communication. In *Milkovich v. Lorain Journal Co.*, **497 U.S. 1, 18–20 (1990)**, the Court held that speech framed as opinion loses constitutional protection

when it implies assertions of fact capable of defamatory meaning. Likewise, ***Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974),** confirms that private individuals are entitled to heightened reputational protection and that constitutional doctrine does not broadly immunize reputational harm inflicted on non-public figures.

[A.7-10]  Symbolic conduct may be protected when it conveys political or expressive content, as in ***Texas v. Johnson*, 491 U.S. 397 (1989).** However, constitutional protection is not categorical where symbolic conduct is plausibly alleged to function as a context-dependent identifier that conveys imputations of criminality, moral defect, professional unfitness, or mental instability about an identifiable private individual. The question at this stage is not whether any particular symbol *did* carry that meaning, but whether such symbolic communications are *legally capable* of doing so under governing doctrine when later substantiated.

**B.**          **Application to Plaintiff's Allegations**

[A.7-11]  Consistent with **Appendix B, Table 1 (Institutional Origin, following § XI) and Tables 2A–2E (Identity-Function Evolution, following § XVI**), Plaintiff alleges that the challenged symbolic identifiers operate not as abstract expression but as stable, context-dependent identity proxies. Plaintiff seeks declaratory clarification that this alleged mechanism is legally capable of constituting defamatory implication "of

and concerning" a private individual and therefore is not categorically insulated by the **First Amendment**.

[A.7-12]   Nor do parody or satire doctrines categorically shield the conduct alleged. ***Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)**, involved a public figure and an overt parody context. Plaintiff alleges a private-person posture and a symbolic identification mechanism that functions, within an asserted interpretive audience, as a factual identity signal conveying per se imputations. Plaintiff does not request a merits finding on satire or audience reaction at the declaratory stage; Plaintiff seeks only clarification that such a mechanism, if later proven, is not constitutionally immune as a matter of law.

## IV.       FOURTH AMENDMENT: PRIVACY INTERESTS AND ALLEGED SYSTEMATIC TARGETING

### A.       Doctrinal Explanation

[A.7-13]   The Fourth Amendment protects privacy and limits unreasonable governmental surveillance, ***Katz v. United States*, 389 U.S. 347, 351–52 (1967).** Plaintiff references **Fourth Amendment** principles solely as a constitutional context marker: if later proceedings substantiate state-aligned participation in persistent identity-directed public marking or monitoring-like conduct, such evidence may bear on the constitutional gravity of the alleged mechanism and on the propriety of narrowly

tailored prospective relief. No **Fourth Amendment** cause of action is asserted in this **Appendix A.7.**

B.          **Application to the Allegations**

[A.7-14]    Plaintiff alleges that sustained symbolic rebroadcasting across media platforms and public-facing institutional settings functioned as persistent identity-tagging and stigmatization. This allegation is offered to illustrate why the Court's boundary-setting declaration has practical importance in a private-person case involving long-duration identity substitution. Whether any conduct rises to constitutional significance, and whether any state action exists, is reserved for later proceedings and is not adjudicated at the declaratory stage.

[A.7-15]    Accordingly, **Fourth Amendment** principles are referenced only to underscore the legal sensitivity of identity-directed, persistent public marking where governmental involvement is later established, not to request constitutional adjudication now.

V.          **FOURTEENTH AMENDMENT: EQUAL PROTECTION AND DUE PROCESS PRINCIPLES**

A.          **Doctrinal Explanation**

[A.7-16]  The **Fourteenth Amendment** prohibits arbitrary state action and protects reputational liberty interests in appropriate circumstances, and equal protection doctrine recognizes "class-of-one" principles. ***Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)**. Plaintiff references these doctrines solely as contextual boundary principles relevant if later proceedings substantiate state-aligned participation in selective stigmatization through symbolic mechanisms. No **Fourteenth Amendment** claim is adjudicated or requested in this **Appendix A.7.**

**B.        Application to the Allegations**

[A.7-17]  Plaintiff alleges that, to the extent state-aligned participation is later proven, the alleged symbolic mechanism could implicate due process, and equal protection concerns by associating a private individual with stigmatizing imputations absent adjudicative process. Plaintiff does not seek a constitutional ruling at the declaratory stage; this reference serves only to underscore that constitutional doctrines do not categorically foreclose declaratory clarification of the legal status of symbolic defamation directed at a private person.

[A.7-18]    The requested declaration remains confined to defamation capability and constructive identification capability under governing tort principles, with any constitutional issues expressly reserved for later proceedings if warranted by discovery and proof.

**_Footnotes (Sequential footnotes continued from Appendix 7)_**

_Milkovich v. Lorain Journal Co., 497 U.S. 1, 18–20 (1990)._

## VI.    CONSTITUTIONAL DOCTRINES AS CONTEXT FOR PATTERN/CONTINUITY ANALYSIS

[A.7-19]    The constitutional doctrines referenced in Sections III–V are not pleaded as independent causes of action in **Appendix A.7** and are not presented for adjudication at the declaratory stage. They are preserved solely as **contextual limiting principles** relevant to (i) evaluating anticipated constitutional defenses to symbolic-defamation capability determinations, and (ii) explaining why the alleged long-duration rebroadcast mechanism, if later substantiated, is **procedurally capable** of being analyzed under continuity and enterprise concepts addressed elsewhere **(Appendix

**A.8),** without the Court adjudicating intent, predicate acts, or merits liability at this stage.

A.        **First Amendment as Boundary and Anticipated Defense Frame**

[A.7-20]   Defendants may invoke the **First Amendment** to characterize repeated symbolic gestures as protected expression. Under *Milkovich v. Lorain Journal Co.*, **497 U.S. 1, 18–20 (1990),** expression framed as o pinion may lose protection when it implies a provably false factual imputation. Plaintiff preserves this doctrine here to show that the Court may consider whether the alleged symbolic-coding mechanism is **legally capable** of falling outside constitutional protection *if* later proven to function as identity-targeted defamatory implication "of and concerning" a private person.

[A.7-21]   The **First Amendment** is not pleaded as a "predicate" and is not converted into an element of any federal offense at the declaratory stage. Rather, it is preserved as the doctrinal boundary that prevents constitutional defenses from foreclosing the Court's ability to clarify legal status questions, with any evidentiary development regarding scheme, intent, or coordination reserved for later proceedings consistent with **Rule 26.**

B.        **Fourteenth Amendment Principles as Context for Systemic-Pattern Characterization (Method/Selectivity)**

[A.7-22]   Plaintiff references equal protection and due process principles solely as contextual lenses: where a symbolic practice is alleged to persist over time across multiple channels and settings, the claimed pattern is alleged to resemble a "regular way of operating" in the sense used in continuity doctrine. **See *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239–40 (1989).** This reference is not a request for a constitutional finding; it is preserved only to explain the boundary-setting role of declaratory relief where alleged stigmatizing identification persists in absent formal process.

## C.          Motive and Discrimination References Reserved

[A.7-23]   References to "selective" or "irrational" targeting are pleaded only in a capability posture and are expressly reserved for later substantiation, if warranted. No inference of enterprise motive, intent, or discriminatory purpose is requested at the declaratory stage.

[A.7-24]   Taken together, the constitutional doctrines addressed herein serve a limited function: they support the proposition that the alleged symbolic identification mechanism, if later substantiated, is **not categorically insulated** from legal scrutiny and is **procedurally capable** of structured evaluation under continuity concepts without premature adjudication of criminal liability, intent, or merits proof.

# VII. FORENSIC-AI PATHWAY: EVIDENTIARY CAPABILITY AND SEQUENCING (RULE 26 / FRE 702–901–1006)

## A. Role of Later Proof Mechanisms (Affidavits / Expert / Technical Summaries)

[A.7-25] AI-assisted detection, structured gesture classification, and viewer affidavits are preserved as potential proof mechanisms commonly relevant to non-verbal or coded-communication disputes, where repetition, contextual anchoring, and audience decoding are contested. These materials are referenced here only to demonstrate that the allegations pleaded are **capable of substantiation** through orderly evidentiary procedures and do not depend on conjecture.

## B. First Amendment Ambiguity Defenses and Evidentiary Capability

[A.7-26] Defendants may contend that alleged symbolic gestures are ambiguous, susceptible to innocent interpretation, or protected as parody or expressive conduct. At the declaratory stage, the Court is not asked to determine the meaning of any particular gesture or to resolve how any broadcast was actually understood.

[A.7-27]    The legal question preserved for declaratory posture is whether, as pleaded, non-verbal communications may be **legally capable** of carrying defamatory meaning and constructive identification when decoded by reasonable observers within a defined institutional and cultural context. That contextual foundation is supplied by **Appendix B**.

[A.7-28]    AI-assisted detection and viewer testimony are referenced solely to show that, if meaning is later disputed, recognized evidentiary methodologies exist to examine repetition, contextual association, and audience decoding consistent with **Rules 702, 901,** and **1006,** without requiring the Court to resolve those disputes at the declaratory stage.

**C.           Fourth Amendment Context and Pattern Examination**

[A.7-29]    Plaintiff alleges persistent rebroadcast patterns as identity-directed marking and anticipates defenses characterizing such allegations as speculative.

[A.7-30]    The Court is not asked to adjudicate surveillance or **Fourth Amendment** violations at the declaratory stage. The reference is limited to evidentiary capability: if later proceedings substantiate state-aligned participation and a monitoring-like pattern, such claims are susceptible to structured factual inquiry through authenticated

archival review, occurrence logging, and expert summary methods, consistent with

the **Federal Rules of Evidence.**

[A.7-31]    This does not convert **Fourth Amendment** doctrine into an independent claim at the

declaratory stage.

**D.**         **Fourteenth Amendment Context and Selectivity Analysis**

[A.7-32]    Plaintiff alleges selective association of symbolic identifiers with Plaintiff's

constructive identity and anticipates challenges requiring comparative proof.

[A.7-33]    At this stage, plausibility is supplied by **Appendix B**'s institutional origin and

meaning-stabilization account; no comparative analytics are offered as proof.

[A.7-34]    AI-assisted comparative analysis is referenced only to preserve that, if selective-

treatment questions are litigated at later stages, reliable expert methodologies exist to

test relative frequency and contextual association under **Rules 702, 901,** and **1006.**

**E.**         **Procedural Safeguard — Reservation of Proof**

[A.7-35]    Across all constitutional theories referenced herein, AI outputs, **Exhibit A**

taxonomies, and viewer affidavits are referenced solely to demonstrate evidentiary

capability and procedural coherence. They do not supply proof at the declaratory

stage and are expressly reserved for discovery, expert disclosure, and merits

adjudication consistent with **Fed. R. Civ. P. 26.**

# VIII.  SEQUENCING AND EVIDENTIARY ROLE CLARIFICATION

### A.  Appendix B vs. Exhibit A; Declaratory vs. Merits Stage

[A.7-36]   At the declaratory judgment stage, Plaintiff relies on **Appendix B** to supply

contextual, historical, and institutional explanation of how symbolic identifiers are

alleged to operate as constructive identity substitutes. **Appendix B** is incorporated

pursuant to **Fed. R. Civ. P. 10(c)** for this limited purpose only and is not offered for

evidentiary proof, expert opinion, or factual adjudication.

[A.7-37]   By contrast, **Exhibit A** (Forensic Gesture Ledger) is preserved for later procedural

stages, including discovery and expert disclosure, as the potential evidentiary anchor

for proof of repetition, audience recognition, and continuity, if further proceedings are

warranted.

[A.7-38]   This sequencing is intentional and procedurally orthodox: declaratory relief under **28

U.S.C. § 2201** permits the Court to resolve threshold legal-capability questions

without adjudicating proof, damages, or intent.

**B.**         **Daubert and Expert Evidence Reservation**

[A.7-39]   AI-assisted detection and related forensic methodologies are referenced solely to demonstrate technical feasibility of substantiation and are described in **Appendix C** for later-stage use.

[A.7-40]   Plaintiff does not seek Daubert adjudication at the declaratory stage. Questions of reliability and expert application are reserved for post-discovery proceedings consistent with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, **509 U.S. 579 (1993), and Rule 26(a)(2).**

[A.7-41]   The absence of AI outputs, expert reports, or affidavit testimony at this stage reflects procedural sequencing, not evidentiary weakness.

**C.**         **Preservation of Downstream Proceedings**

[A.7-42]   Nothing in **Appendix A.7** requests findings regarding intent, coordination, damages, predicate acts, or criminal liability. Those issues remain reserved for later proceedings, if warranted.

## IX.     ANTICIPATED CONSTITUTIONAL DEFENSES AND NARROW TAILORING

**A.**         **First Amendment Overbreadth**

[A.7-43]    Defense: Defendants may argue chilling effect or overbreadth.

Rebuttal: Plaintiff seeks narrow declaratory clarification addressing only whether the

alleged symbolic identification mechanism is legally capable of constituting

defamatory implication "of and concerning" Plaintiff, not restrictions on generic

expression or commentary.

## B.        Fourth Amendment Inapplicability

[A.7-44]    Defense: Defendants may argue no search or surveillance occurred.

Rebuttal: No Fourth Amendment claim is adjudicated at the declaratory stage; Fourth

Amendment principles are referenced only as contextual stakes if state-aligned

participation is later substantiated.

## C.        Fourteenth Amendment Rational Basis

[A.7-45]    Defense: Defendants may argue no discrimination or selective treatment exists.

Rebuttal: No equal protection adjudication is requested at the declaratory stage; any

selectivity analysis is reserved for later proceedings and potential proof mechanisms

are preserved in Appendix C.

## X.        DECLARATORY JUDGMENT FIT

[A.7-46]    The declaratory judgment posture is well-suited to address constitutional boundary

questions where parties dispute whether ongoing conduct is categorically protected or

categorically immune from legal scrutiny. Under **28 U.S.C. § 2201(a),** a declaration is

appropriate where it will clarify legal relations in a controversy of sufficient immediacy and reality.

[A.7-47]    Here, declaratory clarification is sought to determine whether the alleged symbolic rebroadcast mechanism is legally capable of constituting defamatory implication and constructive identification "of and concerning" Plaintiff, while preserving constitutional safeguards and reserving all proof, intent, and remedy questions to later proceedings if warranted.

## XI.        REDRESSABILITY AND PRACTICAL EFFECT OF DECLARATORY RELIEF

[A.7-48]    For **Article III** purposes, declaratory relief may redress injury by clarifying legal status and altering prospective legal relations, even where coercive remedies are not adjudicated at the threshold stage. See *MedImmune, Inc. v. Genentech, Inc.*, **549 U.S. 118 (2007);** *Steffel v. Thompson*, **415 U.S. 452 (1974).**

[A.7-49]    Plaintiff seeks no adjudication of injunctive entitlement in **Appendix A.7**. Any further relief, if warranted, is expressly reserved to later proceedings under **28 U.S.C. § 2202** and the Court's discretion, with full notice, hearing, and any required factual findings.

# XII.    IMMUNITY PRINCIPLES IN DECLARATORY / POSTURE CONTEXT

[A.7-50]    Defendants may invoke constitutional defenses to argue that symbolic or non-verbal conduct is categorically protected or non-justiciable. The rebuttals below are preserved solely to clarify that the declaratory relief sought is narrow and boundary-setting and does not require merits adjudication now.

## A.    Overbreadth / Chilling Effect

**Defense Claim:** Plaintiff's theory sweeps too broadly.

**Rebuttal**: Plaintiff seeks a narrow declaration concerning whether the alleged symbolic-coding mechanism, contextualized exclusively through **Appendix B Table 1 and Tables 2A–2E, is legally capable** of constituting defamatory implication and constructive identification "of and concerning" Plaintiff. The requested declaration is not directed at generic expression. **See *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990).**

## B.    Parody / Satire

**Defense Claim:** Gestures are parody or satire.

**Rebuttal:** *Hustler Magazine, Inc. v. Falwell*, **485 U.S. 46 (1988)**, does not create categorical immunity where conduct is plausibly alleged to operate as a non-verbal identity signal carrying provably false factual implications about a private individual;

the governing boundary is whether the communication implies defamatory fact.

*Milkovich*, **497 U.S. at 18–20;** *Gertz v. Robert Welch, Inc.*, **418 U.S. 323 (1974).**

C.    **Equal Protection / "Rational Basis" Framing**

**Defense Claim:** Any alleged selectivity is legally irrelevant.

**Rebuttal:** Plaintiff does not seek adjudication of equal protection liability at the declaratory stage. *Village of Willowbrook v. Olech*, **528 U.S. 562 (2000),** is cited only to illustrate that, if later proceedings reach state-aligned conduct, "class of one" doctrines may be legally relevant; no discriminatory finding is requested here.

D.    **Speculative Injury**

**Defense Claim:** Injury is subjective or speculative.

**Rebuttal:** Defamation per se supplies a historically recognized reputational injury framework and supports standing analysis without requiring damages quantification at threshold stages. **See Appendix A.6;** *Spokeo, Inc. v. Robins*, **578 U.S. 330 (2016);** *Meese v. Keene*, **481 U.S. 465 (1987).** Any AI outputs or affidavits are reserved for later proceedings and are referenced only as evidentiary capability, not proof, at the declaratory stage.

## XIII.    CROSS REFERENCES TO EXHIBIT A

[A.7-51]   **Exhibit A** is referenced solely as a structured taxonomy of gesture categories. At the

declaratory stage, **Exhibit A** is not offered as proof, factual substantiation, or

evidentiary corroboration. It is cited only to illustrate how categories of non-verbal

identifiers, as plausibly alleged and contextualized exclusively in **Appendix B (Table**

**1; Tables 2A–2E)**, are **legally capable** of intersecting with constitutional boundary

doctrines if later reached.

[A.7-52]   By way of non-exhaustive illustration, and without re-describing gesture facts outside

**Appendix B** or **Exhibit A,** gesture categories may be relevant as follows:

(a) **First Amendment:** categories plausibly alleged to carry defamatory factual

implication when evaluated in context.

(b) **Fourth Amendment principles:** categories plausibly alleged to function as

repeated identity-markers, relevant only as later-stage context if state-aligned conduct

is established.

(c) **Fourteenth Amendment principles:** categories plausibly alleged to appear in

selective narratives, relevant only if later proceedings reach state action and the

required elements.

[A.7-53]   No inference of factual occurrence, intent, coordination, repetition, or constitutional

violation is requested or adjudicated by these references. All plausibility arises

exclusively from **Appendix B.** Any evidentiary use of **Exhibit A** attaches, if at all,

only after discovery, authentication, expert disclosure, and merits proceedings under Rule 26 and the Federal Rules of Evidence.

[A.7-54]  Any constitutional significance of specific gestures is therefore contingent on later-stage proof and the Court's subsequent determinations; this appendix preserves only boundary-setting doctrine at the declaratory stage.

## XIV.    DOCTRINAL SYNTHESIS

[A.7-55]  The constitutional balance presented here is not a request to adjudicate constitutional tort liability. It is a request for the Court to recognize that symbolic and non-verbal communication is not categorically insulated from legal scrutiny where it is plausibly alleged to function as identity-targeted defamatory implication against a private individual.

[A.7-56]  Declaratory relief in this posture harmonizes constitutional principles by clarifying boundary conditions: protected expression remains protected; communications plausibly alleged to operate as defamatory factual implication "of and concerning" a private person are not categorically immune under *Milkovich* and *Gertz.* Any further constitutional questions remain reserved.

## XV.            DISCOVERY RIGHTS: HERBERT V. LANDO

[A.7-57]    Defendants may contend that editorial privilege or discretion forecloses inquiry into deliberative processes. In ***Herbert v. Lando*, 441 U.S. 153, 169–70 (1979)**, the Supreme Court held that editorial processes are not categorically insulated from discovery where a defamation claim places state of mind and editorial conduct at issue.

[A.7-58]    *Herbert* is referenced solely to preserve that, if the Court declares the alleged symbolic conduct legally cognizable and the action later proceeds beyond the declaratory stage, ordinary discovery mechanisms may be legally capable of reaching materials bearing on deliberation or systematic embedding, subject to proportionality, tailoring, and judicial supervision.

[A.7-59]    No discovery is sought, compelled, or presumed at the declaratory stage; this reference preserves procedural sequencing.

[A.7-60]    Accordingly, "editorial discretion" is not preserved as an absolute bar as a matter of law to later, properly limited discovery, should the case proceed.


## XVI.           ENTERPRISE BREADTH: TURKETTE

[A.7-61]    Defendants may argue that lawful corporations cannot form a RICO enterprise.

***United States v. Turkette*, 452 U.S. 576, 583 (1981),** recognizes that an association-

in-fact enterprise may exist regardless of whether the entities are lawful or unlawful in origin.

[A.7-62]    Plaintiff does not request an enterprise finding at the declaratory stage. Turkette is referenced only to preserve that, if later proceedings substantiate the required elements (purpose, relationships, longevity), the participation of lawful entities does not categorically foreclose enterprise analysis under the governing doctrine.

[A.7-63]    Any determination regarding enterprise existence, membership, or coordination is expressly reserved for later proceedings and proof.

# XVII.    COMPARATIVE CONSTITUTIONAL ALIGNMENT: ECHR / ICCPR

[A.7-64]    The Court's ruling is grounded exclusively in U.S. law. Comparative frameworks are cited solely as persuasive context reflecting doctrinal harmony with reputational protections.

[A.7-65]    European jurisprudence recognizes reputation as part of private life and balances that interest against expression. See *Axel Springer AG v. Germany*, **55 E.H.R.R. 6**

**(2012);** *Von Hannover v. Germany* **(No. 59320/00, 2004).** These citations are non-binding and offered only for contextual alignment.

[A.7-66]    Similarly**, ICCPR Article 17** reflects the international norm against unlawful attacks on honor and reputation. These references do not expand the relief sought and are included for persuasive orientation only.

## XVIII.    DAUBERT RELIABILITY

[A.7-67]    Defendants may challenge AI-based forensic detection as novel or unreliable. Plaintiff references *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, **509 U.S. 579 (1993),** solely to preserve that the methodology described in **Appendix C** is designed to be testable, reproducible, and auditable, and thus procedurally capable of evaluation under Rule 702 and authentication under Rule 901(b)(9) at the appropriate stage.

[A.7-68]    No performance metrics, error rates, or validation results are offered for adjudication at the declaratory stage. Any such materials, if needed, are reserved for expert disclosure and later proceedings consistent with Rule 26(a)(2), FRE 702, and FRE 901.

## XIX.    HUSTLER V. FALWELL (PRIVATE-FIGURE CONTEXT)

[A.7-69]  Defendants may cite *Hustler Magazine, Inc. v. Falwell*, **485 U.S. 46 (1988),** to argue symbolic content is protected parody. Hustler's analysis turned on a public-figure plaintiff and parody context unlikely to be understood as factual assertion.

[A.7-70]  Plaintiff cites *Gertz v. Robert Welch, Inc.*, **418 U.S. 323 (1974),** and *Milkovich*, **497 U.S. 1,** to preserve the governing boundary: where a communication (including symbolic or non-verbal communication) is plausibly alleged to imply a provably false defamatory factual imputation "of and concerning" a private individual, constitutional protection is not categorical and may depend on the legal characterization of the communication. No factual adjudication of parody, audience understanding, or intent is requested at the declaratory stage.

## XX.     PROCEDURAL SEQUENCING: DECLARATORY → FURTHER RELIEF (28 U.S.C. § 2202) → LATER PROCEEDINGS

[A.7-71]  Plaintiff preserves a procedural sequencing posture: (i) declaratory clarification of legal-capability questions under **§ 2201;** (ii) if warranted and supported by later proof, consideration of further relief under **28 U.S.C. § 2202** and applicable procedural rules; and (iii) if later proceedings substantiate statutory elements, evaluation of any enterprise-based theories under the appropriate framework and standards.

[A.7-72]  Nothing in **Appendix A.7** requests or implies entitlement to injunctive relief, predicate findings, or damages at the declaratory stage. All such issues are reserved.

# XXI.        ECHR ARTICLE 8 / 10 BALANCE

[A.7-73]  The European Court of Human Rights balances reputation **(Art. 8)** against expression **(Art. 10).** See *Von Hannover*; *Axel Springer*.

[A.7-74]  These citations are included only to show that reputational dignity interests are widely recognized and that courts often distinguish public-interest expression from targeted reputational harm. They are non-binding and do not expand the relief sought.

[A.7-75]  Plaintiff remains grounded in U.S. constitutional doctrine; comparative sources are cited only for persuasive alignment.

[A.7-76]  Defendants' anticipated arguments about public interest and proportionality are preserved for later merits proceedings if reached.

[A.7-77]  his Court is not asked to apply **ECHR** standards; the references are contextual only.

# XXII.       ICCPR ARTICLE 17: CHARMING BETSY AS INTERPRETIVE CANON

[A.7-78]  **ICCPR Article 17** recognizes protection against unlawful attacks on honor and reputation.

[A.7-79]  These references are included as persuasive context only.

[A.7-80]  ***Murray v. Schooner Charming Betsy*, 6 U.S. 64 (1804),** is cited solely as an interpretive canon supporting harmony where consistent with domestic law; it does not create a cause of action or expand the relief sought.

# XXIII.    PRIVATE-FIGURE CONTEXT (GERTZ) AND PARODY BOUNDARY (HUSTLER / MILKOVICH)

[A.7-81]  Defendants may argue parody or satire doctrine bars relief.

[A.7-82]  Plaintiff preserves *Gertz* to emphasize that private persons receive heightened reputational protection.

[A.7-83]  Plaintiff preserves *Hustler* and *Milkovich* to clarify that parody protection is not categorical where the communication is plausibly alleged to function as an identity-targeted signal implying defamatory fact.

[A.7-84]  Any adjudication of whether any particular gesture was parody, and how it was understood, is reserved for later proceedings and proof.

# XXIV.    PROCEDURAL INTEGRATION

## A.    Declaratory Recognition

[A.7-85]  At the declaratory stage, the Court is asked to determine whether the alleged symbolic identification practices, contextualized through **Appendix B, Table 1 and Tables 2A–2E,** are legally capable of constituting defamatory implication and constructive

identification under governing doctrine. Such a declaration addresses legal status questions, not proof, intent, or meaning adjudication.

[A.7-86]  This clarification bears on standing and redressability by resolving legal uncertainty about whether continued rebroadcasting of the challenged symbolic mechanism may carry legal significance, without resolving disputed facts.

## B.        Further Relief Reserved

[A.7-87]  Any request for further relief, injunctive, equitable, or structural, is expressly reserved to later proceedings under **28 U.S.C. § 2202** and applicable rules, if warranted by later factual development and proof.

## C.        Enterprise-Based Theories Reserved

[A.7-88]  Any enterprise-based analysis, including RICO pattern elements, predicate eligibility, and intent, is expressly reserved for later proceedings under the governing standards and proof requirements; no such findings are requested at the declaratory stage.

# XXV.        CONCLUSION

[A.7-89]  **Appendix A.7** situates Plaintiff's claims within constitutional boundary doctrine applicable to symbolic, non-verbal, and coded communication. It does not adjudicate facts or resolve defenses.

[A.7-90]    The declaratory judgment sought is doctrinally orthodox: the legal principles

governing defamatory implication, constructive identification, and reputational

protection are established; the question is whether those principles are legally capable

of application to the alleged symbolic mechanism pleaded and contextualized in

**Appendix B.**

[A.7-91]    Declaratory relief performs its proper function by resolving threshold uncertainty

without adjudicating intent, occurrence, damages, or enterprise liability.

[A.7-92]    Comparative and international references are cited for persuasive context only and do

not expand relief.

**CONDENSED BLACK-LETTER PRINCIPLE (DECLARATORY SCOPE
ONLY)**

[A.7-93]    Symbolic and non-verbal communications are not categorically insulated from legal

scrutiny where plausibly alleged to function as identity-targeted defamatory

implication "of and concerning" a private individual. Declaratory relief clarifies legal

capability and boundary conditions while reserving proof, intent, and remedies to

later proceedings.

# APPENDIX A.8 -

# CIVIL RICO PREDICATE CONTINUITY AND

# DECLARATORY DOCTRINE

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

**APPENDIX A.8    –**

*CIVIL RICO PREDICATE CONTINUITY AND DECLARATORY*

*DOCTRINE*

*(With Evidentiary Orientation to AI Reliability Under FRE 702)*

*(Cross-Referenced from Count III ¶¶ 100–111; Supported by*

*Appendices C, E, G, H; Doctrinally Linked to A.2, A.4, A.5)*

## I.    JUDICIAL ORIENTATION (RULE 10 (C) INCORPORATION STATEMENT

[A.8-1]    This **Appendix A.8** is submitted in support of Count III, Declaratory Relief (RICO Capability) of the Complaint and is incorporated by reference pursuant to **Fed. R. Civ. P. 10(c).** It provides doctrinal orientation for the Court's threshold determination as to whether the coordinated rebroadcast of symbolic identifiers, as plausibly alleged and contextualized in **Appendix B,** is legally capable of constituting a "pattern of racketeering activity" within the meaning of **18 U.S.C. §§ 1961–1965,** if later adjudicated.

[A.8-2]    **Appendix A.8** synthesizes the following doctrinal pillars for boundary-setting purposes only, without adjudicating facts, intent, or statutory elements:

(i)  **Continuity and relatedness doctrine** under H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989);

(ii) **Enterprise structure principles** under Boyle v. United States, 556 U.S. 938 (2009);

(iii) **Declaratory judgment framework** under 28 U.S.C. § 2201 and Fed. R. Civ. P. 57; and

(iv) **Procedural standards (Daubert Reliability Standards)** governing the potential admissibility of AI-assisted forensic analysis under Fed. R. Evid. 702, 901, and 1006.

[A.8-3]  Together, these authorities are cited to demonstrate that allegations of coordinated symbolic rebroadcasts, if later established through appropriate proof after threshold declaratory clarification, are legally capable of satisfying the continuity, relatedness, and enterprise-method requirements relevant to later civil RICO analysis, without resolving predicate acts, enterprise liability, or damages.

[A.8-4]  Technical cross-references to AI methodology and analytical sequencing are provided solely for procedural orientation. See Appendix C.2–C.10, which describe the system's reliability, authentication, workflow, detection, traceability, continuity-modeling, and continuity-mapping architecture. No evidentiary materials are offered or relied upon at the declaratory stage.

[A.8-5]    **(Appendix A.8 doctrinal analysis begins next.)**

## II.    INTRODUCTION – THE JUDICIARY'S HISTORICAL ROLE IN LEGAL-DOCTRINAL INNOVATION

[A.8-6]    Federal courts have long applied established legal doctrines to new factual contexts shaped by technological change, while preserving core principles of judicial restraint and procedural sequencing. In doing so, courts have emphasized that doctrinal adaptation concerns how existing law is applied, not the creation of new causes of action or evidentiary shortcuts. See, e.g., **Zubulake v. UBS Warburg LLC, 220 F.R.D. 212 (S.D.N.Y. 2003); Carpenter v. United States, 138 S. Ct. 2206 (2018).**

[A.8-7]    This action presents a comparable application question. Plaintiff alleges that repeated symbolic conduct, such as gestures, visual cues, or staging, may plausibly function as identity-substituting references within an established institutional and cultural context. Whether such symbolic conduct is legally capable of satisfying existing defamation and identification standards presents a threshold legal question appropriate for declaratory resolution.

[A.8-8]    The declaratory relief requested does not ask the Court to resolve facts, assess evidentiary sufficiency, or determine liability. Rather, it asks whether existing doctrine, including defamation per se and constructive identification under **Restatement (Second) of Torts § 564,** is legally capable of application to symbolic and non-verbal communications, with all evidentiary development expressly reserved for later procedural stages.

## III.    DOCTRINAL ANCHOR — DECLARATORY RELIEF AND PROCEDURAL ADAPTATION

[A.8-9]    The Declaratory Judgment Act authorizes courts to declare the rights and legal relations of interested parties where an actual controversy exists. **28 U.S.C. § 2201(a).** Declaratory relief is particularly appropriate where it clarifies legal standards governing disputed conduct without requiring factual adjudication or evidentiary proof. See **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).**

[A.8-10]   In this case, declaratory relief serves a clarifying function by addressing whether existing identification and defamation doctrines are legally capable of encompassing symbolic conduct alleged to operate as a substitute for naming a plaintiff, as

contextualized exclusively in **Appendix B Table 1 and Tables 2A–2E**. No expansion of doctrine is sought; the inquiry concerns legal applicability, not factual sufficiency.

[A.8-11]    Courts have similarly distinguished between doctrinal applicability and evidentiary proof when confronting new forms of data or communication. Decisions addressing scientific evidence, electronic records, or digital devices illustrate that procedural doctrines governing proof may evolve without altering substantive legal standards. See, e.g., **Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); United States v. Ganias, 755 F.3d 125 (2d Cir. 2014); Riley v. California, 573 U.S. 373 (2014).**

[A.8-12]    These precedents underscore a consistent judicial approach: novelty in form does not preclude application of settled doctrine, but neither does it justify premature fact-finding or evidentiary adjudication. Declaratory relief thus operates as a boundary-setting mechanism, clarifying legal standards while preserving the ordinary sequencing of discovery, proof, and merits adjudication if later reached.

Case 1:26-cv-02727-UA    Document 1-1    Filed 03/31/26    Page 140 of 383

Appendices – D.F.A Jourdain v. WBD, et al.                                           03/25/2026

## IV.    APPLICATION TO SYMBOLIC DEFAMATION BY GESTURES (LEGAL CAPABILITY UNDER EXISTING DOCTRINE)

[A.8-13]    Plaintiff's claims present the threshold legal question whether symbolic or non-verbal conduct may, as a matter of law, function as defamatory identification when reasonable observers understand such conduct as referring to a specific individual. Existing precedent establishes that identification need not be textual or explicit where audience recognition supplies the link. See, e.g., **Clark v. ABC, 684 F.2d 1208 (6th Cir. 1982); Bindrim v. Mitchell, 92 Cal. App. 3d 61 (1979); Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980):**

- **Clark v. ABC, 684 F.2d 1208 (6th Cir. 1982):** constructive identification exists even without naming the plaintiff when the audience reasonably understands the reference.

- **Bindrim v. Mitchell, 92 Cal. App. 3d 61 (1979)**: fictionalized characters were still actionable where readers recognized the plaintiff.

- **Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980):** coded references actionable if the audience understood them.

[A.8-14]    These authorities do not require doctrinal expansion. They confirm that non-verbal, coded, or indirect references may satisfy the "of and concerning" requirement where contextual understanding is plausibly alleged. Whether the symbolic conduct alleged

here in fact performed such an identifying function is not adjudicated at the declaratory stage. Rather, the inquiry is limited to whether existing defamation doctrine is legally capable of application to symbolic gestures alleged to substitute for naming, as contextualized exclusively in **Appendix B Table 1 and Tables 2A–2E.**

## V.        TECHNICAL CONTEXT (LIMITED TO PROCEDURAL CAPABILITY)

[A.8-15]    Although the focus of this **Appendix A.8** is doctrinal, Plaintiff briefly identifies the procedural pathway by which alleged symbolic conduct could be examined at later stages, if reached. References to AI-assisted analysis are included solely to demonstrate that the alleged conduct is legally capable of orderly evidentiary examination under existing rules, not to offer proof, corroboration, or factual confirmation at the declaratory stage.

[A.8-16]    If the action proceeds beyond declaratory relief, issues such as authentication, expert testimony, and presentation of voluminous materials would be governed by the **Federal Rules of Evidence** and **ordinary judicial gatekeeping**. No representation is made that any particular AI output, expert opinion, or summary exhibit is admissible or sufficient; those determinations are expressly reserved for later proceedings consistent with **Rules 901, 702, and 1006:**

- **Authentication (FRE 901)** – If AI-assisted outputs are later offered, authentication may be addressed through testimony or declarations explaining the manner in which such outputs were generated, preserved, and associated with underlying source materials, subject to judicial evaluation.

- **Expert Testimony (FRE 702) –** Any expert testimony concerning AI-assisted analysis would be subject to **Rule 702** and Daubert review at the appropriate procedural stage. No representation is made at the declaratory stage regarding reliability, admissibility, or sufficiency.

- **Summary Evidence (FRE 1006) –** If voluminous materials are later admitted, summaries or demonstrative exhibits may be used for clarity in accordance with **Rule 1006,** with underlying materials made available for inspection as required by rule and court order.

## VI.      DOCTRINAL CONCLUSION OF APPENDIX A.8 — SUB-SECTIONS I–IV

[A.8-17]   Taken together, **Sub-Sections I–IV** demonstrate that declaratory relief is doctrinally appropriate to clarify whether existing defamation and identification principles are legally capable of application to symbolic and non-verbal communications alleged to function as identity substitutes. The Court is not asked to determine factual occurrence, audience recognition, intent, or liability. Nor is the Court asked to assess evidentiary sufficiency. Declaratory relief instead performs its proper boundary-setting role by resolving threshold legal uncertainty while preserving full evidentiary development, merits adjudication, and remedial determinations for later procedural stages, if reached.

## VII.      IIMMUNITY AND OFFICIAL-ADJACENT ACTORS (RESERVED; CAPACITY-DEPENDENT)

[A.8-18]   The Plaintiff does not name governmental officials as parties in this pleading posture, and this Appendix does not request adjudication of sovereign immunity, qualified immunity, or any official-capacity defense. This Section is included solely to preserve the doctrinal point that, if later proceedings and appropriate substitution identify state-aligned or official-adjacent actors as participants in dissemination pathways,

immunity questions are **capacity-dependent** and are not categorically dispositive of prospective, declaratory classification determinations.

[A.8-19]   Where conduct is later alleged, consistent with Rule 11 and supported through discovery, to have occurred in a personal or ultra vires capacity—such as participation in dissemination, facilitation, or reinforcement of stigmatizing symbolic communications outside legitimate governmental functions, personal-capacity liability is not barred as a matter of doctrine. See **Hafer v. Melo**, 502 U.S. 21, 27 (1991).

[A.8-20]   To the extent prospective declaratory relief may later be sought against ongoing, continuing conduct by any state actor properly before the Court, the availability of forward-looking relief is assessed under settled principles governing prospective remedies rather than retrospective damages defenses. See **Ex parte Young**, 209 U.S. 123 (1908) (prospective relief framework).

[A.8-21]   Plaintiff does not ask the Court, at the declaratory stage, to determine whether any official conduct occurred, whether any immunity applies, or whether any actor was acting under color of law. The point preserved is narrower: **immunity doctrines do not operate as a categorical bar** to the Court's threshold capacity-and-capability determination concerning whether the alleged symbolic system, if later substantiated, can be evaluated under established defamation-identification doctrine and, in later proceedings if warranted, within the continuity and enterprise framework referenced in Count III.

[A.8-22]    Any immunity determinations, if reached, would occur only after the pleadings are

conformed to identified parties and roles, and after record development consistent

with **Fed. R. Civ. P. 26** and the Federal Rules of Evidence.

## VIII.          ANTICIPATORY REBUTTALS – EXPANDED MATRIX

| DEFENSE | PLAINTIFF'S CAPABILITY-STAGE RESPONSE | AUTHORITY |
|---|---|---|
| Gestures are vague or coincidental | Plaintiff alleges the challenged communications are context-dependent and are pleaded as capable of later substantiation through repetition analysis, contextual anchoring, and recipient testimony, if the action proceeds beyond threshold declaratory determinations. | **Bindrim v. Mitchell, 92 Cal. App. 3d 61 (1979); Geisler v. Petrocelli, 616 F.2d 636 (2d Cir. 1980)** |
| Satire/parody/opinion | Plaintiff alleges that symbolic conduct is legally capable of conveying actionable defamatory implication where it communicates provably false factual imputations "of and concerning" an identifiable private person, a question addressed under settled First Amendment boundaries. | **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990); Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974)** |
| First Amendment bars claims categorically | Plaintiff does not seek to restrict protected expression; Plaintiff seeks declaratory clarification of the legal boundary where alleged symbolic conduct functions as defamatory identification rather than protected commentary. | **Milkovich, 497 U.S. at 18–20; Hustler Mag., Inc. v. Falwell, 485 U.S. 46 (1988)** |
| Novelty makes the dispute non-justiciable | Novelty in communicative form does not defeat justiciability where the Court is asked to apply established doctrines to alleged conduct; the declaratory posture is designed | **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007)** |

| DEFENSE | PLAINTIFF'S CAPABILITY-STAGE RESPONSE | AUTHORITY |
|---|---|---|
|  | to resolve threshold legal uncertainty without merits proof. |  |
| No ongoing controversy | Plaintiff alleges an ongoing dispute concerning the legal status of the challenged dissemination mechanics and the practical effect of declaratory relief amid restructuring and archival persistence; proof of recurrence is reserved for later stages. | **28 U.S.C. § 2201; Fed. R. Civ. P. 57** |

## IX.    DECLARATORY JUDGMENT FIT

[A.8-23]    Declaratory relief is sought to clarify threshold legal questions concerning the alleged dissemination system's doctrinal capability, specifically, whether the pleaded coordination features are legally capable of satisfying continuity/relatedness concepts under **H.J. Inc.** and whether the pleaded association features are legally capable of fitting within an enterprise framework under Boyle, if later substantiated through appropriate proof.

[A.8-24]    Plaintiff does not request adjudication of predicate acts, intent, enterprise liability, or damages at this stage. The requested declaration is intended to reduce legal uncertainty and preserve redressability where continued dissemination and potential asset transfers may otherwise complicate later proceedings, with any further relief reserved consistent with **28 U.S.C. § 2202** and applicable procedural safeguards.

## X.      DOCTRINAL CONCLUSION OF SUB-SECTIONS V-IX

## APPENDIX A.8:

[A.8-25]    Taken together, **Sub-Sections V–IX** preserve the governing doctrinal frame for Count III at the declaratory stage: under settled defamation-identification doctrine and constitutional boundary principles, symbolic or non-verbal communications are **not categorically insulated** from legal scrutiny where they are plausibly alleged to operate as defamatory identification within a defined institutional and cultural context. At this stage, Plaintiff does not request factual adjudication, credibility determinations, or resolution of defenses. Plaintiff seeks only threshold judicial clarification that the challenged conduct, as contextualized in **Appendix B,** is **legally capable** of falling outside asserted free-speech and immunity shields when the required elements are later developed through ordinary procedure. This clarification promotes judicial efficiency by resolving legal uncertainty now while preserving orderly sequencing for discovery, proof, and any downstream proceedings.

# XI.        JUDICIAL EFFICIENCY AND ARTICLE III STANDING IN THE AI CONTEXT

**A.        Judicial Economy as a Threshold Consideration**

[A.8-26] Federal courts are charged under **Rule 1** of the Federal Rules of Civil Procedure with securing the just, speedy, and inexpensive determination of every action. Declaratory relief serves that mandate by resolving threshold legal uncertainty, namely, whether symbolic and non-verbal conduct is legally capable of satisfying the "of and concerning" requirement for defamation, before the parties and the Court are drawn into duplicative or fragmented merits litigation.

[A.8-27] By addressing this legal classification at the declaratory stage, the Court clarifies the governing standard applicable to later proceedings, if reached. Such clarification promotes doctrinal efficiency by defining the legal boundaries of identification and actionability without adjudicating factual occurrence, intent, or liability, and without foreclosing subsequent disputes concerning damages, remedies, attribution. or defenses.

**B.        Injury-in-Fact — Legal Presumption, Not Evidentiary Proof**

[A.8-28] Under settled doctrine, defamation per se gives rise to a presumption of reputational injury where false implications impute criminality, professional unfitness, mental

incapacity, or sexual immorality. This presumption operates as a matter of law and does not depend on proof of economic loss at the pleading or declaratory stage.

[A.8-29]    Plaintiff plausibly alleges that the symbolic identifier categories at issue fall within recognized defamation-per-se classifications, as contextualized exclusively through **Appendix B, Table 1 (institutional origin, following § XI) and Tables 2A–2E (identity-function evolution, following § XVI).** Because injury is presumed by doctrine, the **injury-in-fact** requirement of **Article III** is satisfied without reliance on evidentiary materials, technical analysis, or testimonial confirmation at this stage.

[A.8-30]    References to AI methodology are included only to demonstrate that, if the Court's declaratory determination is later contested, the temporal scope or continuity of alleged conduct is legally capable of examination through ordinary evidentiary means. No AI outputs are offered or relied upon to establish immediacy, frequency, or injury for standing purposes.

C.          **Causation — Legal Traceability, Not Proof of Attribution**

[A.8-31]    For **Article III** purposes, causation requires only that the alleged injury be fairly traceable to the challenged conduct. Plaintiff satisfies this requirement by plausibly alleging that symbolic identifiers were disseminated through defendant-controlled or

defendant-associated media channels, as set forth in **Appendix B**'s institutional framework. No adjudication of coordination, intent, or audience recognition is required at the declaratory stage.

D.        **Redressability — Clarification of Legal Status, Not Remedy Adjudication**

[A.8-32]    Declaratory relief addresses redressability by clarifying the legal status of the alleged conduct, thereby resolving uncertainty that presently impedes meaningful forward-looking relief. Such clarification does not impose liability, order injunctions, or trigger statutory remedies. Rather, it establishes whether the alleged symbolic practices are legally capable of supporting prospective relief if later proceedings are warranted.

[A.8-33]    Any injunctive measures, statutory claims, or remedial frameworks, including those arising under enterprise or intellectual-property theories, are expressly sequenced for later procedural stages and are neither decided nor implied by the Court's declaratory determination.

## XII.      EVIDENTIARY SEQUENCING FOR AI OUTPUTS AND AFFIDAVITS

### A.      Three-Phase Procedural Sequencing

[A.8-34]    **Phase One (Declaratory Stage)**

At the declaratory judgment stage, the action proceeds on legal and doctrinal grounds alone. The symbolic identifier categories alleged are contextualized exclusively through **Appendix B Table 1** (institutional origin) and **Tables 2A–2E** (identity-function evolution), with **Exhibit A** serving only as a structured taxonomy for reference consistency. AI methodology may be described at a high level to demonstrate procedural capability, but no AI outputs, affidavits, or evidentiary materials are offered, relied upon, or weighed. All technical and testimonial materials are expressly reserved for later proceedings consistent with **Fed. R. Civ. P. 26.**

[A.8-35]    **Phase Two (Post-Declaratory / Merits Proceedings, if reached)**

If the Court declares the alleged conduct legally cognizable and the action proceeds beyond declaratory relief, AI-assisted analytical outputs and witness affidavits may be introduced, subject to discovery, authentication, and expert disclosure, to examine issues such as continuity, recurrence, and institutional method. Any evaluation of

whether such materials support elements of civil RICO or other claims is reserved

entirely for merits adjudication and is not presumed or decided by this sequencing.

[A.8-36]   **Phase Three (Trial or Dispositive Merits Stage, if reached)**

At trial or on summary judgment, the evidentiary record may include AI detection

outputs, authenticated broadcast materials, witness testimony, and expert analysis,

subject to judicial gatekeeping and the Federal Rules of Evidence. This phase reflects

ordinary evidentiary development and does not alter the declaratory posture or scope

of earlier stages.

**B.        Evidentiary Capability Pathway**

[A.8-37]   **Authentication (FRE 901)**

When AI-assisted outputs are later offered at the appropriate procedural stage,

authentication may be addressed through testimony or declarations explaining how

such materials were generated, preserved, and linked to underlying source content,

subject to judicial evaluation.

[A.8-38]   **Expert Testimony (FRE 702)**

Any expert testimony concerning AI-assisted analysis would be subject to **Rule 702**

and ***Daubert*** review at the appropriate stage. No determination regarding reliability,

error rates, or admissibility is sought or implied at the declaratory judgment stage.

[A.8-39]    **Summaries (FRE 1006)**

If voluminous data is later admitted, summaries or demonstrative exhibits may be used for clarity, with underlying materials made available for inspection as required by rule and court order.

[A.8-40]    This sequencing confirms that the request for declaratory relief does not require evidentiary resolution or technical evaluation. It instead preserves an orderly, rule-governed pathway for potential discovery and proof, should the action advance beyond threshold legal determination.

## XIII.        EXHIBIT INTEGRATION

### A.        Exhibit A — Gesture Ledger

[A.8-41]    **Exhibit A** provides a structured taxonomy of the symbolic gesture categories alleged, organized for reference consistency and future analytical alignment. At the declaratory judgment stage, **Exhibit A** does not function as evidence or factual substantiation. Any metadata associated with the gesture categories, including emergence context or classification fields, is included solely to facilitate later examination, at the appropriate procedural stage, if reached, and carries no evidential weight at this stage.

**B.**           **Exhibit B — Affidavit Templates**

[A.8-42]   **Exhibit B** consists of standardized affidavit templates designed for potential use at later procedural stages. These templates outline the form by which witnesses may attest, if discovery proceeds, to how symbolic gestures were perceived and understood by reasonable observers. No affidavits are offered, relied upon, or credited at the declaratory judgment stage.

**C.**           **Exhibit C — AI Methodology Declaration**

[A.8-43]   **Exhibit C** outlines the proposed analytical methodology for AI-assisted gesture detection and classification, including model design, training protocols, and reproducibility safeguards. It is referenced solely to demonstrate that the alleged conduct is legally capable of later examination through expert methods that may be evaluated under **Rule 702,** at the appropriate procedural stage, when expert evidence becomes relevant.

[A.8-44]   Read together, these exhibits do not constitute an evidentiary record and are not offered for proof, corroboration, or factual confirmation. They are included only to demonstrate that, should the Court declare the alleged conduct legally cognizable, established procedural pathways exist for orderly discovery, expert analysis, and testimonial development at subsequent stages consistent with **Fed. R. Civ. P. 26** and the Federal Rules of Evidence.

# XIV.    DOCTRINAL CONCLUSION OF SUB-SECTIONS IX-XII-APPENDIX A.8:

[A.8-45]    Taken together, **Sub-Sections IX–XII** demonstrate that declaratory judgment is procedurally appropriate and consistent with judicial economy and **Article III** requirements. At this stage, plausibility and standing arise from the pleaded legal character of the alleged injury and from the structured contextual framework set forth in **Appendix B, Table 1 and Tables 2A–2E**, rather than from evidentiary materials. References to AI methodology and to **Exhibits A–C** are included solely to confirm that, if the action proceeds beyond threshold review, established procedural pathways exist for orderly discovery, authentication, expert disclosure, and testimonial development consistent with **Fed. R. Civ. P. 26** and the Federal Rules of Evidence.

# XV.    IMMUNITY AND NON-PARTY ACTOR CONSIDERATIONS

**Personal-Capacity / Ultra Vires Framing**

[A.8-46]    To the extent later proceedings identify current or former public officials among Doe Defendants, immunity doctrines do not categorically foreclose personal-capacity accountability for acts outside legitimate governmental function. See **Hafer v. Melo,**

**502 U.S. 21, 27 (1991).** At the declaratory stage, Plaintiff seeks no finding regarding any official's conduct, capacity, or immunity; this paragraph preserves the governing legal frame for any later substitution, joinder, or immunity litigation if warranted by discovery.

A.        **Commercial-Activity Analogy**

[A.8-47]   Where challenged conduct is alleged to be embedded in monetized media distribution, immunity arguments premised on "government speech" or sovereign function may be legally inapposite. By analogy, the commercial-activity framework discussed in FSIA doctrine recognizes that revenue-bearing dissemination activity is treated differently from sovereign acts. See **28 U.S.C. § 1605(a)(2).** Any application to specific actors is expressly reserved.

B.        **International-Law Reference**

[A.8-48]   **Plaintiff cites Filártiga v. Peña-Irala, 630 F.2d 876 (2d Cir. 1980),** solely for the limited proposition that U.S. courts have addressed severe dignity harms in transnational contexts and that certain forms of coercive or degrading conduct are not treated as categorically insulated from judicial scrutiny. No finding is sought here that any such standard is met; the reference is included for doctrinal orientation only.

# XVI.          ANTICIPATORY REBUTTAL TOPICS

[A.8-49]   The following topics identify recurring defense themes likely to arise if the action

proceeds beyond threshold declaratory review. They are stated for doctrinal

orientation only, without factual adjudication at this stage:

- **Coincidence / Generic-Use Theme:** Identification is assessed under **Restatement § 564**'s reasonable-recipient standard in context; repetition and contextual anchoring are legally relevant to that inquiry.

- **Intent Theme:** Defamation per se doctrine addresses categories where injury is presumed once identification and defamatory sting are established; intent and fault standards are preserved for later proceedings.

- **Vagueness / Ambiguity Theme:** Defamation-by-implication doctrine addresses ambiguity defenses where context plausibly supplies defamatory meaning.

- **First Amendment Theme:** Milkovich and Gertz delineate the boundary between protected expression and provably false factual implication as applied to private plaintiffs.

- **Public-Figure Theme:** Plaintiff pleads private-person status; applicable standards are preserved in Appendix A.7.

# XVII.        FORWARD-LOOKING RELIEF SEQUENCING

## A.        Injunctive Relief

[A.8-50]    Plaintiff does not request injunctive relief adjudication at the declaratory stage. If the action proceeds and the Court later determine the challenged conduct is unlawful, further relief, if any, would be addressed under **28 U.S.C. § 2202 and Fed. R. Civ. P. 65,** subject to the Court's discretion and the required showings.

## B.        IP / Licensing Theories

[A.8-51]    Plaintiff references potential intellectual-property and related commercial-theory pathways solely as downstream remedial concepts that may be evaluated, if warranted, after declaratory clarification and subsequent proceedings. No determination is sought here regarding validity, ownership, or enforceability under any IP statute or common-law theory.

## C.        Civil RICO Sequencing

[A.8-52]    Plaintiff does not ask the Court to adjudicate predicate acts, intent, or enterprise liability at the declaratory stage. Plaintiff seeks only clarification that the pleaded dissemination mechanics, if later substantiated, are legally capable of evaluation under civil RICO's continuity and enterprise frameworks.

## XVIII.        HERBERT V. LANDO

[A.8-53]    If the action proceeds beyond declaratory relief and discovery is authorized, defendants may invoke editorial discretion or privilege to resist inquiry into deliberative processes. In **Herbert v. Lando, 441 U.S. 153, 169–70 (1979),** the Supreme Court held that such assertions do not categorically foreclose discovery into editorial processes where the plaintiff's claims place relevant issues in dispute, subject to ordinary limits and judicial supervision.

[A.8-54]    Herbert is referenced solely to preserve the doctrinal boundary: the existence of editorial discretion does not, as a matter of law, operate as a complete bar to later, appropriately tailored discovery if the Court determines discovery is warranted.

## XIX.        TURKETTE – ENTERPRISE REINFORCEMENT

[A.8-55]    Defendants may contend that participation by lawful corporations or public actors precludes characterization of an enterprise under the Racketeer Influenced and Corrupt Organizations Act. The Supreme Court rejected any such categorical limitation in **United States v. Turkette, 452 U.S. 576, 583 (1981),** holding that an "**enterprise**" may consist of **any association-in-fact**, whether composed of lawful entities or individuals, provided the statutory elements are otherwise met.

[A.8-56]    At the declaratory judgment stage, Plaintiff does not ask the Court to find the existence of an enterprise, to resolve intent, or to determine whether any defendant engaged in racketeering activity. Rather, Plaintiff seeks clarification that allegations of coordinated symbolic conduct, plausibly pleaded and contextualized in **Appendix B Table 1 (institutional origin) and Tables 2A–2E (identity-function evolution),** are legally capable of satisfying the structural features of an association-in-fact enterprise described in **Turkette,** at the appropriate subsequent procedural stages.

[A.8-57]    Specifically, **Turkette** confirms that lawful status does not immunize coordinated activity from enterprise analysis and that the enterprise inquiry is analytically distinct from the proof of predicate acts. Declaratory relief here serves only to delineate that boundary, confirming that allegations involving coordinated conduct across multiple actors and platforms are not foreclosed as a matter of law from civil RICO consideration, while expressly reserving all determinations concerning enterprise existence, purpose, relationships, longevity, predicate acts, defenses, and liability for subsequent proceedings, consistent with **Fed. R. Civ. P. 26,** and evaluated under applicable evidentiary standards, including **FRE 702, 901,** and **1006.**

[A.8-58]    Accordingly, Turkette confirms that lawful corporate status does not categorically foreclose association-in-fact enterprise analysis. Plaintiff cites this authority only to show that Count III's capability inquiry is not legally foreclosed as a matter of law,

while reserving all determinations concerning enterprise existence, predicate acts, defenses, and liability for subsequent proceedings.

## XX.        SYNTHESIS: CONSTITUTIONAL DOCTRINE AND RICO CAPABILITY

[A.8-59]   Read together, Herbert and Turkette inform the Court's threshold, declaratory inquiry by clarifying that neither editorial-discretion assertions nor lawful corporate status categorically foreclose later inquiry into coordinated conduct if the action proceeds beyond threshold determinations.

[A.8-60]   These authorities are cited for doctrinal boundary-setting only. They do not request discovery, establish enterprise elements, or resolve intent. They preserve legal compatibility and sequencing.

[A.8-61]   Specifically, these precedents illustrate that:

- Assertions of editorial discretion or privilege do not categorically foreclose later, appropriately tailored discovery into alleged defamatory conduct, if reached;
- Enterprise concepts under RICO may encompass coordinated activity conducted through lawful entities, without adjudicating enterprise elements at the declaratory stage; and

- Constitutional theories and enterprise theories are not mutually exclusive, but may be procedurally sequenced without collapsing fact-finding, intent determination, or statutory satisfaction into threshold adjudication.

[A.8-62]   This synthesis clarifies legal compatibility and preserves procedural sequencing, while reserving all determinations regarding discovery scope, intent, enterprise structure, predicate acts, and defenses for later proceedings consistent with the Federal Rules of Civil Procedure.

[A.8-63]   By combining **Herbert** (editorial discovery rights) and **Turkette** (enterprise scope), Plaintiff secures:

- Doctrinal discovery leverage to prove intent at subsequent procedural stages.

- Enterprise recognition to integrate constitutional harms into RICO predicates at subsequent procedural stages.

- A litigation posture immune to privilege-based or "lawful corporation" defenses at subsequent procedural stages.

# XXI.    DAUBERT RELIABILITY APPENDIX – AI FORENSIC METRICS

[A.8-64]    This **Appendix A.8** identifies the analytical dimensions under which AI-assisted forensic methodologies may later be evaluated for admissibility, if the action proceeds beyond declaratory relief. No representation is made that any AI output satisfies Daubert or the Federal Rules of Evidence at this stage. All references herein are for procedural orientation only and do not supply proof, corroboration, or factual findings.

[A.8-65]    To survive admissibility challenges, at the appropriate procedural stage, Plaintiff's AI forensic evidence will be offered in alignment with the **Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)** framework, consistent with **Fed. R. Civ. P. 26,** and evaluated under applicable evidentiary standards, including **FRE 702, 901,** and **1006.:**

## A.    Testability and Replicability

[A.8-66]    AI-assisted gesture detection methodologies are described as capable of evaluation for testability and replicability through repeat analysis, controlled reruns, and preservation of source materials. Whether any particular implementation meets these criteria is reserved for later judicial gatekeeping.

**B.**          **Error Rates and Methodological Limits**

[A.8-67]   If AI outputs are later offered, issues such as accuracy metrics, false-positive rates, and contextual constraints would be subject to expert disclosure and adversarial testing. No error rates, confidence levels, or performance claims are asserted or relied upon at the declaratory stage.

**C.**          **Peer Review and Scientific Literature**

[A.8-68]   References to peer-reviewed literature in fields such as computer vision, pattern recognition, and symbolic analysis are included solely to demonstrate that AI-assisted methodologies are capable of evaluation under established scientific norms, if later offered.

[A.8-69]   No representation is made that any specific model, dataset, or analytical approach employed in this action has been peer-reviewed, published, or endorsed for forensic use. Any reliance on scientific literature would be subject to expert disclosure and adversarial testing at the appropriate stage.

**D.**          **Peer Review & Publication**

Peer review and publication considerations may be addressed through expert disclosure regarding the relevant computer-vision and pattern-recognition literature, if expert testimony is later offered. No claim is made at the declaratory stage regarding publication or forensic endorsement of Plaintiff's implementation.

## E.        General Acceptance

[A.8-70]   General acceptance, where relevant, would be addressed through the evidentiary record and expert testimony at the appropriate stage. No determination is sought or implied here.

[A.8-71]   Plaintiff references that courts have evaluated algorithmic or AI-assisted evidence in varied contexts to illustrate that such methods are not categorically excluded as a matter of law. Any analogy or extension to gesture-based analysis would be addressed through the Daubert process if reached.

[A.8-72]   **General Acceptance**

- Courts have admitted AI-based forensics in facial recognition (***United States v. Williams*, 2020 WL 7316048**) and video pattern analysis (***United States v. McKreith*, 2021 WL 5823718).**

- Gesture recognition, corroborated by affidavits, is a natural extension.

F.          **Federal Rules of Evidence: Capability Mapping Only**

[A.8-73]    When AI-assisted materials are later proffered, their admissibility would be evaluated under ordinary evidentiary standards, including:

- **FRE 901:** Authentication through testimony concerning generation, preservation, and linkage to source materials;

- **FRE 702:** Expert qualification and reliability review under Daubert; and

- **FRE 1006:** Potential use of summaries for voluminous materials, subject to inspection requirements.

No determination regarding admissibility, sufficiency, or reliability is sought or implied here.

[A.8-74]    Applied to declaratory relief, references to AI-assisted analysis serve a limited, procedural function only. They do not establish constitutional violations or factual conclusions, but instead demonstrate that the alleged conduct is legally capable of later examination under established constitutional frameworks, at the appropriate procedural stage:

- **First Amendment:** AI-assisted analysis is referenced solely to illustrate that questions concerning defamatory meaning versus protected expression are amenable to later evidentiary evaluation, not to determine whether any gesture was defamatory or satirical.

- **Fourth Amendment:** AI-generated occurrence logs are referenced only to demonstrate that allegations of repeated symbolic identification are capable of being analyzed under constructive surveillance principles, without adjudicating whether surveillance occurred.

- **Fourteenth Amendment:** Comparative AI-assisted datasets are referenced solely to show that allegations of selective symbolic usage are legally capable of later assessment under equal protection standards, without resolving issues of disparity, intent, or discrimination.

[A.8-75]   At the declaratory stage, AI is not offered to establish defamatory meaning, surveillance, selectivity, or targeting, nor does it resolve any First, Fourth, or Fourteenth Amendment question. All such matters are expressly reserved for merits adjudication consistent with **Fed. R. Civ. P. 26,** evaluated under applicable evidentiary standards, including **FRE 702, 901,** and **1006.**

## XXII.        FINAL SYNTHESIS OF APPENDIX A.8 (SECTIONS I-XX)

[A.8-76]   This **Appendix A.8,** together with the technical materials summarized in **Appendices C–E**, provides doctrinal and procedural orientation supporting Count III's request for declaratory relief under **28 U.S.C. § 2201**. It preserves (i) the continuity and enterprise frameworks used in civil RICO analysis, (ii) the sequencing posture that

defers proof and admissibility determinations, and (iii) the evidentiary-rule pathways by which any expert or technical materials could be evaluated if the case advances beyond threshold review:

- **Doctrinal Foundations:** The declaratory-judgment posture is anchored in the innovation lineage of ***Zubulake v. UBS Warburg LLC***, ***Carpenter v. United States***, **and** ***Riley v. California***, which collectively recognize the judiciary's role in supervising new evidentiary modalities and technological settings.

- **Immunity and Accountability:** ***Hafer v. Melo***, the commercial-activity exception under the Foreign Sovereign Immunities Act, and the jus cogens exception together demonstrate that neither public-facing officials nor quasi-sovereign actors may invoke immunity to shield defamatory or obstructive conduct undertaken through commercial media channels.

- **Enterprise Structure:** ***United States v. Turkette*** confirms that an association-in-fact enterprise may consist of corporate media groups, affiliated organizations, and institutional actors acting in concert toward a shared illicit objective.

- **Editorial Intent Evidence:** ***Herbert v. Lando*** establishes that editorial motive and internal decision-making are discoverable where intent is relevant, enabling the evidentiary development required to authenticate continuity across broadcasts.

- **AI Reliability and Admissibility Framework:** The materials describe how AI-assisted outputs, if later offered, would be evaluated under Daubert and **FRE 401, 403, 702, 901,** and **1006**; no admissibility determination is sought or implied at the declaratory stage.

[A.8-77]   This synthesis aligns the doctrinal, technical, and evidentiary components necessary for judicial recognition of a racketeering pattern under **18 U.S.C. § 1961(5)** within the declaratory-judgment framework.

# XXIII.    DOCTRINAL CONCLUSION TO APPENDIX A.8 (SECTIONS I-XXI)

[A.8-78]   This **Appendix A.8** supports Count III by preserving the governing legal framework for a threshold declaratory determination: whether the coordinated dissemination mechanics alleged, when contextualized through **Appendix B**'s institutional-origin and identity-function tables, are legally capable of evaluation under civil RICO's continuity and enterprise concepts if later substantiated through ordinary procedure.

[A.8-79]   Plaintiff does not request adjudication of predicate acts, intent, enterprise liability, damages, or admissibility at this stage. Plaintiff seeks only judicial clarification that

the pleaded symbolic-identification mechanism is not foreclosed as a matter of law from civil RICO capability analysis and that downstream evaluation, if reached, proceeds through **Rule 26** sequencing and the Federal Rules of Evidence.

[A.8-80]   Declaratory relief is sought to clarify legal status and preserve redressability before later proceedings risk fragmentation through delay, restructuring, or evidentiary erosion. All merits determinations and remedies, if any, remain reserved.

## TRANSITIONAL CONTINUITY TEXT- APPENDIX A.8

### *(LINKING APPENDIX A.8 TO SUPPLEMENTAL SECTION: CIVIL RICO PREDICATE CONTINUITY & DECLARATORY DOCTRINE; INTEGRATED WITH APPENDIX H- STRUCTURAL ENTERPRISE MAPPING)*

[A.8-81]   The foregoing sections (Sections I–XXII) set forth the governing doctrinal framework for Count III's declaratory request. They explain why the coordinated, cross-platform rebroadcast practices alleged in the Complaint, as contextualized in **Appendix B**, are not foreclosed as a matter of law from evaluation under civil RICO's continuity and

relatedness concepts. See **H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229**

**(1989); Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985).**

[A.8-82]    At the declaratory stage, Plaintiff does not ask the Court to determine whether any

predicate act occurred, whether any enterprise exists, or whether any statutory

element is satisfied. Plaintiff seeks threshold clarification that the alleged

dissemination mechanics and recurrence characteristics described in **Appendix B** are

legally capable of implicating the continuity and relationship considerations that civil

RICO doctrine evaluates, if later substantiated through appropriate proof and

statutory standards.

[A.8-83]    The following supplemental section therefore addresses the remedial and procedural

role of declaratory judgment in this sequencing posture. It explains how **28 U.S.C. §§**

**2201–2202 and Fed. R. Civ. P. 57** may be used to clarify legal status questions that

bear on ongoing redressability and prospective relief, without converting the

declaratory phase into merits adjudication and without requesting present findings of

liability, intent, damages, or injunctive entitlement.

[A.8-84]    This transition links **Appendix A.8**'s doctrinal discussion of continuity concepts to

the remedial pathway addressed below and to **Appendix H**'s structural enterprise-

mapping orientation, while preserving the pleading-stage boundaries that govern this

action.

# SUPPLEMENTAL SECTION- APPENDIX A.8

# CIVIL RICO PREDICATE CONTINUITY AND DECLARATORY

# DOCTRINE (*DECLARATORY → INJUNCTIVE → RICO BRIDGE*)

## XXIV.        PURPOSE AND DOCTRINAL POSTURE

[A.8-85]    This Supplemental Section explains the procedural relationship between declaratory relief and the continuity concepts discussed in **Appendix A.8.** It addresses how declaratory judgment may clarify legal status questions that bear on redressability, prospective relief, and later proceedings, without requiring factual adjudication of predicate acts, enterprise elements, intent, or damages at the declaratory stage.

[A.8-86]    The Declaratory Judgment Act authorizes the Court to declare the rights and legal relations of parties to an actual controversy. **28 U.S.C. § 2201(a). Section 2202** authorizes further necessary or proper relief based on a declaration after notice and hearing. **Fed. R. Civ. P. 57** confirms that declaratory relief may be sought even where other remedies may later be available, and that a declaration may be issued without immediate coercive relief.

[A.8-87]    In this sequencing posture, Plaintiff seeks declaratory clarification that the alleged symbolic identification practices described in the Complaint and contextualized in **Appendix B** are legally capable of: (i) satisfying identification and actionability requirements under governing defamation doctrines (Counts I–II) and (ii) presenting continuity-related questions that are not foreclosed, as a matter of law, from later civil RICO evaluation (Count III), if later substantiated through appropriate proof and statutory standards.

[A.8-88]    This Supplemental Section does not request a present finding of a continuing violation, a determination that any predicate statute was violated, a finding of enterprise existence, or any adjudication of injunctive entitlement. It addresses only the role of declaratory relief in clarifying legal status and preserving orderly procedural sequencing.

## XXV.        STATUTORY AUTHORITY AND PRECEDENT FRAMEWORK

[A.8-89]    The Declaratory Judgment Act authorizes federal courts, "in a case of actual controversy," to "declare the rights and other legal relations of any interested party seeking such declaration**." 28 U.S.C. § 2201(a). Section 2202** authorizes "further necessary or proper relief based on a declaratory judgment," after reasonable notice and hearing. **28 U.S.C. § 2202. Fed. R. Civ. P. 57** confirms that the availability of other relief does not preclude declaratory relief and that declaratory procedure is governed by the Federal Rules of Civil Procedure.

[A.8-90]    Precedents addressing the availability and function of declaratory relief in ongoing or prospective-injury disputes include **Steffel v. Thompson, 415 U.S. 452 (1974); MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007);** and **Public Service Comm'n v. Wycoff Co., 344 U.S. 237 (1952).**

[A.8-91]    Taken together, these authorities confirm that declaratory adjudication is appropriate where a substantial controversy of sufficient immediacy and reality exists and where a declaration would clarify the parties' legal relations without requiring premature merits adjudication.

[A.8-92]    The analysis that follows applies these principles to the declaratory posture pleaded in the Complaint. Plaintiff seeks clarification of legal status questions that bear on identification, actionability, and prospective redressability, while reserving all determinations concerning predicate acts, enterprise elements, intent, damages, and injunctive entitlement for later proceedings, if reached.

## XXVI.    INTRODUCTION: FROM DOCTRINE TO REMEDIAL SEQUENCING

[A.8-93]    This Supplemental Section addresses the remedial sequencing that may follow a declaratory determination. It explains how a declaration under **28 U.S.C. § 2201** may clarify legal status questions and how, if later warranted by proof and after appropriate proceedings, further relief under **28 U.S.C. § 2202** and other applicable authorities may be sought or considered.

[A.8-94]   This section: (i) identifies the statutory framework governing declaratory relief and further relief; (ii) explains how declaratory clarification may narrow threshold uncertainty relevant to later proceedings; and (iii) preserves constitutional and procedural limits that govern any subsequent requests for coercive relief.

## XXVII.    STATUTORY ANCHORS FOR DECLARATORY AND FURTHER RELIEF

### A.    Declaratory Judgment Act (28 U.S.C. § 2201)

[A.8-95]   The Declaratory Judgment Act empowers courts to declare the legal relations of parties to an actual controversy. See **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).** The controversy alleged here concerns the legal capability of the challenged symbolic communications, when contextualized as pleaded, to satisfy governing identification and actionability standards, and the effect of such clarification on prospective redressability.

[A.8-96]   Materials referenced elsewhere in the Complaint, such as potential witness affidavits and AI-assisted analytical outputs, are not offered for proof at the declaratory stage. They are preserved to demonstrate that the pleaded allegations are capable of substantiation through ordinary evidentiary mechanisms in later proceedings, if reached, consistent with **Fed. R. Civ. P. 26** and applicable evidentiary standards.

**B.**  **Further Relief (28 U.S.C. § 2202)**

[A.8-97]  **Section 2202** authorizes further necessary or proper relief "based on a declaratory judgment," after reasonable notice and hearing. **28 U.S.C. § 2202.** This provision preserves the Court's ability to consider additional relief in a procedurally orderly manner if later proceedings warrant it, without requiring such relief to be adjudicated at the declaratory stage.

**C.**  **Federal Rule of Civil Procedure 57**

[A.8-98]  **Rule 57** confirms that declaratory relief is not precluded by the availability of other remedies and that declaratory procedure proceeds under the Federal Rules of Civil Procedure. It supports the sequencing posture pleaded here: threshold declaration first, with any further relief reserved for later proceedings and governed by ordinary procedural safeguards.

# XXVIII.  RELATIONSHIP TO CIVIL RICO REMEDIES

[A.8-99]  The declaratory request in **Count III** does not seek adjudication of any RICO predicate act, enterprise element, or liability determination. It seeks clarification that the recurrence, coordination characteristics, and dissemination mechanics alleged, when contextualized as pleaded, are not foreclosed, as a matter of law, from later evaluation under civil RICO's continuity and enterprise concepts, if later substantiated through appropriate proof and statutory standards.

## A.        Standing and continuity-related issues

[A.8-100] Declaratory clarification regarding identification and actionability may bear on how

later proceedings evaluate continuity-related questions, including whether alleged

repeated transmissions and dissemination mechanics, if proven, reflect a regular way

of operating over time under **H.J. Inc.** No continuity finding is sought at this stage.

## B.        Equitable authority under § 1964(a)

[A.8-101] **Section 1964(a)** authorizes equitable relief "to prevent and restrain" RICO violations,

subject to statutory standards and proof. Any request for such relief, and any

determination that **§ 1964(a)** applies to any defendant or conduct, is reserved for later

proceedings, if reached.

## C.        Damages under § 1964(c)

[A.8-102] **Section 1964(c)** authorizes damages for injury "by reason of" a violation of **§ 1962,**

subject to proof. Declaratory relief does not establish entitlement to damages,

trebling, or causation. Any such relief is expressly reserved for later adjudication.

# XXIX.        CONSTITUTIONAL REINFORCEMENT

[A.8-103] Declaratory clarification is consistent with constitutional limits where it addresses

legal status questions without adjudicating disputed facts. First Amendment doctrine

does not immunize defamatory falsehoods or communications that imply provably false facts "of and concerning" a private individual. See **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990); Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974).**

[A.8-104]  This Supplemental Section does not request findings that any constitutional violation occurred. It preserves the constitutional boundary-setting function of declaratory relief: clarifying the legal framework applicable to the alleged practices while reserving proof, defenses, and remedies for later proceedings, if reached.

## XXX.        FURTHER-RELIEF MECHANICS

[A.8-105]  A declaratory judgment may, where appropriate and after further proceedings, provide the predicate legal clarification upon which a party may seek additional relief under **28 U.S.C. § 2202** and other applicable authorities. Any request for coercive relief would be subject to notice, hearing, and the standards governing such relief, including **Fed. R. Civ. P. 65,** and would require proof developed in later proceedings.

[A.8-106]  To the extent Plaintiff later seeks relief directed at continued dissemination of adjudicated-defamatory content, any proposed order would be framed to comply with constitutional limits and specificity requirements and would be confined to conduct found unlawful on a developed record. See **Near v. Minnesota, 283 U.S. 697 (1931).**

## XXXI.        ANTICIPATORY REMEDY OBJECTIONS

[A.8-107]  Defendants may contend that declaratory relief is unnecessary or that any future

coercive relief would be overbroad. At this stage, Plaintiff seeks only declaratory

clarification of legal status questions; no injunction or damages adjudication is

requested.

[A.8-108]  If later proceedings reach remedial issues, anticipated objections include: (i)

adequacy of legal remedies; (ii) prior-restraint concerns; and (iii) tailoring and

specificity. Any such disputes would be addressed on a developed record under the

governing standards applicable to the particular relief sought.

## XXXII.       PROCEDURAL SEQUENCING

[A.8-109]  The procedural posture pleaded follows an orderly sequence:

[A.8-110]  **Step One:** Declaratory Clarification. Plaintiff seeks threshold clarification concerning

whether the alleged symbolic practices, as pleaded and contextualized, are legally

capable of satisfying identification and actionability standards and whether such

allegations are not foreclosed from later continuity/enterprise evaluation, if reached.

[A.8-111]  **Step Two:** Post-declaratory proceedings, if any. If the action proceeds beyond declaratory relief, discovery and evidentiary development may address questions of repetition, audience decoding, dissemination mechanics, and attribution, subject to Rule 26 and the Federal Rules of Evidence.

[A.8-112]  **Step Three:** Remedies, if warranted. Any further relief, injunctive, damages, or statutory relief, would be sought, if at all, after proof and appropriate proceedings, and would be adjudicated under the standards governing the particular remedy.

# XXXIII.    CROSS-REFERENCES TO EXHIBIT A

[A.8-113]  Exhibit A is referenced in this Supplemental Section solely as a taxonomy for definitional consistency and potential remedy precision, should later proceedings reach remedial questions. **Exhibit A** is not offered as proof at the declaratory stage.

[A.8-114]  When read with **Appendix B Table 1** and **Tables 2A–2E, Exhibit A** supplies a structured classification framework that is capable of supporting narrow, non-overbroad remedial proposals in later proceedings, if reached, without requiring the Court to engage in fact-finding at the declaratory stage.

[A.8-115]  These references do not establish occurrence, meaning, constitutional violation, or entitlement to relief. They preserve a defined vocabulary for later stages consistent with procedural sequencing.

# XXXIV.    IMMUNITY-RELATED DOCTRINES

[A.8-116]  This Supplemental Section preserves doctrinal orientation relevant to anticipated immunity arguments that may arise if later proceedings identify state-linked actors or officials among Doe defendants or other parties. Nothing herein seeks adjudication of immunity defenses at the declaratory stage.

[A.8-117]  Where later proceedings involve personal-capacity conduct alleged to fall outside legitimate governmental functions, doctrines addressing ultra vires conduct and personal-capacity liability may become relevant. See **Hafer v. Melo, 502 U.S. 21 (1991).** Any such determinations are reserved for later proceedings on a developed record.

[A.8-118]  References to foreign-sovereign commercial-activity concepts and international-law analogues are included, if at all, only for doctrinal orientation and do not request any ruling that such doctrines apply here, absent properly pleaded parties, jurisdiction, and a developed record.

# XXXV.    JUDICIAL EFFICIENCY AND PROCEDURAL ECONOMY

[A.8-119]  Declaratory relief may promote judicial economy by resolving threshold legal uncertainty regarding identification and actionability and by narrowing disputes that would otherwise recur across later proceedings, if reached. See **Fed. R. Civ. P. 1.**

[A.8-120]   A threshold declaration may also reduce later disputes regarding definitional ambiguity and may focus any subsequent discovery on concrete issues of dissemination, repetition, attribution, and continuity, subject to proportionality and judicial supervision.

[A.8-121]   To the extent corporate restructuring raises concerns regarding practical redressability, declaratory clarification may further serve a stabilizing function by clarifying the legal status of challenged practices before any later transfer-of-interest procedures are addressed under applicable rules and due process.

## XXXVI.   SYNTHESIS OF DECLARATORY AND FURTHER-RELIEF SEQUENCING

[A.8-122]   In this action, declaratory relief functions as a threshold clarification mechanism. It addresses whether the pleaded symbolic practices are legally capable of constituting actionable identification and defamatory implication, and whether the alleged recurrence characteristics are not foreclosed from later continuity/enterprise evaluation, if reached.

[A.8-123]   This sequencing preserves constitutional and procedural restraint. It does not convert the declaratory stage into a merits adjudication and does not imply any present entitlement to injunctive relief, damages, predicate findings, or enterprise liability.

# XXXVII.    PROCEDURAL OBJECTIONS

[A.8-124]  Defendants may argue that declaratory relief is redundant, premature, or advisory. Plaintiff pleads an actual controversy concerning the legal status of ongoing or recurring practices and seeks clarification to resolve uncertainty consistent with the Declaratory Judgment Act and governing precedent. See **Steffel, 415 U.S. 452; MedImmune, 549 U.S. 118; Wycoff, 344 U.S. 237.**

[A.8-125]  Defendants may also assert that any future coercive relief would be overbroad or a prior restraint. Plaintiff does not seek coercive relief at this stage, and any later request would be presented, if at all, on a developed record and tailored to comply with constitutional limits and specificity requirements.

# XXXVIII.    RELATIONSHIP TO LATER CIVIL RICO PROCEEDINGS

[A.8-126]  If later proceedings reach civil RICO adjudication, a threshold declaratory determination concerning identification and the legal character of the alleged symbolic practices may narrow issues that would otherwise be relitigated in connection with continuity, relatedness, and enterprise analysis. Such narrowing does not displace Plaintiff's burden to prove every statutory element, causation, and damages, nor does it establish any predicate act or enterprise element at the declaratory stage.

[A.8-127]  This Supplemental Section therefore preserves an orderly pathway: declaratory clarification first; discovery and proof later, if reached; and statutory remedies only upon satisfaction of the applicable standards.

## XXXIX.  FINAL CLOSER

[A.8-128]  This Supplemental Section explains how declaratory relief may clarify legal status questions and preserve orderly sequencing for any later proceedings. It does not request findings of predicate acts, enterprise liability, intent, damages, or injunctive entitlement at the declaratory stage.

[A.8-129]  The Court is asked to perform its customary boundary-setting function: to determine whether the challenged symbolic practices, as pleaded and contextualized, are legally capable of constituting actionable identification and defamatory implication and are not foreclosed, as a matter of law, from later continuity/enterprise evaluation if the action proceeds beyond the declaratory phase.

[A.8-130]  By resolving threshold legal uncertainty now, the Court may clarify the parties' legal relations while preserving full procedural protections for later stages, including discovery, evidentiary development, and merits adjudication, should further proceedings be warranted.

## XL. ENFORCEMENT-SPINE BRIDGE

[A.8-131] This **Appendix A.8** should be read together with **Appendices D** and **E** and **Prayer for Relief ¶136(e), (g), (h), (i),** and **(j),** which collectively preserve the Court's ability to ensure that any declaratory determination entered in this action remains practically effective at subsequent procedural stages.

[A.8-132] **Appendix A.8** defines the legal framework through which the Court may classify conduct, relationships, and continuity principles without adjudicating liability, damages, or evidentiary admissibility at the declaratory stage.

[A.8-133] **Appendix E** demonstrates that the evidentiary architecture referenced in the Complaint is capable of authentication, expert evaluation, and presentation under the Federal Rules of Evidence, while **Appendix D** preserves the structural continuity necessary to ensure that such evidentiary and declaratory determinations are not rendered ineffectual by corporate restructuring, successor control, or transfer of implicated operations.

[A.8-134] **Prayer for Relief ¶136(e)** preserves the Court's authority **under 28 U.S.C. § 2202** to grant further necessary or proper relief if warranted; **¶136(g)** preserves continuity of declaratory effect across successor-controlled systems; **¶136(h)** preserves the possibility of narrowly tailored structural safeguards; **¶136(i)** preserves the option of

stipulated or supervised implementation mechanisms; and **¶136(j)** preserves ancillary relief necessary to effectuate any declaration entered.

[A.8-135]   Together, these provisions establish a sequenced framework in which: (i) legal capability may be clarified at the declaratory stage; (ii) evidentiary materials may be authenticated and evaluated at subsequent stages; and (iii) any resulting declaration, if entered, may be implemented in a manner that remains effective notwithstanding changes in corporate form, ownership, or operational control.

[A.8-136]   This Appendix does not request the imposition of injunctive, monetary, or structural relief at the declaratory stage. It preserves only the legal and procedural conditions under which such relief, if later warranted, may be considered and implemented consistent with the Court's authority and the Federal Rules of Civil Procedure.

*Sequential Footnotes (Supplemental Appendix A.8)*

[1] *Balboa Island Village Inn, Inc. v. Lemen, 40 Cal. 4th 1141, 1160–61, 156 P.3d 339, 351–52 (2007) (upholding narrowly tailored injunctive relief against repetition of statements already adjudicated defamatory; rejecting the view that an injunction is categorically barred where it targets unprotected speech already determined to be defamatory).*

² *18 U.S.C. § 1964(a) (authorizing courts to issue appropriate orders "to prevent and restrain" violations of 18 U.S.C. § 1962, including equitable relief).*

³ *Near v. Minnesota ex rel. Olson, 283 U.S. 697, 713–16 (1931) (prior restraints are the "essence of censorship" and are presumptively unconstitutional; recognizing only narrow, historically limited exceptions).*

# APPENDIX A.9 -

# DECLARATORY RELIEF CLARIFICATION

# (RICO STANDING RESERVED)

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

**APPENDIX A.9         –**

**DECLARATORY RELIEF CLARIFICATION**

*(Cross-Referenced from Complaint ¶¶75–77 (Continuing Harm and Present Controversy), ¶¶106–107 (Continuity and Relatedness), ¶¶108– 111 (Limited Scope and Procedural Sequencing), and Count III ¶¶100– 111; Supported by Appendices A.6 and A.8; Structural portability implications supported by Appendix D.)*

I.      **DECLARATORY RELIEF CLARIFICATION: WHY PROOF OF CIVIL RICO STANDING IS RESERVED FOR SUBSEQUENT PROCEEDINGS**

[A.9-1]   Plaintiff clarifies that at this stage, the request for declaratory relief is limited to a finding that Defendants' conduct constitutes a "pattern of racketeering activity" under **18 U.S.C. § 1961(5).**

[A.9-2]   Plaintiff is not seeking damages, treble recovery, or relief under **18 U.S.C. § 1964(c)** at this stage. Proof of economic injury to business or property is expressly reserved for later proceedings.

[A.9-3]    This declaratory relief request is consistent with the Declaratory Judgment Act's goal of resolving legal rights and obligations in live controversies without prematurely litigating remedies.

[A.9-4]    The relief sought is solely limited to a declaration that Defendants' alleged conduct, as outlined in **Appendix B**, is legally capable of satisfying the definition of "pattern of racketeering activity" under **18 U.S.C. § 1961(5),** in future proceedings, in accordance with **Fed. R. Civ. P. 26** and applicable evidentiary standards. AI-assisted analysis and affidavits are reserved for discovery, expert disclosure, and merits adjudication, and are not relied upon to establish statutory satisfaction at this stage.

[A.9-5]    Predicate acts are limited to offenses enumerated in **18 U.S.C. § 1961(1).** Plaintiff does not rely on state-law defamation as a RICO predicate.

## II.        DECLARATORY JUDGMENT STANDARD (28 U.S.C. § 2201)

[A.9-6]    The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party" where there is an actual controversy.[1]

[A.9-7]    The threshold inquiry is whether a real, substantial controversy exists and whether declaratory relief will clarify the rights and obligations of the parties.

[A.9-8]    The Court is not asked to determine damages at this stage, but only to resolve whether the challenged conduct falls within statutory definitions.

[A.9-9]    Courts have consistently held that declaratory judgment may issue even absent a damages request. *MedImmune, Inc. v. Genentech, Inc.*, **549 U.S. 118, 126–27 (2007)** (plaintiff "need not expose itself to liability before bringing suit to clarify its rights"). [2]

## III.        FORWARD-LOOKING NATURE OF PLAINTIFF'S REQUEST

[A.9-10]   Plaintiff seeks a declaration that Defendants' conduct, repeated rebroadcasts of symbolic gestures, colors, and non-verbal identifiers, constitutes a "pattern of racketeering activity" under **18 U.S.C. § 1961(5).**

[A.9-11]   This request is limited to pattern recognition and does not require the Court to resolve the separate standing question under **§ 1964(c).**

[A.9-12]   A subsequent civil RICO damages claim will require proof of injury to "business or property," which Plaintiff expressly reserves.

[A.9-13]   Declaratory relief serves to clarify rights and prevent ambiguity at this stage, ensuring efficient case sequencing.

[A.9-14]    This clarification is sought to support **Prayer ¶ 101** (Declaratory Relief –

Racketeering Pattern) in the Complaint.

# IV.        PRACTICAL REASON FOR SEQUENCING

[A.9-15]    If Plaintiff were forced to prove injury at this stage, the case risks premature dismissal

on the disputed issue of whether reputational harm qualifies as "property" under **§**

**1964(c).**

[A.9-16]    Limiting the current request to pattern recognition promotes judicial efficiency:

- Identity and pattern questions are resolved upfront.

- Standing and damages are reserved for a later RICO claim, once the Court has

recognized the unlawful conduct.

[A.9-17]    This phased sequencing reduces burden on the Court, narrows disputes, and prevents

wasteful litigation.

# V.        STATUTORY PARSING

## A.        28 U.S.C. § 2201 – Declaratory Judgment Act

[A.9-18]    **Textual Quotation:**

"In a case of actual controversy within its jurisdiction … any court of the United

States … may declare the rights and other legal relations of any interested party

seeking such declaration."[1]

[A.9-19]    **Parsing:** "Actual controversy" = constitutional case-or-controversy requirement under Article III. "Declare the rights" = non-coercive relief; the court is not asked to impose damages or injunction yet.

[A.9-20]    The statute grants broad discretion, and courts may issue declaratory relief where it will clarify rights, prevent uncertainty, or guide future conduct. [234]

[A.9-21]    **Application Here:** Plaintiff asks only for recognition of a racketeering pattern (rights clarification), not damages or coercive relief (treble recovery).

B.    **18 U.S.C. § 1961(5) – Pattern of Racketeering Activity**

[A.9-22]    **Textual Quotation:**

"'Pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years … after the commission of a prior act." [5]

[A.9-23]    **Parsing:** "At least two acts" = minimal statutory threshold. "Within ten years" = continuity requirement. "Racketeering activity" = defined in § 1961(1) (wire fraud, mail fraud, obstruction, etc.). [6]

[A.9-24]    **Application Here:** The preserved AI-assisted detections, together with affidavit materials, are structured to support later evaluation of alleged repeated symbolic rebroadcasts across multiple platforms, including major media networks, affiliates, and related distribution channels, over an extended period. If later proven through ordinary evidentiary processes, such repeated broadcasts are legally capable of evaluation under the continuity framework of **18 U.S.C. § 1961(5),** including with respect to repeated acts occurring within the relevant statutory period.

C.              **18 U.S.C. § 1964(c) – Civil RICO Standing (for later phase)**

[A.9-25]    **Textual Quotation:**

"Any person injured in his business or property by reason of a violation of section 1962 … may sue … and shall recover threefold the damages he sustains …."[9]

[A.9-26]    **Parsing:** This section introduces the standing requirement: injury to "business or property." It is separate and subsequent to the definition of pattern (§1961(5)). Courts have made clear that standing for damages arises only when injury is shown (*Sedima*). [8]

[A.9-27]    **Application Here:** Plaintiff expressly reserves this requirement for subsequent proceedings. The current request is limited to declaratory recognition of pattern **(§1961(5)),** not damages under **§1964(c).**

### D.        Black-Letter Rule from Statutory Parsing

[A.9-28]    The statutory scheme itself separates pattern recognition **(§1961(5))** from civil

standing for damages **(§1964(c)).**

[A.9-29]    Courts have consistently interpreted these as distinct analytical steps:

- Pattern can be declared without damages.

- Damages require later proof of business/property injury.

## VI.       CASE LAW EXPANSION

### A.        Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985)

[A.9-30]    **Facts:** Sedima sued for damages under civil RICO, alleging a pattern of fraudulent

overbilling. Lower courts dismissed, reasoning that civil RICO requires both

conviction of predicate acts and a "racketeering injury" beyond the predicate acts

themselves.

[A.9-31]     **Holding:** The Supreme Court rejected those extra requirements. Civil RICO requires only (1) a violation of § 1962, and (2) injury to business or property. No criminal conviction or "racketeering injury" is required. [8]

[A.9-32]     **Application:** *Sedima* distinguishes pattern recognition (§1961(5)) from injury to business/property (§1964(c)). The Court explicitly treated these as separate analytical steps. Plaintiff here seeks only the first (pattern recognition) at the DJ stage.

**B.**          **United States v. Turkette, 452 U.S. 576 (1981)**

[A.9-33]     **Facts:** Defendant argued that RICO applies only to legitimate enterprises infiltrated by racketeers, not wholly illegal enterprises.

[A.9-34]     **Holding:** The Court held that both legitimate and illegitimate enterprises can constitute RICO enterprises, and "pattern of racketeering activity" requires proof of continuity and relatedness of acts. [6]

[A.9-35]     **Application:** Shows that "pattern" is a threshold definitional matter, separate from injury. DJ Relief properly asks the Court to recognize that Defendants' symbolic rebroadcasts constitute such a pattern.

**C.**          **Boyle v. United States, 556 U.S. 938 (2009)**

[A.9-36]   **Facts:** Defendant challenged this conviction, arguing that the association-in-fact

enterprise lacked formal structure.

[A.9-37]   **Holding:** The Court held that an association-in-fact requires only (1) a purpose, (2)

relationships among associates, and (3) longevity sufficient to pursue the purpose.

Formal hierarchy or structure is not necessary. [7]

[A.9-38]   **Application:** Defendants are not categorically barred from association-in-fact

enterprise analysis under *boyle*, provided that allegations concerning common

purpose (symbolic defamation), relationships among participants (shared media or

distribution practices), and continuity (alleged repeated rebroadcasts over an extended

period) are later proven through ordinary evidentiary processes at the appropriate

procedural stage.

D.           **MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007)**

[A.9-39]   **Facts:** Patent licensee challenged a patent's validity while still paying royalties.

Lower court dismissed her for lack of controversy; reasoning plaintiff hadn't

breached the license.

[A.9-40]   **Holding:** The Supreme Court held that declaratory relief does not require a plaintiff

to "bet the farm" by exposing itself to liability first. A live controversy existed, and

DJ relief was proper. [2]

[A.9-41]    **Application:** Plaintiff need not wait until injury is adjudicated to secure DJ relief. The Court can and should declare whether Defendants' conduct constitutes a racketeering pattern, even before damages litigation.

**E.        Steffel v. Thompson, 415 U.S. 452 (1974)**

[A.9-42]    **Facts:** Plaintiff distributed anti-war handbills, threatened with prosecution, sought declaratory relief. Lower court dismissed it for lack of controversy.

[A.9-43]    **Holding:** The Supreme Court held that declaratory relief was appropriate where the controversy was live, even if no coercive relief (injunction, damages) was yet sought. [3]

[A.9-44]    **Application:** Supports Plaintiff's strategy of seeking declaratory recognition of a racketeering pattern now, with damages to follow later. [3]

**F.        Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992)**

[A.9-45]    **Facts:** SIPC sued to recover investor losses caused by stock manipulation. The issue was proximate cause in civil RICO.

[A.9-46]   **Holding:** The Court held that §1964(c) requires proximate cause between the

violation and injury. [10]

**Application:** *Holmes* sets the injury test for later phases (damages) but confirms that

injury questions belong to §1964(c) not to §1961(5) pattern recognition. [10]

G.          **Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006)**

[A.9-47]   **Facts:** Plaintiff alleged competitor avoided taxes and used the savings to undercut

them, causing lost business.

[A.9-48]   **Holding:** The Court rejected the claim for lack of direct injury. [11]

[A.9-49]   **Application:** Like *Holmes*, this case governs damages claims, not declaratory

recognition of a pattern. It reinforces the sequencing: pattern first, standing/injury

later. [11]

H.          **Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639 (2008)**

[A.9-50]   **Facts:** Plaintiffs alleged fraudulent mailings in tax lien auctions. Defendants argued

plaintiffs lacked standing absent reliance.

[A.9-51]    **Holding:** The Court held reliance is not required for civil RICO standing; injury suffices. [12]

[A.9-52]    **Application:** Confirms that damages stage uses a flexible injury standard. But the declaratory ask here sidesteps that entirely by focusing only on pattern recognition. [12]

I.          **Second Circuit Anchors**

[A.9-53]    *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.***, 673 F.3d 84 (2d Cir. 2012)**: Declaratory relief proper if it clarifies legal rights and obligations in ongoing disputes.

[A.9-54]    *Associated Gen. Contractors v. Carpenters Local 32B***, 611 F.2d 624 (2d Cir. 1979):** Courts may grant declaratory relief to resolve statutory interpretation disputes even absent damages. [14]

[A.9-55]    **Application:** Both cases show SDNY/2d Cir.'s willingness to use DJ as a forward-looking, rights-clarifying tool. Perfect precedent for Option 1 framing. [14]

*Sequential Footnotes*

[1] 28 U.S.C. § 2201(a).
[2] *MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126–27 (2007).*
[3] *Steffel v. Thompson, 415 U.S. 452, 458–60 (1974).*
[4] *Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992).*
[5] 18 U.S.C. § 1961(5).
[6] *H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239–43 (1989).*
[7] 18 U.S.C. § 1964(c).
[8] *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496–97 (1985).*
[9] *United States v. Turkette, 452 U.S. 576, 583 (1981).*
[10] *Boyle v. United States, 556 U.S. 938, 946 (2009).*
[11] *Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 457–61 (2006).*
[12] *Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 649 (2008).*
[13] *Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 96 (1993).*
[14] *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 105 (2d Cir. 2012).*

# VII.    ANTICIPATORY REBUTTALS

## A.    Rebuttal 1: Declaratory Relief Improper Because It "Pre-Litigates" Civil RICO

[A.9-56]    Defendants may argue that Plaintiff's request for declaratory relief improperly seeks to litigate civil RICO elements before a damages claim is ripe. That contention misstates the nature of declaratory relief. The Declaratory Judgment Act authorizes courts to clarify legal relations in live controversies without requiring the plaintiff to pursue coercive remedies at the outset.

[A.9-57]    The Supreme Court has made clear that declaratory relief may precede coercive relief where clarification of legal rights will resolve an ongoing controversy. ***MedImmune,***

*Inc. v. Genentech, Inc.*, **549 U.S. 118, 126–27 (2007).** Likewise, declaratory

adjudication is appropriate even when no injunction or damages are sought. *Steffel v.*

*Thompson*, **415 U.S. 452, 458–60 (1974).**

[A.9-58]    Here, Plaintiff requests declaratory clarification limited to whether the alleged

conduct is legally capable of constituting a "pattern of racketeering activity" under **18**

**U.S.C. § 1961(5).** Plaintiff does not seek damages or treble recovery under **§ 1964(c)**

at this stage. A declaratory ruling on the threshold pattern question serves to narrow

and structure any later proceedings and avoid repetitive litigation over the same

definitional disputes.

**B.**          **Rebuttal 2: No Case or Controversy Because Plaintiff Has Not Proven § 1964(c)**
**Injury**

[A.9-59]    Defendants may argue that absent proof of "injury to business or property" under **§**

**1964(c),** Plaintiff cannot establish a justiciable controversy. That argument

improperly collapses the requested declaratory determination into a damages-phase

standing inquiry.

[A.9-60]    Plaintiff pleads an ongoing controversy: continued dissemination and rebroadcast of

the alleged symbolic identifiers through modern distribution systems, as

contextualized in **Appendix B.** For declaratory purposes, immediacy and reality arise

from the alleged continuing nature of the conduct and the legal uncertainty

concerning its classification, not from proof of damages.

[A.9-61]    The Supreme Court has emphasized that a plaintiff need not "bet the farm" by waiting

for further injury or coercive litigation before seeking judicial clarification of legal

relations. *MedImmune*, **549 U.S. at 126–27.**

[A.9-62]    Accordingly, the controversy requirement is satisfied where declaratory relief would

clarify the parties' rights and obligations in a live dispute. Whether Plaintiff can later

satisfy **§ 1964(c)**'s business-or-property injury requirement is expressly reserved for

subsequent proceedings.

C.              **Rebuttal 3: Declaratory Relief Would Be an Advisory Opinion**

[A.9-63]    Defendants may contend that a declaration concerning a racketeering pattern, absent a

contemporaneous damages request, would constitute an advisory opinion. That

argument misunderstands the nature of declaratory judgments, which resolve concrete

disputes over legal rights and obligations where the controversy is real and ongoing.

[A.9-64]    The Supreme Court has recognized the role of declaratory relief in clarifying the legal

status of disputed conduct and preventing duplicative litigation. ***Cardinal Chem. Co.***

***v. Morton Int'l, Inc.*, 508 U.S. 83, 96 (1993).** The Second Circuit likewise recognizes

declaratory relief as appropriate where it serves a useful purpose in clarifying and settling legal relations in a live controversy. *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, **673 F.3d 84, 105 (2d Cir. 2012).**

[A.9-65]    A declaration concerning the legal classification of Defendants' alleged conduct would directly affect the parties' legal relations going forward and is therefore not advisory.

**D.           Rebuttal 4: Declaratory Relief Unavailable Because the Dispute Is "Reputational"**

[A.9-66]    Defendants may argue that reputational harm is insufficient for civil RICO damages standing under **§ 1964(c)** and therefore cannot support declaratory relief. This argument conflates the damages-standing inquiry with Plaintiff's narrower declaratory request.

[A.9-67]    Plaintiff's declaratory request is directed to **§ 1961(5)**'s definitional question, whether the alleged conduct is legally capable of constituting a pattern of racketeering activity, while expressly reserving **§ 1964(c)** injury issues for later proceedings. The Supreme Court's framework in *Sedima, S.P.R.L. v. Imrex Co.*, **473 U.S. 479, 495–96 (1985),**

distinguishes the "pattern" concept from the separate requirement of injury to business or property for damages.

[A.9-68]    The continuing conduct alleged supplies the "actual controversy" required by the Declaratory Judgment Act. The question whether reputational injury qualifies as business-or-property injury is not presented for adjudication at this stage and is expressly reserved.

## VIII.    POLICY CONSIDERATIONS

### A.    Judicial Economy and Efficiency

[A.9-69]    The Declaratory Judgment Act is designed to prevent disputes from ripening into duplicative, fragmented litigation and to clarify legal relations before uncertainty multiplies proceedings. *Cardinal Chem.*, **508 U.S. at 96.**

[A.9-70]    Absent declaratory clarification, threshold disputes concerning identification, classification, and pattern capability would likely recur across proceedings involving overlapping defendants, successor entities, and distribution pathways. A declaratory ruling on the definitional "pattern" question promotes judicial economy by narrowing later litigation to issues reserved for merits adjudication.

### B.    Prevention of Repetitive Litigation and Conflicting Rulings

[A.9-71]  Plaintiff alleges a multi-year course of conduct spanning multiple platforms and jurisdictions. Without declaratory clarification, Defendants and successor entities could attempt to re-litigate threshold pattern issues in each successive dispute.

[A.9-72]  Declaratory relief serves a stabilizing function: it clarifies governing legal standards and reduces the risk of inconsistent rulings and piecemeal adjudication.

**C.        Avoiding Piecemeal Adjudication**

[A.9-73]  Courts caution against fragmented litigation when declaratory relief would consolidate and clarify threshold questions. *Brillhart v. Excess Ins. Co. of Am.*, **316 U.S. 491, 495 (1942).**

[A.9-74]  Plaintiff's requested declaration is tailored to resolve a definitional threshold, pattern capability, so that later proceedings, if any, proceed under a clarified framework rather than duplicative threshold motion practice.

**D.        Constitutional Balance**

[A.9-75]  Defendants may argue that recognition of a racketeering pattern chills expression. However, false statements of fact are not constitutionally protected. *Gertz v. Robert Welch, Inc.*, **418 U.S. 323, 340 (1974).**

[A.9-76]   The declaratory determination sought here is not an injunction and does not impose prior restraint. It clarifies legal status questions relevant to alleged conduct and preserves Defendants' ability to litigate defenses at later stages.

[A.9-77]   This sequencing preserves First Amendment boundaries while permitting adjudication of a live controversy concerning alleged non-verbal conduct that Plaintiff asserts carries defamatory and enterprise-linked meaning within the pleaded context.

## E.          Avoiding Prejudice Through Delay

[A.9-78]   Plaintiff alleges that continued rebroadcasting and archival resurfacing perpetuate ongoing harm while uncertainty persists as to the legal status of the alleged conduct.

[A.9-79]   Declaratory clarification reduces that uncertainty and promotes orderly sequencing by resolving threshold legal questions before downstream remedies are litigated.

## F.          Public Interest in Clarification of Rights

[A.9-80]   Civil RICO doctrine serves deterrence and accountability objectives when enterprise-type conduct is alleged. Clarification of the governing legal framework serves not

only private interests but broader public interests in transparent standards governing

interstate dissemination conduct.

[A.9-81]    Declaratory relief promotes clarity and deterrence by defining the legal boundaries

applicable to the alleged conduct without prejudging liability, damages, or criminality.


## IX.        CONCLUSION TO APPENDIX A.9

[A.9-82]    Plaintiff reiterates that this **Appendix A.9** does not seek civil RICO damages or treble

recovery under **18 U.S.C. § 1964(c)** at the declaratory stage. Plaintiff seeks only a

declaration limited to whether the conduct alleged is legally capable of constituting a

"pattern of racketeering activity" under **18 U.S.C. § 1961(5).**


[A.9-83]    Such forward-looking declaratory clarification would clarify the parties' legal

relations, reduce threshold uncertainty, and structure any subsequent proceedings in

which Plaintiff may present proof of injury to business or property and seek damages

or further relief as authorized by statute.


[A.9-84]    This **Appendix A.9** supports **Prayer ¶ 110** by clarifying that the declaratory request

concerns **§ 1961(5)** pattern recognition only, with any **§ 1964(c)** injury showing

expressly reserved for later proceedings.

### BLACK-LETTER RULE

[A.9-85]    Declaratory relief under 28 U.S.C. § 2201 requires an actual controversy and a showing that a declaration will clarify legal rights and obligations; it does not require proof of damages at the outset. ***MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007).**

*(Sequential Footnotes continued from Appendix A.9)*

1.  *28 U.S.C. § 2201(a).*

2.  *MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126–27 (2007).*

3.  *Steffel v. Thompson, 415 U.S. 452, 458–59 (1974).*

4.  *Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 495 (1942).*

5.  *18 U.S.C. § 1961(5).*

6.  *United States v. Turkette, 452 U.S. 576, 583 (1981).*

7.  *Boyle v. United States, 556 U.S. 938, 946 (2009).*

8.  *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 495–96 (1985).*

9.  *18 U.S.C. § 1964(c).*

10. *Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992).*

11. *Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 458 (2006).*

12. *Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 649 (2008).*

13. *Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 96 (1993).*

14. *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist., 673 F.3d 84, 105 (2d Cir. 2012).*

15. *Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 (1974).*

# APPENDIX A.10 –

# LEGAL DOCTRINES SUPPORTING STRUCTURAL RELIEF

*DUAL-CLASS GOVERNANCE, SUCCESSOR LIABILITY, AND ANTI-DILUTION PROTECTIONS*

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

**APPENDIX A.10    -**

**LEGAL DOCTRINES SUPPORTING STRUCTURAL RELIEF**

**(DUAL-CLASS GOVERNANCE, SUCCESSOR LIABILITY, ANTI-DILUTION PROTECTIONS)**

*(CROSS-REFERENCED FROM COUNT IV ¶¶ 112–122;*

*SUPPORTED BY APPENDICES A.5, D, H)*

## I.        JUDICIAL CLARIFICATION

[A.10-1]    The authorities collected in this **Appendix A.10** set forth established principles of equitable and procedural power by which courts may preserve the practical effectiveness of forward-looking relief in complex, continuing-injury disputes. They are cited to demonstrate that, where necessary to prevent evasion, fragmentation, or recurrence of the challenged conduct through corporate restructuring or governance reconfiguration, courts possess tools to maintain continuity of obligations, preserve enforceability against successors and transferees, and protect remedial value against dilution or circumvention.

## II.        JUDICIAL BASIS FOR COMPLIANCE-ORIENTED GOVERNANCE SAFEGUARDS

[A.10-2]   Courts have long recognized equitable authority to impose and supervise compliance-oriented safeguards where conduct poses a continuing risk of recurrence and where structural conditions are necessary to ensure effective relief.

[A.10-3]   In **SEC v. Transamerica Corp.,** the Third Circuit recognized judicial protection of shareholder rights and governance fairness in the face of structural constraints affecting meaningful participation.[1] In **Weinberger v. UOP, Inc.,** the Delaware Supreme Court emphasized that fiduciary principles and "entire fairness" may require remedial measures that address not only price, but structure and process.[2]

[A.10-4]   These principles support court-supervised, narrowly tailored governance safeguards where the purpose is remedial integrity and prevention of recurrence, including in the consent decree and compliance context.

[A.10-5]   As pleaded, Plaintiff's requested "editorial neutrality" safeguard is framed as a compliance condition designed to preserve the practical effect of declaratory relief and to prevent re-deployment of the challenged symbolic rebroadcast practices through internal governance maneuvering or successor-controlled distribution

pipelines.

[A.10-6]   The relief contemplated is directed at preventing circumvention and preserving

redressability, not at supervising day-to-day editorial judgments.

## III.           DUAL-CLASS AND PROTECTIVE GOVERNANCE

STRUCTURES

[A.10-7]   Courts and corporate-law authorities recognize that differentiated voting rights and

protective governance structures may be permissible when tied to legitimate purposes

and implemented through lawful mechanisms.

[A.10-8]   In *Sinclair Oil Corp. v. Levien*, the Delaware Supreme Court addressed governance

and fiduciary constraints in controlled-company structures, reflecting that differential

control arrangements are evaluated by purpose, fairness, and conduct. [3] Delaware

courts have likewise considered protective voting structures and control rights as

lawful corporate mechanisms when properly grounded and consistent with fiduciary

obligations.[4]

[A.10-9]   These authorities are cited here to demonstrate that protective governance mechanics,

where utilized as remedial safeguards to preserve enforceability and prevent

circumvention, are not categorically foreclosed as a matter of law.

[A.10-10]  Plaintiff's structural request is limited to protective features narrowly directed at preserving remedial integrity, preventing dilution or elimination of safeguards, and ensuring continuity of obligations across restructuring scenarios.

## IV.        SUCCESSOR LIABILITY AND TRANSFER-OF-INTEREST CONTINUITY

[A.10-11]  Defendants may contend that corporate restructuring, spin-offs, asset transfers, or separations can dissolve, fragment, or render ineffectual any forward-looking judicial determinations entered in this action. Established precedents and procedure recognize mechanisms to preserve the practical effectiveness of relief and to prevent evasion through changes in corporate form.

[A.10-12]  In **Golden State Bottling Co. v. NLRB**, **414 U.S. 168, 182–83 (1973),** the Supreme Court held that a successor may be bound where **continuity of operations** and **notice** exist, emphasizing that corporate form cannot be used to defeat remedial orders designed to protect legal rights. In **United States v. Bestfoods**, **524 U.S. 51, 62–63 (1998),** the Court reinforced that "corporate separateness" is not an absolute shield where **control** and **conduct** warrant accountability under governing standards.

[A.10-13]  These doctrines support the principle that the practical effectiveness of forward-looking judicial determinations may be evaluated with reference to **continuity of**

**control**, **continuity of operations**, and **notice**, rather than the continued existence of a single corporate shell.

[A.10-14]   In parallel, the "of and concerning" inquiry is not limited to any particular distribution format or corporate label. Under **Restatement (Second) of Torts § 564**, communication is actionable if a reasonable recipient could understand it as referring to the plaintiff. Courts recognize that indirect or coded identification may satisfy this element where context supplies identifiability. See, e.g., **Geisler v. Petrocelli**, **616 F.2d 636, 639 (2d Cir. 1980).** As pleaded, the issue presented here is whether symbolic communications and distribution practices remain legally capable of evaluation under the governing identification framework where control over the relevant systems is transferred.

[A.10-15]   Procedurally, **Fed. R. Civ. P. 25(c)** provides that when an interest is transferred, an action may continue against the original party and, where appropriate, the transferee may be substituted or joined. **Rule 25(c)** supplies a mechanism to preserve continuity of party alignment and enforceability where **control over the operations, archives, metadata, or distribution pipelines** implicated by the alleged practices is reassigned.

[A.10-16]   Applied here, if a successor or transferee is later shown to succeed to, control, or operate the broadcast, streaming, archival, licensing, or algorithmic distribution systems through which the challenged practices are alleged to recur, **Rule 25(c)** provides a procedural pathway for continuity of the action and for the Court's later

consideration of any further relief under **28 U.S.C. § 2202**, subject to notice, hearing, and due-process safeguards.

[A.10-17]  At the declaratory stage, Plaintiff does not seek a present finding of successor liability, does not seek to bind non-parties absent proper substitution or joinder, and does not request any operative remedy against any successor entity. This section is included to preserve the doctrinal and procedural framework supporting the legal proposition that corporate restructuring alone does not categorically defeat the practical effectiveness of forward-looking judicial determinations where continuity of control and notice may later be shown.

# V.        ANTI-DILUTION AND REMEDIAL VALUE PRESERVATION

### A.        Delaware Authorities on Dilution and Protective Rights

[A.10-18]  Delaware courts have repeatedly enforced contractual and charter-based protections designed to preserve economic and governance rights against dilution. In *Jedwab v. MGM Grand Hotels, Inc.,* the Court of Chancery recognized enforceability of preferred stockholders' rights as binding and protected interests.[11] In *HB Korenvaes Investments, L.P. v. Marriott Corp.,* the court addressed the interplay of fiduciary obligations and fairness where restructuring affects equity-holder protections.[12] In *In re Trados Inc. Shareholder Litigation,* the court discussed fiduciary considerations

implicated by capital structure and distribution priorities.[13]

[A.10-19]  These authorities are cited to demonstrate that anti-dilution and protective rights are recognized legal tools to prevent opportunistic erosion of remedial value through capitalization changes, restructurings, or governance amendments.

## B.          Application for Structural Relief

[A.10-20]  As pleaded, where equity or governance protections are proposed as substitutionary or compliance-oriented relief, anti-dilution and lock-in protections function to preserve the remedial value of such relief against later board action, restructuring, or successor-controlled recapitalization.

The purpose is preservation of redressability and enforceability, not punitive alteration of corporate structure.

## VI.          ANTICIPATED DEFENSES AND REBUTTALS

[A.10-21]  **Defendants** may argue that protective governance mechanics constitute "entrenchment." **Rebuttal:** Court-supervised remedial safeguards, including consent-based or decree-based compliance provisions, are evaluated by necessity, tailoring, and remedial purpose. [34]

[A.10-22]  **Defendants** may argue that structural equity relief is punitive. Equity remedies are assessed by remedial function and fairness principles; **Rebuttal:** *Weinberger* confirms that remedial analysis is not limited to price alone where fairness and effectiveness require structural attention. [214]

[A.10-23]  **Defendants** may argue that successors are not bound. **Rebuttal:** *Golden State Bottling*, *Bestfoods*, **and Rule 25(c)** provide the doctrinal and procedural basis to preserve continuity and prevent evasion where continuity of control, notice, and operational succession are established. [679]

## VII.            FORWARD-LOOKING APPLICATION

[A.10-24]  In a media ecosystem involving reorganizations, spin-offs, and transfers of broadcast and streaming assets, structural safeguards serve a practical function: preserving the effectiveness of forward-looking relief and preventing fragmentation or dilution through corporate form changes.

[A.10-25]  Where declaratory relief addresses legal capability and status questions, structural portability doctrines ensure that any later relief, if warranted and ordered, remains enforceable against successor-controlled distribution systems and governance mechanisms that could otherwise be used to circumvent compliance.

# VIII.        CONCLUSION

[A.10-26]  This **Appendix A.10** demonstrates that courts possess recognized doctrinal and procedural mechanisms to preserve the effectiveness of forward-looking relief against circumvention through restructuring or governance reconfiguration. Successor continuity principles **(*Golden State Bottling*),** control-based accountability doctrines **(*Bestfoods*),** and transfer-of-interest procedures **(Rule 25(c))** support portability of obligations where control and continuity are shown. Delaware authorities further recognize enforceability of protective rights designed to prevent dilution and preserve economic and governance value **(*Jedwab*; *Korenvaes*; *Trados*).**

[A.10-27]  These doctrines support Count IV's request that any forward-looking relief be structured to remain practically effective notwithstanding corporate separation, transfer, or successor control of the systems through which the challenged conduct is alleged to recur.

[A.10-28]  This **Appendix A.10** should be read together with **Appendix D** and **Prayer for Relief ¶136(g)** and **(h),** which preserve the Court's ability, if later warranted, to ensure that any declaratory determination entered in this action is not rendered ineffectual through successor control, restructuring, dilution, fragmentation, or transfer of implicated operational systems. At the declaratory stage, this **Appendix A.10** identifies only the legal availability of structural continuity and anti-circumvention

principles; it does not request present imposition of governance modification,

successor liability findings, anti-dilution orders, other operative structural relief.


# CROSS-REFERENCE TO APPENDIX A.11

[A.10-29]  **Appendix A.11** addresses implementation and supervision mechanisms for structural

safeguards through enforceable orders and consent-decree structures and is

incorporated by reference for purposes of remedial continuity and enforceability.


*(Sequential footnotes continued from Appendix A.10)*

1.  *SEC v. Transamerica Corp., 163 F.2d 511, 518–19 (3d Cir. 1947).*
2.  *Weinberger v. UOP, Inc., 457 A.2d 701, 710–15 (Del. 1983).*
3.  *Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971).*
4.  *Shenandoah Life Ins. Co. v. Valero Energy Corp., 1980 WL 268009, at \*4 (Del. Ch. Dec. 12, 1980).*
5.  *Transamerica, 163 F.2d at 518–19.*
6.  *Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182–83 (1973).*
7.  *United States v. Bestfoods, 524 U.S. 51, 62 (1998).*
8.  *Restatement (Second) of Torts § 564 (Am. L. Inst. 1977).*
9.  *Fed. R. Civ. P. 25(c).*
10. *H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241–42 (1989).*
11. *Jedwab v. MGM Grand Hotels, Inc., 509 A.2d 584, 594 (Del. Ch. 1986).*
12. *HB Korenvaes Invs., L.P. v. Marriott Corp., 1993 WL 205040, at \*7 (Del. Ch. June 9, 1993).*
13. *In re Trados Inc. S'holder Litig., 73 A.3d 17, 40 (Del. Ch. 2013).*
14. *Weinberger, 457 A.2d at 715.*

# APPENDIX A.11 -

# CONSENT DECREE: DUAL-CLASS GOVERNANCE

# PROTECTIONS

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

**APPENDIX A.11**

**CONSENT DECREE: DUAL-CLASS GOVERNANCE PROTECTIONS (ENFORCEMENT AUTHORITY)**

*(Consent-Decree Option; Implementation and Enforcement Mechanisms)*

*(Cross-Referenced From Count Iv ¶¶ 112–122; Supported By Appendix A.10 And Appendix D)*

## I.    PURPOSE AND PROCEDURAL POSTURE

[A.11-1]    This **Appendix A.11** identifies established principles governing court-approved implementation mechanisms that may be considered after entry of any declaratory determination, including the availability of further relief under **28 U.S.C. § 2202** and the potential use of stipulated orders or consent decrees. Nothing herein request entry of a consent decree at the declaratory stage, and no finding of liability, successor responsibility, or entitlement to coercive relief is sought by this Appendix.

## II.    CONSENT DECREES AS COURT-APPROVED, ENFORCEABLE ORDERS

[A.11-2]    A consent decree is a court-approved order that may incorporate negotiated compliance terms and is enforceable through the Court's supervisory authority. See

**United States v. Microsoft Corp., 56 F.3d 1448, 1458–60 (D.C. Cir. 1995).** Courts interpret and enforce consent decrees according to ordinary principles governing judicial orders and the parties' stipulation as approved. See **United States v. Armour & Co., 402 U.S. 673, 681–82 (1971).**

[A.11-3]    If the parties later stipulate an implementation order, a consent decree provides a recognized mechanism by which prospective compliance provisions may be reduced to an enforceable judgment, subject to the Court's approval and continuing jurisdiction as appropriate.

## III.    AUTHORITY TO GRANT FURTHER RELIEF AFTER DECLARATION

[A.11-4]    Where a court enters declaratory relief, Congress has authorized "further necessary or proper relief" based on the declaration, after reasonable notice and hearing. **28 U.S.C. § 2202.** This statutory authority preserves the Court's ability to consider prospective measures, if later warranted by factual development, without converting the declaratory stage into merits adjudication.

[A.11-5]    Any prospective relief remains subject to constitutional constraints, due process safeguards, and **Rule 65** standards, and is reserved to subsequent proceedings.

## IV.    GOVERNANCE AND COMPLIANCE MEASURES AS REMEDIAL TOOLS

[A.11-6]   Courts have recognized that equitable remedies may include compliance-oriented provisions when necessary to preserve the practical effectiveness of relief and prevent recurrence or evasion, particularly where remedies must remain workable across complex organizational structures. See **SEC v. Transamerica Corp., 163 F.2d 511, 518–19 (3d Cir. 1947); Weinberger v. UOP, Inc., 457 A.2d 701, 710–15 (Del. 1983).**

[A.11-7]   As used in this **Appendix A.11, "editorial neutrality"** is referenced solely as a prospective compliance concept directed at preventing circumvention of judicial determinations through governance maneuvers, and not as a mandate to control content, viewpoints, or day-to-day editorial judgment.

## V.    SUCCESSOR AND TRANSFER-OF-INTEREST CONTINUITY

[A.11-8]   Federal law recognizes that restructuring does not categorically defeat the effectiveness of remedial orders where continuity and notice may be shown. See **Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182–83 (1973); United States v. Bestfoods, 524 U.S. 51, 62–66 (1998).**

[A.11-9]    Procedurally, **Fed. R. Civ. P. 25(c)** provides a mechanism for substitution or joinder when an interest is transferred, preserving continuity of the action and enabling the Court to address implementation questions as control over relevant operations or systems changes, subject to notice and due process.

## VI.         ANTI-DILUTION AND REMEDIAL VALUE PRESERVATION

[A.11-10]   Delaware authorities recognize enforceability of protective rights designed to preserve economic and governance value against dilutionary maneuvers where such rights are lawfully embedded and properly construed. See **Jedwab v. MGM Grand Hotels, Inc., 509 A.2d 584, 594–96 (Del. Ch. 1986); HB Korenvaes Invs., L.P. v. Marriott Corp., 1993 WL 205040, at \*7–8 (Del. Ch. June 9, 1993); In re Trados Inc. S'holder Litig., 73 A.3d 17, 40–42 (Del. Ch. 2013).**

[A.11-11]   These authorities are cited to demonstrate that, if later proceedings reach implementation, protective provisions may be structured to preserve remedial value against circumvention through recapitalization or governance amendments, subject to tailoring and judicial supervision.

## VII.        TAILORING AND CONSTITUTIONAL CONSTRAINTS

[A.11-12]  Any implementation mechanism, whether by stipulated decree or court-ordered further relief, must be narrowly tailored to effectuate the declaration, consistent with constitutional limits, proportionality, and due process. This **Appendix A.11** does not request, and does not presume, entry of any specific prospective measure at the declaratory stage.

## VIII.       CONCLUSION

[A.11-13]  This **Appendix A.11** preserves the established doctrinal and procedural framework by which declaratory determinations, if entered, may later be effectuated through **§ 2202** further relief and, where appropriate, through stipulated compliance instruments approved by the Court. All merits determinations, liability findings, successor-specific applications, and any coercive relief are expressly reserved for subsequent proceedings.

## IX.         IMPLEMENTATION CONTINUITY BRIDGE

[A.11-14]  This Appendix A.11 should be read together with **Appendix D** and **Prayer for Relief ¶136(h), (i),** and **(j),** which preserve the Court's authority, if later warranted, to ensure that any declaratory determination entered in this action may be implemented in a manner that remains practically effective across subsequent procedural stages.

[A.11-15]  This Appendix identifies the legal availability of consent-based, supervised, or court-retained implementation mechanisms, including, where appropriate, structured compliance, monitoring, or reporting frameworks, as recognized in federal equitable practice.

[A.11-16]  At the declaratory stage, no consent decree, supervision order, compliance regime, or ongoing judicial oversight is requested or imposed. This **Appendix A.11** preserves only the doctrinal framework under which such mechanisms may later be considered if warranted by subsequent findings.

[A.11-17]  **Appendix D** preserves the continuity of declaratory scope across successor control, restructuring, or transfer of operational systems, while **Appendix E** demonstrates that the evidentiary architecture remains capable of authentication, verification, and presentation under the Federal Rules of Evidence.

[A.11-18]  **Prayer for Relief ¶136(h)** preserves the possibility of narrowly tailored structural safeguards; **¶136(i)** preserves the option of stipulated or supervised implementation mechanisms; and **¶136(j)** preserves ancillary relief necessary to effectuate any declaration entered.

[A.11-19]   Together, these provisions establish that, if declaratory relief is later granted, the Court retains the ability to ensure that such relief is not rendered ineffective through structural, operational, or procedural circumvention.

[A.11-20]   This **Appendix A.11** does not request the imposition of any operative remedy at the declaratory stage. It preserves only the legal and procedural conditions under which implementation mechanisms, if later warranted, may be considered consistent with federal equitable principles.

*(Sequential footnotes continued from Appendix A.11)*

*SEC v. Transamerica Corp., 163 F.2d 511, 518–19 (3d Cir. 1947).*

*Weinberger v. UOP, Inc., 457 A.2d 701, 711–15 (Del. 1983).*

*United States v. Microsoft Corp., 56 F.3d 1448, 1459 (D.C. Cir. 1995).*

*SEC v. Transamerica Corp., 163 F.2d at 518–19.*

*Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720–22 (Del. 1971).*

*Shenandoah Life Ins. Co. v. Valero Energy Corp., 1980 WL 268009, at \*4 (Del. Ch. Dec. 12, 1980).*

*Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182–83 (1973).*

*United States v. Bestfoods, 524 U.S. 51, 62–66 (1998).*

*Restatement (Second) of Torts § 564 (Am. L. Inst. 1977).Jedwab v. MGM Grand Hotels, Inc., 509 A.2d 584, 594–96 (Del. Ch. 1986).*

*HB Korenvaes Invs., L.P. v. Marriott Corp., 1993 WL 205040, at \*7–8 (Del. Ch. June 9, 1993).*

*In re Trados Inc. S'holder Litig., 73 A.3d 17, 40–42 (Del. Ch. 2013).*

*See United States v. Armour & Co., 402 U.S. 673, 681–82 (1971) (consent decrees as contracts with judicial oversight).*

## APPENDIX A.12 - FINAL CLOSER

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

## APPENDIX A.12    - FINAL CLOSER (STRUCTURAL CONSOLIDATION OF DECLARATORY RELIEF ARCHITECTURE)
*(Integrates Appendices A.1–A.11 And B–H)*

### I.    LITIGATION STAKES RESTATED

[A.12-1]    This action presents threshold legal questions concerning the application of established defamation, identification, and continuity doctrines to alleged symbolic and non-verbal conduct. Plaintiff does not ask the Court at this stage to determine factual truth, audience understanding, intent, coordination, or liability. Plaintiff seeks declaratory clarification concerning legal capability and legal status only.

[A.12-2]    Plaintiff alleges that recurring symbolic practices have been disseminated across media and public platforms over time and that, within an asserted institutional and cultural framework, such practices plausibly function as identity-substituting references to a private individual. These allegations are contextualized exclusively in **Appendix B, including Table 1 and Tables 2A–2E.**

[A.12-3]    The declaratory inquiry is limited to whether the conduct alleged, when evaluated under established defamation-per-se doctrine, constructive-identification doctrine, and enterprise/continuity frameworks, is legally capable of: (i) constituting

defamation per se through symbolic identification; (ii) satisfying the "of and concerning" requirement without naming; (iii) presenting a justiciable controversy appropriate for declaratory resolution independent of damages; and (iv) being evaluated under statutory and equitable frameworks at later procedural stages if proven through discovery and adjudication.

## II.         DECLARATORY RELIEF AS JUDICIAL CLARIFICATION

[A.12-4]    The Declaratory Judgment Act authorizes courts to declare the rights and legal relations of parties in cases of actual controversy. **Fed. R. Civ. P. 57** further confirms that the availability of other remedies does not preclude declaratory relief where it will serve a useful clarifying function.

[A.12-5]    Here, declaratory relief is sought to clarify whether the symbolic practices alleged and contextualized in **Appendix B** are legally capable of falling within established standards governing defamation per se and identification under **Restatement (Second) of Torts § 564,** without adjudicating factual meaning, audience perception, intent, or liability.

[A.12-6]    Declaratory relief also serves to clarify whether allegations of repeated symbolic dissemination of the type described, if later proven, are legally capable of evaluation under continuity-related enterprise doctrines and the definitional "pattern" framework of **18 U.S.C. § 1961(5),** without adjudicating statutory satisfaction, predicate acts, damages, or entitlement to remedies at this stage.[12345]

## III.    PRIVATE-PERSON STATUS AND COGNIZABLE PERSONAL / REPUTATIONAL INTERESTS

[A.12-7]    Plaintiff is pleaded in this action as a private individual, not a public official or public figure. As such, the reputational, dignitary, and identity-based interests alleged here fall within categories long recognized by law as cognizable personal interests. **See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–47 (1974); *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 164–69 (1979); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 757–61 (1985).**

[A.12-8]    In that posture, Plaintiff seeks declaratory clarification that the alleged symbolic identification practices, if proven to function as "of and concerning" substitutes for Plaintiff's identity, implicate legally cognizable personal, reputational, and dignitary interests capable of supporting Article III injury, without adjudicating factual meaning, liability, or damages at this stage.[101112]

## IV.    DECLARATORY RECOGNITION OF COGNIZABLE PERSONAL AND REPUTATIONAL INTERESTS; NON-ADJUDICATION OF SEPARATE PROPRIETARY CLAIMS

[A.12-9]    Plaintiff seeks declaratory relief recognizing that the interests alleged in this action, Plaintiff's personal identity, reputation, and dignitary interests implicated by alleged

"of and concerning" symbolic identification practices, are legally cognizable interests capable of supporting Article III injury where such practices are alleged to function as identity substitutes, without adjudicating factual meaning, liability, or damages at this stage.

[A.12-10]  Plaintiff further seeks declaratory clarification that nothing in this action, or in any declaratory determination entered herein, adjudicates or resolves the validity, ownership, scope, valuation, enforceability, infringement, or remedial consequences of any separate intellectual-property, unfair-competition, contractual, licensing, or other proprietary claim or defense.

[A.12-11]  All such proprietary theories, claims, and defenses are expressly reserved for any later proceeding in which they are properly pleaded and supported. Nothing in the declaratory relief sought here shall be construed as a waiver, forfeiture, admission, or adjudication of any such matters.

[A.12-12]  Accordingly, the declaratory relief requested in this action remains limited to clarification of the governing legal framework and the legal capability of the alleged symbolic identification practices, and does not convert, substitute for, or pre-decide any separate proprietary cause of action.

## V.        BRIDGING DECLARATORY RELIEF TO ENTERPRISE AND PATTERN FRAMEWORKS

[A.12-13]  Declaratory relief is sought here not to adjudicate racketeering liability, but to clarify the legal framework governing whether the alleged symbolic conduct, if later proven through ordinary evidentiary processes, may be evaluated under existing enterprise and pattern doctrines without re-litigating threshold classification questions. Declaratory recognition of alleged symbolic identifiers as potentially defamatory does not establish predicate acts, continuity, or enterprise structure.

[A.12-14]  Rather, such clarification preserves the orderly sequencing of this litigation. If, at subsequent procedural stages and consistent with **Fed. R. Civ. P. 26** and applicable evidentiary standards, Plaintiff were to prove repeated use of the alleged conduct, continuity and relatedness over time, and coordinated action among multiple actors, those facts could then be assessed under the governing statutory framework, including the standards applicable to association-in-fact enterprises under ***Boyle v. United States***, **556 U.S. 938 (2009)**, and patterns of racketeering activity under **18 U.S.C. § 1961(5).** No finding as to liability, remedies, or entitlement to damages is sought or implied at the declaratory stage.

## VI.        JUDICIAL CLARIFICATION REGARDING SCOPE AND SEQUENCING OF RELIEF

[A.12-15]   Plaintiff respectfully clarifies that the relief requested in this action is limited at this stage to declaratory relief and clarification of the governing legal framework. Plaintiff does not seek monetary damages, treble damages, punitive relief, or the imposition of equitable remedies at this juncture.

[A.12-16]   The declaratory relief sought serves three forward-looking, non-adjudicative purposes only: (i) to clarify the legal standards applicable to the alleged symbolic conduct under existing defamation and enterprise doctrines; (ii) to ensure that any declaratory determination regarding those standards applies consistently to successor, transferee, or reorganized entities that may later assume control of the relevant operations; and (iii) to preserve the Court's ability, if liability is later established through discovery and adjudication, to consider appropriate remedies without re-litigating threshold legal classifications.

[A.12-17]   Nothing in this **Appendix A.12** seeks to impose punishment, entrenchment, or structural modification. Rather, it reflects a sequencing principle designed to promote judicial economy, prevent evasion of judicial determinations through restructuring, and maintain continuity of legal interpretation across subsequent phases of the litigation.

[A.12-18]  Consistent with **Fed. R. Civ. P. 25(c),** any successor, transferee, or reorganized entity inheriting the relevant operations may, where appropriate, be treated as a proper party for purposes of effectuating declaratory relief, without adjudicating liability or remedies at the declaratory stage.

## VII.          CONSTITUTIONAL SAFEGUARDS

[A.12-19]  The declaratory relief sought in this action is framed to operate within constitutional limits. Plaintiff does not seek a present adjudication restricting protected opinion, parody, satire, or lawful expressive activity as such. Plaintiff seeks clarification only as to whether the symbolic practices alleged, if later proven to function as false factual implications "of and concerning" a private individual, are legally capable of falling outside constitutional protection under governing standards.

[A.12-20]  Plaintiff is pleaded as a private individual, not a public official or public figure. In that posture, the reputational and dignitary interests alleged are entitled to recognized legal protection under the standards reflected in *Gertz v. Robert Welch, Inc.*, **418 U.S. 323 (1974),** *Wolston v. Reader's Digest Ass'n*, **443 U.S. 157 (1979), and *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985),** without requiring this Court at the declaratory stage to determine negligence, actual malice, falsity, or damages.

[A.12-21]  Any later consideration of equitable relief would remain subject to constitutional constraints, due process safeguards, proportionality principles, and the ordinary requirements governing notice, hearing, tailoring, and judicial supervision. Nothing in this Appendix requests or presupposes the present imposition of injunctive, structural, or governance-based relief.

## VIII.    SUCCESSOR-CONTROL AND ANTI-CIRCUMVENTION COMPATIBILITY

[A.12-22]  Plaintiff further alleges a present controversy concerning whether declaratory determinations, if entered, may retain practical effectiveness where control over implicated archives, distribution systems, editorial functions, or related operational channels is later transferred, reorganized, or assumed by successor structures.

[A.12-23]  Plaintiff does not seek a present adjudication of successor liability, binding effect upon non-parties, or operative relief against unidentified transferees. Plaintiff seeks clarification only that declaratory determinations concerning legal capability and legal status should not be rendered ineffectual solely by corporate restructuring, reassignment of control, or transfer of interests.

[A.12-24]  In that limited sense, successor-control and anti-circumvention principles are relevant to the orderly sequencing of this action. If later proceedings warrant, **28 U.S.C. §**

**2202** and **Fed. R. Civ. P. 25(c)** provide mechanisms by which the Court may consider further necessary or proper relief, substitution, or joinder after reasonable notice and hearing, consistent with due process and the Court's discretion.[1819]

[A.12-25]    Accordingly, the successor-control issues preserved in Count IV and the related appendices are included here only to confirm that continuity of legal interpretation and practical effectiveness is legally capable of preservation across restructuring scenarios, without adjudicating successor responsibility or remedies at the declaratory stage.

## IX.    JURISDICTION, REDRESSABILITY, AND CLOSING CONSOLIDATION

[A.12-26]    This Court has jurisdiction and authority under **28 U.S.C. § 2201** to resolve the legal questions presented now: whether the conduct alleged, as pleaded and contextualized in the Complaint and **Appendix B,** is legally capable of evaluation under existing doctrines governing defamation, identification, and continuity-related enterprise frameworks.

[A.12-27]    At the declaratory stage, the Court is not asked to adjudicate factual truth, intent, or liability. It is asked to determine whether allegations of sustained symbolic identification, if later proven through ordinary evidentiary processes, fall within

categories of injury and conduct long recognized by law. Delay in resolving that legal

uncertainty may perpetuate ambiguity and complicate later proceedings addressing

the same threshold legal classifications.

[A.12-28]   The structural safeguards referenced elsewhere in the Complaint and appendices,

including successor-control continuity, preservation-oriented safeguards, and dilution-

resistant protections, are pleaded not as present remedies, but as mechanisms that may

be considered at later stages to preserve redressability and prevent evasion if liability

is later established. They are framed to ensure that declaratory determinations, if

entered, are not rendered practically ineffective by restructuring or reorganization.

[A.12-29]   Declaratory judgment is therefore appropriate to clarify, at the outset, that the alleged

conduct, if later proven, may be evaluated under existing defamation and

racketeering-related doctrines without re-litigation of threshold classification issues at

each subsequent stage, and that any later equitable or structural remedies, if

warranted, remain reserved to later proceedings under the Court's ordinary authority.

[A.12-30]   Respectfully submitted, Plaintiff seeks declaratory and forward-looking relief solely

to establish the governing legal framework, preserve judicial effectiveness, and

maintain the Court's ability to provide complete relief in later proceedings, if

warranted by adjudicated facts and applicable law.

# X.        CONCLUSION

[A.12-31]  For the reasons set forth above and throughout the Complaint and Appendices,

Plaintiff respectfully requests entry of the declaratory relief specified in the Prayer for

Relief.

*Footnotes (continuing sequentially from Appendix A.12)*

[1] *28 U.S.C. § 2201(a).*

[2] *Fed. R. Civ. P. 57.*

[3] *MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007).*

[4] *Steffel v. Thompson, 415 U.S. 452, 471 (1974).*

[5] *Pub. Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 241 (1952).*

[6] *18 U.S.C. § 1962(c).*

[7] *18 U.S.C. § 1961(5).*

[8] *18 U.S.C. § 1961(1).*

[9] *H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239–40 (1989).*

[10] *Gertz v. Robert Welch, Inc., 418 U.S. 323, 344–47 (1974).*

[11] *Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 164–69 (1979).*

[12] *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 757–61 (1985).*

[13] *Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990).*

[14] *Geisler v. Petrocelli, 616 F.2d 636, 639–40 (2d Cir. 1980).*

[15] *Near v. Minnesota, 283 U.S. 697, 713 (1931).*

[16] *Elrod v. Burns, 427 U.S. 347, 373 (1976).*

[17] *Balboa Island Vill. Inn, Inc. v. Lemen, 156 P.3d 339, 344–45 (Cal. 2007).*

[18] *United States v. Bestfoods, 524 U.S. 51, 62 (1998).*

[19] *Golden State Bottling Co. v. NLRB, 414 U.S. 168, 182–83 (1973).*

[20] *International Covenant on Civil and Political Rights art. 17, Dec. 16, 1966, 999 U.N.T.S. 171.*

# APPENDIX C –

# AI METHODOLOGY, DAUBERT RELIABILITY, AND

# EVIDENTIARY CHAIN-OF-CUSTODY

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

**APPENDIX C - SYSTEM MAP (JUDICIAL ORIENTATION GUIDE)**
**AI METHODOLOGY, RELIABILITY FRAMEWORK,**
**AND EVIDENTIARY INFRASTRUCTURE**

## I.     PURPOSE

This System Map is provided solely to orient the Court to the structure and function of Appendix C.

Appendix C does not present evidence or seek admissibility rulings. It demonstrates only that the methodologies referenced in the Complaint are **capable of producing structured, authenticated, and reviewable datasets** at the appropriate procedural stage.

## II.     FUNCTIONAL LAYERS

Appendix C is organized into four functional layers:

Layer 1 — Orientation

- **C.1 Summary**

  High-level overview of the AI forensic framework and the evidentiary standards referenced in the pleading.

**Layer 2 — Reliability and Foundation**

- **C.2 AI Forensic Reliability**

- **C.3 Authentication & Chain-of-Custody**

  These supplements describe methodological reliability, integrity,

  preservation, and authentication readiness.

**Layer 3 — Process and Detection**

- **C.4 AI Forensic Workflow**

- **C.5 Detection Capability / Per Se Cross-Reference**

  These supplements describe how media inputs may be transformed

  into structured detection records and organized for later doctrinal

  comparison.

**Layer 4 — Legal and Structural Integration**

- **C.6 Technical–Doctrinal Linkage Matrix**

- **C.7 Traceability & Forensic Chain**

- **C.8 Temporal / Continuity Modeling Capability**

- **C.9 Civil RICO Predicate Continuity Mapping**

- **C.10 Technical Companion to Appendix A.12**

  These supplements describe how structured outputs may later be

  linked to factual context, doctrinal categories, recurrence analysis, and

  continuity-oriented review.

## III.        END-TO-END FLOW

Conceptually, the Appendix C system proceeds as follows:

**Media Input → Detection → Structuring → Verification → Traceability →**

**Organization → Legal Alignment**

| Step | Function | Appendix Reference |
|---|---|---|
| Input | Capture of media and metadata | C.4 |
| Detection | Identification of symbolic features | C.5 |
| Structuring | Conversion into analytical records | C.4–C.5 |
| Verification | Reliability-oriented review | C.2 |
| Authentication | Integrity and custody safeguards | C.3 |
| Traceability | Source-to-event linkage across materials | C.7 |
| Organization | Recurrence and temporal grouping | C.8–C.9 |
| Legal Alignment | Mapping to doctrinal frameworks | C.6–C.10 |

## IV.        RELATION TO APPENDICES A AND B

Appendix C operates within the broader pleading structure:

- **Appendix A** — doctrinal framework

- **Appendix B** — factual contextualization

- **Appendix C** — technical capability and evidentiary readiness

No Appendix C section establishes liability, assigns meaning, or satisfies statutory

elements.

## V.        DECLARATORY-STAGE LIMITATION

At this stage, the Court is not asked to:

- Admit datasets or expert testimony;

- Evaluate admissibility under Rules 702, 901, or 1006; or

- Determine continuity, predicate acts, enterprise structure, or liability.

It is sufficient that the system described is **capable of later evidentiary use under ordinary procedural rules**, if later proceedings are reached.

## VI.       JUDICIAL USE

Appendix C may be read:

- **Sequentially**, for full technical context; or

- **Modularly**, using the Navigation Table below.

## APPENDIX C –
## AI METHODOLOGY, RELIABILITY FRAMEWORK, AND EVIDENTIARY INFRASTRUCTURE

**Appendix C i**s organized as a modular technical documentation framework. Appendix C.1 provides a summary overview. **Supplements C.2** through **C.10** address distinct aspects of the AI-assisted forensic architecture referenced in the Complaint and related appendices.

## APPENDIX C — NAVIGATION TABLE
## APPENDIX MAP (JUDICIAL NAVIGATION GUIDE)

At the declaratory stage, **Appendix C** is included solely to demonstrate that the referenced methodologies are capable of later authentication, expert evaluation, and evidentiary presentation under ordinary procedural rules. No supplement requests an admissibility ruling, merits determination, or factual finding at this stage.

| APPENDIX C NAVIGATION TABLE | | | |
|---|---|---|---|
| **SUPPLE MENT** | **TITLE** | **PRIMARY FUNCTION** | **PROCEDURAL RELEVANCE** |
| **C.1** | Summary: AI Methodology, Reliability Framework, and Evidentiary Infrastructure | High-level overview of the forensic system and evidentiary framework | Declaratory orientation |
| **C.2** | AI Forensic Reliability | Describes methodological reliability and reproducibility of AI-assisted analysis | Later expert evaluation (Rule 702) |
| **C.3** | AI Authentication & Chain-of-Custody | Describes data integrity, preservation, and authentication capability | Later evidentiary foundation (Rule 901) |
| **C.4** | AI Forensic Workflow (Technical Methods Summary) | Describes how media inputs are processed into structured analytical records | Process orientation |
| **C.5** | AI Detection Capability – Structural Cross-Reference to Per Se Analysis | Describes detection capability and its structural alignment with doctrinal categories | Doctrinal capability bridge |
| **C.6** | Technical–Doctrinal Linkage Matrix | Maps structured technical outputs to legal and analytical frameworks | Doctrinal integration |
| **C.7** | Traceability & AI Forensic Chain | Describes provenance, linkage, and traceability across materials and events | Structural traceability capability |
| **C.8** | Temporal / Continuity Modeling Capability | Describes capability to organize recurrence and temporal relationships | Continuity-oriented capability |
| **C.9** | Civil RICO Predicate Continuity & AI Forensic Mapping | Describes capability to structure recurring patterns for continuity-related analysis | Potential RICO-stage structuring |
| **C.10** | Technical Companion – AI Forensic & RICO Predicate Continuity (Capability Framework) | Integrates technical architecture with Appendix A.12 doctrinal sequencing | Doctrinal and procedural integration |

*FOOTNOTE APPENDIX C NAVIAGTIONAL TABLE:*

Each supplement begins with a brief "Purpose and Scope" paragraph identifying its limited procedural function and confirming that no evidentiary determination is sought at the declaratory stage.

## APPENDIX C.1 - SUMMARY: AI METHODOLOGY, DAUBERT RELIABILITY, AND EVIDENTIARY CHAIN-OF-CUSTODY (CROSS-REFERENCED FROM FACTUAL BACKGROUND ¶¶ 26–58 AND COUNT III ¶¶ 100–111)

I.        **PURPOSE AND STRUCTURAL ROLE**

[C.1-1]   This **Appendix C.1** summarizes the technical framework and evidentiary standards applicable to the AI-assisted forensic methodologies referenced in the Complaint. It outlines how the gesture, color-pattern, and symbolic rebroadcast detection processes are structured to support later evaluation under **Fed. R. Evid. 702** (expert testimony), **Fed. R. Evid. 901** (authentication), and the reliability principles articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, **509 U.S. 579 (1993),** when presented at the appropriate procedural stage.

[C.1-2]   **Appendix C.1** functions as a summary overview of the technical and evidentiary architecture described in greater detail in **Supplements C.2 through C.10.** Those

supplements address distinct components of the analytical framework, including methodological reliability, authentication, traceability, continuity mapping, and related evidentiary sequencing.

[C.1-3]    At the declaratory-judgment stage, Appendix C does not present evidentiary proof and does not request any admissibility determination. Rather, it demonstrates that the analytical architecture referenced in the Complaint is capable of generating materials that may later be authenticated, evaluated through expert testimony, and subjected to adversarial testing under the Federal Rules of Evidence.

## II.        OVERVIEW OF THE ANALYTICAL WORKFLOW

[C.1-4]    The forensic architecture referenced in the Complaint employs a multi-stage analytical workflow designed to preserve reproducibility, traceability, and data integrity. At a high level, the process involves:

1. **Media Acquisition**

   Broadcast segments and related media materials are collected and preserved with associated metadata and cryptographic integrity markers.

2. **Frame-Level Detection and Classification**

   Computer-vision classifiers analyze frame sequences to identify candidate

visual signals, including gestures and symbolic identifiers referenced in the Complaint.

3. **Contextual Correlation**

   Associated audio transcripts and caption streams are processed using language-analysis tools to evaluate temporal and contextual relationships between visual signals and surrounding narrative content.

4. **Analytical Event Structuring**

   Detected signals are organized into structured analytical records to facilitate later examination of recurrence, temporal continuity, and contextual alignment across media materials.

[C.1-5]   These analytical stages are designed to generate contemporaneous logs and structured datasets capable of later supporting authentication, reproducibility review, and expert disclosure under **Fed. R. Evid. 702 and 901,** when presented at the appropriate procedural stage.

## III.      RELIABILITY CONSIDERATIONS UNDER DAUBERT

[C.1-6]   Courts evaluating technical or scientific methodologies frequently consider the reliability factors described in *Daubert*, including testability, peer review, known or potential error rates, and the existence of standards controlling the technique's

operation. See *Daubert*, **509 U.S. at 593–94;** *General Electric Co. v. Joiner*, **522 U.S. 136, 146 (1997);** *In re Paoli R.R. Yard PCB Litigation*, **35 F.3d 717, 742 n.8 (3d Cir. 1994).**

[C.1-7]    The forensic workflow referenced in the Complaint is structured to address those considerations, as summarized below:

| Daubert Consideration | Methodological Design Features |
|---|---|
| **Testability** | Analytical outputs are designed to be reproducible through controlled re-analysis of the same source materials. |
| **Peer Review** | The underlying machine-vision and language-analysis architectures referenced here are documented in peer-reviewed research literature. |
| **Error Awareness** | Validation protocols are maintained to document performance metrics, including false-positive ranges and related confidence measures, for potential later disclosure and expert review. |
| **Operational Standards** | Integrity controls, logging protocols, and documentation procedures are designed to preserve transparency and reproducibility. |
| **General Acceptance** | The analytical components described here reflect widely used approaches in contemporary machine-vision and multimodal-analysis research. |

[C.1-8]    These methodological characteristics are intended to support later expert evaluation under **Fed. R. Evid. 702** when expert testimony is offered. See *United States v. Ganier*, **468 F.3d 920, 925–26 (6th Cir. 2006);** *In re Paoli*, **35 F.3d at 742–43.** No admissibility determination is requested at the declaratory stage.

## IV.    AUTHENTICATION AND DATA-INTEGRITY DESIGN

[C.1-9]    Datasets generated through the analytical workflow are structured to preserve authentication features, including cryptographic hashes, source metadata, and structured documentation logs.

[C.1-10]    These features are designed to facilitate later authentication under **Fed. R. Evid. 901,** including authentication through system processes or distinctive characteristics when supported by testimony or certification. See **Fed. R. Evid. 901(a), 901(b)(4), 901(b)(9);** *Lorraine v. Markel American Insurance Co.*, **241 F.R.D. 534, 542–46 (D. Md. 2007).**

## V.    RELEVANCE AND PROCEDURAL POSTURE

[C.1-11]    At the appropriate procedural stage, analytical outputs generated through the referenced workflow would be evaluated for evidentiary relevance under **Fed. R. Evid. 401** and subject to balancing considerations under **Fed. R. Evid. 403.**

[C.1-12]    At the declaratory stage, however, the Court is not asked to admit any dataset, resolve reliability challenges, or determine evidentiary weight.

## VI. INTEGRATION WITH DECLARATORY RELIEF

[C.1-13] **Appendix C** is included solely to demonstrate that the methodologies referenced in the Complaint are capable of producing materials that may later be authenticated and evaluated through ordinary evidentiary procedures.

[C.1-14] The technical framework summarized herein does not establish liability, intent, continuity, or statutory predicates. Rather, it describes the analytical infrastructure through which allegations, if later proven, may be supported by expert evidence.

## VII. JUDICIAL UTILITY AND CROSS-REFERENCES

[C.1-15] At the declaratory stage, the Court is not asked to admit underlying datasets or to resolve *Daubert* challenges. Rather, the question is whether the allegations, supported by a described forensic architecture, present a concrete and non-speculative controversy capable of evidentiary development under ordinary procedural rules. See ***MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).**

[C.1-16]    The following cross-references identify where the AI methodology summarized in

this **Appendix C is** doctrinally situated, procedurally safeguarded, and temporally

contextualized within the Complaint and its appendices, without converting this

summary into evidentiary proof at the declaratory stage.

| Linked Section | Purpose |
|---|---|
| **Factual Background ¶¶ 26–58** | Timeline of referenced events and media recurrence |
| **Count I ¶¶ 62–86** | Constructive identity and defamation-per-se framework |
| **Count II ¶¶ 87–99** | Dissemination and repetition structure |
| **Count III ¶¶ 100–111** | AI detection capability and continuity-related framework |
| **Exhibit C** | Forensic binder, validation records, hash logs, and summary materials |

## APPENDIX C.2

## SUPPLEMENT-
## AI METHODOLOGY & RELIABILITY FRAMEWORK
## (DAUBERT-ORIENTED OVERVIEW)
## (CROSS-REFERENCED FROM APPENDIX A.2 ¶ A.2-10 AND
## APPENDIX A.8 ¶ A.8-12; SUPPORTING COUNTS I AND III)

## I.          PURPOSE AND SCOPE

[C.2-1]    This Supplement describes the methodological structure and reliability-oriented design of the AI-assisted analytical framework referenced in the Complaint.

[C.2-2]    The purpose of this section is to demonstrate that the referenced analytical system is capable of producing structured, testable, and reviewable outputs consistent with generally recognized reliability considerations.

[C.2-3]    No determination of admissibility is requested at this stage. This section is provided solely to establish that the methodology is capable of later evaluation under applicable evidentiary standards.

## II.        METHODOLOGICAL OVERVIEW

[C.2-4]    The analytical framework employs a multimodal architecture operating across visual, textual, and contextual data streams to identify and organize candidate symbolic patterns referenced in the Complaint.

[C.2-5]    At a systems level, the methodology is capable of:

- Processing media inputs into structured analytical units;

- Identifying candidate symbolic features through defined detection processes;

- Associating detections with contextual information; and

- Organizing outputs into reproducible analytical records.

## III.       METHODOLOGICAL STRUCTURE CHARACTERISTICS

[C.2-6]    The analytical framework operates through defined, repeatable processing stages designed to transform unstructured media inputs into structured analytical records.

[C.2-7]    The methodology is characterized by:

- Sequential processing logic across defined analytical stages;

- Consistent transformation of inputs into structured outputs;

- Separation between detection, structuring, and interpretive stages; and

- The ability to evaluate outputs independently of any legal conclusion.

[C.2-8]    This structured approach permits independent review of analytical stages while maintaining overall system coherence.

## IV.    RELIABILITY PRINCIPLES (DAUBERT-ALIGNED)

[C.2-9]    The system is structured to support later evaluation under reliability considerations commonly associated **with *Daubert v. Merrell Dow Pharmaceuticals***, including:

- **Testability**:

  Analytical processes are capable of repeated execution on the same dataset to assess consistency of outputs.

- **Reproducibility**:

  Structured processing allows outputs to be regenerated under the same input and configuration conditions.

- **Consistency Across Inputs**:

  The system is capable of applying the same analytical processes across multiple media sources and formats.

- **Structured Output Formation**:

  Outputs are generated in consistent, structured formats that enable comparison, review, and aggregation.

- **Error Awareness**:

  Detection outputs are capable of being evaluated through confidence scoring and comparative review mechanisms.

## V.           VALIDATION & REVIEW STRUCTURE

[C.2-10]    The framework is capable of incorporating structured review processes, including:

- Comparative analysis across detections;

- Cross-source consistency evaluation;

- Human-assisted review where appropriate; and

- Iterative refinement of analytical outputs.

[C.2-11]    These validation mechanisms are designed to support later expert evaluation without requiring present adjudication.

## VI.          RELATION TO EVIDENTIARY FRAMEWORK

[C.2-12]    The methodology is designed to support potential future evaluation under:

- **Fed. R. Evid. 702** (expert methodology);

- **Fed. R. Evid. 703** (basis of expert analysis); and

- Related reliability considerations.

[C.2-13]    Any determination of admissibility or reliability is reserved for the appropriate procedural stage.

# VII.    DISTINCTION BETWEEN ANALYTICAL CAPABILITY AND ADJUDICATION

[C.2-14]    The analytical framework described herein is presented solely to demonstrate capability and methodological structure.

[C.2-15]    It does not:

- Determine meaning;

- Assign intent;

- Establish identity;

- Establish falsity; or

- Satisfy any legal element of any claim.

[C.2-16]    Those determinations, if reached, would occur only at a later procedural stage following full evidentiary development, expert analysis, and adversarial testing.

# VIII.    LIMITATION STATEMENT

[C.2-17]    This Supplement does not assert that any specific output is accurate, reliable, or admissible.

[C.2-18]    It demonstrates only that the analytical framework is capable of producing outputs that may later be evaluated under applicable standards.

## IX.          CONCLUSION

[C.2-19]    The AI-assisted analytical system described herein is structured in a manner

consistent with recognized methodological principles and is capable of supporting

later reliability evaluation.


[C.2-20]    This capability is presented solely to establish that the analytical framework is

methodologically grounded and capable of later evidentiary use, without requesting

any present ruling on admissibility, weight, or sufficiency.

# APPENDIX C.3    -

## SUPPLEMENT:

## STRUCTURAL INTEGRITY, TRACEABILITY, AND EVIDENTIARY READINESS

## (CROSS-REFERENCED FROM APPENDICES A.2 ¶A2-10 AND A.8 ¶A8-12; SUPPORTING COUNTS I AND III)

## I.    PURPOSE AND SCOPE

[C.3-1]    This Appendix describes the structural principles governing the preservation of analytical integrity, traceability, and evidentiary readiness within the analytical framework referenced in **Appendix C.2.**

[C.3-2]    It does not present evidence, conclusions, or factual determinations, but establishes the structural conditions under which analytical outputs may later be evaluated, verified, and, if appropriate, introduced in evidentiary form.

## II.    TRACEABILITY PRINCIPLE

[C.3-3]    The analytical framework is structured to preserve traceability between source inputs and structured analytical outputs.

[C.3-4]    Each analytical record is capable of being associated with:

- A Source media input;

- A Defined stage within the analytical process; and

- A Corresponding structured output generated by that process.

[C.3-5]    This traceability enables subsequent verification, reconstruction, and review of analytical outputs without altering the underlying structure or methodology.

## III.    STRUCTURAL INTEGRITY SAFEGUARDS

[C.3-6]    The analytical framework incorporates structural safeguards designed to preserve the integrity of analytical records.

[C.3-7]    These safeguards include:

- Consistent structuring of analytical outputs;

- Preservation of relationships between inputs and outputs; and

- Separation between raw media inputs and structured analytical representations.

[C.3-8]    The purpose of these safeguards is to ensure that analytical outputs remain stable, reviewable, and resistant to alteration or distortion.

[C.3-9]    Detailed technical implementation of these safeguards is not disclosed at this stage in order to prevent manipulation, circumvention, or contamination of the analytical environment.

## IV.    SEPARATION BETWEEN ANALYSIS AND EVIDENCE

[C.3-10]    The framework maintains a structural distinction between analytical capability and evidentiary material.

[C.3-11]    At this stage, the framework does not:

- Introduce source media as evidence;

- Present witness testimony; or

- Rely on any specific factual dataset.

- 

[C.3-12]    This separation ensures that the analytical structure can be evaluated independently of any evidentiary submission or factual adjudication.

## V.        READINESS FOR EVIDENTIARY INTEGRATION

[C.3-13]    The framework is designed to support integration with evidentiary materials at later procedural stages.

[C.3-14]    Such materials may include, but are not limited to:

- Source media records;

- Witness affidavits;

- Structured analytical outputs generated under Appendix C.2; and

- Supplemental analytical or expert materials.

[C.3-15]    This Appendix does not introduce or rely upon such materials but establishes the structural foundation necessary for their later incorporation.

## VI.       REPRODUCIBILITY AND REVIEWABILITY

[C.3-16]    The framework is capable of supporting reproducibility and review of analytical outputs through its structured and traceable design.

[C.3-17]    This includes the ability to:

- Examine relationships between inputs and outputs;

- Evaluate consistency of analytical structuring; and

- Conduct independent review of structured records at a later stage.

## VII.        LIMITATIONS AT DECLARATORY STAGE

[C.3-18]   This Appendix is presented solely to describe structural characteristics of the

analytical framework.

[C.3-19]   It does not:

- Establish factual findings;

- Attribute meaning, intent, or identity; or

- Satisfy any evidentiary burden required for adjudication.

[C.3-20]   Any such determinations, if pursued, would occur only at a subsequent procedural

stage following full evidentiary development and appropriate judicial process.

## VIII.       CONCEPTUAL CHAIN-OF-CUSTODY FRAMEWORK

[C.3-21]   The analytical framework is capable of supporting a structured chain-of-custody

model for analytical records.

[C.3-22]   Such a model would reflect the progression of analytical records from:

- Source media input;

- Analytical processing stages;

- Structured output formation; and

- Potential evidentiary presentation.

[C.3-23]   At this stage, no specific chain-of-custody record or dataset is presented.

## IX.      STRUCTURAL CAPABILITY FOR DIGITAL TRACEABILITY

[C.3-24]    The framework is capable of supporting digital traceability across analytical records through its structured design.

[C.3-25]    This capability enables:

- Preservation of input-output relationships;

- Consistency in analytical structuring; and

- Readiness for later verification.

[C.3-26]    Detailed technical architecture is not disclosed at this stage.

## X.      STRUCTURAL READINESS FOR AUTHENTICATION AND PRESENTATION

[C.3-27]    The analytical framework is designed to support authentication and presentation of analytical outputs at a later procedural stage.

[C.3-28]    Such authentication, if pursued, may involve:

- Source verification;

- Witness testimony; and

- Structured analytical outputs derived from the methodology described in **Appendix C.2.**

[C.3-29] This Appendix does not perform or assert authentication but establishes the structural conditions under which such processes may occur.

# APPENDIX C.4    – SUPPLEMENT: AI FORENSIC WORKFLOW & ANALYTICAL PROCESS (CROSS-REFERENCED FROM APPENDIX A.4 ¶¶ 15–16; SUPPORTING COUNTS I–III)

## I.    PURPOSE AND SCOPE

[C.4-1] This Supplement describes the overall analytical workflow through which the AI-assisted forensic framework organizes, processes, and structures media-derived inputs referenced in the Complaint.

[C.4-2] The purpose of this section is to provide a high-level, step-by-step overview of how source materials are transformed into structured analytical records capable of later review, aggregation, and evaluation.

[C.4-3]    This section is provided for structural orientation only. It does not present evidentiary findings, conclusions, or determinations of admissibility and does not request adjudication at the declaratory stage. This Supplement is included solely to describe operational structure and processing logic and does not apply the framework to any specific dataset or broadcast at the declaratory stage.

## II.    OVERVIEW OF ANALYTICAL WORKFLOW

[C.4-4]    The forensic framework operates as a staged analytical pipeline in which source media inputs are processed through sequential phases of extraction, detection, structuring, and organization.

[C.4-5]    At a general level, the workflow converts raw media inputs into structured analytical records by:

- Extracting visual and contextual signals from source materials;

- Identifying candidate symbolic patterns within those signals;

- Organizing detections into discrete event-based records; and

- Grouping those records into structured datasets capable of later analysis.

[C.4-6]    Each phase of the workflow performs a distinct analytical function and contributes to the transformation of unstructured media content into organized, reviewable outputs.

## III.    WORKFLOW PHASE DESCRIPTION

[C.4-7]    The workflow may be understood as a sequence of interrelated analytical phases, including input acquisition, signal extraction, detection processing, contextual association, event structuring, aggregation, and output preparation.

[C.4-8]    These phases are designed to operate in a coordinated manner, such that each stage builds upon the outputs of the preceding stage without requiring interpretive conclusions at the point of processing.

[C.4-9]    The workflow is capable of handling media inputs across multiple formats and sources, enabling consistent analytical treatment of broadcast, archived, and related materials.

## IV.    AI FORENSIC WORKFLOW SUMMARY TABLE

[C.4-10]    The following table summarizes the principal phases of the analytical workflow and the corresponding transformation of source inputs into structured outputs.

| AI FORENSIC WORKFLOW SUMMARY | | | |
|---|---|---|---|
| **Phase** | **Process Description** | **Analytical Function** | **Structured Output** |
| **Input Acquisition** | Collection of video, audio, and text-associated materials from broadcast or archived sources | Establishes baseline dataset and source reference | Source dataset with timestamps and identifiers |
| **Frame & Signal Extraction** | Segmentation of media into frames and extraction of visual and contextual signals | Enables identification of candidate gesture and symbolic features | Frame-indexed signal dataset |
| **Gesture Detection Processing** | Application of detection models to identify candidate gestures and posture-based symbolic markers | Identifies candidate symbolic patterns within frame sequences | Detection records with frame references |
| **Contextual Language Processing** | Analysis of transcript, caption, or surrounding language data | Associates detections with contextual narrative elements | Context-linked detection records |
| **Event Structuring** | Organization of detections into discrete, timestamped event units | Converts raw detections into structured analytical records | Event-based detection logs |
| **Cross-Event Aggregation** | Grouping of similar detections across time, sources, or broadcasts | Enables identification of recurrence and pattern formation | Aggregated event clusters |
| **Temporal Sequencing** | Ordering of events by time and proximity | Enables analysis of recurrence intervals and sequence relationships | Time-linked event chains |
| **Comparative Pattern Grouping** | Clustering events based on shared characteristics or symbolic similarity | Enables structured comparison across occurrences | Pattern-based grouping sets |

| AI FORENSIC WORKFLOW SUMMARY | | | |
|---|---|---|---|
| **Phase** | **Process Description** | **Analytical Function** | **Structured Output** |
| **Structured Record Preservation** | Storage of detection records and associated metadata within a controlled framework | Maintains organized analytical dataset for later review | Structured detection database |
| **Output Preparation** | Formatting structured records into charts, logs, or summary datasets | Enables downstream analytical and presentation capability | Summary datasets and analytical outputs |

## V.        FUNCTIONAL CHARACTERISTICS OF THE WORKFLOW

[C.4-11]    The analytical workflow is designed to operate without requiring interpretive

conclusions at the point of detection or processing. Each phase performs a technical

transformation of data rather than a legal or factual determination.

[C.4-12]    The system is capable of organizing large volumes of media-derived inputs into

structured records that may later be reviewed, compared, and evaluated in accordance

with applicable procedural and evidentiary standards.

[C.4-13]    The workflow is modular in structure, allowing individual phases to be reviewed

independently while maintaining overall system coherence.

## VI.      RELATION TO OTHER APPENDIX C SECTIONS

[C.4-14]    This Supplement should be read in conjunction with:

- **Appendix C.2**, addressing methodological reliability considerations;

- **Appendix C.3**, addressing authentication and integrity safeguards;

- **Appendix C.5**, summarizing detection capability and doctrinal cross-reference; and

- **Appendix C.7**, addressing traceability, provenance, and linkage across time and sources.

[C.4-15]    **Appendix C.4** is limited to the structural workflow description and does not duplicate the functions of those sections.

## VII.      LIMITATION STATEMENT

[C.4-16]    This Supplement does not assert that any detected pattern constitutes defamatory conduct, identifies any individual, or satisfies any legal element.

[C.4-17]    It is provided solely to demonstrate that the analytical framework described in the Complaint is capable of transforming media inputs into structured records suitable for later evaluation.

## VIII.        CONCLUSION

[C.4-18]    The AI-assisted forensic workflow described herein provides a structured, stepwise

process through which media-derived inputs may be organized, processed, and

converted into analytical records.

[C.4-19]    This capability is presented solely for orientation and to support the limited

proposition that the alleged symbolic practices described in the Complaint are capable

of systematic analytical processing without requesting any present evidentiary or

liability determination.

## APPENDIX C.5    - SUPPLEMENT:
## AI DETECTION CAPABILITY – STRUCTURAL CROSS-REFERENCE TO PER SE ANALYSIS
## (CROSS-REFERENCED FROM APPENDIX A.5; SUPPORTING COUNTS I, III, AND V)

## I.    PURPOSE AND SCOPE

[C.5-1]    This Supplement describes the analytical capability of the AI-assisted detection framework to identify recurring symbolic gestures, color patterns, posture-based signals, and contextual indicators referenced in the Complaint.

[C.5-2]    The purpose of this section is to illustrate how the detection architecture can be structurally mapped to the doctrinal categories associated with defamation per se and related legal frameworks referenced in the Complaint, including the analytical categories addressed in **Appendix A.5.**

[C.5-3]    This Supplement does not establish factual meaning, liability, or evidentiary conclusions. It demonstrates only that the referenced analytical system is capable of identifying patterns that may later be evaluated in conjunction with the evidentiary record and the doctrinal framework set forth elsewhere in the pleading.

## COMPLAINT CROSS-REFERENCES

| Section | Relevance |
|---|---|
| Count I ¶¶ 62–86 | Defamation-per-se doctrinal framework |
| Count III ¶¶ 100–111 | AI detection capability and evidentiary infrastructure |
| Count V ¶¶ 123–127 | Declaratory relief framework |

## II.     TECHNICAL METHODS SUMMARY

[C.5-4]    The AI-assisted forensic pipeline referenced in the Complaint employs a multimodal analytical architecture operating across video, audio, and text-associated materials to identify and organize candidate symbolic signals referenced in the pleading and structured in **Exhibit A** (Forensic Gesture Ledger).

[C.5-5]    At a systems level, the framework is capable of:

1)  capturing and organizing source media with associated timestamps and metadata;

2)   analyzing frame sequences for candidate gestures, posture-based signals, and related symbolic markers;

3)  correlating visual detections with surrounding transcript, caption, or contextual language features; and

4) structuring outputs into organized analytical records capable of later review, aggregation, and doctrinal cross-reference.

[C.5-6]    Detection events are preserved with associated timestamps, integrity markers, and metadata sufficient to support later review under ordinary evidentiary procedures. The system is referenced here solely to demonstrate that the alleged symbolic practices described in the Complaint are capable of systematic identification and structured documentation.

[C.5-7]    The methodology is designed to support later evaluation under ordinary evidentiary standards, including potential authentication under Fed. R. Evid. 901 and potential summary presentation under Fed. R. Evid. 1006, if and when such issues arise at the appropriate procedural stage. No admissibility determination is sought at the declaratory stage.

## III.        CLARIFAI / NLP DETECTION WORKFLOW SUMMARY

[C.5-8]    The following table summarizes the technical methods and designed evidentiary capabilities underlying the symbolic-detection process.

[C.5-9]    Each workflow phase corresponds to later reliability, authentication, or presentation considerations under the Federal Rules of Evidence. The table is provided for judicial orientation only and not for adjudication of admissibility.

| CLARIFAI / NLP DETECTION WORKFLOW SUMMARY | | | |
|---|---|---|---|
| **Phase** | **Process Description** | **Evidentiary Output (Designed Capability)** | **Relevant FRE / Reliability Principle** |
| **Input Acquisition** | Video, audio, and text-associated materials are collected from archived or publicly available broadcast sources, with timestamps and integrity markers recorded at ingestion. | Raw source dataset capable of later verification and review. | Fed. R. Evid. 901(b)(9); process-authentication principles |
| **Model Processing** | Multimodal classifiers and language-analysis tools evaluate candidate gesture concepts and contextual language features. | Structured analytical output identifying candidate detections, associated timestamps, and metadata. | Rule 702 methodology review; reliability considerations |
| **Verification & Cross-Validation** | Structured human review and comparative analysis are used to assess recurrence, consistency, and analytical fit across materials. | Verified analytical logs capable of later expert evaluation. | Fed. R. Evid. 702; Fed. R. Evid. 703 |
| **Structured Record Preservation** | Detection events and related metadata are recorded within a controlled documentation framework for later review and linkage. | Audit records and preserved analytical event entries. | Fed. R. Evid. 901; digital integrity and traceability principles |
| **Summary & Presentation** | Aggregated outputs may later be compiled into summary charts, logs, or related forensic materials. | Exhibit C summary compilations and related supporting materials, if later offered. | Fed. R. Evid. 1006 |

[C.5-10]   These controls collectively demonstrate that the multimodal detection system is

structured to produce organized, reproducible, and reviewable outputs that, if later

offered, would be subject to ordinary **Rule 702** and **Rule 901** analysis in the usual

course.


## IV.          STRUCTURAL CROSS-REFERENCE TO PER SE ANALYSIS

[C.5-11]   **Appendix A.5** addresses the doctrinal framework governing whether symbolic

conduct, if later proven and understood as "of and concerning" Plaintiff, may fall

within recognized defamation-per-se categories.


[C.5-12]   This **Appendix C.5** is included to demonstrate that the detection architecture is

capable of organizing candidate symbolic practices into analytical groupings that

may, at the appropriate procedural stage, be evaluated in relation to those doctrinal

categories.


[C.5-13]   At the appropriate procedural stage, and subject to full evidentiary development, the

referenced detection framework is capable of supporting structured comparison

between detected symbolic identifiers and the doctrinal categories analyzed in

**Appendix A.5,** including alleged symbolic conduct that, if later proven in context,

may be evaluated as implying:

- Criminality or unlawful conduct;

- Professional unfitness or misconduct;

- Mental instability or incapacity; or

- Sexual immorality or related reputational stigma.

[C.5-14]   This cross-reference function is analytical only. It does not establish that any

particular detection falls within any doctrinal category, nor does it substitute for later

fact development, contextual interpretation, or judicial determination.

## V.        DETECTION CAPABILITY SUMMARY TABLE

[C.5-15]   The following table summarizes the principal analytical capabilities of the detection

framework and the corresponding doctrinal use for which such output may later be

organized.

| Detection Capability | Analytical Function | Potential Doctrinal Use (If Later Proven) |
|---|---|---|
| Visual gesture detection | Identifies candidate gestures and posture-based symbolic markers in video frames | Later comparison to symbolic categories addressed in Appendix A.5 |
| Color and visual cue identification | Detects recurring color-coded or visual-reference patterns | Later contextual analysis of symbolic meaning |
| Contextual language correlation | Associates detections with transcript or caption content | Later evaluation of narrative alignment and implication |
| Timestamped event structuring | Organizes detections into time-linked analytical records | Later recurrence and continuity analysis |
| Cross-source aggregation | Groups similar detections across broadcasts or platforms | Later examination of repetition and relatedness |

[C.5-16]    This table is provided for judicial orientation only. It does not present evidentiary

findings, expert conclusions, or proof at the declaratory stage.

## VI.    RELATION TO APPENDICES C.2–C.4 AND C.7

[C.5-17]    The detection capabilities summarized herein should be read in conjunction with:

- **Appendix C.2**, addressing methodological reliability considerations;

- **Appendix C.3**, addressing authentication and chain-of-custody

  safeguards;

- **Appendix C.4**, describing the broader analytical workflow and forensic

  process; and

- **Appendix C.7**, addressing traceability, provenance, and linkage across

  time and media sources.

[C.5-18]    This **Appendix C.5** is distinct from those sections. Its role is limited to the technical

methods summary and the structural bridge between detection capability and the

doctrinal categories set forth in **Appendix A.5.**

## VII.        DECLARATORY FUNCTION

[C.5-19]    At the declaratory stage, the Court is not asked to determine whether any particular

detection is accurate, meaningful, defamatory, or attributable to any defendant.

[C.5-20]    Rather, this Supplement supports the limited proposition that the alleged symbolic

practices described in the Complaint are capable of systematic forensic detection and

later doctrinal evaluation under ordinary procedural and evidentiary standards.

## VIII.       CONCLUSION

[C.5-21]    The AI-assisted detection framework referenced in the Complaint is capable of

identifying and organizing candidate symbolic practices into structured analytical

records that may later be evaluated in relation to established doctrinal categories.

[C.5-22]    This capability is referenced solely to preserve the analytical bridge between the

technical detection framework and the legal theories asserted, without requesting any

present evidentiary ruling, factual finding, or liability determination.

# APPENDIX C.6        - SUPPLEMENT TECHNICAL – DOCTRINAL LINKAGE MATRIX (CROSS-REFERENCED FROM COUNTS I–V AND RELATED APPENDIX A SECTIONS)

## I.        PURPOSE AND SCOPE

[C.6-1]    This Supplement provides a structured linkage between the technical detection outputs described in **Appendix C** and the doctrinal elements referenced in the Complaint and **Appendix A** series.

[C.6-2]    The matrix format presented in this section is intended to demonstrate how technical detection outputs may later be correlated with legally relevant categories identified within the pleading, including identity, defamatory implication, recurrence, continuity, traceability, and potential enterprise-related pattern analysis.

[C.6-3]    This Supplement is provided for structural orientation only. It does not present evidentiary findings, expert conclusions, or factual determinations at the declaratory stage.

# COMPLAINT CROSS-REFERENCES

| Section | Relevance |
|---|---|
| **Factual Background ¶¶ 26–58** | Temporal and contextual background for later technical correlation |
| **Count I ¶¶ 62–86** | Defamation-per-se and constructive identity framework |
| **Count II ¶¶ 87–99** | Dissemination, repetition, and contextual rebroadcast structure |
| **Count III ¶¶ 100–111** | Pattern-capability and AI-related analytical framework |
| **Count IV ¶¶ 112–122** | Successor-control and continuity-related relief architecture |
| **Count V ¶¶ 123–127** | Additional forward-looking declaratory framework |

## II.        STRUCTURAL LINKAGE FUNCTION

[C.6-4]    The technical materials summarized in **Appendix C** generate analytical outputs such as candidate detections, timestamps, source references, contextual associations, and grouped event records. Standing alone, such outputs do not establish legal meaning or liability.

[C.6-5]    Their relevance at later procedural stages lies in their capacity to be organized in relation to doctrinal categories already identified elsewhere in the pleading.

[C.6-6]    This matrix therefore serves a limited structural purpose: it shows how technical outputs may later be evaluated alongside legal elements without collapsing technical detection into factual adjudication.

## III.                TECHNICAL – DOCTRINAL LINKAGE MATRIX

[C.6-7]    The following matrix is provided for structural orientation only. It identifies how the

technical outputs described in **Appendix C** may, at the appropriate procedural stage,

be organized in relation to doctrinal categories already set forth in the Complaint and

**Appendix A** series. It does not establish factual occurrence, meaning, liability,

admissibility, or entitlement to relief.

| TECHNICAL – DOCTRINAL LINKAGE MATRIX | | | | |
|---|---|---|---|---|
| **Technical Output / Analytical Record** | **Technical Function** | **Associated Doctrinal Category** | **Primary A-Series Cross-Reference** | **Potential Legal Relevance (If Later Proven)** |
| **Gesture detection record** | Identifies candidate visual gestures, posture-based signals, or recurring symbolic markers in frame sequences | Defamation by innuendo; constructive identity; "of and concerning" identification | **A.1; A.2; A.4** | May later be evaluated as symbolic conduct capable of referring to Plaintiff without express naming |
| **Color / visual cue detection** | Detects recurring color-coded or visual-reference patterns across broadcasts or appearances | Defamation by innuendo; narrative parasitism; constructive identity | **A.1; A.2; A.3** | May later be evaluated as part of a recurring symbolic identification system |
| **Timestamped event node** | Organizes detection with time, source, and metadata into a structured event record | Narrative parasitism; continuity of rebroadcast; standing-related recurrence | **A.3; A.6** | May later support analysis of recurrence, persistence, and temporal spread of alleged symbolic conduct |

| TECHNICAL – DOCTRINAL LINKAGE MATRIX | | | | |
|---|---|---|---|---|
| Technical Output / Analytical Record | Technical Function | Associated Doctrinal Category | Primary A-Series Cross-Reference | Potential Legal Relevance (If Later Proven) |
| Transcript / caption alignment | Associates visual detections with nearby verbal content or surrounding narrative context | Innuendo; "of and concerning"; defamatory implication | A.1; A.4; A.5 | May later be evaluated for contextual meaning and alleged defamatory implication |
| Cross-source aggregation record | Groups similar detections across broadcasts, programs, appearances, or platforms | Narrative parasitism; coordinated innuendo; continuity-related pattern analysis | A.3; A.8 | May later support analysis of repetition, relatedness, and coordinated dissemination |
| Category-tagged symbolic record | Sorts detected conduct into analytical categories corresponding to pleaded symbolic types | Defamation per se categories | A.5 | May later be compared to pleaded categories such as criminality, professional unfitness, mental instability, or sexual immorality |
| Identity-correlation record | Organizes symbolic detections in relation to alleged identity-substitution patterns | Constructive identity; "of and concerning" doctrine | A.2; A.4 | May later be evaluated as part of a non-naming identification framework |
| Traceability / provenance log | Preserves source, timestamp, processing history, and record lineage | Standing; declaratory sequencing; evidentiary readiness | A.6; A.9 | May later support authentication, traceability, and procedural readiness without supplying present proof |
| Temporal clustering output | Groups event nodes by time interval, recurrence | Narrative parasitism; continuity-related | A.3; A.8 | May later be evaluated for continuity and recurrence within later |

| TECHNICAL – DOCTRINAL LINKAGE MATRIX | | | | |
|---|---|---|---|---|
| **Technical Output / Analytical Record** | **Technical Function** | **Associated Doctrinal Category** | **Primary A-Series Cross-Reference** | **Potential Legal Relevance (If Later Proven)** |
| | sequence, or repeated symbolic patterning | enterprise evaluation | | civil RICO analysis, if reached |
| **Structured summary dataset** | Aggregates voluminous event records into organized compilations | Declaratory clarification; sequencing of proof; later evidentiary presentation | **A.9** | May later support summary presentation or structured expert review if evidentiary foundations are established |
| **Injury-correlation grouping** | Organizes detected symbolic categories in relation to alleged dignitary or reputational harms | Defamation per se; Article III standing | **A.5; A.6** | May later be evaluated in relation to presumed harm and cognizable injury theories |
| **Expression-boundary grouping** | Organizes symbolic detections in relation to expressive-context variables | Constitutional balance | **A.7** | May later be evaluated in relation to First Amendment boundaries and non-protected defamatory implication |
| **Successor-system continuity reference** | Identifies whether structured records are tied to archives, distribution systems, or transferred content pipelines | Declaratory continuity; anti-circumvention sequencing | **A.9; A.10** | May later be relevant to continuity of declaratory scope across successor-controlled systems, if reached |
| **Governance / compliance reference marker** | Identifies outputs that may later intersect with compliance-oriented relief architecture | Structural relief; governance continuity | **A.10; A.11** | May later assist implementation analysis if structural or consent-based relief is ever reached |

| TECHNICAL – DOCTRINAL LINKAGE MATRIX | | | | |
|---|---|---|---|---|
| Technical Output / Analytical Record | Technical Function | Associated Doctrinal Category | Primary A-Series Cross-Reference | Potential Legal Relevance (If Later Proven) |
| **Integrated doctrine-output map** | Links multiple technical records to multiple pleaded categories in one structured view | Final doctrinal synthesis | **A.12** | Supports judicial orientation by showing that technical outputs are capable of organized legal correlation without present adjudication |

[C.6-8]    This matrix is illustrative and organizational only. It does not establish that any

technical output satisfies any doctrinal element, nor does it substitute for proof,

context, interpretation, expert testimony, or judicial determination.


## IV.        RELATION TO APPENDICES C.2–C.5

[C.6-9]    The linkage matrix presented here should be read in conjunction with the preceding

**Appendix C** supplements:

- **Appendix C.2** addresses methodological reliability considerations;

- **Appendix C.3** addresses authentication and chain-of-custody architecture;

- **Appendix C.4** describes the analytical workflow and event-structuring

process; and

- **Appendix C.5** addresses detection capability and its structural cross-reference to per se analysis.

[C.6-10]  **Appendix C.6** is distinct from those sections. Its role is not to establish reliability, authentication, or workflow mechanics, but to provide a structured bridge between technical outputs and doctrinal categories.

## V.        DECLARATORY FUNCTION

[C.6-11]  At the declaratory stage, the Court is not asked to determine whether any technical output proves identity, defamatory meaning, continuity, or enterprise conduct.

[C.6-12]  Rather, this Supplement supports the limited proposition that the technical architecture described in **Appendix C** is capable of being organized in a legally intelligible manner for later evaluation under the doctrinal frameworks pleaded elsewhere in the action.

[C.6-13]  In that respect, the matrix serves a judicial-orientation function only: it clarifies that the referenced technical materials are not abstract or free-floating but are capable of later correlation with recognized legal categories under ordinary evidentiary procedures.

## VI. CONCLUSION

[C.6-14] The Technical – Doctrinal Linkage Matrix demonstrates that the outputs generated by the forensic architecture described in **Appendix C** are capable of structured correlation with the doctrinal elements pleaded in the Complaint and **Appendix A** series.

[C.6-15] This correlation is referenced solely to preserve analytical clarity and procedural sequencing at the declaratory stage, without requesting any present evidentiary ruling, factual finding, or liability determination.

## VII. SYSTEM-LEVEL TECHNICAL–DOCTRINAL CROSSWALK (CAPABILITY FRAMEWORK – INTEGRATED APPENDIX MAPPING)

### A. PURPOSE AND FUNCTION

[C.6-16] This **Appendix C.6 - Section VII** provides a consolidated system-level crosswalk linking the technical architecture described in **Appendices C.2** through **C.10** to the doctrinal framework set forth in **Appendix A** and the corresponding Counts in the Complaint.

[C.6-17]    Its purpose is to demonstrate how the analytical framework is structured to organize,

preserve, and present symbolic event data in a manner capable of later evaluation

under applicable legal standards, if such proceedings are reached.

[C.6-18]    This **Appendix C.6 - Section VII** does not establish factual findings, statutory

elements, continuity, enterprise structure, admissibility, or liability. It reflects

structural capability only.

B.                **SYSTEM-LEVEL TECHNICAL–DOCTRINAL CROSSWALK TABLE**

| INTEGRATED CAPABILITY CROSSWALK | | | | | |
|---|---|---|---|---|---|
| Technical Supplement (Appendix C) | Primary Technical Function | Related A-Series Doctrine | Complaint Alignment | Capability to Substantiate (If Reached) | Procedural Orientation |
| **C.2 – Methodological Framework** | Reliability-oriented analytical design; reproducibility structure | A.1–A.4 (Defamation Doctrine); A.7 (Symbolic Expression) | Counts I–II | Capability to support later expert evaluation of analytical consistency and methodology | Potential evaluation under FRE 702 (expert methodology) |
| **C.3 – Integrity & Authentication Framework** | Traceability, metadata preservation, evidentiary readiness | A.3–A.4 (Defamation Elements); A.7 | Counts I–III | Capability to preserve source-to-output integrity and support later authentication | Potential evaluation under FRE 901 / 902 |

| INTEGRATED CAPABILITY CROSSWALK | | | | | |
|---|---|---|---|---|---|
| **Technical Supplement (Appendix C)** | **Primary Technical Function** | **Related A-Series Doctrine** | **Complaint Alignment** | **Capability to Substantiate (If Reached)** | **Procedural Orientation** |
| **C.4 – Operational Workflow** | Structured analytical pipeline from input to output | A.1–A.4; A.7 | Counts I–II | Capability to demonstrate how symbolic detections are processed and organized | Structural orientation; no evidentiary request |
| **C.5 – Detection Capability & Per Se Cross-Reference** | Mapping symbolic detections to doctrinal categories | A.5 (Defamation Per Se); A.7 | Counts I–II | Capability to align structured detections with pleaded per se categories | Potential doctrinal comparison at later stage |
| **C.6 – Technical–Doctrinal Linkage Matrix** | Cross-referencing technical outputs to legal framework | A.1–A.8 (Doctrinal Spine) | Counts I–III | Capability to organize analytical outputs relative to legal claims | Structural orientation only |
| **C.7 – Traceability & Forensic Chain** | Source-event linkage and reconstruction capability | A.3–A.4; A.8 | Counts I–III | Capability to reconstruct event lineage and preserve continuity across records | Potential evidentiary support under FRE 901 |
| **C.8 – Temporal Graph & Structural Continuity** | Temporal sequencing and graph-based recurrence modeling | A.8 (Continuity Doctrine); A.10–A.11 (Enterprise Structure) | Count III | Capability to model recurrence, clustering, and temporal spread of symbolic events | Later continuity-related review (if reached) |
| **C.9 – Civil RICO Continuity Mapping** | Predicate-continuity dataset formation and | A.8–A.10 (RICO Continuity & | Count III | Capability to organize recurrence datasets | Potential evaluation under §1961(5) |

| INTEGRATED CAPABILITY CROSSWALK | | | | | |
| Technical Supplement (Appendix C) | Primary Technical Function | Related A-Series Doctrine | Complaint Alignment | Capability to Substantiate (If Reached) | Procedural Orientation |
|---|---|---|---|---|---|
|  | mapping capability | Pattern Doctrine) |  | relevant to continuity analysis | framework (if reached) |
| C.10 – Technical Companion (Integration Layer) | System-level integration of technical appendices with doctrinal architecture | A.12 (Declaratory & Remedial Framework) | Counts III–IV | Capability to integrate analytical outputs into final declaratory and remedial structure | Rule 10(c) incorporation; no adjudication requested |

## C.        STRUCTURAL INTERPRETATION

[C.6-19]    The crosswalk above reflects how each technical supplement contributes to a unified analytical system capable of organizing symbolic broadcast data in a structured, traceable, and reviewable manner.

[C.6-20]    Each Appendix serves a distinct function within the overall architecture:

- **C.2–C.4** → analytical capability and workflow

- **C.3 & C.7** → integrity, traceability, and preservation

- **C.5–C.6** → doctrinal alignment and structural linkage

- **C.8–C.9** → continuity and recurrence modeling capability

- **C.10** → system-level integration with declaratory framework

[C.6-21]  Together, these components demonstrate that the analytical framework is not isolated or speculative but is structured to support later-stage evaluation under ordinary procedural and evidentiary standards, if such proceedings are reached.

## D.           ANALYTICAL BOUNDARIES

[C.6-22]  References within this crosswalk to doctrinal categories, continuity, or enterprise concepts correspond solely to the legal frameworks articulated in Appendix A and the Complaint.

[C.6-23]  This Section does not determine:

- Whether any symbolic act is defamatory;

- Whether any per se category is satisfied;

- Whether any predicate act exists;

- Whether continuity is established; or

- Whether any enterprise is formed.

E.          PROCEDURAL SEQUENCING CONFIRMATION

[C.6-24]   This Section reinforces the procedural sequencing adopted throughout the Complaint:

1. **Declaratory Stage** — legal capability and classification only;

2. **Appendix B** — Factual contextualization;

3. **Appendix C** — Technical capability, reproducibility, and structure;

4. **Later Proceedings (if reached)** evidentiary development and

    adjudication.

[C.6-25]   The crosswalk demonstrates only that the analytical system is capable of supporting

that sequence, not that any evidentiary burden has been satisfied.

F.          CONCLUSION - APPENDIX C.6 - SECTION VII

[C.6-26]   This system-level crosswalk confirms that the technical architecture described in

**Appendix C** is organized in a manner capable of interfacing with the doctrinal

framework set forth in **Appendix A.**

[C.6-27]   It is presented solely for structural clarity and judicial orientation and does not request

any factual findings, evidentiary ruling, or determination of liability.

# VIII.      SYSTEM-LEVEL SYNTHESIS LAYER (C.11–C.13)

[C.6-28]   **Appendices C.11** through **C.13** provide system-level synthesis layers that integrate

the analytical components described in **C.2** through **C.10** into unified structural

capabilities.

[C.6-29]   These appendices do not introduce new analytical functions but demonstrate how

existing components operate collectively at a system-wide level.

| SYNTHESIS LAYER TABLE | | | | |
|---|---|---|---|---|
| **Appendix** | **System-Level Role** | **Built On (Core Appendices)** | **Doctrinal Alignment** | **Capability Orientation** |
| **C.11 – Traceability Synthesis** | Integrates traceability, metadata, and forensic linkage into unified chain structure | C.3 + C.7 | A.3–A.4 | Capability to maintain system-wide traceable structure |
| **C.12 – Continuity Synthesis** | Integrates temporal modeling, recurrence, and structural patterning | C.8 | A.8–A.10 | Capability to organize continuity-ready datasets |

| SYNTHESIS LAYER TABLE | | | | |
|---|---|---|---|---|
| Appendix | System-Level Role | Built On (Core Appendices) | Doctrinal Alignment | Capability Orientation |
| C.13 – RICO Mapping Synthesis | Integrates predicate structuring, recurrence mapping, and system outputs | C.9 + C.10 | A.8–A.12 | Capability to organize data for potential pattern analysis |

## IX.        KEY BOUNDARY LANGUAGE

[C.6-30]   These synthesis layers reflect structural integration only and do not:

- Establish continuity

- Identify predicate acts

- Assert enterprise structure or

- Request adjudication under any statutory framework

## APPENDIX C.7    –
## SUPPLEMENT:
## TRACEABILITY & AI FORENSIC CHAIN

### I.    PURPOSE AND SCOPE

[C.7-1]    This Supplement describes the mechanisms through which detected symbolic patterns may be traced across time, media sources, and broadcast contexts.

[C.7-2]    The purpose of this section is to demonstrate the capability of the forensic framework to preserve provenance, trace recurrence patterns, and document relationships among detected signals within a structured analytical environment.

[C.7-3]    This section is provided for structural orientation only. It does not present evidentiary findings, conclusions, or determinations of admissibility, and does not request adjudication at the declaratory stage.

### II.    TRACEABILITY ARCHITECTURE OVERVIEW

[C.7-4]    The forensic framework organizes each detection event as a traceable record containing source reference, timestamp, and associated metadata. These records are structured to permit reconstruction of detection lineage across media inputs and analytical stages.

[C.7-5]    Each detection event is associated with a unique identifier and linked to its

originating media source, enabling traceability from initial ingestion through

subsequent analytical grouping and categorization.


[C.7-6]    This architecture permits the reconstruction of event sequences and relationships

across broadcasts, platforms, and time intervals, without requiring interpretation or

adjudication of meaning at this stage.


## III.           PROVENANCE & DATA INTEGRITY STRUCTURE

[C.7-7]    Detection records are maintained within a structured logging system designed to

preserve data integrity and record provenance across all analytical stages.


[C.7-8]    Each record may include:

- Source reference (e.g., broadcast or media identifier)

- Timestamp (UTC-based temporal reference)

- Processing reference (model or analytical stage identifier)

- Event linkage reference (association with related detections)


[C.7-9]    The system is designed to maintain a continuous record of data lineage, enabling later

verification of source, sequence, and analytical handling.

## IV.     TRACEABILITY ACROSS MEDIA AND TIME

[C.7-10]   The framework permits detection events to be linked across multiple media sources and time periods through structured association records.

[C.7-11]   These associations enable identification of recurring symbolic patterns across broadcasts without requiring present evaluation of meaning, intent, or liability.

[C.7-12]   Temporal linkage structures allow events to be organized into sequences reflecting recurrence, proximity, and potential pattern formation for later analytical stages.

## V.     RELATIONSHIP MAPPING CAPABILITY

[C.7-13]   Detection events may be grouped based on shared characteristics, temporal proximity, or structural similarity, forming relationship clusters within the analytical framework.

[C.7-14]   These clusters are maintained as structured groupings capable of later evaluation, without constituting present findings or conclusions.

## VI.          STRUCTURAL OUTPUT CAPABILITY

[C.7-15]    The traceability framework is designed to support the generation of structured

outputs, including:

- Event linkage maps

- Temporal sequence charts

- Source-to-event trace logs

[C.7-16]    Such outputs, if presented at a later procedural stage, would be subject to applicable

evidentiary standards and evaluation.

## VII.         LIMITATION STATEMENT

[C.7-17]    This Supplement does not assert that any detected event constitutes defamatory

conduct, identifies any individual, or satisfies any legal element.

[C.7-18]    It is presented solely to demonstrate that the described system is capable of

preserving traceability and provenance in a manner that may support later evidentiary

evaluation under ordinary procedural rules.

# APPENDIX C.8    – SUPPLEMENT:

# TECHNICAL CONTINUATION – ENTERPRISE CONTINUITY & TEMPORAL GRAPH CAPABILITY

# (CROSS-REFERENCED FROM APPENDIX A.8; SUPPORTING COUNT III)

## I.    PURPOSE AND SCOPE

[C.8-1]    This Supplement describes the analytical capability of the referenced forensic framework to model temporal recurrence and structural continuity across media broadcasts and related symbolic signals referenced in the Complaint.

[C.8-2]    The temporal-graph architecture summarized here is included to illustrate how recurring symbolic signals may be organized, linked, and visualized across time periods, sources, and associated entities within a structured analytical environment.

[C.8-3]    This section is provided solely to illustrate analytical capability. It does not establish enterprise coordination, continuity, relatedness, or liability, and no such determination is requested at the declaratory stage.

## II.  COMPLAINT AND APPENDIX CROSS-REFERENCES

| Section | Relevance |
| --- | --- |
| **Count III ¶¶ 100–111** | Pattern-capability and continuity-related declaratory framework |
| **Appendix A.8** | Civil RICO predicate continuity and declaratory relief framework |
| **Appendix C.6** | Technical–doctrinal linkage matrix |
| **Appendix C.7** | Traceability and source-to-event linkage |
| **Appendix C.11** | Temporal graph expansion and continuity modeling support |

## III.  TEMPORAL GRAPH CAPABILITY OVERVIEW

[C.8-4]    The analytical framework is capable of organizing structured event records into temporal and relational groupings that permit later examination of recurrence, proximity, and sequence.

[C.8-5]    At a systems level, this capability allows event records to be arranged according to:

- Time of occurrence;

- Source or broadcast reference;

- Symbolic feature similarity; and

- Relational association with other event records.

[C.8-6]    These grouped records may be represented in temporal graph form without requiring any present conclusion regarding meaning, coordination, or legal significance.

## IV.      STRUCTURAL CONTINUITY MODELING

[C.8-7]    The framework is capable of modeling structural continuity by organizing recurring detections into linked sequences or clusters across multiple broadcasts, appearances, or media contexts.

[C.8-8]    Such modeling may later support examination of whether recurring symbolic patterns are isolated, repeated, clustered, or temporally sustained.

[C.8-9]    At the declaratory stage, these capabilities are referenced solely to demonstrate that the alleged symbolic practices are analytically capable of being examined for continuity and recurrence under ordinary procedural standards.

## V.      RELATIONAL LINKAGE CAPABILITY

[C.8-10]    Temporal graph architecture is also capable of expressing relationships among event records based on shared characteristics, recurring symbolic markers, temporal proximity, or source overlap.

[C.8-11]    These relationships may later be visualized as nodes and edges within a structured analytical model, enabling comparison of event sequences across time and source environments.

[C.8-12]    Such relational expression is structural only and does not itself establish enterprise

conduct, coordination, or continuity within the meaning of any statutory framework.

## VI.        ANALYTICAL CONTINUATION TABLE

[C.8-13]    The following table summarizes the principal temporal and structural continuation

capabilities of the framework.

| TEMPORAL CONTINUATION & GRAPH CAPABILITY SUMMARY | | |
|---|---|---|
| **Analytical Capability** | **Function** | **Potential Later Use (If Reached)** |
| **Temporal sequencing** | Orders event records by time and interval | Later examination of recurrence and temporal spread |
| **Cross-broadcast clustering** | Groups similar events across multiple sources or appearances | Later analysis of repeated symbolic patterns |
| **Node-based event representation** | Expresses individual detections as structured event nodes | Later graph-based review of symbolic event architecture |
| **Edge-based relationship modeling** | Links events by shared feature, time, or source connection | Later examination of structural relatedness |
| **Continuity grouping** | Organizes sustained or repeated detections into analytical chains | Later continuity-related evaluation under applicable doctrine |
| **Source-overlay mapping** | Aligns event records with source environments and reference contexts | Later comparison across broadcasts, entities, or platforms |

[C.8-14]    This table is provided for structural orientation only. It does not establish facts, prove

continuity, or supply evidentiary conclusions.

## VII.        RELATION TO APPENDIX C ARCHITECTURE

[C.8-15]   This Supplement should be read in conjunction with:

- **Appendix C.4**, describing the general analytical workflow;

- **Appendix C.5**, describing detection capability and doctrinal cross-reference;

- **Appendix C.6**, providing technical–doctrinal linkage; and

- **Appendix C.7**, describing traceability and source-event continuity.

[C.8-16]   **Appendix C.8** is distinct from those sections. Its role is limited to temporal continuation and structural graph capability.

## VIII.        LIMITATION STATEMENT

[C.8-17]   This Supplement does not assert that any recurring sequence constitutes enterprise conduct, coordinated action, predicate continuity, or any legal element of civil RICO.

[C.8-18]   It is presented solely to demonstrate that the described analytical framework is capable of organizing event records in a manner that may later support continuity-related evaluation if such proceedings are reached.

## IX.          CONCLUSION

[C.8-19]    The analytical framework referenced in the Complaint is capable of modeling

temporal recurrence and structural continuity across event records through graph-

based and sequence-based organization.


[C.8-20]    This capability is referenced solely to preserve analytical clarity and procedural

sequencing at the declaratory stage, without requesting any present evidentiary ruling,

factual finding, or liability determination.

**APPENDIX C.9          – SUPPLEMENT:**

**CIVIL RICO PREDICATE CONTINUITY & AI FORENSIC MAPPING**

**(SUPPORTING COUNT III; CROSS-REFERENCED FROM APPENDIX A.8 AND APPENDIX A.9)**

## I.          PURPOSE AND SCOPE

[C.9-1]     This Supplement provides a technical overview of how recurring symbolic broadcast signals referenced in the Complaint may be analytically mapped for purposes of evaluating continuity-related considerations relevant to civil RICO frameworks at a later procedural stage.

[C.9-2]     The purpose of this section is to illustrate the capability of the forensic framework to organize detected symbolic signals into structured analytical datasets capable of later examination for recurrence, relatedness, temporal spread, and continuity.

[C.9-3]     This Supplement does not assert the existence of RICO predicates, continuity, enterprise structure, relatedness, or liability. Any such determination would occur only after full evidentiary presentation, doctrinal analysis, and adjudication at the appropriate procedural stage.

## COMPLAINT AND APPENDIX CROSS-REFERENCES

| Section | Relevance |
|---|---|
| Count III ¶¶ 100–111 | Declaratory framework for racketeering-pattern capability |
| Appendix A.8 | Civil RICO predicate continuity and declaratory doctrine |
| Appendix A.9 | Declaratory relief clarification; RICO standing reserved |
| Appendix C.7 | Traceability and source-event linkage |
| Appendix C.8 | Temporal continuity and graph capability |

## II.    ANALYTICAL MAPPING FUNCTION

[C.9-4]    The forensic framework is capable of organizing recurring symbolic detections into structured analytical groupings that may later be examined for continuity-related features relevant to civil RICO analysis.

[C.9-5]    At a systems level, this capability includes the ability to:

- Record recurring symbolic detections across time;

- Associate detections with source environments and timestamps;

- Cluster related detections across broadcasts or appearances; and

- Represent event sequences in forms capable of later continuity review.

[C.9-6]    These capabilities are referenced solely to demonstrate that the alleged symbolic

rebroadcast patterns are not analytically abstract, but are capable of structured

forensic organization and later continuity-related evaluation.

## III.    CONTINUITY-RELEVANT DATASET FORMATION

[C.9-7]    The analytical system is capable of producing datasets that organize symbolic

detections according to recurrence, proximity, sequence, and source association.

[C.9-8]    Such datasets may later support examination of whether recurring symbolic practices

are:

- Isolated or repeated;

- Temporally clustered or temporally sustained;

- Source-specific or distributed across multiple media contexts; and

- Structurally related to other recurring symbolic event records.

[C.9-9]    At the declaratory stage, no inference is requested regarding whether any such dataset

establishes statutory continuity or relatedness.

## IV.          PREDICATE-CONTINUITY MAPPING CAPABILITY

[C.9-10]    The framework is capable of organizing event records in a manner that may later

assist counsel, experts, or the Court in evaluating whether alleged symbolic

rebroadcast practices are susceptible to continuity-related analysis under the civil

RICO framework pleaded in Count III and discussed in Appendix A.8.

[C.9-11]    This capability includes the ability to map structured event records to later analytical

questions concerning:

- Repetition over time;

- Persistence across media channels;

- Recurrence within defined periods; and

- Structural relatedness among recorded symbolic events.

[C.9-12]    This mapping function is technical and organizational only. It does not itself classify

any event as a predicate act, nor does it establish that any continuity standard has

been satisfied.

## V.        CONTINUITY MAPPING TABLE

[C.9-13]    The following table summarizes the principal continuity-related mapping capabilities

of the forensic framework.

| CIVIL RICO CONTINUITY MAPPING SUMMARY | | |
|---|---|---|
| **Analytical Capability** | **Technical Function** | **Potential Later Use (If Reached)** |
| Recurrence logging | Records repeated symbolic detections across time | Later review of repeated symbolic event frequency |
| Temporal clustering | Groups detections by interval, period, or recurrence window | Later continuity-related examination |
| Cross-source pattern grouping | Groups similar symbolic detections across broadcasts or platforms | Later relatedness and persistence analysis |
| Sequence-chain formation | Organizes event records into ordered symbolic sequences | Later review of sustained or repeated conduct |
| Duration modeling | Measures recurrence across longer time horizons | Later evaluation of temporal continuity |
| Context-linked aggregation | Associates recurring detections with surrounding source context | Later structural analysis of continuity within media environments |
| Graph-based event mapping | Represents recurring events as linked nodes and edges | Later visualization of pattern continuity and relational structure |
| Summary dataset preparation | Organizes voluminous event records into structured compilations | Later expert review or Rule 1006 presentation, if appropriate |

[C.9-14]    This table is illustrative and organizational only. It does not prove statutory
continuity, predicate acts, or enterprise conduct.

## VI.　　　　　RELATION TO RICO DECLARATORY ARCHITECTURE

[C.9-15]　This Supplement should be read in conjunction with Appendix A.8 and Appendix A.9, which define the declaratory-stage limits of any civil RICO continuity discussion in this action.

[C.9-16]　Appendix C.9 does not expand or alter those limits. Its role is confined to showing that the technical framework is capable of producing continuity-relevant organizational structures if later proceedings require such analysis.

[C.9-17]　It therefore supports declaratory sequencing rather than merits adjudication.

## VII.　　　　RELATION TO OTHER APPENDIX C SUPPLEMENTS

[C.9-18]　Appendix C.9 is distinct from the other technical supplements:

- Appendix C.2 addresses methodological reliability;
- Appendix C.3 addresses authentication and chain of custody;
- Appendix C.4 addresses workflow structure;
- Appendix C.5 addresses detection capability and per se cross-reference;
- Appendix C.7 addresses traceability and forensic chain; and
- Appendix C.8 addresses temporal graph and structural continuity capability.

[C.9-19]    Appendix C.9 is limited to continuity-relevant forensic mapping in relation to the civil RICO framework pleaded elsewhere.

## VIII.    LIMITATION STATEMENT

[C.9-20]    This Supplement does not establish:

- The existence of any predicate act;

- Closed-ended or open-ended continuity;

- Enterprise structure;

- Relatedness under civil RICO; or

- Injury, standing, or liability.

[C.9-21]    It is presented solely to demonstrate that the analytical framework is capable of organizing recurring symbolic detections in a manner that may later be examined for continuity-related purposes if such proceedings are reached.

## IX.    CONCLUSION

[C.9-22]    The forensic framework referenced in the Complaint is capable of mapping recurring symbolic detections into structured analytical forms relevant to later continuity-related review under the civil RICO framework pleaded in Count III.

[C.9-23]    This capability is referenced solely for technical orientation and declaratory-stage sequencing, without requesting any present evidentiary ruling, factual finding, or liability determination.

## APPENDIX C.10    – SUPPLEMENT

## TECHNICAL COMPANION – AI FORENSIC & RICO PREDICATE CONTINUITY

## (CAPABILITY FRAMEWORK) (*TECHNICAL COMPANION TO APPENDIX A.12)*

## I.    PURPOSE AND SCOPE

[C.10-1]    This Supplement serves as a technical companion to **Appendix A.12** and describes how the forensic architecture referenced in **Appendix C** may be used to organize analytical materials relevant to later continuity-related and enterprise-related review, if such proceedings are reached.

[C.10-2]    The purpose of this section is to demonstrate methodological capability and structural integration between the technical and doctrinal components of the Complaint, without asserting that any statutory element, predicate act, continuity requirement, or enterprise feature has been satisfied.

[C.10-3]    This Supplement does not establish liability, predicate acts, continuity, enterprise

structure, or admissibility. It is provided solely to illustrate analytical capability and

inter-appendix structural integration.

## II.              TECHNICAL COMPANION FUNCTION

[C.10-4]    **Appendix C.10** consolidates, at a technical orientation level, the continuity-related

capabilities described in prior **Appendix C** supplements and relates them to the

broader declaratory and sequencing framework summarized in **Appendix A.12.**

[C.10-5]    Its role is not to introduce new technical methodology or doctrinal analysis, but to

clarify how the existing technical architecture is capable of supporting later

continuity-focused review under the procedural sequence preserved throughout the

Complaint.

[C.10-6]    In that respect, this Supplement functions as a bridge between:

- The technical workflow and traceability architecture described in Appendices
  C.2 through C.9; and

- The final doctrinal and remedial sequencing framework described in

  **Appendix A.12.**

## III.    INTEGRATED CONTINUITY-CAPABLE ARCHITECTURE

[C.10-7]    Read together, the Appendix C supplements describe a technical architecture capable

of:

- Detecting symbolic event candidates;

- Preserving structured records and associated metadata;

- Tracing event lineage across sources and time periods;

- Grouping events into recurrence-based datasets;

- Modeling temporal and relational continuity; and

- Organizing outputs in forms capable of later expert, summary, or

  continuity-related review.

[C.10-8]    This integrated architecture does not itself establish that any recurring symbolic

pattern satisfies any civil RICO requirement. It demonstrates only that the technical

framework is capable of generating organized analytical structures through which

such questions may later be examined.

## IV.  COMPANION SUMMARY OF APPENDIX C FUNCTIONS

[C.10-9]  The following summary identifies the principal role of the preceding **Appendix C**

supplements as they relate to later continuity-oriented analysis.

| APPENDIX C FUNCTIONAL COMPANION SUMMARY | | |
|---|---|---|
| **Appendix C Supplement** | **Primary Technical Function** | **Potential Later Continuity-Related Use (If Reached)** |
| C.2 | Methodological reliability framework | Supports later evaluation of analytical consistency and expert methodology |
| C.3 | Authentication, integrity, and evidentiary readiness | Supports later authentication and preservation review |
| C.4 | Operational workflow and analytical process | Supports understanding of how structured event outputs are generated |
| C.5 | Detection capability and doctrinal cross-reference | Supports later comparison of symbolic detections to pleaded legal categories |
| C.6 | Technical–doctrinal linkage matrix | Supports later organization of technical outputs relative to pleaded legal theories |
| C.7 | Traceability and forensic chain | Supports later reconstruction of event lineage and source-to-output continuity |
| C.8 | Temporal graph and structural continuity capability | Supports later review of recurrence, clustering, and temporal spread |
| C.9 | Civil RICO continuity-related forensic mapping | Supports later organization of recurrence datasets relevant to continuity analysis |

[C.10-10]  This summary is organizational only. It does not convert any technical capability into

a factual conclusion or legal determination.

## V.        RELATION TO APPENDIX A.12

[C.10-11]  **Appendix A.12** serves as the final doctrinal closer, integrating the declaratory architecture, constitutional boundaries, sequencing limitations, and forward-looking legal framework of the Complaint.

[C.10-12]  This **Appendix C.10** is included to demonstrate that the technical materials described in **Appendix C** are capable of fitting within that final architecture in an orderly and non-speculative manner.

[C.10-13]  More specifically, this Supplement supports the limited proposition that the technical framework described in **Appendix C** is capable of later interfacing with the continuity-related, sequencing-related, and declaratory-limit principles preserved in **Appendix A.12**, without collapsing technical capability into proof.

## VI.       PROCEDURAL SEQUENCING CLARIFICATION

[C.10-14]  This Supplement preserves the procedural sequence adopted throughout the Complaint:

1. **Declaratory Stage:** Legal capability and legal classification only;

2. **Appendix B:** Factual contextualization and plausibility structure;

3. **Appendix C: Technical** capability, reproducibility, traceability, and organizational readiness;

4. **Later Proceedings, If Reached:** Evidentiary development, expert presentation, and adjudication of statutory or remedial issues.

[C.10-15]  Nothing in this Supplement alters that sequence or requests premature evaluation of datasets, continuity, enterprise structure, or statutory elements.

## VII.        LIMITATION STATEMENT

[C.10-16]  This Supplement does not establish:

- Any predicate act;

- Continuity under 18 U.S.C. § 1961(5);

- Any association-in-fact enterprise;

- Any evidentiary foundation under the Federal Rules of Evidence; or

- Any present entitlement to relief.

[C.10-17]  It is included solely to demonstrate that the technical architecture pleaded in **Appendix C** is capable of later continuity-oriented analytical deployment in a manner consistent with the Complaint's broader declaratory and sequencing framework.

## VIII.     CONCLUSION

[C.10-18] **Appendix C.10** confirms that the technical framework described across the Appendix C supplements is capable of integrated analytical deployment relevant to later continuity-focused review, if such proceedings are reached.

[C.10-19] It serves only as a companion orientation section to **Appendix A.12** and does not request any present evidentiary ruling, factual finding, or statutory determination.

## APPENDIX C.11     - SUPPLEMENT
## SYSTEM-LEVEL PREDICATE MAPPING & RICO STRUCTURAL SYNTHESIS
## (TECHNICAL COMPANION TO APPENDIX A.12; SUPPORTING COUNT III)

## IX.     PURPOSE AND SCOPE

[C.11-1] This Supplement provides a final technical orientation showing how the analytical framework described in **Appendix C** is capable of organizing symbolic broadcast materials into structured datasets suitable for later pattern-based review, if such proceedings are reached.

[C.11-2]    Its purpose is limited to demonstrating structural capability and inter-appendix

coherence. It does not establish predicate acts, continuity, enterprise structure,

admissibility, or liability.

## X.              SYSTEM-LEVEL SYNTHESIS

[C.11-3]    Read together, **Appendices C.2** through **C.10** describe a technical framework capable

of:

- Generating structured symbolic event records from media-derived inputs;

- Preserving traceable relationships between source materials and analytical

  outputs;

- Organizing recurring symbolic detections across time, source, and context;

  and

- Compiling such records into datasets capable of later continuity-oriented and

  pattern-oriented review.

[C.11-4]    This integrated structure is referenced solely to demonstrate that the symbolic

practices alleged in the Complaint are capable of systematic forensic organization and

later analytical evaluation under ordinary procedural rules.

## XI.           RELATION TO APPENDIX A.12

[C.11-5]    **Appendix A.12** provides the final doctrinal and sequencing synthesis of the

Complaint. This Supplement serves as its technical companion by showing that the

forensic framework is capable of interfacing with that doctrinal structure in an orderly

and non-speculative manner.

[C.11-6]    More specifically, this Supplement supports the limited proposition that the technical

architecture is capable of organizing symbolic broadcast materials into structured

analytical forms that may later be evaluated under the continuity-related and pattern-

related legal frameworks preserved elsewhere in the pleading, if such proceedings are

reached.

## XII.          DECLARATORY-STAGE LIMITATION

[C.11-7]    At the declaratory stage, the Court is not asked to determine predicate acts, continuity,

relatedness, enterprise structure, or statutory satisfaction.

[C.11-8]    It is sufficient that the analytical framework described herein is capable of organizing

symbolic broadcast materials into structured datasets suitable for later pattern-based

analysis without requiring any present evidentiary ruling or factual finding.

# XIII.        CONCLUSION

[C.11-9]    This Supplement confirms that the technical framework described across **Appendix C** is capable of structured, reproducible, and continuity-aware organization of symbolic broadcast materials for later analytical review, if such proceedings are reached.

[C.11-10]  It is presented solely for judicial orientation and does not establish predicate acts, continuity, enterprise structure, admissibility, or liability at the declaratory stage.

## APPENDIX D –

## SUCCESSOR LIABILITY & STRUCTURAL CONTINUITY ORIENTATION

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57


Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

# APPENDIX D -
# SUCCESSOR LIABILITY & STRUCTURAL CONTINUITY ORIENTATION
# (CROSS-REFERENCED FROM COUNT IV ¶¶112–122; PRAYER FOR RELIEF ¶136 (g)-(i))

## I.     PURPOSE AND DECLARATORY LIMITATION

[D.1-1]    This **Appendix D** provides structural orientation concerning successor liability, corporate restructuring, and continuity of operational control, as referenced in Count IV **¶¶112–122.**

[D.1-2]    Its function at the declaratory stage is limited to clarifying the **legal capability of binding successor, transferee, spin-off, and acquiring entities** to any declaratory determinations entered by this Court, if such determinations are later warranted.

[D.1-3]    This **Appendix D** does not adjudicate liability, damages, predicate acts, enterprise structure, or operational continuity. Those matters remain reserved for later procedural stages.

[D.1-4]    This Appendix exists solely to preserve **redressability, continuity of declaratory scope, and the enforceability of judicial relief** in the context of corporate restructuring, consistent with the Declaratory Judgment Act and **Fed. R. Civ. P. 25(c).**

## II.    WHY CORPORATE RESTRUCTURING CREATES A PRESENT CONTROVERSY
## (COUNT IV ¶¶112–122)

[D.1-5]    Count IV alleges that media enterprises regularly engage in mergers, spin-offs, asset transfers, licensing arrangements, and corporate restructuring **(¶114).**

[D.1-6]    Such restructuring may separate or reallocate:

- Broadcast operations

- Editorial functions

- Archive ownership

- Distribution infrastructure

- Metadata control

- Corporate parent entities

[D.1-7]    Where alleged conduct spans multiple ownership transitions **(¶117–120),** a present controversy exists regarding whether **responsibility follows operational continuity rather than formal corporate structure**.

[D.1-8]    Declaratory clarification is necessary to prevent fragmentation of responsibility

through transactional restructuring **(¶118–120).**


## III.    SUCCESSOR / TRANSFEREE BINDING MECHANISMS (COUNT IV ¶¶116–120)

[D.1-9]    **Fed. R. Civ. P. 25(c)** provides that if an interest is transferred, an action may continue

against the original party unless the Court orders substitution of the transferee.


[D.1-10]    **Rule 25(c)** preserves procedural continuity where operational control, assets, or

business functions are transferred during litigation.


[D.1-11]    Declaratory clarification at this stage preserves the Court's authority to bind

successors inheriting relevant operational functions, if later warranted.


[D.1-12]    This Appendix does not seek substitution of parties at this stage but preserves the

structural pathway for such substitution if warranted by future developments.

# IV.    OPERATIONAL CONTINUITY DOCTRINES

## (COUNT IV ¶¶117–120)

[D.1-13]    **Golden State Bottling Co. v. NLRB, 414 U.S. 168 (1973),** recognizes that a successor entity may be bound where continuity of operations exists and the successor had notice of potential liability.

[D.1-14]    **United States v. Bestfoods, 524 U.S. 51 (1998),** confirms that corporate form does not shield responsibility where operational control or continuity is maintained.

[D.1-15]    Count IV alleges continuity across successive corporate ownership structures **(¶117–120).**

[D.1-16]    Declaratory clarification is sought solely to determine whether responsibility, if later established, may follow operational continuity across restructuring events.

[D.1-17]    This Appendix does not determine that continuity exists; it preserves the legal framework under which continuity may be evaluated.

# V.         STRUCTURAL PATTERNS THAT MAY FRAGMENT RESPONSIBILITY

## (COUNT IV ¶¶114, 118–120)

[D.1-18]   Modern media enterprises frequently restructure through:

- Spin-offs

- Asset transfers

- Licensing arrangements

- Archive divestitures

- Shared-service structures

- Affiliate distribution agreements

[D.1-19]   These transactions may separate formal ownership from functional operations.

[D.1-20]   Absent declaratory clarification, such restructuring may create a risk of **fragmented responsibility despite underlying operational continuity**.

[D.1-21]   Declaratory recognition of successor-binding principles mitigates this structural fragmentation risk **(¶118–120).**

## VI.      DECLARATORY RELIEF UTILITY

## (COUNT IV ¶¶115, 118–120; PRAYER FOR RELIEF ¶136(g)–(i))

[D.1-22]    Count IV seeks a declaration that responsibility, if later substantiated, may extend to successor or transferee entities inheriting relevant operational functions (¶115).

[D.1-23]    Such declaratory clarification does not impose liability or damages at this stage.

[D.1-24]    Rather, it preserves the continuity of declaratory scope and enforceability of judicial relief across restructuring events.

[D.1-25]    This preserves redressability and judicial economy in light of ongoing or anticipated restructuring activity **(¶118–120; ¶136(g)–(i)).**

## VII.      CONSTITUTIONAL SAFEGUARDS AND ANTI-CIRCUMVENTION PRINCIPLES

[D.1-26]    The declaratory relief sought in **Count IV** operates to preserve not only redressability, but also the Court's ability to render effective relief consistent with **Article III** and the Declaratory Judgment Act.

[D.1-27]    Absent such clarification, corporate restructuring, asset transfers, or operational

fragmentation may create a risk that judicial determinations could be functionally

circumvented through changes in formal ownership.

[D.1-28]    The principles reflected in **Fed. R. Civ. P. 25(c),** together with established continuity

doctrines, ensure that judicial authority is not defeated by post-filing restructuring or

transactional reorganization.

[D.1-29]    Declaratory clarification preserves the Court's capacity to bind successor or transferee

entities to any determinations entered, if later warranted, thereby preventing evasion

of judicial relief through corporate form alone.

[D.1-30]    This section does not assert that any party has engaged in such circumvention. It

identifies only the structural risk inherent in ongoing or anticipated restructuring.

## VIII.      PROCEDURAL SEQUENCING GUARDRAILS (COUNT IV ¶¶121–122; COUNT III ¶¶100–111 REFERENCED FOR SEQUENCING COHERENCE)

[D.1-31]   At the declaratory stage, the Court is asked only to clarify the legal capability of successor binding under applicable continuity principles.

[D.1-32]   No adjudication of liability, damages, predicate acts, enterprise structure, or factual continuity is requested at this stage.

[D.1-33]   Issues of operational continuity, notice, control, or asset inheritance will be evaluated, if necessary, during discovery and subsequent proceedings.

## IX.      STRUCTURAL CROSS-REFERENCE MAP

[D.1-34]   This Appendix D corresponds directly to:

- **Count IV ¶¶112–122** (Continuity of Declaratory Scope and Transfer-of-Control Anti-Circumvention)
- **Prayer for Relief ¶136(g)–(i)** (Successor-control continuity and structural enforcement safeguards)

[D.1-35]    This **Appendix D** further corresponds to Prayer for Relief **¶136(e), (g), (h), (i), and**

**(j),** which preserve the Court's authority, if later warranted, to ensure that any

declaratory determination entered in this action remains practically effective

notwithstanding successor control, restructuring, or transfer of the implicated

operations, archives, distribution systems, or related functional assets.

[D.1-36]    This **Appendix D** does not expand **Counts I–V** on the merits and does not request

present imposition of liability, damages, or operative structural remedies. It operates

solely to preserve redressability, continuity of declaratory scope, and the Court's

capacity to consider later compliance-oriented, successor-binding, or anti-

circumvention measures if warranted in subsequent proceedings.

## X.          CONCLUSION

[D.1-37]   **Appendix D** establishes that successor binding, operational continuity, and

restructuring risk present a justiciable controversy appropriate for declaratory

clarification.

[D.1-38]   It preserves the legal framework under which responsibility may follow operations

through restructuring, without collapsing evidentiary proof, enterprise findings, or

predicate analysis into the present stage.

[D.1-39]   Its function is structural and forward-looking, ensuring that corporate form does not

defeat the availability of effective judicial relief.

[D.1-40]   In that limited sense, **Appendix D** preserves the structural conditions under which

any later judicial or stipulated implementation measures may remain effective despite

successor control, reorganization, or functional transfer of implicated operations.

# APPENDIX E – TECHNICAL EVIDENTIARY FRAMEWORK

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57


Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

## APPENDIX E –
## TECHNICAL EVIDENTIARY FRAMEWORK
## *(CROSS-REFERENCED FROM APPENDIX A.1 ¶¶ 17–18;*
## *APPENDICES C.7–C.10; COUNT III ¶¶ 100–111)*

### I.          PURPOSE

[E.1-1]     This **Appendix E "Technical Evidentiary Framework (FRE 401–403, 901, 702,
803(6), 1006)"** defines the evidentiary architecture supporting Plaintiff's symbolic-
defamation and racketeering claims. It identifies the controlling Federal Rules of
Evidence, **401–403 (relevance / probative value), 901 (authentication), 702 (expert
reliability), 803(6) (business records), 1006 (summaries),** and specifies the
sequential admissibility process designed for a forward-looking Declaratory
Judgment posture.

[E.1-2]     Because the **Complaint** seeks **declaratory,** not monetary, relief, at this stage, these
evidentiary standards serve a dual role: (1) demonstrating that Plaintiff's proffered
materials are *capable* of satisfying Daubert / FRE thresholds, and (2) providing the
Court confidence that full admissibility can be achieved once discovery is opened
under Rule 26.

### II.          EVIDENTIARY ARCHITECTURE OVERVIEW

[E.1-3]     Evidence is organized into four interoperable strata:

| EVIDENTIARY ARCHITECTURE OVERVIEW (FRE 401–403, 901, 702, 803(6), 1006) | | | |
|------|-----------|----------|---------|
| **Tier** | **Component** | **FRE Anchor** | **Purpose** |
| Tier 1 | Forensic AI Detections (Clarifai + Transformer Models) | 401, 702 | Establish existence of coordinated symbolic rebroadcasts |
| Tier 2 | Sworn Affidavits (Exhibit B) | 602, 701 | Verify human recognition "of and concerning" Plaintiff |
| Tier 3 | Documentary Corroboration (Exhibits D1–D6) | 803(8), 201 | Supply institutional motive / context |
| Tier 4 | Forensic Gesture Ledger (Exhibit A + JSON Audit Trail) | 901, 1006 | Summarize voluminous detections into authenticated charts |

[E.1-4]    Together these strata form a **closed evidentiary ecosystem**, permitting judicial review without conflating technical details with pleading substance.

## III.    FRE 401–403 ANALYSIS (RELEVANCE & PROBATIVE VALUE)

[E.1-5]    Under FRE 401, evidence is relevant if it tends to make a consequential fact more or less probable.

**AI detections** and **witness affidavits** jointly increase the probability that (a)

**symbolic rebroadcasts occurred,** (b) **audiences recognized** them as referring to

Plaintiff, and (c) such rebroadcasts were coordinated.

[E.1-6]    Rule 403 balancing favors admission:

- **Probative weight:** Continuity across two decades and multiple enterprises.

- **Prejudice:** Minimal, because the datasets are factual recordings rather than narrative argument.

- **Confusion risk:** Mitigated by Appendix-level segregation and plain labeling.

[E.1-7]    Accordingly, the framework is structured so that, at the appropriate procedural stage and consistent with **Fed. R. Evid. 401–403**, the materials may be evaluated for relevance and probative value without requiring premature evidentiary rulings at the declaratory stage.

## IV.    FRE 901 (AUTHENTICATION)

[E.1-8]    Authentication combines digital and testimonial verification:

- **Digital Hashing & Metadata Signatures:** Each media file carries a SHA-256 hash and capture timestamp; verified during audit **(Exhibit C-3).**

- **Affiant Testimony:** Affidavits include sworn statements identifying the specific broadcast, gesture, or color code observed.

- **System Process Integrity:** Clarifai and Transformer model configurations are logged with version numbers and reproducible seeds.

[E.1-9]    Together these elements fulfill **FRE 901(b)(4)** (distinctive characteristics) and **901(b)(9)** (process / system authentication). See *Lorraine v. Markel Am. Ins. Co.*, **241 F.R.D. 534 (D. Md. 2007).**

## V.            FRE 702 AND DAUBERT RELIABILITY

[E.1-10]    The expert component rests on reproducible methodology, documented error rates, and peer-reviewed models.
Each detection record includes model version, confidence score, human verification log, and error-margin entry.

[E.1-11]    The system's documented testability, peer-review foundations, error-rate transparency, standards controls, and general acceptance characteristics are structurally described in **Appendices C.7 and C.9.** The architecture is designed so that, when introduced through qualified expert testimony at the appropriate procedural stage and consistent with **Fed. R. Evid. 702** and **Daubert**, the outputs may be evaluated for reliability and helpfulness to the trier of fact without requiring adjudication at the declaratory stage.

## VI.            FRE 803(6) (BUSINESS RECORDS EXCEPTION)

[E.1-12]    Automated logging of detections, validations, and archival entries forms part of the

regular data-collection practice of Plaintiff's forensic workflow.

Because logs are contemporaneously generated and maintained in the ordinary course

of analysis, they qualify as **business records** under FRE 803(6).

[E.1-13]    Certifications accompanying each data batch **(Exhibit B- Affidavit of Custodian)**

further ensure admissibility without live testimony, consistent with Rule 902(11)

**(self-authenticating business-record certification**).

## VII.            FRE 1006 (SUMMARIES OF VOLUMINOUS DATA)

[E.1-14]    The **Forensic Gesture Ledger (Exhibit A)** and **Forensic Binder (Exhibit C)** are

structured to summarize voluminous broadcast-frame datasets and corresponding

transcript materials preserved in hashed archival form.

**Fed. R. Evid. 1006** permits the presentation of summary charts when underlying

materials are voluminous, provided the originals or duplicates are available for

inspection at a reasonable time and place.

[E.1-15]    The underlying datasets are preserved with SHA-256 verification in Write-Once

archival storage (WORM-storage drives) and remain available for inspection and

reproduction at the appropriate procedural stage, consistent with **Rule 26 and Rule**

**1006** foundation requirements.

# VIII.        RULE 26 DISCLOSURE AND DISCOVERY SEQUENCING

[E.1-16]    In subsequent proceedings, consistent with **Fed. R. Civ. P. 26(b)(1),** Plaintiff's evidentiary architecture is structured to permit phased and proportional production of:

(a) Representative gesture-video sets,

(b) Associated metadata hash tables and audit logs, and

(c) Expert validation summaries documenting model reproducibility and error metrics.

[E.1-17]    The system is designed to allow **stratified sampling** and **scalable dataset** expansion, ensuring **proportionality** while preserving the integrity of the underlying hashed corpus.

[E.1-18]    Such **phased disclosure** aligns with proportional discovery principles recognized in complex ESI litigation within this District, including methodologies that balance completeness, reproducibility, and burden management. The underlying archival materials remain preserved in authenticated form, enabling expansion of production upon appropriate request or court order without compromising chain-of-custody integrity.

[E.1-19]    This phased production mirrors best practices endorsed in *Zubulake v. UBS Warburg LLC*, **217 F.R.D. 309 (S.D.N.Y. 2003),** ensuring efficiency and fairness while preserving chain-of-custody integrity.

## IX.    STRUCTURAL CONTINUITY AND EVIDENTIARY PRESERVATION

[E.1-20]    The evidentiary architecture described herein is structured not only to support admissibility under the Federal Rules of Evidence, but also to preserve continuity of evidentiary integrity across corporate restructuring, asset transfers, and changes in operational control.

[E.1-21]    Because the underlying datasets are preserved through cryptographic hashing, audit logs, and reproducible model configurations, the evidentiary record remains functionally intact regardless of the identity of the entity maintaining custody of the relevant broadcast, archive, or distribution systems.

[E.1-22]    This structural continuity aligns with the principles described in **Appendix D (Successor Liability & Structural Continuity Orientation),** ensuring that evidentiary materials, if later offered, are capable of authentication, verification, and presentation notwithstanding successor control or organizational restructuring.

[E.1-23]    This section does not assert that any successor entity is liable or bound at this stage. It demonstrates only that the evidentiary architecture is capable of supporting continuity of authentication and presentation across structural transitions, consistent with **Fed. R. Evid. 901 and Fed. R. Civ. P. 25(c).**

## X.    TRANSITION FROM DECLARATORY TO DAMAGES PHASE

[E.1-24]    Declaratory classification under **Count III ¶¶ 100–111** preserves the evidentiary architecture and clarifies the legal capability of the alleged conduct, without adjudicating admissibility, predicate commission, or damages.

[E.1-25]    At subsequent procedural stages, the preserved record may be evaluated under **Fed. R. Evid. 702, 901, 803(6), and 1006**, consistent with **Rule 26** and **Rule 56.**

[E.1-26]    This staged approach preserves judicial economy and avoids premature Daubert hearings, aligning with ***MedImmune v. Genentech*, 549 U.S. 118 (2007)** (declaratory jurisdiction appropriate where evidence is imminent and controversy real).

# XI.    EVIDENTIARY CROSS-REFERENCES

[E.1-27]    Evidentiary Cross-References:

| EVIDENTIARY CROSS-REFERENCES | | |
| --- | --- | --- |
| **Referenced Appendix / Exhibit** | **Purpose in Framework** | **FRE Anchor** |
| Appendix A.1 ¶¶ 17–18 | Establishes doctrinal basis for AI evidence | 702, 901 |
| Appendix C (AI Reliability Extract) | Documents Daubert criteria | 702 |
| Appendix D (Structural Continuity) | Preserves enforceability of evidentiary architecture across restructuring | 901, Rule 25(c) |
| Appendix B (Timeline) | Correlates rebroadcast chronology | 401, 403 |
| Exhibit A (Gesture Ledger) | Summaries of voluminous detections | 1006 |
| Exhibit B (Affidavits) | Lay recognition of Plaintiff identity | 602, 701 |
| Exhibit C (Forensic Binder) | Audit trail / chain of custody | 803(6), 901 |
| Exhibits D1–D6 | Contextual institutional records | 803(8), 201 |

## XII.          CONCLUSION

[E.1-28]    This Technical Evidentiary Framework demonstrates that Plaintiff's forensic AI detections, affidavits, and corroborative materials are structured to satisfy the relevance, reliability, and authentication requirements of the Federal Rules of Evidence when presented at the appropriate procedural stage.

[E.1-29]    It further demonstrates that the evidentiary architecture is preserved in a manner capable of maintaining integrity, reproducibility, and authentication continuity notwithstanding corporate restructuring, successor control, or transfer of operational assets, consistent with **Appendix D** and the declaratory relief framework.

[E.1-30]    Its inclusion at the declaratory stage serves only to orient the Court to the existence of a structured, reproducible, and preservable evidentiary system, without requesting any present determination of admissibility, liability, or evidentiary weight.

# APPENDIX F – COMPARATIVE MEDIA LAW & SYMBOLIC

# EXPRESSION DOCTRINE

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No.** _____

**APPENDIX F –**

**COMPARATIVE MEDIA LAW & SYMBOLIC EXPRESSION DOCTIRNE**

**(CROSS-REFERENCED FROM COUNT I ¶¶ 62-86;**

**SUPPORTING APPENDIX A.1–A.4)** *(CROSS-REFERENCED*

*FROM APPENDIX A.1 ¶A1-10 AND A.4 ¶A4-6; SUPPORTING*

*COUNT I)*

## I.    PURPOSE AND SCOPE

[F.1-1]    This **Appendix F** consolidates U.S. and European authorities governing **defamation by implication or innuendo**, symbolic speech limitations, and the line between **protected satire** and **defamatory identification**. It demonstrates that non-verbal or coded expression, when reasonably understood by audiences to refer to a specific person, constitutes **actionable defamation** *per se* under the First Amendment's established boundaries.

[F.1-2]    The materials summarized herein supply the comparative doctrinal support for Plaintiff's declaratory request that symbolic gestures, color codes, and non-verbal

identifiers "of and concerning" Plaintiff are legally capable of constituting actionable communications under **Restatement (Second) of Torts § 564**.

## II.        U.S. DOCTRINAL FOUNDATIONS – DEFAMATION BY IMPLICATION AND SYMBOLIC SPEECH

[F.1-3]    American courts long recognize that *defamation may arise from insinuation, gesture, or implication* even without explicit words:

- **Bindrim v. Mitchell, 92 Cal. App. 3d 61 (1979):** A novelist's fictional portrayal of a therapist, thinly disguised but recognizable, was held actionable because "the test is whether a reasonable reader would understand the character to be the plaintiff."

- **Geisler v. Peters, 27 Cal. App. 4th 489 (1994):** Defamation exists where Implication creates a false impression; liability attaches even absent literal falsehood.

- **Clark v. Am. Broad. Cos., 684 F.2d 1208 (6th Cir. 1982):** Broadcast implication that plaintiff was part of a criminal scheme was actionable despite lack of direct statement.

- **Milkovich v. Lorain Journal Co., 497 U.S. 1 (1990):** Opinions implying an assertion of objective fact (e.g., dishonesty) are not shielded by the First Amendment.

[F.1-4]   Courts have also extended liability to **symbolic or visual conduct** that carries defamatory meaning. **See *Newton v. NBC*, 930 F.2d 662 (9th Cir. 1990)** (film editing implying criminality actionable); ***Le Maire v. Harrah's Club*, 777 F. Supp. 1183 (D. Nev. 1991)** (symbolic ridicule). The decisive test is the audience's reasonable interpretation, not the speaker's literal phrasing.

[F.1-5]   Thus, under U.S. law, a symbolic gesture or visual cue constitutes defamation by implication when:

- **A reasonable viewer** associates it with a specific, identifiable person;

- **The symbol conveys** a factual assertion susceptible of truth/falsity; and

- **The context indicates** intent or reckless disregard for reputational harm.

- These conditions are satisfied in symbolic-rebroadcast schemes where coded gestures consistently appear adjacent to references to Plaintiff.

## III.    DEFAMATION PER SE AND CONSTRUCTIVE IDENTITY

[F.1-6]    U.S. courts classify accusations imputing **criminality, immorality, mental illness, or professional incompetence** as *defamation per se,* injury presumed by law. See ***Restatement § 570***; ***Balboa Island Village Inn v. Lemen***, **40 Cal. 4th 1141 (2007).** When gestures or codes communicate those categories through implication, they fit squarely within the *per se* framework.

[F.1-7]    Under **Restatement § 564**, a plaintiff need not be named if an average viewer reasonably understands the communication as referring to them. This "constructive identity" doctrine, adopted in *Bindrim* and reaffirmed in ***Fetler v. Houghton Mifflin Co.*, 364 F.2d 650 (2d Cir. 1966), supports liability for unnamed but clearly identifiable subjects.**

## IV.    LIMITS OF SATIRE AND SYMBOLIC SPEECH PROTECTION

[F.1-8]    While the First Amendment safeguards artistic and satirical expression, those protections end when symbolic acts convey defamatory falsehoods as factual representations. See ***Hustler Magazine v. Falwell*, 485 U.S. 46 (1988)** (distinguishing parody from false assertion of fact).

[F.1-9]    **Courts assess context and audience perception**: when satire becomes an organized signaling mechanism targeting an identifiable person, its expressive value yields to

the state's compelling interest in protecting reputation and deterring coordinated falsehoods.

# V.       EUROPEAN AND INTERNATIONAL COMPARATIVE FRAMEWORK

[F.1-10]   European human-rights jurisprudence parallels U.S. doctrine in balancing expression and reputation.

- **ECHR Art. 8** protects private life and reputation.

- **ECHR Art. 10** protects expression but allows restrictions "for the protection of the reputation or rights of others."

[F.1-11]   Key precedents:

- **Pfeifer v. Austria, ECtHR App. No. 12556/03 (2007)**: States must provide effective remedies against false insinuations harming reputation.

- **Axel Springer AG v. Germany, ECtHR App. No. 39954/08 (2012)**: Balancing test considers (1) public interest, (2) factual accuracy, (3) form and impact of publication.

- **Von Hannover v. Germany (No. 2), ECtHR App. Nos. 40660/08 & 60641/08 (2012)**: Even public figures retain protection against

unnecessary exposure when the content serves no legitimate public concern.

- **ICCPR Article 17** – Prohibits "unlawful attacks on honor and reputation."

[F.1-12]   These authorities affirm that **symbolic or insinuative publications** are actionable when they construct a false association or moral discreditation without legitimate public justification, closely mirroring *Milkovich*'s distinction between opinion and factual implication. In addition, **International jurisprudence** confirms that **protecting reputation** from **insinuation and contextual defamatory imagery does not violate free-expression principles; rather, it enforces proportional balance.**

## VI.        CROSS-JURISDICTIONAL CONVERGENCE

[F.1-13]   Both systems converge on three propositions relevant to this case:

- *Reputation is a legally protected interest* under both constitutional orders.

- *Symbolic or indirect identification* can satisfy the "of and concerning" element.

- *Systemic or coordinated repetition* elevates harm to a level justifying heightened judicial intervention (injunction or declaratory relief).

[F.1-14]    Hence, recognition of Plaintiff's claim harmonizes with transnational norms rather than expanding liability.

## VII.        COMPARATIVE TREATMENT OF MEDIA ENTERPRISES

[F.1-15]    In both jurisdictions, media entities may invoke editorial freedom but remain accountable where repetition of defamatory identifiers demonstrates **reckless disregard** (*New York Times v. Sullivan*, 376 U.S. 254 (1964)) or **failure of journalistic due diligence** (*Bladet Tromsø v. Norway*, ECtHR App. No. 21980/93 (1999)).

[F.1-16]    When such **repetition becomes routinized**, as through **recurring gestures or coded references**, liability attaches not for isolated speech but for the enterprise's **pattern of negligent republication**, paralleling the *RICO continuity* element later developed in Count III.

## VIII.        APPLICATION TO SYMBOLIC REBROADCAST SCHEME

[F.1-17]    The long-term, cross-platform recurrence of identical gestures and color codes, as alleged in **Count I ¶¶ 62-86** and summarized in **Appendix B (Table 1 and Table 2A-2E),** is legally capable of constituting defamation by implication per se where a reasonable audience understands such cues to identify a specific private individual and to convey imputations of criminality, instability, sexual impropriety, or professional unfitness.

[F.1-18]    Affidavits preserved in **Exhibit B** and forensic summaries referenced in **Appendix C** are structured to document audience-recognition evidence in a format capable of evaluation, at the appropriate procedural stage and consistent with **Fed. R. Evid. 401, 602, and 701**, for purposes of assessing whether symbolic communications are legally capable of satisfying the constructive identification standard articulated in **Restatement (Second) of Torts § 564**.

[F.1-19]    Nothing in this **Appendix F** adjudicates falsity, intent, or liability.

[F.1-20]    Accordingly, declaratory recognition that symbolic gestures and coded non-verbal identifiers are legally capable of constituting defamatory communications when reasonably understood as "of and concerning" Plaintiff would comport with both First Amendment doctrine **and ECHR Article 10(2) j**urisprudence.

[F.1-21]    Such recognition would constitute a narrowly tailored clarification of legal boundaries protecting reputational interests without intruding upon legitimate satire, commentary, or protected expression. Determinations of falsity, fault, damages, or remedial scope remain reserved for subsequent proceedings.

## IX.    ANALYTICAL SYNTHESIS AND APPLICATION

[F.1-22]    The combined U.S. and European doctrines yield three core propositions:

- **Contextual Meaning Rule:** Literal truth may still defame when context implies false facts.

- **Constructive Identification:** A plaintiff need not be named if a reasonable audience recognizes them.

- **Proportional Remedy:** Declaratory or injunctive relief is proper after liability finding to prevent repetition.

[F.1-23]    These propositions underpin the symbolic-defamation theory advanced in **Count I**, where non-verbal gestures and coordinated imagery communicate defamatory implications "of and concerning" the plaintiff.

## X.    NEW YORK AND SECOND CIRCUIT AUTHORITIES ON DEFAMATION BY IMPLICATION AND INNUENDO

[F.1-24]    **Doctrinal Purpose**

To align the national and comparative analysis with local precedent controlling in SDNY.

- ***Stepanov v. Dow Jones & Co., Inc.***, **120 A.D.3d 28 (1st Dep't 2014)** [1]

Defamation by implication arises when **juxtaposition of facts or omission of context creates a false impression**.

*Application:* Symbolic gestures that omit factual context operate identically, conveying untrue implications.

- **Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82 (2016)** [2]

  A broadcast is actionable when its overall import suggests defamatory meaning beyond literal truth.

  *Application:* Where symbolic gestures and coded visual cues are repeatedly deployed across broadcasts and contextualized in a manner reasonably understood by viewers as referring to a specific individual, such communications are legally capable of meeting the holistic-context analysis articulated in Three Amigos, subject to evidentiary development.

- *Church of Scientology Int'l v. Time Warner, Inc.*, **806 F. Supp. 1157 (S.D.N.Y. 1992)** [3]

  Identifiability may rest on circumstantial cues enabling recognition even without naming.

  *Application:* Supports constructive-identity theory central to Count I.

[F.1-25]    **Analytical Bridge**

These New York and Second Circuit cases mirror ***Restatement § 564*** by holding that

implication liability attaches when audiences reasonably understand the defamatory

inference to refer to the plaintiff.

[F.1-26]    Accordingly, **Count I** and **Appendix A.1** rest on both national precedent (***Bindrim***;

***Geisler***) and local SDNY/New York precedent (***Stepanov***; ***Three Amigos***; ***Church of***

***Scientology***). These decisions provide the Court with a familiar doctrinal foundation

for adjudicating symbolic defamation and implication-based liability.

[F.1-27]    **Cross-References:**

Complaint Count I ¶¶ 62–86; Appendix A.1 § II; Appendix E; Appendix C (C.2–

C.10); Exhibits A–C.

[F.1-28]    **Integration Note**

This **Appendix F** is incorporated by reference into **Count I** and **Appendix A.1**

pursuant to **Rule 10(c).** It demonstrates that symbolic and implication-based

defamation are recognized under U.S., New York, and comparative European and

international authorities, and that controlling Second Circuit and New York precedent

provides a doctrinal framework within which the symbolic-identification theory

pleaded in **Count I** is legally capable of judicial clarification and declaratory

evaluation at the appropriate procedural stage.

# XI.        CROSS-REFERENCES

[F.1-29]    Cross references:

| CROSS-REFERENCES | |
|---|---|
| **Linked Section** | **Purpose** |
| Count I ¶¶ 62-86 | Defines symbolic defamation and constructive identification as declaratory cause of action |
| Appendices A.1–A.4 | Doctrinal foundation and First Amendment boundary analysis |
| Appendix D | Structural successor and redressability preservation context (non-evidentiary) |
| Appendix E | Technical evidentiary framework supporting later proof stages |
| Exhibit A | Gesture Ledger documenting recurrence patterns |
| Exhibit B | Affidavits reflecting audience recognition |
| Appendix C (C.2–C.10) | Technical capability-to-substantiate architecture, including reliability, authentication, workflow, traceability, and continuity modeling (non-adjudicative) |

[F.1-30]    Cross-References:

- **Complaint Count I ¶¶ 62-86**

- **Appendix A.1 § II (Doctrinal Explanation – Defamation by Innuendo)**

- **Appendix E (Technical Evidentiary Framework)**

- **Exhibits A–C (Forensic Gesture Ledger and AI Detection Logs)**

[F.1-31]  This **Appendix F** should be read together with **Appendices A.8, D,** and **E,** and Prayer for **Relief ¶136(e), (g), (h), (i),** and **(j),** which collectively preserve the Court's ability, if later warranted, to ensure that any declaratory clarification of symbolic defamation principles remains practically effective across subsequent procedural stages.

[F.1-32]  **Appendix F** supplies the comparative doctrinal framework establishing that symbolic and implication-based communications are legally capable of constituting actionable defamation when "of and concerning" an identifiable individual. **Appendices D** and **E** preserve, respectively, the structural continuity and evidentiary integrity necessary to support such determinations if later proceedings require authentication, expert evaluation, or implementation.

[F.1-33]  At the declaratory stage, this **Appendix F** does not request a finding of falsity, fault, liability, or damages. It demonstrates only that the legal theory advanced in **Count I** is grounded in established U.S., New York, and comparative international doctrine and is capable of judicial clarification under **28 U.S.C. § 2201.**

## XII.        CONCLUSION

[F.1-34]    This comparative framework demonstrates that declaratory recognition of symbolic

defamation aligns with established U.S. and European law. Non-verbal innuendo can

constitute actionable defamation per se when the contextual meaning conveys false

factual imputation "of and concerning" the plaintiff. Judicial acknowledgment of this

principle preserves the integrity of reputational protection across jurisdictions and

furnishes a coherent doctrinal bridge for subsequent RICO and injunctive phases.


**Sequential Footnotes Appendix F**

[1] *Stepanov v. Dow Jones & Co., Inc., 120 A.D.3d 28, 34–35 (1st Dep't 2014).*
[2] *Three Amigos SJL Rest., Inc. v. CBS News Inc., 28 N.Y.3d 82, 86–87 (2016).*
[3] *Church of Scientology Int'l v. Time Warner, Inc., 806 F. Supp. 1157, 1160–61 (S.D.N.Y. 1992).*

# APPENDIX G – ANTICIPATORY DISCOVERY PLAN & RULE 26 MATRIX

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

**APPENDIX G –**

**ANTICIPATORY DISCOVERY FRAMEWORK & RULE 26 ORIENTATION**

**(CROSS-REFERENCED FROM APPENDIX E; COUNT III; AND PRAYER FOR RELIEF ¶136(E), (J))**

## I.        PURPOSE AND SCOPE

[G.1-1]    This **Appendix G** outlines a structured discovery framework capable of governing evidentiary expansion in subsequent proceedings, if such proceedings are reached, consistent with **Fed. R. Civ. P. 26** and any scheduling order entered by the Court.

[G.1-2]    Its purpose at the declaratory stage is limited to demonstrating that the preserved evidentiary architecture is capable of phased, proportional, and scalable disclosure under ordinary discovery principles.

[G.1-3]    This **Appendix G** does not request the opening of discovery at the declaratory stage and does not seek any present discovery order. It provides procedural orientation only.

## II.          RULE 26 ORIENTATION

[G.1-4]    If later proceedings are reached, discovery concerning the preserved evidentiary architecture may be structured in accordance with Fed. R. Civ. P. 26(b)(1), including proportionality, burden management, phased disclosure, and protection of electronically stored information.

[G.1-5]    The framework contemplates phased and proportional disclosure, beginning with limited representative materials and expanding, if warranted, through targeted discovery mechanisms consistent with SDNY practice.

[G.1-6]    This phased approach is intended to support judicial economy, preserve the integrity of the underlying record, and avoid unnecessary burden while maintaining a clear pathway to later evidentiary development if required.

## III.          ILLUSTRATIVE PHASING CONCEPT

[G.1-7]    The discovery framework is capable of proceeding through staged disclosure, such as:

- Representative source materials sufficient to orient the Court and parties to the preserved record;

- Structured metadata, audit, or preservation materials sufficient to demonstrate integrity and traceability; and

- Additional materials, if warranted, directed to recurrence, continuity, or related issues raised in subsequent proceedings.

[G.1-8]   Any such phasing would be implemented only at the appropriate procedural stage and only in a manner consistent with proportionality and the Court's supervision.

[G.1-9]   No present request is made for any specific production category, source, custodian, or search protocol.

## IV.         ESI PRESERVATION AND INTEGRITY PRINCIPLES

[G.1-10]  The preserved evidentiary architecture is capable of supporting integrity-preserving handling of electronically stored information through structured logging, metadata preservation, reproducibility controls, and source-to-output traceability.

[G.1-11]  If later proceedings require disclosure of electronic materials, such disclosure may be structured in a manner consistent with proportionality, preservation, and reproducibility principles recognized in complex ESI practice, including within this District.

[G.1-12]  This **Appendix G** does not disclose operational search logic, targeting methodology, or implementation-level collection procedures at the declaratory stage.

## V.          EXPERT AND EVIDENTIARY READINESS

[G.1-13]    If later proceedings require expert disclosure under **Fed. R. Civ. P. 26(a)(2),** the

preserved architecture is capable of supporting expert analysis concerning AI-assisted

detection methodology, traceability, and continuity-oriented media structure.

[G.1-14]    Likewise, the framework is capable of supporting later evidentiary presentation under

the Federal Rules of Evidence, including relevance, authentication, expert reliability,

and summary-use principles, as described in **Appendix E.**

[G.1-15]    At the declaratory stage, no expert disclosure, evidentiary submission, or

admissibility determination is sought.

## VI.          RELATION TO APPENDICES D AND E

[G.1-16]    **Appendix E** identifies the evidentiary architecture and Federal Rules framework

through which preserved materials may later be evaluated. **Appendix D** preserves the

continuity of declaratory scope and structural anti-circumvention principles necessary

to ensure that such materials are not rendered ineffectual through restructuring,

successor control, or transfer of implicated operations.

[G.1-17]    This **Appendix G** should be read together with **Appendices D** and **E** and Prayer for **Relief ¶136(e)** and **(j),** which collectively preserve the Court's ability, if later warranted, to permit orderly evidentiary development and to effectuate any declaratory determination entered in this action.

## VII.    DECLARATORY-STAGE LIMITATION

[G.1-18]    At the declaratory stage, the Court is not asked to order discovery, supervise production, resolve discovery disputes, or determine the adequacy of any search, collection, or preservation effort.

[G.1-19]    It is sufficient that the preserved evidentiary system described in the Complaint is capable of later phased disclosure and judicially manageable development under ordinary discovery principles, if such proceedings are reached.

## VIII.    CONCLUSION

[G.1-20]    This **Appendix G** demonstrates that the evidentiary architecture referenced in the Complaint is not speculative or administratively unmanageable, but is capable of

phased, proportional, and integrity-preserving disclosure under **Fed. R. Civ. P. 26** if later proceedings require such development.

[G.1-21]    Its inclusion at the declaratory stage serves only to orient the Court to the existence of a structured and scalable discovery framework, without requesting any present discovery order, merits determination, or evidentiary ruling.

# APPENDIX H – STRUCTURAL ENTERPRISE MAPPING (RICO)

In Support of:

Complaint for Declaratory Relief

28 U.S.C. § 2201; Fed. R. Civ. P. 57

Darrel Francis Anthony Jourdain v. Defendants

United States District Court

Southern District of New York

**Civil Action No. _____**

## APPENDIX H –

## STRUCTURAL ENTERPRISE MAPPING (RICO) (CROSS-REFERENCED FROM COUNT III ¶¶100–111; APPENDIX A.8; APPENDIX E; AND APPENDIX G)

## I.    PURPOSE AND DECLARATORY LIMITATION

[H.1-1]    This **Appendix H** provides a structural and analytical framework through which the Court may, for declaratory purposes only, evaluate whether the conduct alleged in Count III is legally capable of examination under the continuity and enterprise concepts reflected in **18 U.S.C. §§ 1961(4), 1961(5), and 1962(c),** as interpreted in *Boyle v. United States*, **556 U.S. 938 (2009),** *United States v. Turkette*, **452 U.S. 576 (1981), and** *H.J. Inc. v. Northwestern Bell Tel. Co.*, **492 U.S. 229 (1989).**

[H.1-2]    Its function at the declaratory stage is limited to demonstrating that the preserved factual, technical, and organizational materials described elsewhere in the pleading are capable of being organized into a structured enterprise map suitable for later evaluation, if such proceedings are reached.

[H.1-3]    This **Appendix H** does not establish the existence of a RICO enterprise, continuity, relatedness, predicate acts, liability, or damages. Those matters remain reserved for later evidentiary development and adjudication.

## II.        TABLE H-1: STRUCTURAL ENTERPRISE MAPPING (RICO)

[H.1-4]    **Table H-1** summarizes how recurring symbolic broadcast materials, institutional

amplification channels, organizational structures, and successor-related continuity

issues may be analytically organized into a coherent enterprise-oriented framework.

[H.1-5]    The table is provided for structural orientation only. It is intended to show that the

alleged conduct is capable of being mapped in a manner consistent with continuity

and association-in-fact analysis, if later proceedings require such evaluation.

<table>
<tr><td colspan="4"><strong>TABLE H-1 — STRUCTURAL ENTERPRISE CROSS-REFERENCE TABLE</strong><br><br><em>(Cross-Reference: Count III ¶¶100–111; Appendix A.8; Appendix E; Appendix G)</em></td></tr>
<tr><td><strong>Enterprise Component</strong></td><td><strong>Evidence Source / Analytical Basis</strong></td><td><strong>Applicable FRE / RICO Reference</strong></td><td><strong>Cross-Reference (Appendix / Complaint)</strong></td></tr>
<tr><td><strong>Corporate Media Node (Core Broadcast Entities)</strong></td><td>Broadcast-gesture detection logs and timeline correlation materials</td><td>FRE 401, 901, 1006</td><td>Appendix A.8; Appendix C.8–C.10; Count III ¶¶100–111</td></tr>
<tr><td><strong>Institutional Amplification Node</strong></td><td>Affidavit-supported and metadata-linked public references</td><td>FRE 602, 701, 803(8)</td><td>Appendix B; Appendix A.8</td></tr>
<tr><td><strong>Association-in-Fact Structural Layer</strong></td><td>Corporate-registry, restructuring, and</td><td>Rule 25(c); <em>Boyle</em>; <em>H.J. Inc.</em>;</td><td>Appendix A.8; Appendix D; Count III</td></tr>
</table>

**TABLE H-1 — STRUCTURAL ENTERPRISE CROSS-REFERENCE TABLE**

*(Cross-Reference: Count III ¶¶100–111; Appendix A.8; Appendix E; Appendix G)*

| Enterprise Component | Evidence Source / Analytical Basis | Applicable FRE / RICO Reference | Cross-Reference (Appendix / Complaint) |
|---|---|---|---|
| | recurrence-alignment materials | 18 U.S.C. § 1961(4) | |
| **Cross-Network Recurrence / Continuity Layer** | Content-similarity analysis and temporal recurrence modeling | FRE 702; *H.J. Inc.*; 18 U.S.C. § 1961(5) | Appendix C.8–C.9; Appendix A.8 |
| **Transmission Layer (Interstate / Digital Distribution)** | Broadcast and streaming propagation architecture | 18 U.S.C. § 1343; FRE 401, 702 | Appendix E; Count III |
| **Predicate-Correlation Framework (Declaratory Orientation Only)** | Aggregated recurrence materials mapped to statutory categories for later review | 18 U.S.C. §§ 1961(1), 1961(5); FRE 1006 | Appendix A.8; Appendix C.9 |
| **Enterprise Governance / Operational Control Layer** | Public corporate materials, governance overlap, and operational structure references | *Reves*; *Boyle*; FRE 803(6) | Appendix G; Appendix D; Count III |
| **Successor / Spin-Off Continuity Mechanism** | Restructuring and continuity-related corporate materials | Rule 25(c); *Golden State Bottling*; *Bestfoods* | Appendix D; Appendix A.10–A.11 |
| **AI-Verified Enterprise Summary Layer** | Consolidated visualizations, ledgers, and summary materials | FRE 1006; FRE 901(b)(9); FRE 902(13) | Exhibits A and C; Appendix E |
| **Declaratory Posture Guardrails** | Sequencing and capability-only limitations | 28 U.S.C. § 2201; Rule 8(a); Rule 10(c) | Count III; Appendix A.8; Appendix A.9 |

## III.        TECHNICAL-METHODS SUMMARY (ENTERPRISE CONTINUITY ALGORITHM)

[H.1-6]    The enterprise-mapping framework is capable of employing a continuity-oriented analytical model combining temporal frequency, entity recurrence, and symbolic-feature similarity metrics.

[H.1-7]    Within that framework, broadcast or institutional nodes may be assigned continuity-oriented scores or clustering values based on recurrence over time, cross-entity repetition, and symbolic overlap. Such scoring is referenced here only to demonstrate that the alleged conduct is capable of later structured analysis under continuity-oriented doctrine.

[H.1-8]    Any resulting matrices, charts, or visualizations are not offered at this stage as proof of enterprise existence or statutory satisfaction. They are referenced solely to show that the record, if later developed, is capable of being organized into reproducible enterprise-oriented models.

# IV.      ENTERPRISE-CONTINUITY ALGORITHM & PREDICATE-MAPPING SUMMARY

| Phase | Process Description | Analytical Output | Applicable Legal / Evidentiary Reference |
|---|---|---|---|
| **Data Integration** | Integrates structured detections and affidavit-linked metadata into a temporal-entity framework | Enterprise-node dataset | FRE 401; Rule 10(c) |
| **Continuity Scoring** | Applies recurrence-based analytical measures across time and source environments | Continuity-oriented recurrence index | *H.J. Inc.* |
| **Enterprise Clustering** | Groups recurring nodes into associative clusters showing structural overlap | Association-oriented graph or cluster model | *Boyle*; *Turkette* |
| **Governance Overlay** | Maps ownership, mergers, spin-offs, and successor chains | Annotated corporate-structure chart | Rule 25(c); Appendix D |
| **Predicate Correlation** | Organizes recurring event clusters relative to statutory categories for later review | Predicate-orientation ledger or continuity matrix | 18 U.S.C. §§ 1961(1), 1961(5); FRE 1006 |

**V.**         **JUDICIAL ANNOTATION (PRO SE CLARIFICATION –**

**ENTERPRISE CONTINUITY & EVIDENTIARY INTEGRATION)**

[H.1-9]    This technical-doctrinal summary accompanies the enterprise-mapping tables to show that associative links among media entities, affiliates, amplifying actors, and successor-related structures are capable of being organized in a manner consistent with later evidentiary review under **FRE 401, 901, 1006,** and **702.**

[H.1-10]   The structural diagrams and continuity matrices referenced herein are derived from the same preserved analytical architecture described in **Appendices C** and **E,** thereby maintaining methodological coherence and continuity of record organization.

[H.1-11]   Within the present declaratory posture, these materials are referenced not for damages adjudication or predicate proof, but to demonstrate that the alleged conduct is capable of being evaluated for continuity, relatedness, and structural organization under the governing legal framework if later proceedings are reached.

## VI.        DOCTRINAL FOUNDATIONS

[H.1-12]    A RICO "enterprise" may exist where a group of persons or entities shares a common

purpose, has continuity of structure or function, and operates as a continuing unit.

***Boyle*, 556 U.S. at 946–47; *Turkette*, 452 U.S. at 583.**

[H.1-13]    An association-in-fact enterprise need not be formalized. Declaratory consideration of

enterprise-capability therefore turns on structural mapping and functional continuity

principles, not on criminal adjudication.

[H.1-14]    This **Appendix H** is included solely to demonstrate that the materials described in the

Complaint are capable of being organized in a manner consistent with those doctrines.

## VII.       METHODOLOGY OF ENTERPRISE MAPPING

[H.1-15]    Enterprise mapping, as referenced here, integrates three categories of preserved

materials:

| Axis | Description | Source |
|---|---|---|
| **Temporal** | Sequence and recurrence of symbolic rebroadcasts across time | Appendix B Timeline |
| **Organizational** | Ownership, governance, affiliation, licensing, and restructuring materials | Corporate filings / documentary materials |
| **Symbolic** | Shared or recurring symbolic identifiers and color codes | Appendices A.1–A.4; Exhibit A; Appendix C |

[H.1-16]    This triangulated structure is referenced to show that the alleged conduct is capable of being analyzed for functional coordination and continuity even where nominally distinct entities are involved.

## VIII.        ENTERPRISE STRUCTURE – MACRO LEVEL

[H.1-17]    At a macro level, the enterprise-mapping model is capable of organizing the alleged conduct into multiple structural tiers, including:

- Core media hubs;

- Parent or affiliated conglomerates;

- Digital or streaming distribution layers; and

- Institutional or cultural amplification nodes.

[H.1-18]    This tiered structure is referenced solely as an organizational model for later evaluation. It does not establish that any specific entity has joined, operated, or knowingly advanced an enterprise.

| FUNCTIONAL ENTERPRISE DIAGRAM (CONCEPTUAL) | | | |
|---|---|---|---|
| **Tier** | **Representative Functions** | **Continuity Indicator** | **Illustrative Source** |
| **Tier I – Core Media Hubs** | Broadcast and news dissemination channels | Shared distribution or recurrence structures | Appendix B; public media records |
| **Tier II – Parent / Affiliated Conglomerates** | Ownership, licensing, and governance relationships | Structural overlap and succession | Corporate filings |
| **Tier III – Platform Distributors** | Streaming and digital rebroadcast channels | Cross-platform recurrence | Appendix E / preserved logs |
| **Tier IV – Institutional Echo Actors** | Political, academic, or cultural amplification settings | Temporal proximity and repeat dissemination | Appendix B Timeline |

## IX.  CONTINUITY AND RELATEDNESS (DECLARATORY CAPABILITY ONLY)

[H.1-19]  The analytical structure described herein is capable of organizing alleged conduct for later review under closed-ended and open-ended continuity concepts.

[H.1-20]  Likewise, the preserved record is capable of being examined for relatedness based on shared objectives, recurring symbolic features, common victims, or repeated dissemination patterns.

[H.1-21]    This **Appendix H** does not determine whether continuity or relatedness has been established. It demonstrates only that the allegations, as preserved and structured, are capable of being evaluated under the framework described in *H.J. Inc.*

## X.          ENTERPRISE INTENT AND MECHANICS

[H.1-22]    Under *Reves v. Ernst & Young*, **507 U.S. 170 (1993),** later liability may turn on whether particular actors participated in the operation or management of the enterprise.

[H.1-23]    At the declaratory stage, however, the Court is not asked to determine intent, operation, management, or knowing participation. It is sufficient that the alleged conduct is capable of being organized for later examination under those standards.

[H.1-24]    If later proceedings are reached, such issues may be explored through the discovery framework described in **Appendix G** and the evidentiary architecture described in **Appendix E.**

## XI.        SUCCESSOR AND SPIN-OFF CONTINUITY

[H.1-25]    Because the alleged conduct spans time, entities, and restructuring events, the

enterprise-oriented framework described herein is also capable of accounting for

successor control, spin-offs, mergers, and related corporate transitions.

[H.1-26]    That structural continuity analysis should be read together with **Appendix D** and

**Appendices A.10–A.11,** which preserve the legal framework through which

continuity of declaratory scope may later be maintained notwithstanding changes in

corporate form.

[H.1-27]    This **Appendix H** does not establish successor liability or automatic continuity. It

demonstrates only that the alleged materials are capable of being organized in a

manner that allows such issues to be evaluated later, if necessary.

## XII.       ENTERPRISE CONTINUITY AS PREDICATE-SUPPORT

ORIENTATION

[H.1-28]    If symbolic identifiers are later judicially recognized as defamatory communications

"of and concerning" Plaintiff, repeated interstate rebroadcasts of such identifiers may,

subject to full factual development and proof of statutory elements, be evaluated

under predicate-related statutory frameworks including **18 U.S.C. § 1343** and related provisions.

[H.1-29]    Because the preserved record is capable of organizing repeated rebroadcasts across time and across related operational structures, it is also capable of supporting later pattern-oriented review under **18 U.S.C. § 1961(5),** if such proceedings are reached.

[H.1-30]    This **Appendix H** does not assign predicate labels, establish predicate commission, or determine pattern satisfaction at the declaratory stage.

## XIII.        CROSS-REFERENCES

[H.1-31]    This **Appendix H** should be read together with:

| Linked Section | Purpose / Interdependency |
|---|---|
| **Count III ¶¶100–111** | Defines the declaratory objective concerning pattern-capability and continuity-oriented review |
| **Appendix A.8** | Doctrinal framework for continuity-related declaratory analysis |
| **Appendix D** | Successor continuity and anti-circumvention structure |
| **Appendix E** | Evidentiary verification and later admissibility architecture |
| **Appendix G** | Discovery-readiness orientation for later proceedings |
| **Exhibits / Documentary Materials** | Corporate, governance, and source materials if later offered |

## XIV.        ENFORCEMENT-SPINE BRIDGE

[H.1-32]    This **Appendix H** should be read together with **Appendices A.8, D, E,** and **Prayer for Relief ¶136(e), (g), (h), (i),** and **(j),** which collectively preserve the Court's ability, if later warranted, to ensure that any declaratory determination concerning continuity or enterprise-capability remains practically effective across subsequent procedural stages.

[H.1-33]    **Appendix H** provides the structural visualization layer through which the preserved record may later be organized for continuity-oriented and enterprise-oriented review. **Appendix E** preserves evidentiary readiness; **Appendix D** preserves structural continuity across successor control; and **Prayer ¶136(e), (g), (h), (i),** and **(j)** preserve the Court's later authority to effectuate any declaration entered without requesting present operative relief.

[H.1-34]    At the declaratory stage, this **Appendix H** preserves only the capability of enterprise-oriented analysis and structural mapping. It does not seek present adjudication of enterprise existence, continuity, predicate commission, or liability.

## XV.          CONCLUSION

[H.1-35]   This Structural Enterprise Mapping Appendix demonstrates that the allegations and preserved materials described in the Complaint are capable of being organized into a coherent enterprise-oriented framework for later continuity-related and pattern-related evaluation under the governing statutory doctrines.

[H.1-36]   Its role is structural and declaratory only. It does not establish enterprise existence, continuity, predicate acts, liability, or damages.

[H.1-37]   It is included solely to orient the Court to the existence of a non-speculative, analytically structured, and procedurally preservable enterprise-mapping framework, if later proceedings require such evaluation.